UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LETHONIA MILLER,

          PLAINTIFF,

vs.

NEW YORK STATE POLICE, KEVIN KENDALL,

          DEFENDANT.

**COMPLAINT**

Index No.

Plaintiff, Lethonia Miller alleges as follows:

### PARTIES

1. Plaintiff, Lethonia Miller, is a natural person with a place of residence at 60 Floss Avenue, Buffalo, New York, 14221.
2. Defendant, New York State Police, with offices located at 65 Court Street, Buffalo, New York 14202.
3. Defendant, Kevin Kendall, is a Senior Investigator for the New York State Police.

### JURISDICTION AND VENUE

4. The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and as conferred by 42 U.S.C. §§ 2000e to 2999e-17 (amended 1972, 1978, and by the Civil Rights Act of 1991, Pub. L. No. 102-166) and 20 U.S.C.A. § 1681.
5. Defendant is subject to the jurisdiction of this Court and venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) as the acts and omissions giving rise to the claims in this complaint occurred within the Western District of New York.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Plaintiff has exhausted administrative remedies as a prerequisite to bringing this claim as follows:

7. On September 9, 2013, Plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC). That complaint was designated as EEOC Charge No. 525-2013-00798.
8. On February 27, 2014, the EEOC mailed Plaintiff a Dismissal and Notice of Rights letter demonstrating that he has exhausted his administrative remedies Under Title VII.

## FACTUAL BACKGROUND

9. Plaintiff is a forty-nine year old African-American male who was hired by Defendant on March 30, 1987 as a Recruit Trooper.
10. Plaintiff began working in the Violent Felony Warrant Squad of the New York State Police, Troop A, in March of 2008. Plaintiff's current position is that of Investigator in the Violent Felony Warrant Squad.
11. Plaintiff's supervisor in the Violent Felony Warrant Squad is Senior Investigator Kevin Kendall.
12. Kendall has a history of using derogatory comments to refer to African-Americans including remarking that African-Americans are "niggers," "niggas," "monkeys," "savages" and "animals."
13. Plaintiff has repeatedly asked Kendall not to use derogatory terms to refer to African-Americans, stating that the usage is unwelcome, inappropriate and offensive.
14. In June of 2010, Kendall and Plaintiff were working in the course of their employment when a witness used the term "nigger." Both Kendall and Plaintiff were in close proximity and both heard the comment. Despite this, Kendall repeated the term laughingly to Plaintiff several times.
15. In August of 2010, Kendall referred to the victims of a shooting incident –all of whom were African-American- as "animals" after Kendall read that those victims had police records.
16. On February 17, 2011, Kendall commented on an interviewee's statement to him regarding a case. Kendall made this comment mocking the interviewee in a derogatory, mocking, minstrelsy voice stating "y'all ain't gonna catch him, he's a smart nigga."
17. On July 27, 2012, while working in the course of their employment, Kendall recounted an imitation of a fellow Caucasian colleague's impression of a witness and stated "why do you keep referring to the [suspect] as 'that nigga'? …So that means you're sitting there with his baby that's half a nigga."
18. In the summer of that year, while working in the course of their employment, Kendall, plaintiff and others were conducting a search of a home that was occupied by African-Americans.

2

Kendall emerges from the residence and stated "they're fucking animals... how can they live in that shit?"

19. Kendall, pursuant to the course of his employment, created a pseudonym on Facebook. This pseudonym was created as part of an investigation and depicted the account owner as an African-American female. Kendall routinely posts comments under this pseudonym.

20. On November 5, 2012, Kendall posted the term "nigga" on Facebook under this pseudonym.

21. On November 6, 2012, Kendall calls the plaintiff over to Kendall's desktop computer. Kendall shows plaintiff the post where he used the term "nigga" and reads the Facebook post aloud to plaintiff. In reading the post aloud, Kendall uses the term "nigga" several times.

22. On January 14, 2013, Kendall and plaintiff were working in the course of their employment. Kendall states to an African-American witness that "[her] brother and a bunch of other savages beat up a retarded kid."

23. Later, during the same day and incident, Kendall and plaintiff move out of earshot of the African-American witness. Kendall then makes a comment that the witness "had a great body for monkey sex."

24. On January 28, 2013 Kendall recounted an imitation of a fellow Caucasian colleague's impression of an "old Black guy." Kendall's imitation was performed in a derogatory, mocking, minstrelsy voice where Kendall stated "aww man... I ain't seen that nigger in a minute."

25. At some time in 2013, Kendall and plaintiff were present at the Troop A – Violent Felony Office working in the course of their employment. Kendall calls plaintiff over to Kendall's desk to show plaintiff a video titled "Sweet Brown's Cold Pop Escape." This video is an edited, news report set to music which depicts an African-American female describing her flight from a fire in her housing complex.

26. After showing this video, Kendall began laughing and imitated the subject of the video using a derogatory, mocking, minstrelsy voice.

27. On May 2, 2013, Kendall and plaintiff were working in the course of their employment. Plaintiff described a witness who was an older, African-American male. Kendall responded with an imitation of a fellow Caucasian colleague's impression of an "old Black guy." Kendall's imitation was performed in a derogatory, mocking, minstrelsy voice where Kendall stated "aww man... I ain't seen that nigger in a minute."

28. On June 11, 2013 Kendall and plaintiff were working in the course of their employment. Kendall commented on a witness he encountered with an imitation of a fellow Caucasian colleague's impression of an "old Black guy." Kendall's imitation was performed in a derogatory, mocking, minstrelsy voice where Kendall stated "aww man… I ain't seen that nigger in a minute."

29. Sometime in July of 2013, Plaintiff speaks to Kendall about participating in the U.S. Marshal's Office Sex Offender Detail. This represented an overtime opportunity to the plaintiff. It was agreed that both Kendall and plaintiff would attend when the Detail became available.

30. On July 15, 2013 plaintiff filed an internal complaint with the defendant's Equal Employment Opportunity Office. This complaint described the racial harassment that Kendall inflicted on plaintiff by his use of derogatory terms of "nigger" and "nigga." Plaintiff met with Captain Lyons, a New York State Police EEO Counselor. During that meeting, plaintiff described how Kendall has used the terms "nigger" and "nigga" since 2008 and is currently plaintiff's supervisor.

31. On August 1, 2013 plaintiff spoke to Captain Kevin Reilly of the Internal Affairs Bureau – West. During that meeting, Reilly promised plaintiff that Kendall's computer would be forensically examined for evidence pursuant to the investigation regarding plaintiff's complaint. Reilly also stated that Kendall would be notified the following day that Kendall was the subject of a personnel complaint.

32. On August 7, 2013 plaintiff contacted Kendall for permission to work the U.S. Marshal's Office Sex Offender Detail that Kendall had previously agreed that plaintiff could participate in. Despite this consent, Kendall now denied plaintiff permission to attend. Kendall stated that there were too many people on the detail for plaintiff to participate.

33. On August 8, 2013 Senior Investigator June Bradley returned plaintiff's phone call. Plaintiff detailed to Bradley Kendall's denial of plaintiff's request to attend the U.S. Marshal's Office Sex Offender Detail.

34. Also on August 8, 2013, plaintiff speaks to Deputy U.S. Marshal Rick Rooney, coordinator of the Rochester Sex Offender Detail for the U.S. Marshals. Despite Kendall's representation to the contrary, Rooney told plaintiff that plaintiff could have participated in the program for the last two days.

35. Defendant's discriminatory and retaliatory conduct harmed plaintiff financially and psychologically. Defendant's illegal conduct resulted in plaintiff becoming depressed, losing sleep, and losing thirty pounds, losing stature in his position at work and the respect of his colleagues.

## FIRST CAUSE OF ACTION

### Discrimination in Violation of Title VII of the Civil Rights Act of 1964

36. Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

37. To establish a prima facie case of discrimination, a plaintiff must show four things: (1) she is a member of the protected class; (2) she is qualified for his position; (3) she has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of discrimination. 42 U.S.C. 2000e-2; *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466-7 (2d Cir 2001).

38. As to the first element, plaintiff is a member of a protected class: plaintiff is African-American.

39. As to the second element, plaintiff is qualified for his position as he remains employed and consistently receives performance reviews which state that he meets the employers expectations.

40. As to the third element, plaintiff has suffered an adverse employment action by his denial of requested overtime in participating in the U.S. Marshal's Office Sex Offender Detail.

41. As to the fourth element, circumstances exist surrounding that adverse employment action that give rise to the inference of discrimination. Here, Kendall consistently used language that displayed his discriminatory mind-set against African-Americans. Kendall's use of this language was consistent, constant, and despite plaintiff's repeated requests for Kendall to cease using that language. Despite this, Kendall continued to display his discriminatory animus to African-Americans.

## SECOND CAUSE OF ACTION

### Retaliation in Violation of Title VII of the Civil Rights Act of 1964

42. Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

43. To establish a prima facie case for retaliation/opposed discrimination, plaintiff must show that: (1) he engaged in protected activity; (2) the employer was aware of the activity; (3) the employer

took adverse actions; and (4) a causal connection exists between the protected activity and the adverse action. *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

44. As to the first element, plaintiff engaged in a protected activity by complaining of Kendall's racial slurs.

45. As to the second element, the employer was aware of the activity because of plaintiff's numerous requests to Kendall, complaints internally, and complaints filed externally with the EEOC.

46. As to the third element, the employer took an adverse action against plaintiff by denying his previously granted request for overtime work.

47. As to the fourth element, a causal connection exists between the protected activity and the adverse action. The adverse action, the denial of the previously granted request for overtime work, came six (6) days after Kendall was made aware of plaintiff's complaint.

## THIRD CAUSE OF ACTION

### Hostile Work Environment Discrimination in Violation of Title VII of the Civil Rights Act of 1964

48. Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

49. To plead a claim of hostile work environment, plaintiff must show: (a) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (b) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Petrosino v. Bell*, 385 F.3d 210 (2d Cir. 2004), citing *Mack v. Otis Elevator Co.*, 326 F.3d at 122 (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir.1999)).

50. As to the first element, plaintiff's workplace was permeated with discriminatory intimidation by Kendall's constant use of racial slurs for a period of years. The racial slurs were used at least since 2008 until 2013, which demonstrates that the racial harassment was severe and pervasive.

51. As to the second element, defendant Kendall's conduct in creating the hostile work environment can be imputed to the employer as the defendant New York State Police was made aware of defendant Kendall's conduct by plaintiff's numerous complaints of Kendall's conduct, including both internal complaints and external complaints.

## FOURTH CAUSE OF ACTION

### Discrimination in Violation of §1983 by defendant Kevin Kendall

52. Plaintiff repeats each and every allegation set forth herein in the preceding paragraphs as though fully set forth herein.

53. In order to establish a case of discrimination in violation of §1983 "two-and only two-allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S. Ct. 1920, 1923, 64 L. Ed. 2d 572 (1980).

54. As to the first element, defendant has deprived the plaintiff of a federal right to be free from racial discrimination under Title VII of the Civil Rights Act of 1964 by creating a hostile work environment and retaliating against plaintiff for complaining of that hostile work environment by denying plaintiff a previously granted request for overtime.

55. As to the second element, plaintiff has alleged that the defendant Kendall acted under color of state law by Kendall's operation of his authority as plaintiff's supervisor in the employ of the New York State Police.

56. The traditional definition of "acting under color of state law" requires "that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West. v. Atkins*, 487 U.S. 42, 49, (1988).

57. The New York State Police was established pursuant to statute by the New York Legislature in Executive Law §31.

58. Therefore, in exercising his authority as plaintiff's supervisor, Kendall acted under color of state law.

**WHEREFORE**, Plaintiff respectfully requests this Court to enter an Order

    A.    Awarding plaintiff lost overtime and benefits in an amount to be determined at trial;

    B.    Awarding plaintiff damages for his pain, suffering, loss of enjoyment of life, humiliation and other injuries in an amount to be determined at trial;

C. Directing defendants pay all unreimbursed medical costs incurred by Plaintiff as a result of the stress and anxiety resulting from the discrimination he suffered and the hostile working conditions he endured, including diagnostic analysis, treatment and therapy, and follow up therapy;

D. Defendants pay plaintiff the costs of this action, together with reasonable attorneys' fees and disbursements;

E. Defendants to pay punitive damages for their intentional violation of plaintiff's rights;

F. Injunctive relief as this Court deems just and equitable; and

G. Plaintiff to have such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) Fed. R. Civ. P., plaintiff hereby demands a trial by jury for all issues triable of right by a jury in this case.

Dated: May 23, 2014

Respectfully submitted,
Plaintiff Lethonia Miller
By his attorney

Lindy Korn, Esq.
*Attorney for Plaintiff*
Law Office of Lindy Korn
Electric Tower
535 Washington Street, Ninth Floor
Buffalo, New York 14203
Telephone: (716) 856-5676
Facsimile: (716) 507-8475
Lkorn@lkorn-law.com