UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LETHONIA MILLER

                            Plaintiff,

    -vs-                                              **Case No. 14-cv-00393-RJA**

NEW YORK STATE POLICE,
KEVIN KENDALL, and
FRANCIS P. CHRISTENSEN

                            Defendants.

_____


### DECLARATION OF GEORGE MICHAEL ZIMMERMANN

    GEORGE MICHAEL ZIMMERMANN, declares under penalty of perjury, pursuant to

28 U.S.C. §1746, that the following is true and correct:

1.    I am an Assistant Attorney General, of counsel to Barbra D. Underwood, Attorney

General of the State of New York, counsel for defendants New York State Police and Francis P.

Christensen in this matter.

2.    I have attached to this declaration, as Exhibit "A", relevant portions of the deposition of

the plaintiff, Lethonia Miller, taken on January 4, 2018.

3.    I have attached to this declaration, as Exhibit "B", relevant portions of the deposition of

Kevin Kendall, taken on August 16 and September 7, 2017.

4.    I have attached to this declaration, as Exhibit "C", relevant portions of the deposition of

Matthew S. Renneman, taken on November 13, 2017.

5.    I have attached to this declaration, as Exhibit "D", relevant portions of the deposition of

Marcus Walthour, taken on November 13, 2017.

1

6.      I have attached to this declaration, as Exhibit "E", plaintiff's interview statement taken on August 1, 2013, which was marked as Exhibit "3" at the plaintiff's deposition.

7.      I have attached to this declaration, as Exhibit "F", the interrogation statement of Kevin Kendall taken on September 23, 2013, which was marked as Exhibit "19" at Kendall's deposition.

8.      I have attached to this declaration, as Exhibit "G", the report of Capt. Kevin M. Reilly, dated November 14, 2013, regarding plaintiff's complaint of discrimination dated July 15, 2013.

9.      During the discovery process in this matter, plaintiff's counsel provided four recordings made surreptitiously by the plaintiff.  In September of 2017, I provided copies of these recordings to the Court Reporting firm of De Paolo-Crosby Reporting Services, requesting that they transcribe these tapes.

10.      I have attached to this declaration, as Exhibit "H", relevant portions of the transcript of the recording which was identified by plaintiff's counsel as 140723-0098 "a recording made on July 23, 2014 between Plaintiff and Dr. Mcintyre".

11.      I have attached to this declaration, as Exhibit "I", the Charge of Discrimination filed with the Equal Employment Opportunity Commission on September 9, 2013.

DATED:      Buffalo, New York
            November 13, 2018


                                        /s/ George Michael Zimmermann
                                        GEORGE MICHAEL ZIMMERMANN
                                        Assistant Attorney General of Counsel
                                        Main Place Tower, Suite 300A
                                        350 Main Street
                                        Buffalo, NY 14202
                                        (716) 853-8444
                                        George.Zimmermann@ag.ny.gov

Exhibit "A"

VOLUME I                                    LETHONIA MILLER

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

----------------------------------------------------

LETHONIA MILLER,

                        Plaintiff,

        -vs-

NEW YORK STATE POLICE,
KEVIN KENDALL, and
FRANCIS P. CHRISTENSEN,

                        Defendants.

----------------------------------------------------

                        Examination Before Trial of

LETHONIA MILLER, Plaintiff, taken pursuant to the Federal

Rules of Civil Procedure, in the law offices of PERSONIUS

MELBER, LLC, 2100 Main Place Tower, 350 Main Street,

Buffalo, New York, taken on August 14, 2017, commencing at

9:06 A.M., before VALERIE A. ROSATI, Notary Public.

2

<u>INDEX TO EXHIBITS</u>

Exhibits                                           For Identification

1        Amended Complaint dated                    4
         October 25, 2016

2        New York State Police                      4
         Memorandum dated July 15, 2013

3        Member Witness-Interview dated             4
         August 1, 2013

4        Plaintiff's Response to                    146
         Document Demands by Defendants
         New York State Police and
         Francis F. Christensen dated
         April 5, 2017

5        one-page Printout of an E-mail             187
         dated August 18, 2013, with
         attachment

6        Public Safety Psychology,                  207
         Fitness for Duty Evaluation
         dated July 23, 2014

3

1        APPEARANCES:

2        THE LAW OFFICE OF LINDY KORN, PLLC,
         By LINDY KORN, ESQ., and
3        WILLIAM F. HARPER, V, ESQ.,
         535 Washington Street,
4        Electric Tower, 9th Floor,
         Buffalo, New York 14203,
5        Appearing for the Plaintiff.

6        NEW YORK STATE ATTORNEY GENERAL,
         By GEORGE MICHAEL ZIMMERMANN, ESQ.,
7        Assistant Attorney General,
         300A Main Place Tower,
8        350 Main Street,
         Buffalo, New York 14202-3750,
9        Appearing for Defendants
         New York State Police and
10       Francis P. Christensen.

11       PERSONIUS MELBER, LLC,
         By RODNEY O. PERSONIUS, ESQ.,
12       2100 Main Place Tower,
         350 Main Street,
13       Buffalo, New York 14202,
         Appearing for Defendant
14       Kevin Kendall.

15       PRESENT:  Kevin Kendall
                   Christina Croglio
16

17

18           (The following stipulations were entered

19       into by all parties.)

20           It is hereby stipulated by and between counsel

21       for the respective parties that the oath of the

22       Referee is waived, that filing and certification

23       of the transcript are waived, and that all

4

1    objections, except as to the form of the

2    questions, are reserved until the time of trial.

3

4         (Whereupon, an Amended Complaint dated

5    October 25, 2016 was then received and marked as

6    Exhibit 1,

7         a New York State Police Memorandum dated

8    July 15, 2013 was then received and marked as

9    Exhibit 2,

10        and a Member Witness-Interview dated August 1,

11   2013 was then received and marked as Exhibit 3,

12   for identification.)

13

14   MS. KORN:  I'd like to read and sign.

15   MR. PERSONIUS:  That's fine.

16

17            L E T H O N I A   M I L L E R,

18    1207 Discover Green Lane, Mableton, Georgia 30126,

19         after being duly called and sworn,

20              testified as follows:

21

22   EXAMINATION BY MR. PERSONIUS:

23

5

1    Q.    Good morning, Mr. Miller.  We've met before.  We
2          met this morning.  I'm Rod Personius, and I
3          represent Senior Investigator Kendall in the
4          lawsuit that you've brought.
5    A.    Um-hum.
6    Q.    We always go through these instructions at the
7          beginning of a deposition.  I know you've
8          testified before, so they probably aren't
9          necessary.  But, rather than assume that they're
10         unnecessary, I'll briefly mention a few rules
11         that we ask you to follow.  Is that okay?
12   A.    Sure.
13   Q.    All right.  Because we have a court reporter here
14         who has to take down what is stated on the
15         record, it's important that in responding to a
16         question you use words such as yes and no, and
17         not an uh-huh or a nod of the head.  Okay?
18   A.    Yes.
19   Q.    And if you'll permit us to complete our questions
20         before you give your answer, that too would be
21         helpful so that we get the full question and then
22         you'll have the opportunity to give your full
23         answer.  Is that okay?

8

1    Q.   And you indicated you're currently residing in
2         Georgia?
3    A.   Yes.
4    Q.   Okay.  You formerly resided in Buffalo?
5    A.   Buffalo.
6    Q.   I know you were on Floss Avenue.  Is that in
7         Cheektowaga?
8    A.   No.  That's in Buffalo.
9    Q.   Buffalo?  Okay.  If you could, just tell us
10        roughly the date.  When did you move from Buffalo
11        to Georgia?
12   A.   It's actually an ongoing process.  I have a town
13        house that I'm responsible for in Georgia.
14        That's where my mother is.
15   Q.   Okay.
16   A.   And I also have property in Buffalo on 60 Floss
17        Avenue.
18   Q.   All right.  So are you living at both locations?
19   A.   Whenever I have to do some work on the house in
20        Buffalo, I'm doing some remodeling, I'm in
21        Buffalo.
22   Q.   Okay.  And my question had been when it was, just
23        roughly, that you moved from the Buffalo area to

10

1          for the internal complaint of the NYSP.

2     Q.   Okay.  And that was back in July of 2013, that

3          document?

4     A.   Yes.

5     Q.   All right.  And in addition to that, did you

6          review any other written material?

7     A.   I glanced at the IAB interview.

8     Q.   The IAB interview?  What is IAB, please?

9     A.   I guess that's the Internal Affairs Bureau for

10         the New York State Police.

11    Q.   Was that the interview that was conducted on

12         August 1st of 2013?

13    A.   I'm not exactly sure of the date.

14    Q.   Was that the interview that was conducted by Mr.

15         Reilly and Ms. Bradley?

16    A.   Yes.

17    Q.   Under oath?

18    A.   Yes.

19    Q.   Okay.  Anything else you reviewed to prepare for

20         your testimony today?

21    A.   Oh, my attorney gave me a DVD regarding

22         depositions.

23    Q.   Oh, okay.  Anything else, sir?

11

1    A.   No.

2    Q.   All right.  During the course of processing your

3         complaints in this matter, there were occasions

4         where you tape-recorded conversations with

5         others, including Senior Investigator Kendall; is

6         that correct?

7    A.   That is correct.

8    Q.   All right.  And did you review those recordings

9         to prepare for your testimony today?

10   A.   No.

11   Q.   Are you married, sir?

12   A.   No.

13   Q.   Have you ever been married?

14   A.   No.

15   Q.   Do you have any children?

16   A.   No.

17   Q.   And were you born and raised in Buffalo?

18   A.   Yes.

19   Q.   Where did you attend high school?

20   A.   I went to City Honors High School.

21   Q.   Did you graduate from City Honors?

22   A.   Yes.

23   Q.   What year?

24

```
 1       an indication you're not sure if you went from

 2       Farmingdale to Batavia?

 3   A.  It was a while ago and, you know, I don't exactly

 4       know, you know, the dates when I transferred from

 5       one station to another so --

 6   Q.  Would you describe yourself as a person who has

 7       good recall, average recall, or poor recall of

 8       prior events?

 9   A.  I would say average recall.

10   Q.  Okay.  When you transferred you believed to

11       Batavia, what was your assignment?

12   A.  I was a trooper assigned to road patrol.

13   Q.  Would this be on the thruway?

14   A.  No.  That was in the Genesee County area.

15   Q.  What was the reason that you went from

16       Farmingdale to Batavia?

17   A.  Because most of my family lived in the Buffalo,

18       New York area, and I didn't really have any

19       family down there in Long Island.

20   Q.  So was it your request?

21   A.  It was my request.

22   Q.  How long did you remain at Troop A in Batavia?

23   A.  I'm not exactly sure, but I think maybe a year.
```

25

1    Q.   And whatever that period of time was, did you

2         patrol Genesee County that entire time?

3    A.   Yes.

4    Q.   After what you think may have been a year in

5         Batavia, were you transferred somewhere else

6         within the state police?

7    A.   My next duty station that I transferred to was SP

8         West Henrietta on the thruway.

9    Q.   And as a trooper?

10   A.   As a trooper.

11   Q.   And how long did you remain at Henrietta?

12   A.   Maybe two years.

13   Q.   And, again, you're not certain?

14   A.   Two to three years.  I'm not exactly sure.

15   Q.   During that entire period, did you patrol the

16        thruway?

17   A.   Yes.

18   Q.   And do you know where we are time-wise now?  When

19        you're at Henrietta, what years was that?

20   A.   Maybe '90 -- 1990 to 1992.

21   Q.   And the way you gave that response was -- made it

22        sound like a question.  Does that mean you're not

23        sure?

26

1    A.   I don't remember the exact dates of when I was

2         assigned there.

3    Q.   All right.  And had it been your request to go

4         from Batavia to Henrietta?

5    A.   Yes.

6    Q.   What was your reason for requesting a transfer?

7    A.   Actually, I was trying to get closer to home, and

8         going out on the thruway was the best option.

9    Q.   Okay.  Was your sister in Rochester at that

10        point?

11   A.   My sister was in Rochester, yes.

12   Q.   All right.  So you had family there?

13   A.   Yes.

14   Q.   Did you live in Rochester then?

15   A.   No.

16   Q.   Where did you live?

17   A.   In Buffalo.

18   Q.   When you were in Batavia, did you live in Buffalo

19        too?

20   A.   Yes.

21   Q.   Did you live alone in Buffalo at that time?

22   A.   No.  I stayed with my mother.

23   Q.   Okay.  And as far as siblings, you have a sister

31

1      back to Buffalo.

2   Q.  All right.  Did you indicate that at Clarence you

3      were in the backroom?

4   A.  Yes.

5   Q.  What does that mean?

6   A.  The backroom is a term for investigators who work

7      out of the duty station.  It's not in the back.

8      It's just a designation that, you know -- I guess

9      the state police use the backroom as, you know, a

10     bullpen for investigators.

11  Q.  Okay.  Would every investigator who was assigned

12     to the barracks at Clarence be referred to as

13     working in the backroom, then?

14  A.  Yes.

15  Q.  What period of time were you at Clarence?

16  A.  I think in 1995, 1996.

17  Q.  Okay.  And what were your duties?

18  A.  To investigate the crimes of, you know, the Penal

19     Law.

20  Q.  All right.  On behalf of the state police?

21  A.  Yes.

22  Q.  All right.  Was it at Clarence that you met Kevin

23     Kendall?

32

1    A.  Yes.

2    Q.  All right.  Had you known him before that?

3    A.  Not that I can recall.

4    Q.  Did you tell us that you were at Clarence for

5        about two years?

6    A.  Yes.

7    Q.  And where did you go after that?

8    A.  I went to T4 Buffalo.  Troop T, Zone 4, in

9        Buffalo as an investigator in the backroom.

10   Q.  Okay.  Where were you stationed?

11   A.  At the state police barracks at Buffalo, the one

12       located at the 33 and the 90.

13   Q.  Okay.  Is that what we might know as the state

14       thruway and the Kensington Expressway?

15   A.  Yes.

16   Q.  All right.  What was your reason for transferring

17       from Clarence to that barracks that's at the 33

18       and the 90?

19   A.  Once again, it's closer to home.

20   Q.  Well, closer to home by, what, ten or fifteen

21       minutes?

22   A.  Yes.

23   Q.  All right.  And that was the reason for you

37

```
 1        were with that organization, preparing 710.30

 2        statements?

 3   A.   I would have to actually look at one to refresh

 4        my recollection.

 5   Q.   Okay.  As you sit here now, you don't recall that

 6        either?

 7   A.   No.

 8   Q.   All right.  You, sir, are on certain medications

 9        for a diagnosis of depression?

10   A.   Yes.

11   Q.   All right.  And you were diagnosed as being

12        depressed many years ago, correct?

13   A.   Yes.

14   Q.   All right.  Does it go back -- I don't want to

15        misstate it, but does it go back as far as the

16        early '90s?

17   A.   Yes.

18   Q.   Okay.  And you've been treated since the early

19        '90s by different physicians and psychologists

20        for that condition, correct?

21   A.   Yes.

22   Q.   And you've been prescribed medications, true?

23   A.   Yes.
```

38

1   Q.   All right.  And what stands out in my head is one

2        of the medications I know you've taken for some

3        period of time is Zoloft.

4   A.   Yes.

5   Q.   All right.  And do you still take Zoloft?

6   A.   Yes.

7   Q.   And do you take that medication, sir, to assist

8        with coping with this medical condition you have

9        that's been diagnosed as depression?

10  A.   Yes.

11  Q.   Has your depression -- your condition of

12       depression been described as chronic depression?

13  A.   You would have to talk to my doctor.

14  Q.   You don't know?

15  A.   I don't know.

16  Q.   Okay.  And throughout the period from the early

17       '90s to the present, has Zoloft been the primary

18       medication you've taken for your depression?

19  A.   Yes.

20  Q.   Okay.  You take that every day?

21  A.   Yes.

22  Q.   At different periods in time, the dosage level

23       has been lower and then higher?

1     was never sent to Albany to be trained in report

2     writing so --

3  Q.  All right.  All the report writing training you

4     would have got would have been during the

5     six-month-or-so period you were at the academy?

6  A.  That's correct.

7  Q.  And as far as exactly what it is, as you sit here

8     now, you don't remember?

9  A.  I don't remember.

10  Q.  Was part of the training, though, that you

11     received the importance of accurately setting out

12     information that you had received during the

13     course of an investigation?

14  A.  Yes.

15  Q.  And that would include accurately setting out

16     statements received from subjects or witnesses,

17     correct?

18  A.  Yes.

19  Q.  And if you were able to do so, it would be

20     preferable -- or, it is preferable to take down

21     those statements of subjects or witnesses

22     verbatim, true?

23  A.  It would be preferable.

41

1   Q.   To get verbatim statements?

2   A.   Yes.

3   Q.   And put those in your reports?

4   A.   (Indicating yes.)

5   Q.   Correct?

6   A.   Correct.

7   Q.   And why is that?  Why is that preferable?

8   A.   Because it's better to have a subject's own words

9        as opposed to you paraphrasing or repeating what

10       you think they might have said.

11  Q.   All right.  And that preference for verbatim

12       statements doesn't include an exception if the

13       statement that's been provided includes offensive

14       words, does it?

15  A.   Could you repeat the question?

16  Q.   Sure.  Sure.  Let me try to state it a different

17       way.  If the statement that was made verbatim,

18       for example, includes a vulgarity, there's no

19       exception that says that when you report on that

20       statement that you should omit the vulgarity, is

21       there?

22  A.   No.

23  Q.   Okay.  You want to get it verbatim, right?

42

1    A.   Yes.

2    Q.   Sometimes the words that a subject or witness

3         uses, no matter how offensive, is important to

4         the investigation, true?

5    A.   I think it depends on the investigation itself.

6    Q.   What do you mean by that?

7    A.   Are we talking about a hate crime or are we

8         talking about rape, murder, shooting --

9    Q.   In your mind there's --

10   A.   -- drug case?

11   Q.   In your mind there are exceptions where you're

12        not expected to take down statements from

13        witnesses or subjects verbatim?

14   A.   No.

15   Q.   There is no exception, is there?

16   A.   No.

17   Q.   All right.  Now, getting back to your work

18        history.  You did CNET work in Batavia for a

19        period of time?

20   A.   We were stationed in Batavia, yeah.

21   Q.   I'm sorry.  But it covered the Western New York

22        area?

23   A.   Yes.

53

```
 1        have you stayed in touch with any of them?
 2   A.   A couple are Facebook friends.
 3   Q.   Who is that, please?
 4   A.   Oh, Tracy Welch.
 5   Q.   Is Tracy Welch a Facebook friend?
 6   A.   Yeah.
 7   Q.   Who else?
 8   A.   Paulette Harris, Raymond Smith.
 9   Q.   So Welch, Smith, and Harris continue to be
10        Facebook friends?
11   A.   Yes.
12   Q.   They're all in the Buffalo area?
13   A.   No.  Well, Raymond Smith is in Phoenix.  Paulette
14        is in the Buffalo area.  Tracy Welch I'm not too
15        sure about.
16   Q.   Do you remember that after you filed your
17        complaint, you were interviewed in Albany by a
18        gentleman whose name was Dr. McIntyre?
19   A.   Yes.
20   Q.   And you recorded that interview?
21   A.   I did.
22   Q.   And did Dr. McIntyre know you were recording him?
23   A.   He did not.
```

54

1   Q.   Did you have his permission to record it?

2   A.   I guess not.

3   Q.   Well, is there any doubt about that?  You said I

4        guess not.  But, you didn't have his permission,

5        did you?

6   A.   Well, it was my understanding that New York was a

7        one-party state.

8   Q.   Let me ask the question again.  Did you have his

9        permission?

10  A.   From him, no.

11  Q.   Now, during that recorded interview, do you

12       remember telling Dr. McIntyre that you really

13       have no friends?

14  A.   I don't recall that.

15  Q.   Do you remember telling him that your -- the

16       people you hang around with are your family

17       members?

18  A.   I do.

19  Q.   And when you were asked about your activities,

20       you indicated that what you principally do is

21       watch television and movies?

22  A.   I do.

23  Q.   Do you remember telling him that?

55

1   A.   I do.

2   Q.   Okay.  And wouldn't it be fair, sir, to describe

3        you as a loaner?

4   A.   Yes.

5   Q.   Now, getting back to the Queens County DA's

6        office.  You were there for what period of time?

7   A.   Maybe a year and a half.

8   Q.   All right.  And did the investigations for the

9        DA's office, fair enough?

10  A.   That's correct.

11  Q.   And did you transfer somewhere after that?

12  A.   I actually transferred back to CNET West.

13  Q.   That would be back in Batavia?

14  A.   Yes.

15  Q.   Okay.  And was that your choice?

16  A.   That was my choice.

17  Q.   When you went back to CNET West in Batavia or out

18       of Batavia, how long did you stay there?

19  A.   Maybe three, four years.

20  Q.   You don't recall?

21  A.   I don't recall exactly.

22  Q.   And what time period are we in now, sir?  If you

23       can recall.

56

1    A.   Probably prior to 2008.  So maybe 2006 to 2008.

2    Q.   Okay.  And did you do undercover work when you

3         went back with CNET West?

4    A.   Yes.

5    Q.   From CNET West you then got the transfer to

6         what's called the Violent Felony Warrant Squad?

7    A.   Um-hum.  Yes.

8    Q.   That is work that's done through the United

9         States Marshals Service?

10   A.   Yes.

11   Q.   And the Violent Felony Warrant Squad, you

12        remained with them from when in 2008?  When did

13        you go there?  Do you remember?

14   A.   I believe it was March of 2008.

15   Q.   All right.  And remained with them until June of

16        2013?

17   A.   Yes.  I believe so.

18   Q.   All right.  In June of 2013, the doctor you were

19        treating with prepared a letter indicating that

20        you needed time off of work.  Do you recall that?

21   A.   Yes.

22   Q.   That was Dr. Mirza?  M-I-R-Z-A.

23   A.   Yes.

57

```
1    Q.   Okay.  And you had been -- you continue to treat
2         with Dr. Mirza?
3    A.   No.
4    Q.   When did you stop treating with her?
5    A.   I don't know exactly.
6    Q.   You don't recall that either?
7    A.   No, not exactly, when I stopped.
8    Q.   What was your reason for stopping treating with
9         Dr. Mirza?
10   A.   Because I was relocating to Atlanta.
11   Q.   Okay.  And are you treating with someone else
12        now?
13   A.   Yes, I am.
14   Q.   Who is that, please?
15   A.   I can't remember the doctor's name.
16   Q.   Did you say you can't remember the doctor's name?
17   A.   Well, it's a new doctor, and I think I've seen
18        her once so I'm not really familiar with her.
19   Q.   It's a female?
20   A.   Yes.
21   Q.   Psychiatrist?
22   A.   Yes.
23   Q.   When did you see that person?
```

58

1    A.   Maybe a few months ago.

2    Q.   And before that, you were still treating with Dr.

3         Mirza?

4    A.   Yes.

5    Q.   All right.  And you treated with Dr. Mirza for

6         decades?

7    A.   Yes.

8    Q.   Do you remember when you first treated with her?

9    A.   Not exactly, no.

10   Q.   Back in the '90s?

11   A.   I don't think it was back in the '90s.

12   Q.   Was there a period of time you treated with her

13        then you stopped and then you went back and

14        treated with her again for an extended period of

15        time?

16   A.   No.  There wasn't a period.

17   Q.   There was no interruption in your treatment with

18        her?

19   A.   No.

20   Q.   And you don't remember when it started?

21   A.   Exactly, no.

22   Q.   Well, whether it was the '90s or after 2000, you

23        don't even remember that, do you?

69

1   Q.  And they make reference, the paragraphs do, to

2       specific comments that you say were made by

3       Senior Investigator Kendall on different dates,

4       correct?

5   A.  Yes.

6   Q.  In many instances the exact date is provided,

7       correct?

8   A.  Yes.

9   Q.  Now, during the period of time that you allege

10      that these statements were being made by Senior

11      Investigator Kendall, did you ever complain to

12      anyone at the New York State Police about this

13      behavior on the part of Senior Investigator

14      Kendall?

15   A.  You mean besides telling him to stop doing it?

16   Q.  Yes.

17   A.  He was the only person that I complained to until

18      I actually spoke to the EEO counselor -- I forgot

19      his -- Captain -- I forgot his name -- in June of

20      2013 when I submitted the -- oh, excuse me.  July

21      of 2013 when I submitted the memo.

22   Q.  The memo meaning your internal complaint to the

23      New York State Police?

70

1    A.   Yes.

2    Q.   So over that three-year period, and despite what

3         you characterize as these offensive statements

4         and actions of Senior Investigator Kendall, you

5         never complained to anybody except him?

6    A.   That's correct.

7    Q.   I'm going to show you now what's marked as

8         Exhibit 2.  And is this the formal complaint that

9         you filed on July 15, 2013 with the New York

10        State Police against Kevin Kendall?

11   A.   Yes.

12   Q.   And by the way, when you submitted this

13        complaint, is it correct that you didn't sign it?

14   A.   I initialed the memo.

15   Q.   On the first page.  Did you sign the document?

16   A.   Well, I guess in the general course of business,

17        if you submit a memo in the New York State

18        Police, it was expected that you would initial

19        next to your name, not a signature.

20   Q.   Did you sign the document?

21   A.   No.

22   Q.   Exhibit 2, the July 15, 2013 complaint to the

23        state police, do you agree that that covers the

91

 1  Q.  All right.  And did you consult any other

 2      resource documents, or just this case book and

 3      the investigative files?

 4  A.  No.  Nothing else that I can recall.

 5  Q.  All right.  Now, you then were called upon to

 6      provide testimony regarding your July 15, 2013

 7      complaint?

 8  A.  Yes.

 9  Q.  And you did that on August 1 of 2013?  Do you

10      recall the date or not?

11  A.  No, I don't recall exactly the date.

12  Q.  All right.  I'll show you what's marked as

13      Exhibit 3.  Is that a transcript of your

14      interview?

15  A.  Yes.

16  Q.  Okay.  And it was on August 1 of 2013?

17  A.  Yes.

18  Q.  And when you provided this statement, was it

19      under oath?

20  A.  Actually, I don't recall.

21  Q.  Do you see -- go to page two --

22  A.  Okay.

23  Q.  -- of Exhibit 3.  And the second question from

96

1   Q.  Well, you signed the -- signed it as to its

2       truthfulness, did you not, on August 21 of 2013?

3   A.  That's correct.

4   Q.  And above where you signed it it's typed, refer

5       to attached addendum for corrections, right?

6   A.  Yes.

7   Q.  And below it is your signature?

8   A.  Yes.

9   Q.  The date is August 21 of 2013.

10  A.  Okay.

11  Q.  As of August 21, 2013, you had, did you not,

12      recordings that you had made on your own of

13      conversations with Kevin Kendall, with Rick

14      Rooney, and with Michael Malcolm, true?

15  A.  I don't recall the dates of the recordings, so I

16      would have to actually listen to them to refresh

17      my recollection.

18  Q.  Do you recall that you had made those recordings

19      earlier in August of 2013?

20  A.  Once again, I'd have to listen to the recordings

21      to --

22  Q.  All right.  Do you agree -- we'll get to it.

23      But, do you agree that if those recordings had

1  A.  Correct.

2  Q.  But that was the triggering event in your mind?

3  A.  Yes.

4  Q.  Okay.  Tell us why you waited nine months to

5      complain.

6  A.  As you can see, the fact that I'm sitting here

7      giving a deposition, it's very difficult to bring

8      a complaint against another member, let alone

9      with me being a black investigator and him being

10     a white supervisor, so I didn't just jump into

11     it.  I thought about it, gathered my thoughts,

12     gathered my information, and then I submitted the

13     memo.

14 Q.  And it took you nine months to do that?

15 A.  Yeah.

16 Q.  Yes?

17 A.  Yes.

18 Q.  Okay.  If you would, go to Exhibit 3, on page

19     thirteen.  The third question, that's when you

20     began being asked questions about each one of

21     these incidents, correct?

22 A.  Yes.

23 Q.  What it says specifically, so it's clear on the

114

1    A.   I don't recall exactly.

2    Q.   Do you recall when or where it was that you were

3         told that?  Anything about the circumstances?

4    A.   I know Teddy Cook for one.  But other than that,

5         I couldn't tell you.

6    Q.   And that Teddy Cook interaction was back at the

7         academy in Brockport?

8    A.   That's correct.

9    Q.   In 1987?

10   A.   Yes.

11   Q.   On page forty-six of Exhibit 3, the second A, on

12        the left-hand margin you refer to Senior

13        Investigator Kendall as very highly regarded by

14        people on and off the job, correct?

15   A.   That's correct.

16   Q.   Is that true?

17   A.   It was then.  I don't know about now.

18   Q.   Okay.  And you go on to say that you mentioned

19        something to a friend of yours that got back to

20        him that was not of a racial nature, true?

21   A.   Yes.

22   Q.   Okay.  Who was the friend that you made a comment

23        to?

115

1   A.   To the best of my recollection, it was Dorothy
2        Jones.
3   Q.   When was that?
4   A.   I don't, I don't know exactly when.
5   Q.   Do you have any idea at all?
6   A.   But I remember the situation.
7   Q.   Do you have any idea at all what year it was?
8   A.   No.
9   Q.   Where was it?
10  A.   In Buffalo somewhere.  I don't know if I was on
11       the telephone with her or in person.
12  Q.   Was this sometime after you came to the Violent
13       Felony Warrant Squad?
14  A.   Yes.
15  Q.   But you don't know when?
16  A.   I don't know when.
17  Q.   And what was your criticism of Mr. Kendall?
18  A.   I had mentioned that Kendall had become kind of
19       like infatuated with the Buffalo contingent of
20       the task force.  And when I say infatuated, those
21       guys, you know, they had a heavy hand when it
22       came to dealing with defendants.
23  Q.   Tell us what you mean by they had a heavy hand.

1    A.   Yes.

2    Q.   All right.

3    A.   Sorry.

4    Q.   She didn't ask you what you meant by infatuated?

5    A.   I don't remember exactly how the conversation

6         went, but I do remember the situation.  And it

7         might have already been stated or -- I don't

8         know.  Maybe it was a comment that I made in

9         reference to something she might have said so --

10   Q.   All right.  And then what happened after you had

11        this infatuation conversation with Dorothy Jones?

12   A.   The relationship between Kendall and I kind of

13        soured, which I thought was odd, you know,

14        because I thought everything was status quo.

15   Q.   When you say the relationship with Senior

16        Investigator Kendall soured, what do you mean?

17   A.   Well, the relationship with Kendall soured.  I

18        mean, he just -- he was kind of standoffish, not

19        as inclusive as he had been before, you know, as

20        far as me being part of the group or whatever.

21   Q.   How long did that last?

22   A.   I couldn't really honestly tell you.  But, I

23        remember the situation and the distinct

1       impression that there was something that changed

2       in our relationship.

3   Q.  Did it endure forever after that?

4   A.  I can't honestly say.

5   Q.  You don't remember?

6   A.  I don't remember.

7   Q.  All right.  Would you go to page fifty, please.

8       On page fifty, the third A, on the left margin,

9       from the bottom, you testified, I felt like, you

10      know, I've been treated like a second-class

11      citizen within the group.  You know, whatever.

12      You know, I don't really care as much but --

13          Do you see where you testified about that?

14  A.  I do.

15  Q.  Okay.  The group you're referring to is whom?

16  A.  The U.S. Marshals Task Force.

17  Q.  Okay.  And you're saying who -- is it the whole

18      task force treated you as a second-class citizen?

19  A.  Yes.

20  Q.  Okay.  And when was this that this happened?

21  A.  Well, after I made the internal complaint with

22      the state police, the U.S. Marshal Chief over

23      there, David Goldman, ordered the members of the

119

1     task force not to speak to me.

2  Q.  When did he do that?

3  A.  I don't know the exact date, but I was told that,

4     you know, they were ordered not to speak to me.

5  Q.  Okay.  You filed your complaint July 15 --

6  A.  Yes.

7  Q.  -- of 2013?

8  A.  Yes.

9  Q.  All right.  You gave your testimony on August 1

10    of 2013?

11  A.  Yes.

12  Q.  Is it your testimony that this directive by Mr.

13    Goldman would have occurred, then, between those

14    two dates?

15  A.  I don't know when it occurred.

16  Q.  Well, your testimony is on August the 1st.  You

17    filed the complaint on July 15th.

18  A.  Um-hum.

19  Q.  You're telling us now that this second-class-

20    citizen treatment you got was based on a

21    directive after you filed the complaint, right?

22  A.  That's correct.

23  Q.  So it would have had to be within that two-week

121

```
 1        15th and August 1st of 2013?
 2   A.   Sure.
 3   Q.   Otherwise, how could you testify about it on
 4        August 1st?
 5   A.   But I don't know exactly which date.
 6   Q.   I didn't ask you that.  I just said was it within
 7        that time period.  You agree it was?
 8   A.   Yes.
 9   Q.   Right?  And Goldman was whom?
10   A.   He was a chief over at the Western District in
11        Buffalo.
12   Q.   Okay.  So Chief Goldman?
13   A.   Yes.
14   Q.   All right.  Now, who told you about this
15        directive?
16   A.   I heard it from -- let's see, Sandra Olden and
17        Michael Malcolm.
18   Q.   Okay.  What did Ms. Olden tell you?
19   A.   Just that, that the chief ordered everybody not
20        to talk to me.
21   Q.   Is that all she said?
22   A.   That's all she said.
23   Q.   Okay.  And you don't remember when she told you
```

122

1    that?

2  A.  Not exactly.

3  Q.  It would have been after the complaint and before

4      your testimony, within that two-week window?

5  A.  Within that two-week window.

6  Q.  Right.  And Michael Malcolm, he's a marshal?

7  A.  Yes.

8  Q.  Okay.

9  A.  Deputy U.S. Marshal.

10  Q.  All right.  And what did he say to you?

11  A.  Pretty much the same thing that Sandra Olden did.

12  Q.  What did he tell you, do you remember?

13  A.  That the chief ordered everybody not to talk to

14      me.

15  Q.  All right.  Did he say anything else?

16  A.  No.

17  Q.  All right.  And after that -- those

18      conversations, was it your experience that the

19      members of the task force didn't speak to you?

20  A.  The Buffalo contingent of the task force

21      didn't -- no, they didn't speak to me.

22  Q.  They didn't?

23  A.  They did not speak to me.  The Niagara County

123

1          contingent where I actually worked on a daily
2          basis, they did speak to me.  There were two
3          Niagara County deputies, one ICE agent, and there
4          was a U.S. Marshal, Brent Novak.
5    Q.    Okay.  They were the Niagara contingent?
6    A.    Yes.
7    Q.    They did not treat you as a second-class citizen?
8          Is that what you're saying?
9    A.    No.  I said they spoke to me.
10   Q.    Yes.  Right.
11   A.    I didn't say anything about --
12   Q.    I said they did not treat you as a second-class
13         citizen.  Is that true?  Or they did?
14   A.    They spoke to me.  We worked together.
15   Q.    All right.  You're drawing a distinction.  Are
16         you suggesting that even the ones in Niagara
17         County treated you as a second-class citizen
18         after your complaint?  Is that your testimony?
19   A.    Repeat the question.
20   Q.    As I understand your testimony, after the -- what
21         you claim was this directive by Chief Goldman,
22         that the Buffalo contingent of the task force did
23         not speak to you.

124

1    A.   Yes.

2    Q.   Correct?

3    A.   That's correct.

4    Q.   And that the Niagara County contingent did speak

5         to you?

6    A.   Yes.

7    Q.   All right.  Is it nonetheless your testimony that

8         after you filed the complaint, the Niagara County

9         contingent treated you as a second-class citizen?

10   A.   Speaking to one person and treating them as a

11        second-class citizen are like two different

12        things.  Do you want to know if they spoke to me

13        or if they treated me badly?

14   Q.   I'll ask the question again.

15   A.   Okay.

16   Q.   Your testimony is that Niagara County people

17        would speak to you?

18   A.   Yes.

19   Q.   Is it nonetheless your testimony that the Niagara

20        County contingent after you filed your complaint

21        treated you as a second-class citizen?

22   A.   I'm saying they spoke to me.

23   Q.   Why is this so difficult?  I asked you a straight

125

```
1        question that I think is very clear, and I've
2        asked it to you three or four times and you won't
3        answer it.  I'll ask it one more time.  Is it
4        your testimony that after you filed your
5        complaint, the Niagara County contingent treated
6        you as a second-class citizen?
7   A.   Yes.
8   Q.   Okay.  And how were you -- what did the Niagara
9        County people do that you considered to be
10       second-class-citizen treatment?
11  A.   Well, I was always referred to as the black guy
12       by Brent Novak.
13  Q.   Always?
14  A.   Always.
15  Q.   Never ended?
16  A.   It ended when I confronted him.
17  Q.   Okay.  When was that?
18  A.   I don't have the exact date but --
19  Q.   So when you say always, he didn't always.  You
20       confronted him about it and he stopped, right?
21  A.   That's correct.
22  Q.   And was that sometime before you filed your
23       complaint?
```

126

1   A.   No.   That was -- I think it was before the

2        complaint.   Hmm.   Yes.   It was before the

3        complaint.

4   Q.   All right.   My question -- I'll ask it again.

5        What did the Niagara County contingent do after

6        you filed your complaint that you viewed as

7        second-class-citizen treatment?

8   A.   It was -- well, it's difficult to put into words.

9        I just got the sense that I wasn't an equal in

10       the Niagara County contingent of the task force.

11  Q.   After you filed your complaint?

12  A.   That's correct.

13  Q.   But you can't give us a single specific example

14       of what you're referring to?

15  A.   No.

16  Q.   Now, you say that the Buffalo contingent after

17       you filed your complaint stopped talking to you?

18  A.   That's correct.

19  Q.   All right.   And was Rick Rooney part of the

20       Buffalo contingent?

21  A.   Actually, Rick Rooney, I don't know exactly --

22       well, I think he was doing some offshoot, like

23       sex offender registration enforcement, so I can't

127

1       say whether he got the directive or not.

2    Q.  Are you saying Rick Rooney didn't talk to you

3       after you filed your complaint?

4    A.  I can't recall if, you know, we did have a

5       conversation.

6    Q.  How about Mike Malcolm, is he part of the Buffalo

7       contingent?

8    A.  He's part of the Buffalo contingent, yes.

9    Q.  Is it your testimony that after you filed the

10      complaint, he didn't talk to you anymore?

11   A.  Well, as a supervisor of the task force, he had

12      to actually talk to me regarding task force

13      business, so he did talk to me about task force

14      business.

15   Q.  About task force business?

16   A.  That's correct.

17   Q.  But that was it?

18   A.  That was it.

19   Q.  And Deputy -- are you going to add something?

20   A.  I was going to say I'd like a bathroom break.

21   Q.  Okay.  We'll get to it in a minute.  Okay?  We

22      can even -- I don't know what time it is, but we

23      can take a longer break.  Can you hold for a

128

1        couple minutes?  If you can't, say so.

2  A.   No.  I think I better go now.

3  Q.   Okay.

4  A.   I'm sorry.

5  MR. PERSONIUS:  We can take a break, but I'd like to

6        finish this subject.

7  MS. KORN:  Okay.

8           (Whereupon, a short recess was then taken.)

9  BY MR. PERSONIUS:

10  Q.   Mr. Miller, I've been asking you about this

11       directive by Chief Goldman that you were told

12       about by Sandra Olden and Mike Malcolm in the

13       latter part of July of 2013.

14  A.   Yes.

15  Q.   And we had been talking about Rick Rooney and

16       Michael Malcolm and whether they were part of

17       what you described as the Buffalo contingent.  Do

18       you recall that?

19  A.   Yes.

20  Q.   All right.  After you filed your complaint, did

21       you continue to communicate with Rick Rooney?

22  A.   Yes.

23  Q.   Was it about official business?

129

1   A.   Yes.

2   Q.   All right.  Did you communicate, after you filed

3        your complaint, with Rick Rooney in what we might

4        describe as small talk?

5   A.   There might have been small talk.

6   Q.   All right.  And Michael Malcolm, after you filed

7        your complaint, did you converse with him about

8        official business?

9   A.   Yes.

10  Q.   And did you also engage in small talk with him?

11  A.   Not so much.

12  Q.   And when you say not so much, what do you mean?

13  A.   Not as much as we had small talk before the

14       complaint.

15  Q.   And do you know somebody named Chris Snack?

16  A.   Yes, I do.

17  Q.   All right.  Deputy marshal?

18  A.   Yes.

19  Q.   Was he on the task force?

20  A.   Yes.

21  Q.   All right.  And did you continue, after you filed

22       your complaint, to converse on official business

23       with Deputy Marshal Snack?

131

```
 1   A.   Yes.

 2   Q.   Okay.  And Kevin Kendall, did he stop talking to

 3        you after you filed your complaint?

 4   A.   Yes.  He kept it business only.  And I was -- I

 5        would even go as far as saying that he didn't

 6        really want to talk to me.  He would send me like

 7        an e-mail -- we're sitting in an office in close

 8        proximity.  He would send me an e-mail rather

 9        than actually advise me on something

10        administrative so --

11   Q.   On how many occasions did Kevin Kendall do that

12        after you filed your complaint?

13   A.   Just once that I can remember.

14   Q.   And what did that relate to?

15   A.   Something administrative.  I don't, don't

16        remember what the -- what had to be corrected or,

17        you know, addressed.  But, I just thought it was

18        odd that he was sitting no less than twenty feet

19        away from me and he couldn't tell me.  He had to

20        send me an e-mail so --

21   Q.   You don't remember the subject matter?

22   A.   I don't.

23   Q.   Happened one time?
```

1  A.   As far as I can remember.

2  Q.   Now, when you said on page fifty of Exhibit 3

3       that you were treated by the group as a

4       second-class citizen after you filed your

5       complaint, are you referring to anything else?

6  A.   There was a detail that I worked overtime in, and

7       I worked with the Buffalo contingent.  And I

8       responded to the Seneca garage where we met up

9       and I guess the briefing was held, you know, and

10      I was not given an assignment.  So we went out to

11      the field.  We were looking for someone who was

12      wanted.  I don't remember who it was or what he

13      was wanted for, but I know he was supposedly

14      frequenting a bar on Main Street, like the old

15      Mickey Rats.  Is that the one -- on Minnesota and

16      Main Street.

17           And I remember being out there feeling like,

18      you know, a fifth wheel, because no one would,

19      you know, keep me up to speed on what was going

20      on, what transpired during the investigation.  As

21      a matter of fact, it went as far as changing the

22      radio frequency, which I later found out.  So it

23      was at night, and I was sitting there by myself

```
 1        pretty much, and no communication with the group

 2        because they had changed the frequency on me so --

 3   Q.   When did this happen?

 4   A.   I couldn't tell you exactly when it happened.

 5   Q.   Give us an idea if you can.

 6   A.   I know it was in the summertime.

 7   Q.   Of what year?

 8   A.   It was after I made the complaint.

 9   Q.   All right.  So it was the summer of 2013?

10   A.   It would have to be.

11   Q.   All right.  And this involved activity regarding

12        a suspect in or around Main and Minnesota?

13   A.   I guess this guy was supposedly frequenting this

14        bar.

15   Q.   Okay.

16   A.   And I don't know what the name of the bar was at

17        that time, but it was -- it's the old Mickey Rats

18        so --

19   Q.   And who participated in this detail?

20   A.   The Buffalo contingent of the task force.

21   Q.   That would be Cooley and Kiefer?

22   A.   Cooley, Kiefer -- everyone I mentioned there.

23   Q.   So Snack, Baryza, Falkowitz, Cooley, Kiefer,
```

134

1       Kendall?

2    A.    I don't remember Kendall being there.

3    Q.    Okay.  So this is not involving Kevin Kendall?

4    A.    Right.

5    Q.    All right.  But, what you're saying happened is

6          you reported for this detail down at the Seneca

7          Street garage --

8    A.    Yes.

9    Q.    -- of the Buffalo Police Department?

10   A.    Yes.

11   Q.    And people were given an assignment, but you were

12         not?

13   A.    Yes.

14   Q.    And then those involved changed the radio

15         frequency so you could not communicate by radio

16         with the other individuals?

17   A.    Yes.

18   Q.    Which could have created a dangerous

19         circumstance, true?

20   A.    Yes.

21   Q.    You're not able to communicate with your other

22         members of the detail, right?

23   A.    Correct.

135

1   Q.  They're not able to communicate with you, right?

2   A.  Correct.

3   Q.  Who did you report that to after that happened?

4   A.  Oh, I mentioned it to Kendall.

5   Q.  When did you mention it to Senior Investigator

6      Kendall?

7   A.  The very next day.

8   Q.  Okay.  And was anybody present when you mentioned

9      that to him?

10  A.  No.

11  Q.  All right.  And what did he say in response?

12  A.  Honestly, I don't remember what he said.

13  Q.  Did you ever follow up with him to see if he had

14     taken any action regarding the position you had

15     been put in?

16  A.  No.

17  Q.  You considered that to be a pretty serious

18     matter, didn't you?

19  A.  I did.

20  Q.  Now, can you give us any other examples of what

21     you intended to reference when you mentioned on

22     August 1st that you were getting second-class-

23     citizen treatment?

136

1  A.   Well, I wasn't allowed to have a task force or

2       state police laptop, for that matter, to

3       actually, you know, facilitate doing

4       administrative work in Niagara County.  I made a

5       request to both agencies, but I was never allowed

6       to get a laptop so -- and I also asked for like a

7       computer fob that would have allowed like remote

8       access to our state police intranet, and that was

9       denied also.

10 Q.   When did you make the request for the laptop?

11 A.   It was after the complaint.  And I don't remember

12      the exact date.

13 Q.   Who did you direct that request to?

14 A.   To the best of my recollection, I actually did a

15      memo asking for those items, and it went up the

16      chain.  It was denied.

17 Q.   Okay.  But you don't remember who you directed

18      the request to?

19 A.   I couldn't tell you.  I think most of the

20      memos -- or, requests, you know, they put the

21      major's name.  I mean --

22 Q.   Let me ask it a different way.  Was that request

23      directed to Kevin Kendall?

137

1    A.   No.

2    Q.   All right.  And you said something about a

3         computer fob that you asked for?

4    A.   That's correct.

5    Q.   Was that also after you filed your complaint?

6    A.   That's correct.

7    Q.   And that was denied?

8    A.   That was denied.

9    Q.   And that would have not been directed to Kevin

10        Kendall?

11   A.   No.

12   Q.   All right.  Last time I'm going to ask it.

13        Anything else of a second-class-citizen nature

14        you want to mention after you filed your

15        complaint?

16   A.   Not that I can recall.

17   MR. PERSONIUS:  Okay.  Want to break now?

18   MS. KORN:  Yes.

19   MR. PERSONIUS:  We can go off the record.

20        (Whereupon, a lunch recess was then taken

21        from 12:56 p.m. to 2:03 p.m.)

22   BY MR. PERSONIUS:

23   Q.   Good afternoon, Mr. Miller.

138

1   A.   Good afternoon.

2   Q.   Over the lunch break did you review any material,

3        including documents, recordings, anything to

4        assist with the continuation of your testimony?

5   A.   No.

6   Q.   Okay.  Thank you.  The complaint that you lodged

7        with the New York State Police regarding the

8        behaviors of Kevin Kendall in July of 2013, did

9        you ever lodge any complaint with the marshals

10       service regarding Mr. Kendall?

11  A.   No.

12  Q.   Okay.  This Violent Felony Warrant Task Force

13       that existed, who was the head of that?  Who was

14       the head of it?

15  A.   You mean nationally or locally?

16  Q.   In Buffalo.

17  A.   Above the chief was -- in that -- in this

18       building over here was Goldman, but this Western

19       District I believe the marshal is Chuck Salina,

20       unless it's changed.  Chuck Salina.

21  Q.   Okay.  I'm not asking you who the head of the

22       marshal service is.  I'm asking who for the

23       Western District of New York, specifically

139

1          Buffalo, who is in charge of or who runs the
2          Violent Felony Warrant Squad?
3     A.   Well, Mike Malcolm was the last supervisor that I
4          knew of.
5     Q.   All right.  Mike Malcolm?
6     A.   Yes.
7     Q.   All right.  Do you know who it was before that?
8     A.   Dan Larish.
9     Q.   Okay.  And did you ever complain to either Dan
10         Larish or Mike Malcolm about your claims
11         regarding the behavior of Kevin Kendall?
12    A.   No.
13    Q.   The incident you testified about just before the
14         lunch break involving the meeting over at the
15         Seneca Street garage and then going up to the
16         Main/Minnesota area where your radio was on a
17         different frequency than everyone else, did you
18         report that to Mike Malcolm?
19    A.   Actually, I did tell him.
20    Q.   Okay.  And what did he say?
21    A.   To the best of my recollection, I think he just
22         mentioned that it was wrong and that was it.
23    Q.   So as far as you know, he didn't do anything

140

1      further about it?

2   A.  Not that I'm aware of.

3   Q.  Okay.  And just so it's on the record, Mike

4       Malcolm is a person of color?

5   A.  Yes.

6   Q.  Okay.  Included in your complaint, the one filed

7       in Federal Court, is a reference to an issue

8       involving overtime, correct?

9   A.  Yes.

10  Q.  All right.  And with respect to overtime, that

11      could be obtained in different ways, right?

12  A.  Yes.

13  Q.  You could be involved in some activity that could

14      lead to an arrest, that could lead to processing,

15      that could take longer than your scheduled

16      workday, and it's not like you can leave when the

17      clock strikes four or five, whatever your time to

18      leave is; you have to finish that project, right?

19  A.  Yes.

20  Q.  And when you have to stay like that, you get

21      overtime for that, right?

22  A.  Yes.

23  Q.  And something else I think may even be mentioned

141

1      in your complaint is another way to get overtime

2      is on what are called details.

3   A. I know the state police call -- they call them

4      details.  I don't know if the marshals actually

5      call them details, but that's what I call it.

6   Q. Okay.  Do you call them a detail?

7   A. Detail, yes.

8   Q. All right.  Tell us if you would what a detail

9      is, please.

10  A. It's a -- when the group -- the task force

11     members are directed to perform a certain

12     function or execute a certain warrant, that's

13     considered a detail.

14  Q. Okay.  Who is responsible for assigning members

15     of the task force to a particular detail?

16  A. I think it falls on the supervisor of the task

17     force.

18  Q. Okay.  So would that be Mike Malcolm or Dan

19     Larish?

20  A. Yes.

21  Q. All right.  And during the period of time that

22     you worked on the task force, initially that

23     would have been Dan Larish, right?

142

1    A.   Yes.

2    Q.   And then when did he cease being the supervisor

3         of the task force?

4    A.   I know it was prior to me lodging my complaint,

5         so before July, 2013.

6    Q.   All right.  Was it sometime, though, in 2013?

7    A.   I believe so.

8    Q.   All right.  And then he was succeeded by Michael

9         Malcolm?

10   A.   Yes.

11   Q.   All right.  And so originally it was Dan Larish

12        and then later -- much later in your tenure with

13        the task force, decision making of who would be

14        assigned to these details was in the hands of

15        Mike Malcolm?

16   A.   Yes.

17   Q.   All right.  In your complaint -- do you have that

18        in front of you?  It's Exhibit 1.  If you'd go,

19        please, to paragraph thirty in Exhibit 1.  You

20        allege -- or, it's alleged in that paragraph that

21        in July of 2013, you spoke to Kevin Kendall about

22        participating in a marshals office sex offender

23        detail, correct?

143

```
 1   A.   Yes.

 2   Q.   And that it was an overtime opportunity?

 3   A.   Yes.

 4   Q.   The detail you're referring to, was that a detail

 5        that was to be held in Rochester?

 6   A.   Yes.

 7   Q.   Okay.  And you indicate that, it was agreed that

 8        both Kendall and Plaintiff would attend when the

 9        detail became available.

10             Right?

11   A.   Yes.

12   Q.   Okay.  Now, this detail that's referred to in

13        paragraph thirty of the complaint, the date or

14        dates that that was held was in August of 2013?

15   A.   I believe so.

16   Q.   Do you remember the dates in August?

17   A.   No.  Not exactly.

18   Q.   You indicate -- or, again, the paragraph in the

19        complaint indicates that you spoke to Kevin

20        Kendall about that in July of 2013.  When you

21        spoke to him, did you discuss the dates of the

22        detail?

23   A.   No.  Just spoke to him regarding participating in
```

144

1        the detail when it came about.

2    Q.  Okay.  So at that point in time, dates had not

3        been assigned for the detail?

4    A.  Not that I'm aware of.

5    Q.  Okay.  And if you then go to paragraph

6        thirty-three of Exhibit 1.  It indicates that on

7        August 7, 2013, you contacted Kendall for

8        permission to work the detail, right?

9    A.  Yes.

10   Q.  And the indication that you asked Kevin Kendall

11       for permission -- you've indicated to us that the

12       person who made assignments for the detail was

13       the supervisor for the task force, right?

14   A.  Yes.

15   Q.  And so permission for you to participate in the

16       task force as of August of 2013 would have had to

17       have gone to Michael Malcolm, correct?

18   A.  If -- yes.

19   Q.  All right.  Now, you indicate -- again, I'm

20       sorry.  The amended complaint indicates in

21       paragraph thirty-three that Kevin Kendall denied

22       you permission to attend, indicating there were

23       too many people on the detail for you to

149

1   A.  Yes.

2   Q.  Do you remember what that conversation -- what

3       the subject matter of it was?

4   A.  It was regarding the sex offense detail.

5   Q.  Okay.  Now, in Exhibit 4 on page seven, it

6       identifies the date of that recorded conversation

7       as August 8, 2013, right?

8   A.  Yes.

9   Q.  In the complaint, Exhibit 1, paragraph

10      thirty-three, the date of a conversation between

11      you and Kevin Kendall regarding the sex offender

12      detail is identified as August 7th, 2013,

13      correct?

14   A.  That's correct.

15   Q.  Do you know which is the accurate date?

16   A.  No, I do not.

17   Q.  Okay.  Do you recall at the beginning of the

18      recording you made of this conversation that you

19      identified the date on the recording as being

20      August 8th, 2013?

21   A.  Well, I would have to listen to the recording

22      but --

23   Q.  My question is, do you recall doing that?

150

1   A.   Yes.

2   Q.   All right.  And as you sit here now, are you

3        certain that the date of the conversation with

4        Kevin Kendall regarding the sex offender detail

5        was August 8 as opposed to August 7?

6   A.   I'm not exactly sure.

7   Q.   Okay.  During the recorded call, do you agree

8        that Kevin Kendall was cordial with you?

9   A.   Could you repeat the question?

10  Q.   Sure.  Do you agree that during this recorded

11       call that you made regarding the sex offender

12       detail that Kevin Kendall was cordial with you?

13  A.   You mean in asking about my family or whatever

14       or --

15  Q.   No.  No.  His tone.  Was it a cordial tone?

16  A.   It was civil.

17  Q.   Okay.  Civil.  And do you remember him mentioning

18       that Rick said that he had too many people --

19       Rick had too many people for this detail?

20  A.   Vaguely, yes.

21  Q.   Okay.  And Rick would be Rick Rooney?

22  A.   Yes.

23  Q.   Okay.  What was Rick Rooney's -- at the time what

1       was Rick Rooney's position with the task force?

2   A.  He was the coordinator of the sex offense

3       details.

4   Q.  All right.  And do you remember Mr. Kendall said

5       during the call that Rick Rooney had asked Mr.

6       Kendall to come to keep him company for the ride

7       between Buffalo and Rochester?

8   A.  Vaguely, yes.

9   Q.  All right.  And you asked about a detail that was

10      coming up on either the 26th and 27th or 27th and

11      28th of August.  Do you remember that?

12  A.  Yes.

13  Q.  Okay.  And do you remember also that on this

14      recording you say should you talk to Rick about

15      whether or not you can be on that detail?  Do you

16      remember saying that?

17  A.  Yes.

18  Q.  Okay.  And that Mr. Kendall agreed that you

19      should talk to Rick Rooney about being on that

20      detail, right?

21  A.  Yes.

22  Q.  All right.  Now, again, you don't remember if on

23      the date of this conversation it was the very

152

1      same day as the detail?

2  A.  For the life of me, I couldn't tell you.

3  Q.  Okay.  And do you recall, by the way, that on

4      August 7th of 2013, you also had an appointment

5      with Dr. Mirza?

6  A.  No.

7  Q.  Do you remember what time of day you had the

8      appointment with Dr. Mirza on August 7 of 2013?

9  A.  No.

10 Q.  The decision to record that conversation with

11     Kevin Kendall, was that made by you?

12 A.  What do you mean?

13 Q.  Did you decide to do that?

14 A.  Yes.

15 Q.  Okay.  And what was your reason for deciding to

16     record that phone call?

17 A.  I guess to record whether or not he was going to

18     be truthful about the detail.

19 Q.  Okay.  As you sit here now, do you agree he was

20     truthful about the detail?

21 A.  No.

22 Q.  What was he untruthful about?  What did he say

23     during that recorded call that was untruthful?

1       you were going to get a no, and that's why you

2       recorded the call, true?

3  A.   No.  No.

4  Q.   Well, again, you say you recorded the call

5       because you wanted to see if Kevin Kendall was

6       going to be truthful.  And truthful about what?

7  A.   About following through on my participation in

8       the sex offense detail.

9  Q.   But you agree it wasn't his decision, right?

10 A.   From a state police standpoint, it was his

11      decision.  I can't --

12 Q.   It wasn't his decision, was it?  If you wanted

13      to -- sir, I cut you off and I'm sorry.  Go

14      ahead.

15 A.   No.  Go ahead.

16 Q.   Thank you.  And I apologize.  You knew that under

17      task force rules and procedure that if you want

18      to serve on one of these overtime details, you

19      have to get permission from the supervisor for

20      the task force; i.e., Dan Larish or Mike Malcolm,

21      right?

22 A.   Or the coordinator, Rick Rooney.

23 Q.   Okay.  Or Rick Rooney.  And you knew from a prior

```
 1        detail.
 2   Q.   So are you telling us that paragraph thirty of
 3        Exhibit 1 may be inaccurate?
 4   A.   No.  That's accurate.  When I heard about the
 5        detail, I called Kevin.
 6   Q.   So you talked to him about it?
 7   A.   Yes.
 8   Q.   All right.  And knowing that the detail was
 9        coming up, what is the reason that you didn't
10        contact either Mike Malcolm or Rick Rooney about
11        participating in it?
12   A.   Well, number one, if there is a detail, okay, we
13        had already previously discussed that we would
14        both participate.
15   Q.   All right.
16   A.   As overtime goes in the task force, if you don't,
17        you know, use it, you lose it.
18   Q.   Yes.
19   A.   And we had a prior conversation that indicated
20        that when the next sex offense detail rolls
21        around that we would both participate --
22   Q.   Sure.
23   A.   -- like we did the previous year --
```

158

1   Q.  Okay.

2   A.  -- so --

3   Q.  So why didn't you call -- you knew about it in

4       July, it being the sex offender detail in

5       Rochester.  Why didn't you call Rick Rooney or

6       Mike Malcolm to ask to be part of it?

7   A.  Before I could be part of anything, I have to

8       talk to my supervisor who is the state police

9       supervisor.  I can't just --

10  Q.  You had already talked to him in July, and he

11      said it was okay.  That's what paragraph thirty

12      of Exhibit 1 says, doesn't it?

13  A.  No.

14  Q.  Doesn't it say in the last sentence, sir, it was

15      agreed that both Kendall and Plaintiff would

16      attend when the detail became available?  Isn't

17      that what it says?

18  A.  That's what it says.

19  Q.  Okay.  You knew you had permission.  If you

20      needed it, you had it from him.  You talked about

21      it in July.

22  MS. KORN:  Objection.  I think it's a bit

23      argumentative and you're not letting him answer.

159

1    MR. PERSONIUS:  Okay.  Then let me restate it.

2    BY MR. PERSONIUS:

3    Q.  Did you know in July that you had the permission

4        of Kevin Kendall to participate in this Rochester

5        sex offender detail when it became available?

6    A.  We had a conversation in July in which he

7        indicated that we would both work the detail when

8        it became available.  When it did become

9        available, I was not notified.

10   Q.  Is there some reason you didn't follow up on

11       it -- did you have his permission in July?  If

12       you needed it, did you have it in July?

13   A.  Well, if I wanted to fart, you know -- strike

14       that.  I'm sorry.

15   Q.  Did you say if you want to fart?

16   A.  It, it --

17   Q.  Pardon me.  Did you say if you want to fart?

18   A.  You're making --

19   Q.  Sir, did you say if you want to fart?  Is that

20       what you said?

21   A.  I said strike that.  Excuse me.

22   Q.  Why did you say that?

23   A.  Because you making it seem as if -- that I had

160

1     permission when it was just a conversation

2     between Kendall and I that we would both work a

3     detail that was upcoming.  Now, when that detail

4     came about, I was not notified.  He went to the

5     detail and I was not notified --

6  Q.  But, sir --

7  A.  -- so --

8  Q.  -- you knew it was coming up in July.  Do you

9     agree you knew in July it was coming up?

10  A.  No.

11  Q.  Okay.  So paragraph thirty that says -- of

12     Exhibit 1 that says, sometime in July of 2013,

13     Plaintiff speaks to Kendall about participating

14     in a U.S. Marshals office sex offender detail,

15     period.

16  A.  Yes.

17  Q.  Is that true?

18  A.  Yes.

19  Q.  All right.  And is it also true that, it was

20     agreed that both Kendall and Plaintiff would

21     attend when the detail became available, period?

22        Is that true?

23  A.  Yes.  That is true.

161

1  Q.  All right.  And you've already told us that the

2      necessary permission to participate in the detail

3      had to come from either Michael Malcolm as

4      supervisor of the task force or Rick Rooney who

5      was the supervisor of the detail, correct?

6  A.  Correct.

7  Q.  When you recorded this phone call, did you decide

8      that day to do it or had you planned it ahead of

9      time?

10 A.  That day.

11 Q.  And the equipment that you used to do the

12     recording, what type of equipment did you use?

13 A.  It was a mini recorder.

14 Q.  A mini recorder?

15 A.  Um-hum.

16 Q.  Okay.  And did you have to attach that to your

17     phone?

18 A.  Did I do what?

19 Q.  Did you have to attach it to your phone?

20 A.  No.

21 Q.  So how did you do it?  Tell us how you did it.

22     How did you record the call?

23 A.  Well, there is a -- what do you call it?  Are you

172

1    Q.   Do you remember, sir, that you first went

2         after -- well, at some point you went to the New

3         York State Police office at 65 Court Street --

4    A.   Yes.

5    Q.   -- correct?  And you had a conversation or

6         conversations there that were recorded, correct?

7    A.   Yes.

8    Q.   All right.  And when you were at the state police

9         office, 65 Court Street, you had conversations

10        that were recorded that concerned official state

11        police business; isn't that true?

12   A.   With Kendall?

13   Q.   Doesn't matter with Kendall.  You certainly did

14        with Kendall, right?

15   A.   I did not record any official business that I can

16        recall.

17   Q.   At the New York State Police offices?

18   A.   That's correct.

19   Q.   And if you did, you agree that would have

20        violated New York State Police policy and

21        procedure, correct?

22   A.   Yes.

23   Q.   Okay.  And you didn't get permission from anybody

173

1     before you went and did that, correct?

2  A.  No.

3  Q.  You decided to do it on your own, correct?

4  A.  I did.

5  Q.  You weren't doing it at the directive of anybody

6     from the state police?

7  A.  No.

8  Q.  They didn't know about it, correct?

9  A.  That's correct.

10  Q.  And then you left the state office and you went

11     to Family Dollar.  Do you remember that?

12  A.  Vaguely.

13  Q.  Do you remember what you bought there?

14  A.  No.

15  Q.  Then you went to the marshals office?

16  A.  I would have to listen to the recording.

17  Q.  You don't remember going to the marshals office?

18  A.  I would have to listen to the recording to say

19     whether or not I did.  I mean, I've gone to the

20     marshals office in --

21  Q.  Do you remember you going to the marshals office

22     on August 8th of 2013 wearing a recording device?

23  A.  Yes.

179

```
 1   A.   No.  I, I recall not wanting to share, you know,
 2        my personal information with him.
 3   Q.   Why?
 4   A.   Because Rick Rooney didn't like me.
 5   Q.   Rick Rooney didn't like you?
 6   A.   Yeah.
 7   Q.   Why do you say Rick Rooney didn't like you, sir?
 8   A.   I don't know.  You would have to ask him about
 9        that but --
10   Q.   Why do you say it?  Why do you think he didn't
11        like you?
12   A.   Well, I wasn't treated like a friend or -- well,
13        not even like a colleague so --
14   Q.   How did Rick Rooney treat you, sir?
15   A.   I think people tolerated me in the task force.
16   Q.   I'm going to ask you the question for at least
17        the third time, if not the fourth.  We're doing
18        it again.  I want it on the record.
19            How did Rick Rooney treat you?
20   A.   Not like a friend.
21   Q.   You're going to keep giving me the same answer,
22        not like a friend.  Okay.  How should Rick Rooney
23        had have treated you?
```

180

```
 1    A.   Not saying -- if I say like a friend, you're
 2         going to be upset.  I mean -- like a colleague,
 3         you're going to be upset, so I mean --
 4    Q.   I'm asking you for the specifics of what he did
 5         or did not do that causes you to testify under
 6         oath that he didn't like you.
 7    A.   How does anyone know that a person doesn't like
 8         them?  I mean, they don't treat you like a friend
 9         or a colleague.  I mean, I don't know how else to
10         explain it.  I mean, he just didn't like me.
11    Q.   Can you give us any specific examples of
12         something that Rick Rooney did or did not do,
13         said or did not say, that supports your testimony
14         under oath that Rick Rooney didn't like you?
15    A.   No.  There is nothing that I could tell you.
16    Q.   Asking you about what your hobbies are, what you
17         enjoy doing, is that something a friend would do?
18    A.   Yes.
19    Q.   Okay.  And when you finally answered his question
20         and you told him that you played pool, that you
21         played video games with your nephews, he was
22         interested, wasn't he?
23    A.   Not really.
```

181

1   Q.   You don't remember him asking you follow-up
2        questions about where you played pool?  Do you
3        remember that?
4   A.   Yeah.
5   Q.   Do you remember him asking if you played at the
6        Hippodrome?
7   A.   Yes.
8   Q.   Do you remember that conversation?
9   A.   I do.
10  Q.   And do you remember what you and he did after
11       that?
12  A.   No.
13  Q.   Do you remember you were sitting down, watching
14       golf with him, talking about a golf match, eating
15       candy?  Do you remember that?
16  A.   So that makes us buddies?
17  Q.   Do you remember doing that, sir?
18  A.   I do.
19  Q.   Okay.  So what we have captured on a recording
20       for this person you say didn't treat you like a
21       friend is a gentleman who asked you about your
22       hobbies and then sits down and eats candy with
23       you while watching a golf match.  You agree all

1       of that is true, right?

2   A.  That is true.

3   Q.  Do you remember also talking at length with at

4       least Michael Malcolm, maybe Rick Rooney, about

5       your cousin?

6   A.  Yes.

7   Q.  And that you were complaining about your cousin

8       living in an apartment and not paying you rent?

9   A.  Yes.

10  Q.  Using your toilet paper?

11  A.  Yes.

12  Q.  Your paper towels?

13  A.  Yes.

14  Q.  Who did you have that conversation with?

15  A.  Mike Malcolm.

16  Q.  Just Mike?

17  A.  Just Mike.

18  Q.  Small talk?

19  A.  (Indicating yes.)

20  Q.  True?

21  A.  Yes.

22  Q.  And your conversations with Rick Rooney, that was

23      small talk too, wasn't it?

183

1   A.   Yes.

2   Q.   Okay.  And do you remember there was a -- it may

3        be in poor taste, but there was a contest of

4        sorts that the task force had where you would try

5        to get another member of the task force to say

6        Dan Larish's name?

7   A.   Yes.

8   Q.   And there was some talk about that when you were

9        over there too, wasn't there?

10  A.   Yes.

11  Q.   And was somebody trying to trick you into saying

12       Dan Larish's name?  Do you remember that?

13  A.   I can't recall if they were trying to trick me

14       into saying it, but I do remember that they had

15       some kind of jar set up.

16  Q.   And do you remember Mike Malcolm telling you that

17       he got tricked the day before into saying

18       Larish's name?

19  A.   Vaguely, yes.

20  Q.   Small talk?

21  A.   Yes.

22  Q.   Do you remember telling Mike Malcolm that this

23       Rochester sex offender detail was a big trade

184

1      secret?

2   A.   Yes.

3   Q.   Telling him that they didn't even tell you about

4        it?

5   A.   I do remember that.

6   Q.   That they was Kevin Kendall and Rick Rooney?

7   A.   Yes.

8   Q.   We know from the complaint, Exhibit 1, paragraph

9        thirty, that you had discussed it with Kevin

10       Kendall, don't we?

11  A.   Prior -- yeah.  Kendall and I discussed it prior

12       to the detail.

13  Q.   It was only after you told Mike Malcolm that

14       they, including Kevin Kendall, hadn't told you

15       about the detail that he called Kevin Kendall on

16       that recording a snake, right?

17  A.   I don't know if he was referring to Kendall or --

18       what's his name?  Rooney.

19  Q.   He called somebody a snake?

20  A.   He did.

21  Q.   And it was after you told him that you had not

22       been told about the detail, right?

23  A.   Yes.

185

1   Q.   The fiscal year ends as of September 30th,

2        correct?

3   A.   Which fiscal year?

4   Q.   The state police.  When you're figuring overtime,

5        you knew that you had to get the overtime in by

6        the end of the fiscal year, which was September

7        30th of 2013, correct?

8   A.   Yes.

9   Q.   Okay.  And do you know what your overtime ended

10       up being for the fiscal year that ended September

11       30th, 2013?

12  A.   No.

13  Q.   Do you know how much short you were of the actual

14       maximum amount of overtime you could have had?

15  A.   No, I don't know.

16  Q.   Do you know that you crushed it later in August

17       and in September of 2013?  Do you remember that?

18  A.   I'd have to see the figures, but I guess.

19  Q.   Don't guess.  I don't want you to guess about

20       anything.  Guesses are no good.  Do you remember

21       that Rick Rooney told you when you were talking

22       to him -- this person you say doesn't like you,

23       told you about an overtime opportunity that would

186

1    be coming up down in Chautauqua and that you

2    could crush it?  Do you remember him saying that

3    to you on this recording that you made?

4  A.  He did tell me about the Chautauqua detail.

5  Q.  He did.  And, in fact, you took full advantage of

6    it, did you not?

7  A.  I did.

8  Q.  Okay.  But as you sit here now, you have no idea

9    how close you came to what the ceiling was for

10    your overtime hours for the fiscal year that

11    ended September 30th of 2013?

12  A.  No, I don't.

13  Q.  And by the way, that's a part of the -- your

14    retaliation claim, right, is that you were denied

15    overtime in retaliation for filing your

16    complaint?

17  A.  Yes.

18  Q.  Now, you also complained -- or, have complained

19    about overtime that was received by you and

20    others for the fiscal year that ended September

21    30th of 2010?

22  A.  Yes.

23  Q.  Okay.  And you've alleged that there was a

187

1    Caucasian named Donald Rieger who got the max or

2    pretty close to max, right?

3 A.  Yes.

4 Q.  Okay.  And you got considerably less than that,

5    right?  Correct?

6 A.  Yes.

7 Q.  Okay.  And do you know that, that circumstance

8    notwithstanding, your overtime compensation was

9    some two thousands dollars more than Kevin

10   Kendall's?  Do you know that?  For fiscal year

11   ending September 30th of 2010.

12 A.  I wasn't aware of that.

13 Q.  You're not aware of that?

14 A.  No.  I wasn't aware.

15

16       (Whereupon, a one-page Printout of an E-mail

17   dated August 18, 2013, with attachment, was then

18   received and marked as Exhibit 5, for

19   identification.)

20

21 BY MR. PERSONIUS:

22 Q.  Mr. Miller, I'm showing you what we've marked as

23   Exhibit 5.  It's a two-page exhibit.  The first

192

1       DeJesus got twelve thousand dollars, and you got
2       ten thousand dollars, and Kendall got eight
3       thousand dollars, that was why they changed the
4       system so that it would be more equitable, true?
5   A.  I wasn't aware of any change in the accounting
6       system.
7   Q.  Sir, for 2009-2010, did you receive these e-mails
8       from Kevin Kendall that informed you on where you
9       were and how much more overtime you could get
10      before the end of the fiscal year?  Did you get
11      that?
12  A.  No.
13  Q.  All right.  In the later years you did, right?
14  A.  I did.
15  Q.  You did?
16  A.  Yeah.
17  Q.  All right.  In the complaint, Exhibit 1, you
18      indicate at paragraph thirteen that, Kendall has
19      a history of using derogatory comments to refer
20      to African-Americans.
21          And then you identify what those comments
22      are, correct?
23  A.  Yes.

193

1   Q.   The complaint does.  And is that history that's

2        being referred to there what then is set forth

3        between paragraph fifteen and paragraph

4        twenty-nine?  Is that the history?

5   A.   Yes.

6   Q.   All right.  And that's the entirety of the

7        history, right, of the comments by Kevin Kendall?

8   A.   No.

9   Q.   All right.  What's left out?

10  A.   Well, from 2008 to around 2010, he would use the

11       N word, and I would say something to him,

12       tactfully, trying to get him to stop using the

13       word.  It didn't work.  And as a result, my

14       overtime was curtailed in the 2009-2010 fiscal

15       year.  And when he realized that with the federal

16       system if you don't use it, you lose it, then my

17       overtime actually went back up on par with

18       everybody else in the following years.

19  Q.   All right.  You'll agree my question had to do

20       with that was the extent of the history, right?

21  A.   Yes.

22  Q.   And your answer ended up talking about overtime,

23       correct?

194

1   A.   Yes.

2   Q.   Okay.   And I'm happy to talk to you about that.

3        Okay?   Let's start with that.

4   A.   Okay.

5   Q.   You just said under oath that because of

6        conversations you had with Kevin Kendall about

7        his use of what you claim were racial epithets,

8        that he cut down your overtime for the fiscal

9        year ending September of 2010, correct?

10  A.   Correct.

11  Q.   All right.   What do you base that on, other than

12       the numbers?

13  A.   Just the numbers.

14  Q.   Just the numbers?   Anything else, sir?

15  A.   Yeah.

16  Q.   What?

17  A.   Just that.   Just the numbers.

18  Q.   All right.   When I ask you if there's anything

19       else, and you say yeah, and then you say just the

20       numbers, let's be clear.   Your sworn testimony

21       that Kevin Kendall punished you for commenting on

22       what you claimed were his use of racial epithets

23       is solely based upon a comparison of the numbers

195

```
 1        for overtime that are reflected on page two of
 2        Exhibit 5; is that correct?
 3   A.   That's correct.
 4   Q.   And those are numbers that show Kevin Kendall
 5        making two thousand dollars less than you for
 6        overtime for that period, correct?
 7   A.   That's correct.
 8   Q.   So back to what my question had to do with.  Your
 9        testimony is that, in addition to what's set out
10        in paragraphs fifteen through twenty-nine of the
11        complaint, that there were prior instances when
12        Kevin Kendall had made improper racial comments.
13        Is that your testimony?
14   A.   That is my testimony.
15   Q.   Okay.  And have you testified to that before?
16   A.   Yes, I have.
17   Q.   When was that, sir?
18   A.   I think in the IAB interview.
19   Q.   All right.  Now, tell us, sir, of any instance,
20        other than what's set forth in the complaint -- I
21        don't care when it was; it could have been
22        yesterday -- when Kevin Kendall made some
23        improper racial remark in your presence.  Tell us
```

196

1        about it.

2   A.   Well, if it was something that I vividly

3        remembered, it would have been in the complaint.

4   Q.   Tell us about any other instance that you recall

5        as you sit here today.

6   A.   I can't recall specifically.

7   Q.   All right.  And you tell us that generally during

8        the period 2008, 2009, Kevin Kendall would use a

9        racial slur and you would talk to him about it.

10       Is that what you're saying?

11  A.   Yes.

12  Q.   Okay.  And how many times did that happen?

13  A.   I couldn't even venture a guess.

14  Q.   Did you keep any kind of record of when that

15       occurred?

16  A.   No.

17  Q.   And can you give us any examples of what Mr.

18       Kendall said that you considered to be a racial

19       slur that was directed toward you?

20  A.   Directed towards me?

21  Q.   Yes.

22  A.   I don't recall.

23  Q.   Okay.  Can you tell us about any of these

197

1  conversations that you had with Kevin Kendall

2  prior to the incidents outlined in the complaint

3  where you talked to him about the inappropriate

4  use of racial language or racial slurs?  Do you

5  remember any of the conversations you had with

6  him?

7 A. Not specifically, no.

8 Q. Do you recall them generally?

9 A. Generally, Kendall would repeat whatever he heard

10  on the street, and I would tell him, not for

11  nothing, you know, it's still not cool, referring

12  back to our earlier conversation in SP Clarence

13  when I told him point-blank, you cannot use that

14  word.

15 Q. Okay.  And what was -- if you recall -- and I

16  know we're talking generalities -- what was the

17  response that Mr. Kendall would provide?

18 A. That basically he wasn't calling me one, that he

19  was just repeating what they said.

20 Q. Okay.  Do you remember anything else about what

21  he said?

22 A. No.

23 Q. Okay.  Do you remember anything else about what

198

1      you said?

2   A.   No.

3   Q.   All right.  I think it's a dozen instances that

4        are referred to in the complaint, starting at

5        paragraph fifteen --

6   A.   Um-hum.

7   Q.   -- as I've indicated, going through paragraph

8        twenty-nine.  Is it your testimony that on each

9        of those alleged occasions that the racial remark

10        by Kevin Kendall was directed toward you?

11   A.   No.

12   Q.   Are you able to segregate if or identify if any

13        of those were directed toward you?

14   A.   Just by him saying it, knowing that, you know, I

15        find it offensive, makes it directed towards me.

16   Q.   Okay.  That's how you deduce that.  But, you are

17        not claiming that any of these comments that are

18        in these paragraphs were made by Kevin Kendall,

19        if they were made -- but, made by Kevin Kendall

20        and directed at you, correct?

21   MS. KORN:  Object to the form.  I think he already

22        answered that.

23   MR. PERSONIUS:  Well, what I'm saying I think is a

199

```
 1      little different.
 2   MS. KORN:  Okay.
 3   MR. PERSONIUS:  And maybe it isn't.  Just let me see
 4      what his answer is to that.
 5   BY MR. PERSONIUS:
 6   Q.  Do you see the distinction I'm drawing or not?  I
 7      may not be saying it correctly.  Do you want me
 8      to try it again?
 9   A.  Please.
10   Q.  I understand your testimony to be that you infer
11      from the discussions you said you had with Kevin
12      Kendall that these incidents that are captured in
13      the amended complaint were directed by him toward
14      you because he knew that you didn't approve.  Is
15      that what you're saying?
16   A.  Yes.
17   Q.  All right.  And what I'm saying is something a
18      little different, which is, you agree that when
19      he used these terms, he wasn't calling you any of
20      these terms, correct?  He wasn't calling you --
21      he never called you the N word, right?
22   A.  They still hurt just as much.
23   Q.  That's not my question.  My question is, he
```

200

1     didn't call you the N word ever, did he?

2  A.  No.

3  Q.  Okay.  That's the difference.  Now, in paragraph

4     thirty-one --

5  A.  Exhibit 1?

6  Q.  Yes.  Thank you.  Exhibit 1, the amended

7     complaint.  It says in the next to the last line,

8     Kendall has used the terms -- and then there's a

9     couple of N words referenced -- since 2008.

10     Do you see that?

11  A.  Yes.

12  Q.  Okay.  Is the testimony that we've covered today,

13     does that cover that subject?  Is there anything

14     more that you have to add to Mr. Kendall's

15     alleged use of the N word that we haven't

16     covered?

17  A.  No.

18  Q.  Okay.  On Exhibit 1, please go to paragraph

19     sixty-eight.  The second sentence -- I'm sorry.

20     The third sentence of paragraph sixty-eight

21     alleges that, Kendall's use of this language was

22     consistent, constant, and despite Plaintiff's

23     repeated requests for Kendall to cease using that

204

1   A.  I do.

2   Q.  All right.  And have we covered that subject?

3   A.  Yes.

4   Q.  Okay.  In Exhibit 1 on -- I believe you have to

5      go to paragraph eighty.  It alleges in the second

6      and third line that, the New York State Police

7      was made aware of Defendant Kendall's conduct by

8      Plaintiff's numerous complaints of Kendall's

9      conduct, including both internal complaints and

10     external complaints.

11        Do you see that language?

12  A.  I do.

13  Q.  Okay.  And are you able to identify for us what

14     the reference to internal complaints means?  Do

15     you know what that means?

16  A.  The basis for the internal investigation.

17  Q.  Okay.  Exhibit 2?

18  A.  Yes.

19  Q.  Okay.  Is that the -- are there any other

20     internal complaints, or as far as you know, is

21     that it?

22  A.  Nope.  That's it.

23  Q.  All right.  And then it says external complaints.

205

1      Do you know what that phrase is intended to
2      reference?
3  A.  The EEOC complaint against Kendall.
4  Q.  All right.  And do you know if it references
5      anything else or is that it?
6  A.  Nope.  That's it.
7  Q.  All right.  Thank you.  You worked together with
8      Kevin Kendall in I think what you described as
9      the backroom in Clarence between 1995 and 1996?
10 A.  Yes.
11 Q.  Was that -- what period of time was that?  Was it
12     two years or was it eighteen months?
13 A.  I don't know exactly.  Maybe two years.
14 Q.  So you think it was about two years?
15 A.  Yes.
16 Q.  All right.  And is it correct that during that
17     interaction with Kevin Kendall, you never had an
18     issue with his use of inappropriate language?
19 A.  Not after we had the conversation about using the
20     N word.
21 Q.  You had that conversation with Kevin Kendall back
22     in '95, '96?
23 A.  Yes.

216

```
 1        terms of individuals that you do things with
 2        socially, do you have any individuals you do
 3        things socially with?
 4   A.   I do.
 5   Q.   All right.  And did you back in July of 2014?
 6   A.   No, I didn't.
 7   Q.   Okay.  What has happened since 2014 that you now
 8        do have some friends that you do things with
 9        socially?
10   A.   I have a lot of free time.  I mean, I'm retired
11        so --
12   Q.   Okay.  It says -- continuing.  It's the very next
13        part of that same sentence.  Second paragraph,
14        second sentence.  Does not associate with other
15        cops because, in quotes, I don't trust them.
16            And is that accurate?
17   A.   Yes.
18   Q.   Okay.  Can you tell us when -- first of all, when
19        it says cops, is that anybody involved in law
20        enforcement?
21   A.   Yes.
22   Q.   And why is it that you don't trust anyone
23        involved in law enforcement?
```

217

1    A.   Just my experience working with cops.  The cops

2         I know I probably wouldn't associate with.

3    Q.   Okay.  Why, sir?

4    A.   I guess I just don't trust them.

5    Q.   You can't give us a reason?

6    A.   No.

7    Q.   And when you say cops, which means law

8         enforcement, is that all members of law

9         enforcement?

10   A.   Well, I haven't, you know, experienced dealing

11        with a lot of different law enforcement agencies,

12        but for the most part, the ones I've dealt with I

13        would probably tend to avoid, just knowing how

14        their membership acts.  You know, from being

15        close colleague -- well, working with them or

16        whatever.

17   Q.   Maybe I could put it this way -- and you tell me

18        if it's wrong.  Based on your own interactions

19        with law enforcement, you don't trust cops; is

20        that a fair way to put it?

21   A.   True.

22   Q.   The next sentence in that paragraph -- and,

23        again, we're still on Exhibit 6 -- refers to you

236

1  A.  Not that I can recall.

2  Q.  It goes on to state in the second full paragraph

3      under the caption, mental status, on page three

4      of Exhibit 6 that you have thoughts of suicide.

5      Quote, would be easier if not around, end quote.

6          Do you remember saying that?

7  A.  Yes.

8  Q.  And then it goes on to say here in that same

9      paragraph, quote, if I have to go, I'm not going

10     alone.  Then when asked who else he would kill,

11     he stated, quote, Kevin, that is a given.

12          And I think you agree.  You did say that?

13 A.  I believe the doctor said Kevin, and I said,

14     that's a given.

15 Q.  All right.  And when you said that, was that a

16     serious remark by you?

17 A.  No.

18 Q.  Why did you say it?

19 A.  I'm pretty sure that I -- that was prefaced by I

20     fantasized about suicide.

21 Q.  Okay.  Well, whether you fantasized or thought

22     it, in your mind is that different?  Isn't a

23     fantasy a thought?

237

1   A.   A fantasy is a thought.

2   Q.   Okay.  So you -- number one, you thought about

3        killing yourself, right?

4   A.   Yes.

5   Q.   And you thought that more than -- on more than

6        one occasion?

7   A.   I have thought about it, yeah.

8   Q.   Okay.  How many times?  Do you know?

9   A.   Not often.  Maybe two, two times, maybe three.

10  Q.   All right.  And you have actually thought about

11       killing Kevin Kendall, right?

12  A.   He -- excuse me.  Dr. McIntyre said, who else

13       would you kill?  And, you know, if I'm there

14       being examined because of this whole racial

15       complaint, yeah, I said, that's a given.  I

16       didn't say, I want to kill Kevin.  I just agreed

17       with what he said.  I know that it's not right

18       but --

19  Q.   Well, you made the statement, Kevin would be a

20       given, right?  You said that?

21  A.   I think he said, Kevin, and I said, that would be

22       a given.

23  Q.   All right.  When you said that would be a given,

240

```
 1   A.   No.
 2   Q.   Did you say during the interview that you wanted
 3        to smash Kevin Kendall in the face?
 4   A.   Yes.
 5   Q.   Okay.  And what was the trigger that caused you
 6        to have that feeling?
 7   A.   Based on being harassed by Kevin and the
 8        lieutenant at the office.
 9   Q.   When you say Kevin harassed you at the office,
10        are you referring to a specific incident?
11   A.   Yes.  When him and Lieutenant Rataczak responded
12        to VFW office and treated me like I was some kind
13        of like suspect.  For whatever reason they wanted
14        to know my itinerary for like the last week or
15        so.  And when I explained it to them, it all made
16        sense, working with the task force in Niagara
17        County and -- but instead of like calling me and
18        asking me, well, what did you do this week, Lee,
19        he called the lieutenant and then came and they
20        pretty much pinned me up in the office and they
21        wanted to know exactly what I did and I told
22        them.
23   Q.   We've got to work through this.  When did this
```

241

1    happen?

2  A.  Let's see.  I think Monday would have been the

3      16th.  That would have been the 13th.

4  Q.  What would have been the 13th?

5  A.  The Friday before I got the letter from the

6      doctor.

7  Q.  That was June 14th of 2014?

8  A.  Yes.

9  Q.  All right.  And so when did this incident you're

10     testifying about happen with Senior Investigator

11     Kendall and Lieutenant Rataczak?

12 A.  I'm not exactly sure about the time.  Probably

13     around, I don't know, eleven, twelve o'clock.

14 Q.  Okay.  But -- and I'm sorry.  Do you know the

15     date when it happened?

16 A.  That was the date, on the 16th.

17 Q.  It happened on the 16th of June?

18 A.  No.  On the 16th, I went to see Dr. Mirza.  That

19     Friday before then is when the incident occurred.

20 Q.  So it's mid June of 2014?

21 A.  Yes.

22 Q.  All right.  Before Dr. Mirza wrote her letter

23     about you needing two weeks off for stress?

247

1       he was not allowed by his superiors to do so?

2       Did you ever think of that?

3   A.  No, I did not.

4   Q.  All right.  But in any event, your reaction to

5       this was that you wanted to punch him?

6   A.  I felt like punching him.

7   Q.  And how long did you harbor that feeling that you

8       wanted to punch Kevin Kendall?

9   A.  It was fleeting.  At the time, you know, when I

10      had two state police members doing everything but

11      accusing me of dereliction of duty, yeah, I was,

12      I was not happy.

13  Q.  Okay.  So, again -- and I'm sorry if I missed

14      your answer if you gave it -- how long did you

15      harbor those feelings of wanting to punch Mr.

16      Kendall in the face?

17  A.  Probably for the duration of the interrogation.

18  Q.  Oh, okay.  You say it was an interrogation.  How

19      long did this last?

20  A.  Maybe fifteen, twenty minutes.

21  Q.  And what about it causes you to characterize it

22      as an interrogation?

23  A.  Well, generally, it was one-sided.  I had no idea

VOLUME II                                      LETHONIA MILLER

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------

LETHONIA MILLER,

                          Plaintiff,

        -vs-

NEW YORK STATE POLICE,
KEVIN KENDALL, and
FRANCIS P. CHRISTENSEN,

                          Defendants.

--------------------------------------------------

                          Examination Before Trial of

LETHONIA MILLER, Plaintiff, taken pursuant to the Federal

Rules of Civil Procedure, in the law offices of PERSONIUS

MELBER, LLC, 2100 Main Place Tower, 350 Main Street,

Buffalo, New York, taken on August 15, 2017, commencing at

9:04 A.M., before VALERIE A. ROSATI, Notary Public.

255

1      APPEARANCES:

2      THE LAW OFFICE OF LINDY KORN, PLLC,
       By LINDY KORN, ESQ., and
3      WILLIAM F. HARPER, V, ESQ.,
       535 Washington Street,
4      Electric Tower, 9th Floor,
       Buffalo, New York 14203,
5      Appearing for the Plaintiff.

6      NEW YORK STATE ATTORNEY GENERAL,
       By GEORGE MICHAEL ZIMMERMANN, ESQ.,
7      Assistant Attorney General,
       300A Main Place Tower,
8      350 Main Street,
       Buffalo, New York 14202-3750,
9      Appearing for Defendants
       New York State Police and
10     Francis P. Christensen.

11     PERSONIUS MELBER, LLC,
       By RODNEY O. PERSONIUS, ESQ.,
12     2100 Main Place Tower,
       350 Main Street,
13     Buffalo, New York 14202,
       Appearing for Defendant
14     Kevin Kendall.

15     PRESENT:  Kevin Kendall

16

17

18          (The following stipulations were entered

19     into by all parties.)

20          It is hereby stipulated by and between counsel

21     for the respective parties that the oath of the

22     Referee is waived, that filing and certification

23     of the transcript are waived, and that all

256

1      objections, except as to the form of the

2      questions, are reserved until the time of trial.

3

4          (Whereupon, a Packet of Western New York

5      Psychotherapy Services Records was then received

6      and marked as Exhibit 7,

7          a Packet of Madiha A. Mirza, M.D. Records

8      was then received and marked as Exhibit 8,

9          a one-page Office of Carol Descutner, Ph.D.,

10     PCP Report dated June 19, 2014 was then received

11     and marked as Exhibit 9,

12         and a one-page Printout of an E-mail dated

13     October 18, 2013 was then received and marked as

14     Exhibit 10, for identification.)

15

16             L E T H O N I A   M I L L E R,

17     1207 Discover Green Lane, Mableton, Georgia 30126,

18             after being duly called and sworn,

19               testified further as follows:

20

21  CONTINUING EXAMINATION BY MR. PERSONIUS:

22

23  Q.  Good morning, Mr. Miller.

1   A.   Morning.

2   Q.   Since we were together late yesterday afternoon,

3        have you reviewed any written materials,

4        recordings, to assist you with the continuation

5        of your testimony?

6   A.   No.

7   Q.   After August 8th of 2013, you continued until

8        June of 2014 to be a member of the -- active

9        member of the task force, correct?

10  A.   Yes.

11  Q.   All right.  And during this period of time, you

12       had many occasions to be in contact with Rick

13       Rooney?

14  A.   No, not a lot.  He was apart from the actual task

15       force.  He was coordinator for the sex offense

16       squad, so he did his own thing wherever.

17  Q.   Did you have contact with him?

18  A.   No.

19  Q.   None?

20  A.   No.  I had contact with him, but --

21  Q.   All right.  Not a lot --

22  A.   Not a lot.

23  Q.   -- but you had contact with him?

258

1  A.  Yes.

2  Q.  And how about Mike Malcolm, did you have contact

3     with him?

4  A.  Not a lot of contact --

5  Q.  Okay.

6  A.  -- no.

7  Q.  But contact with him?

8  A.  Yes.

9  Q.  All right.  And Chris Snack?

10  A.  Not a lot of contact.

11  Q.  Okay.  But some?

12  A.  Some.

13  Q.  Okay.  As to any or all of those three gentlemen,

14     at any point in time, did you pull them aside and

15     tell them, I think you should know that I

16     secretly recorded conversations with you on

17     August 8th of 2013?

18  A.  No.

19  Q.  Since you left active service on or about June

20     14th of 2014, have you had any contact with Mr.

21     Rooney or Mr. Malcolm or Mr. Snack?

22  A.  Could you repeat the question?

23  Q.  I sure can.  Since you left active duty with the

267

1          someone about anger management.

2     Q.   Had you had discussions with Dr. Mirza about the

3          fact that you had anger management issues?

4     A.   Just as far as I told her I felt like, you know,

5          smashing Kendall in the face.

6     Q.   Was that a thought or a fantasy?

7     A.   I would have to say that would fall into the

8          realm of an emotion.

9     Q.   So was that a third category that you operate

10         under, that an emotion is different than a

11         thought is different than a fantasy?

12    A.   Yes.  That's how I felt.

13    Q.   Okay.  Tell us, if you would, what the difference

14         is between -- in your mind between an emotion and

15         a thought.

16    A.   An emotion is something that's, to me, based on

17         feelings.  They don't have to be based on

18         thought.  They could be a reaction to like a

19         situation or person.  It's not a thought-driven

20         thing in my mind.  It's just how you feel.

21    Q.   What, again, was the context of you experiencing

22         this emotion of smashing Senior Investigator

23         Kendall in the face?

1    A.   When him and Lieutenant Ratajczak responded to

2         the office and pinned me up and pretty much

3         interrogated me regarding my activity for I guess

4         the previous week.

5    Q.   Okay.  Whether you had been at Niagara County?

6    A.   Yes.

7    Q.   That incident?

8    A.   Yes.

9    Q.   Did you say penned you up?

10   A.   Pinned -- well, I was sitting at my desk and I

11        was -- well, no.  I wasn't allowed to leave, but

12        just there.

13   Q.   All right.  Were you sitting at your desk?

14   A.   I was sitting at my desk.

15   Q.   And this is a cubicle, right?

16   A.   No.  It's an open-air squad room I guess.

17   Q.   Okay.  So it's an open area without a door?

18   A.   Yes.

19   Q.   Right?

20   A.   Um-hum.

21   Q.   Yes?

22   A.   Yes.

23   Q.   And Senior Investigator Kendall and Lieutenant

269

1      Ratajczak came over to talk to you?

2   A.  Yes.

3   Q.  Right?  And did you go to a different location or

4       did the interaction occur right there at your

5       desk?

6   A.  It occurred right there at the desk.

7   Q.  And in your mind you were penned up?

8   A.  Yes.

9   Q.  Was that the only reason -- that interaction, was

10      that the only reason that Dr. Mirza suggested you

11      go see Dr. Bernstein about anger management?

12  A.  Yes.

13  Q.  You had also, as we talked about yesterday,

14      reached out to Dr. Pace, right?

15  A.  Yes.

16  Q.  Had phoned him immediately after your interview

17      with Dr. McIntyre, right?

18  A.  Yes.

19  Q.  While you were waiting for your ride, right?

20  A.  Yes.

21  Q.  And I mentioned to you yesterday that, do you

22      recall that in speaking to Dr. Pace's office, you

23      mentioned specifically anger management.  Do you

1        anymore?
2    A.  I didn't feel as though his help was necessary
3        for the ADD anymore.
4    Q.  But he had not said that to you, that he didn't
5        think further treatment was necessary, correct?
6    A.  No.  But he understood that I was in a transition
7        going from Buffalo to Atlanta.
8    Q.  Back in 2013, 2014, you were transitioning to
9        Atlanta?
10   A.  Yes.
11   Q.  In what respect?
12   A.  Trying to move to Atlanta.  Cut ties with Buffalo
13       and just move on with my life in Atlanta.
14   Q.  In 2013, 2014, what steps had you actually taken
15       to transition your life from Buffalo to Atlanta?
16   A.  I started moving things down to Atlanta little by
17       little.
18   Q.  What did you move down there?
19   A.  Clothing.  There was some furniture.
20   Q.  What furniture?
21   A.  Let's see.  I had an inflatable mattress that I
22       took down there.
23   Q.  An inflatable mattress?

1    A.   Yes, it is.

2    Q.   All right.  The date is July 31, 2014?

3    A.   Yes.

4    Q.   Did you fill this out at the time of your only

5         visit to Dr. Bernstein?

6    A.   Yes.

7    Q.   And on that fourth page, the first page of the

8         clinical questionnaire, there's a box near the

9         top that says, do you have any children?

10            Do you see that?

11   A.   Yes.

12   Q.   And the yes box is checked?

13   A.   Yes.

14   Q.   Is that an error?

15   A.   That is an error.

16   Q.   If you go down about two thirds of the way on

17        that page, the fourth page, in italics it says,

18        two, current clinical data.

19   A.   Yes.

20   Q.   And there's handwriting there that indicates, I

21        suffer from depression and lately, because of

22        work related stress, I've had thoughts of hurting

23        myself and others.

286

1  A.  Yes.

2  Q.  Right?  Your words, right?

3  A.  Yes.

4  Q.  Doesn't say fantasies, does it?

5  A.  No.

6  Q.  And can you tell us as you sit here what thoughts

7     you were having of hurting yourself?

8  A.  Not specifically.  Just thinking I needed relief

9     from the stress that was I under, and I

10     irrationally thought that, you know, hurting

11     myself might help me.

12  Q.  Had you given any -- and I'm sorry to put you

13     through this.  But, had you given any thought to

14     what you might do to hurt yourself?

15  A.  No.

16  Q.  Nothing at all, whether it be pills or a knife or

17     a rope?  You hadn't given any -- a gun?  You

18     hadn't given any thought to it at all?

19  A.  No.

20  Q.  And it says others.  That's your hand, right?

21  A.  Yes.

22  Q.  Who were the others you were thinking about

23     hurting?

288

1    Q.   And what you're referring to there is your
2         complaint to the state police?
3    A.   Yes.
4    Q.   What you're referring to there is the decision of
5         your internal complaint that was made by the
6         state police?
7    A.   Yes.
8    Q.   And what you're referring to there is that in
9         that decision, the single criticism of Kevin
10        Kendall that the state police had involved his
11        use of the N word on a Facebook?  The Facebook
12        post, sir?
13   A.   Repeat the question.
14   Q.   The report responding to your internal complaint
15        that was issued by the state police had a single
16        founded finding, correct?
17   A.   Yes.
18   Q.   And that founded finding had to do with a
19        Facebook post, correct?
20   A.   Yes.
21   Q.   That was a Facebook post that had been made by
22        Kevin Kendall, correct?
23   A.   Yes.

289

1   Q.   And the Facebook post had to do with an

2        investigation, correct?

3   A.   Yes.

4   Q.   All right.  And the criticism that was made in

5        that finding was that Mr. Kendall had used the N

6        word in a post and had not gotten permission

7        before using the photograph of the fictitious

8        person associated with that Facebook page, right?

9   A.   Could you repeat the question?

10  Q.   Let me ask it this way.  What is your

11       understanding, sir, of the founded finding that

12       was made by the state police?

13  A.   My understanding is that they found sufficient

14       evidence that he had used the racial slur by

15       posting it on Facebook after the subject had

16       already been arrested.

17  Q.   Okay.  And there was no finding, was there, that

18       that was directed at you?

19  A.   No.

20  Q.   But you were still angry about the fact that

21       because of that criticism of Mr. Kendall that he

22       had not been transferred?

23  A.   Early on in the internal investigation, I was

1           And, again, you circled three, to a very
2      strong degree, correct?
3  A.   Yes.
4  Q.   And what was it that you wanted to void?
5  A.   The situation at work.
6  Q.   And in what respect?
7  A.   I read it to mean avoid certain things, places,
8      and people.
9  Q.   Well, the word is void, not avoid, right?
10  A.   But I read it to -- at the time to mean avoid
11      certain things, places --
12  Q.   So you wanted to avoid work?
13  A.   I did want to avoid work, only because it
14      stressed me out.
15  Q.   Down at the bottom of this page, you wrote in, if
16      I'm reading it correctly, paranoid about people
17      from my job breaking into my.
18  A.   Yes.
19  Q.   Is that your handwriting?
20  A.   That is.
21  Q.   All right.  And breaking into what?
22  A.   Into my house.
23  Q.   And who were you fearful was going to break into

296

1      your house?

2  A.   Well, somebody from the job.

3  Q.   Who?

4  A.   I'm not exactly sure.

5  Q.   Kevin Kendall?

6  A.   No.  Not specifically, no.

7  Q.   Why did you have this fear that people you had

8       worked with were going to break into your home?

9  A.   Because I didn't feel safe at work, which made me

10      feel like I wasn't safe at home.

11 Q.   And when you say you didn't feel safe at work,

12      tell us what you mean.  Did you fear for your

13      physical harm?

14 A.   At work?

15 Q.   Yes.

16 A.   Every day.

17 Q.   Because of the people you worked with?

18 A.   Every day.

19 Q.   You were fearful the people you worked with were

20      going to do physical harm to you?

21 A.   Every day.

22 Q.   And did you ever, before today, ever voice that

23      to anybody?

```
 1   A.  It wasn't necessary.

 2   Q.  Please.  Yes or no?  Before --

 3   A.  No.

 4   Q.  Before today --

 5   A.  No.

 6   Q.  -- August 15th, 2017, in a deposition, did you

 7       ever voice that concern that people you worked

 8       with were going to be doing physical harm to you,

 9       to anyone?

10   A.  No.

11   Q.  What was the reason if you had this fear you

12       didn't tell anyone about it?

13   A.  It was just a general fear of men with guns.

14   Q.  You had been seeing Dr. Mirza, a psychiatrist,

15       for over two decades, right?

16   A.  Yes.

17   Q.  You never told her about it?

18   A.  No.

19   Q.  You had seen this gentleman, Pace, a

20       psychologist.  You never told him about it?

21   A.  No.

22   Q.  You had been seeing -- well, you saw Dr.

23       Bernstein.  Even with Dr. Bernstein you didn't
```

298

1       mention it to him, right?

2   A.  No.

3   Q.  You'd seen other medical professionals over the

4       years and you never mentioned it to them, right?

5   A.  True.

6   Q.  You filed a complaint with the New York State

7       Police, an internal complaint.  You never

8       mentioned it there?

9   A.  No.

10  Q.  You filed an EEOC complaint.  You never mentioned

11      it there?

12  A.  No.

13  Q.  You filed a federal lawsuit.  Until today, you've

14      never mentioned it, correct?

15  A.  Correct.

16  Q.  And what was the basis for this fear that the

17      people you worked with were going to do physical

18      harm with their guns to you?

19  A.  Just based on the fact that I've worked with --

20      well, the police officers that I've worked with,

21      I've seen what they're capable of and what they

22      have done.

23  Q.  To co-workers?

299

1   A.   No.   Just people in general.

2   Q.   You mentioned to us yesterday there was one

3        incident where someone put a gun to your chest.

4        I think it was down in New York City.

5   A.   Yes.

6   Q.   Okay.   Since yesterday, have you remembered that

7        person's name?

8   A.   No.

9   Q.   Go ahead.

10  A.   I have remembered another incident.

11  Q.   Well, let's focus on this one for a minute.

12  A.   Okay.

13  Q.   This person that put the gun to your chest, you

14       still don't remember that person's name?

15  A.   For the life of me, I don't remember his name.

16  Q.   Was there ever any other time in your life you've

17       had someone put a gun to your chest?

18  A.   I've had a gun pulled out on me, but not to my

19       chest.

20  Q.   And was that in your line of duty?

21  A.   It was another state police member.

22  Q.   Okay.   Well, tell us about that.   Who pointed a

23       gun at you?

1    A.    No.   That was done with court approval.

2    Q.    I'm talking about surreptitiously, sir, where you

3          don't have court approval.

4    A.    Well, that was done with court approval.

5    Q.    I understand.   My question is, do you know of a

6          single instance that someone working with the

7          state police, United States Marshal Service, or

8          the task force that you worked on, surreptitiously,

9          without court approval, entered a building?

10   A.    No.

11   Q.    Any other basis for this fear that you've told us

12         about for the first time today?

13   A.    Yeah.   I've seen defendants pummeled with batons,

14         pistol whipped, sprayed with mace.

15   Q.    Are you telling us, sir, that you also have a

16         fear that someone from the state police, the U.S.

17         Marshal Service, or the task force that you

18         worked on is going to pistol whip you or pummel

19         you with a baton?

20   A.    That's a fear.

21   Q.    You have that fear?

22   A.    Yes.

23   Q.    As you sit here now, you have that fear?

1  A.  Yes.

2  Q.  How long have you had that fear?

3  A.  Well, since I got on the job and I had a gun held

4      to my chest by another state police officer.

5  Q.  And that happened down when you were in New York

6      City?

7  A.  Yes.

8  Q.  Okay.  And this fear of someone you work with

9      breaking into your home, have you had that same

10     fear since that time?

11 A.  Yes.

12 Q.  But today is the first time you've ever told

13     anybody about that?

14 A.  Yes.

15 Q.  On the next page of Exhibit 7, it's the seventh

16     page of the exhibit.  The first entry at the top

17     is a lower case D, family functioning.  Do you

18     see that?

19 A.  Yes.

20 Q.  And that you were supposed to there describe

21     problems you are having affecting your

22     relationship with family members, correct?

23 A.  Yes.

1   Q.   -- in that response?

2   A.   Yes.

3   Q.   So it's other members of law enforcement?

4   A.   Yes.

5   Q.   And any others?

6   A.   Not that I can recall.

7   Q.   And then down for question fifteen, felt

8        compelled to isolate yourself.  And you said --

9        or, checked both present and past --

10  A.   Yes.

11  Q.   -- correct?  And for what period of time had you

12       felt that you wanted to isolate yourself?

13       Looking back.

14  A.   I think when I actually submitted the memo that

15       initiated the internal investigation and it

16       became clear to me that, you know, the people I

17       worked with didn't really have my best interest

18       at heart and ignored me and blackballed me from

19       the group, I did withdraw inward.

20  Q.   Okay.  And when you talk about being isolated and

21       blackballed, when did that start?

22  A.   Once again, when I submitted the memo that

23       initiated the internal complaint.

312

1   Q.   So it started in July of 2013?

2   A.   Yes.

3   Q.   All right.  And did that isolation and

4        blackballing manifest itself when you were at the

5        state police office at 65 Court Street?

6   A.   Yes.

7   Q.   And did it manifest itself when you were at the

8        marshals office at the Jackson Federal Courthouse

9        at 2 Niagara Square?

10  A.   Yes.

11  Q.   And did it manifest itself as well in the field

12       when you were working with these other members of

13       the task force?

14  A.   Yes.

15  Q.   Do you currently feel that you have to isolate

16       yourself, sir?

17  A.   No.

18  Q.   When did it end?

19  A.   When I retired.

20  Q.   When did you retire?

21  A.   August of 2015.

22  Q.   August of?

23  A.   2015.

1   Q.  Okay.  Talk about stressors in your life?

2   A.  Sometimes.

3   Q.  Now, as far back as 2000, you had reported to Dr.

4       Mirza you did not like the people you were

5       working with?

6   A.  Yes.

7   Q.  Okay.  And is there anything further from --

8       beyond what you've already told us the past day

9       and a half, that was the reason or reasons for

10      not liking the people you worked with?  Is there

11      anything you want to add to that?

12  A.  No.

13  Q.  And you also indicated to her back in November of

14      2000 you were not happy with your line of work?

15      In that first paragraph.  That's the third and

16      second to last line.  It says, he is not happy

17      with the line of work that he is in.  Generally

18      feels dissatisfied with his life and

19      accomplishments at this time.

20  A.  Yes.

21  Q.  And was that accurate at that time?

22  A.  Yes.

23  Q.  Was that always the case, that you didn't like

350

1    Senior Investigator Kendall that there was a

2    discussion about retirement?

3  A.  I don't recall.

4  Q.  Do you remember specifically that Investigator

5    Gardner asked you what your retirement plans

6    were?

7  A.  I don't recall.

8  Q.  Do you remember saying to Investigator Gardner

9    that you noticed that he had a duality and that

10    he should only talk to you about work related

11    matters?

12  A.  I vaguely remember that.

13  Q.  Okay.  And what was your reason for making that

14    comment to Investigator Gardner, only talk to me

15    about work related matters?

16  A.  The first day that Gardner showed up at the

17    office, I introduced myself.  We spoke briefly,

18    small talk.  And I guess he was putting his best

19    foot forward being in a new unit.  After a couple

20    days, or whenever the time elapsed, he became

21    standoffish, also ignored me.  And so I don't

22    know why he started ignoring me, but when he did,

23    I just explained to him that, yeah, there was a

351

1          duality in his conversation with me, and I just

2          wanted to talk about job related issues and keep

3          it on a professional level.

4     Q.   Well, at the time he was trying to have a

5          conversation with you about a non-job-related

6          matter, right?

7     A.   Right.

8     Q.   And you elected to limit the conversation to the

9          job related issue?

10    A.   That's correct.

11    Q.   I'm going to show you what's marked as Exhibit 10.

12         Exhibit 10 is a one-page document, an e-mail

13         thread between you and June Bradley in October of

14         2013, correct?

15    A.   Yes.

16    Q.   And you sent an e-mail to Investigator Bradley as

17         shown here on October 17, 2013 at four-twenty-one

18         p.m., right?

19    A.   Yes.

20    Q.   And you complained to her about how you were

21         being treated by the other employees that you

22         worked with, right?

23    A.   Yes.

352

1    Q.   And this was a description by you in this e-mail
2         of the condition that existed both at the 65
3         Court Street and over at the marshals office and
4         in the field since you had filed this complaint,
5         right?
6    A.   Yes.
7    Q.   And the way you describe it in the e-mail is --
8         it starts in the fourth line of the second
9         paragraph of your October 17 e-mail,
10        investigators avoid me like the plague.  Won't
11        even acknowledge me or even talk to me.
12            Right?
13   A.   Yes.
14   Q.   And was that an accurate description of what your
15        experience had been with the task force members
16        after you filed the complaint?
17   A.   Yes.
18   Q.   You go on to say, then there are the
19        investigators who talk to me like I am a
20        terminally ill patient in Hospice.
21   A.   Yes.
22   Q.   And by that reference to Hospice and a terminally
23        ill patient, what was happening that you used

1           that descriptor?

2    A.    They -- when people spoke to me, they spoke to me

3          as if, you know, there was something wrong with

4          me.  Slightly condescending, you know.  That's

5          all I can remember.

6    Q.    Who spoke to you that way?

7    A.    I can't remember exactly who, but there were

8          people in the office at 65 Court Street.

9    Q.    Can you give us one name of somebody that treated

10         you like a terminally ill patient in Hospice?

11   A.    There was an investigator from -- I believe he

12         was from the computer crimes unit or something

13         that -- it had something to do with computer

14         crimes.  I can't remember his name.

15   Q.    Was he a member of the task force?

16   A.    No.

17   Q.    You go on to indicate in this e-mail that, not to

18         mention the people who have never spoken to me in

19         years now suddenly mechanically addressing me as

20         they enter or leave the office as if ordered to

21         do so.

22               Correct?

23   A.    Yes.

1   Q.   All right.  And can you identify the people who

2        were doing that?

3   A.   Investigator John Lubecki.

4   Q.   John?

5   A.   Lubecki.

6   Q.   Can you spell that, please?

7   A.   L-U-B-E-C-K-I, I believe.

8   Q.   All right.  And was he a member of the task

9        force?

10  A.   No.

11  Q.   Okay.  Who else was treating you in this

12       mechanical fashion?

13  A.   I can't even remember the lieutenant's name.  Oh,

14       Laughton.  Laughton.  L-A-U-G-H-T-A-N -- T-O-N

15       maybe.

16  Q.   Was he a member of the task force?

17  A.   No.

18  Q.   Anyone else that you can think of?

19  A.   No.

20  Q.   All right.  Would you please go back to Exhibit 1.

21       That's the amended complaint.  And go, please, to

22       paragraph sixty-one.  And, actually, if you go

23       back to paragraph fifty-two, you referenced the

1       fact you made a request to engage in outside
2       employment, right?
3   A.  Yes.
4   Q.  And that was at Delta Airlines?
5   A.  A subsidiary, I guess, of Delta.
6   Q.  Okay.  And down in paragraph sixty-one, the
7       allegation is, upon information and belief, other
8       Caucasian employees have not been denied this
9       type of request in the past.
10          Right?
11  A.  Yes.
12  Q.  Can you name a Caucasian employee that had made a
13      request similar to yours in the same circumstance
14      you were in for outside employment that had been
15      granted?
16  A.  No.
17  Q.  Do you have any information at all that that ever
18      occurred?
19  A.  That a state police member or a Caucasian member?
20  Q.  Caucasian.  It says here, other Caucasian
21      employees have not been denied this type of
22      request in the past.
23  A.  No.

358

1   Q.  Well, let's take your response.  You said you're

2       pretty sure.  What do you mean pretty sure?  Are

3       you making an assumption?

4   A.  Just an observation.

5   Q.  Is it a guess?

6   A.  Just an observation.

7   Q.  Is it a speculation?

8   A.  Observation.

9   Q.  All right.  When you say it's an observation,

10      tell us what you mean.  What factually occurred

11      that supports your testimony that Kevin Kendall

12      ever made a racist comment in the presence of

13      other colleagues that caused them to lose respect

14      for you?  Other than being pretty sure.  Cite

15      evidence that supports that.

16   A.  When the comments were made about savages or

17      animals --

18   Q.  In the presence of whom?

19   A.  Brent Novak, Don Rieger.  Nobody else that I can

20      think of.

21   Q.  Okay.  And what action or statement by either

22      Novak or Rieger caused you to believe that they

23      lost respect for you?

359

1    A.   Well, with Novak, he continued his campaign of

2         always referring to me as the black, the black

3         guy, whether we were in the field, at a

4         restaurant, in the Niagara County office.

5    Q.   And by the way, is it your claim -- you say he

6         continued his campaign.  Is it your recollection

7         that -- he was a deputy marshal, right?

8    A.   Yes.

9    Q.   That Deputy Novak never stopped referring to you

10        as the black guy?

11   A.   He did when I confronted him --

12   Q.   Well, all right.

13   A.   -- in the Niagara County office.

14   Q.   All right.  So you let him know you didn't like

15        it and he stopped, right?

16   A.   Yes.

17   Q.   Okay.  So how long did this -- what you described

18        as a campaign, how long did that go on?

19   A.   I'm not exactly sure.

20   Q.   When did it stop?

21   A.   When I confronted him in the Niagara County

22        office.

23   Q.   Okay.  When was that, sir?

360

```
 1   A.   I'm not exactly sure.

 2   Q.   Do you have any idea?

 3   A.   I did see it in the paperwork, so I'm pretty sure

 4        there's a date attached to it, but I don't know

 5        off the top of my head what it is.

 6   Q.   So your position is that Deputy Novak referring

 7        to you as the black guy was somehow tied to the

 8        alleged comment or comments by Kevin Kendall

 9        about animals and savages?  Is that your

10        testimony?

11   A.   That is my testimony.

12   Q.   What's the basis for you drawing that conclusion?

13   A.   If Brent Novak had respected me, he probably

14        wouldn't have kept referring to me as the black

15        guy.

16   Q.   Was Brent Novak referring to you as the black guy

17        before Kevin Kendall allegedly used the comment

18        animals or the comment savages?

19   A.   I'm not exactly sure.

20   Q.   Well, it would make a difference, wouldn't it?

21   A.   No.

22   Q.   Rieger was a state police investigator, right?

23   A.   Yes.
```

1  Q.  You say he was present for the alleged comments

2      about animals and savages, right?

3  A.  Yes.

4  Q.  And by the way, you allege there was one comment

5      where the word animals was used, right?

6  A.  Yes.

7  Q.  And one comment where the word savages was used,

8      right?

9  A.  Two.

10  Q.  Two?  What were the two?

11  A.  Once when he came out of a house when Brent Novak

12      was present, and then the other during --

13  Q.  Wait.  Wait.  Wait.  When he came out of the

14      house and Brent Novak was present, which one is

15      that of these incidents in the complaint?

16  A.  Number nineteen.

17  Q.  Nineteen refers to savages?

18  A.  Nope.  It refers to fucking animals.

19  Q.  Right.  We're talking about savages, sir.  You

20      said it happened more than once.  You said one

21      time is when he came out of a house.  Is it

22      twenty-three?

23  A.  Yes.

362

1   Q.   All right.  And the context of that was,

2        according to you, her brother and a bunch of

3        other savages beat up a retarded kid.

4             Did I read that right?

5   A.   That's correct.

6   Q.   Is that the incident that you're referring to?

7   A.   Yes.

8   Q.   When was the other one where he used savages?

9   A.   I believe that was the only one.

10  Q.   And as far as animals, he used that once, right?

11       Paragraph nineteen of Exhibit 1?

12  A.   Yes.  I see that.

13  Q.   And he came out of a residence and said, quote,

14       and I'm going to read it verbatim, they're

15       fucking animals.  How can they live in that shit,

16       unquote.

17            Right?  That's what you allege?

18  A.   Yes.

19  Q.   And, sir, it's your testimony that because of

20       those two comments, that they're animals, how can

21       they live in that shit, and her brother and a

22       bunch of other savages beat up a retarded kid,

23       it's your testimony that that triggered Deputy

363

```
 1      Novak to refer to you as the black guy?  Is that
 2      your testimony?
 3  A.  Yes.
 4  Q.  And what effect did it have on Investigator
 5      Rieger?  How did that manifest itself that you
 6      believe he lost respect for you?
 7  A.  I'm not sure.
 8  Q.  Are there any other of your colleagues who lost
 9      respect for you because of the alleged actions of
10      Kevin Kendall?
11  A.  Not that I recall.
12  Q.  Would you go to Exhibit 3, please, your
13      transcript.
14  A.  Um-hum.
15  Q.  Exhibit 3 is the transcript of your interview on
16      August 1, 2013 in reference to your internal
17      complaint?
18  A.  Um-hum.
19  Q.  Yes?
20  A.  Yes.
21  Q.  Please go to page seven.  At the bottom of page
22      seven, you were asked about having to recently
23      confront a Deputy United States Marshal in your
```

1   Q.   That was Senior Investigator Kendall's reaction

2       to Novak's actions, right?

3   A.   Yes.

4   Q.   Now, in your view is it offensive to refer to a

5       person of color as a black guy?

6   A.   It would depend on the context.

7   Q.   Okay.  And when would it be appropriate to do

8       that?

9   A.   If you're going to make a distinction between an

10      individual based on race and you didn't know that

11      individual's name, yeah, and if he was black

12      then -- as opposed to white or Asian or whatever

13      the case may be, I think it's appropriate to say,

14      yes, the black man or the black guy.

15   Q.   And the references that -- when Deputy Novak

16      would refer to you as the black guy, weren't

17      those instances in the field where you were

18      dealing with members of the community and he was

19      referring to you, and these members of the

20      community would not know that your name was

21      Lethonia Miller or that you were Investigator

22      Miller; and, therefore, he would refer to you as

23      the black guy or the black investigator?  Isn't

366

1        that what he was doing?

2   A.   No.

3   Q.   What was he doing?

4   A.   He was reminding me that I was African-American.

5   Q.   But it was in reference -- he was referring to

6        you as the -- whether it was the black guy or the

7        black investigator or the black person, using the

8        word black as a descriptor, it was in identifying

9        you for other members of the community, wasn't

10       it?

11  A.   Well, why didn't he say the black officer.  Or if

12       we go into a restaurant, is it necessary to say,

13       well, we're waiting on another guy, the black

14       guy.  Or, even to prompt a civilian to start

15       using the N word because he says, do you know

16       this black guy?

17  Q.   So was it the -- it wasn't the use of the word

18       black, it was the use of the word guy that

19       offended you in conjunction with black?

20  A.   No.  Just the context.

21  Q.   Okay.  But if he had said black officer, it would

22       have been okay with you?

23  A.   It would have been okay.

369

1    Q.   Okay.  Now, let's go back, if we can, to Exhibit 1.

2         On page seven.  Exhibit 1 you had in front of

3         you.  It's the amended complaint.  And please go

4         to page seven of Exhibit 1.  Paragraph sixty-six.

5         The complaint alleges in paragraph sixty-six

6         that, you consistently received performance

7         reviews which state you meet the employer's

8         expectations.

9              Right?

10   A.   Yes.

11   Q.   And who was it that prepared those performance

12        reviews?

13   A.   Kendall.

14   Q.   You never had any complaint with his reviews of

15        your performance, correct?

16   A.   Only after I filed the internal complaint, I

17        objected to him doing my performance evaluations.

18   Q.   Well, okay.  But the evaluations that he

19        completed where he evaluated your behavior, you

20        had no objection with those, did you?

21   A.   No.

22   Q.   And just to clarify the use of the N word.  In

23        your testimony in Exhibit 3 to the state police,

370

1    on page six, up at the top, you testified -- and

2    it's regarding the use of the N word.  And you

3    said on the second line and continuing, you can't

4    do it.  And just -- you know, I don't care what

5    context.  Not unless it, paren, inaudible, close

6    paren, to like an investigation and you're being,

7    paren, inaudible, close paren, or, you know, a

8    witness says something to identify some -- I can

9    understand that.  But, you know, as casual, you

10   know, uh, talk, no.  It, it is just -- uh,

11   doesn't work so --

12       I know that's a little choppy, but did I

13   read it correctly?

14   A.   Yes.

15   Q.   All right.  And is it correct from that statement

16   by you that you agree that if the N word is being

17   used in the context of an investigation to report

18   on a statement by a witness or a subject where

19   the word was used, you would view that as being

20   appropriate?

21   A.   Depending on the investigation.  If it's a hate

22   crime or if the witness states it and it becomes

23   a matter of record, yes, I think it's

371

```
 1        appropriate.
 2   Q.   Okay.  Well, when you say if it becomes a matter
 3        of record -- if as part of your task force
 4        activities, one of the members of the task force
 5        had contact with a witness, and the witness used
 6        the N word, and that investigator or deputy comes
 7        back to the group to report on what that witness
 8        said, and reporting on what that witness said
 9        verbatim uses the N word, would that be in your
10        eyes appropriate or inappropriate?
11   A.   Once again, it would depend on the context.  If
12        it was an official briefing --
13   Q.   I'm talking about out in the field.  This isn't
14        an official briefing.  You're out in the field.
15        You're trying to locate someone.
16   A.   Um-hum.
17   Q.   And let's say that Brendan Kiefer talks to
18        someone, and that witness uses the N word to
19        describe what that person knows about the
20        whereabouts of this subject, and he comes back to
21        the group, and you're part of that group, and is
22        repeating verbatim what that witness said about
23        the whereabouts of this subject and it includes
```

373

1    Q.   Okay.  Something you plug into a computer to hold
2         electronic information?
3    A.   Yes.
4    Q.   Looks like the size of a thumb?
5    A.   Yes.
6    Q.   Why they call it a thumb drive I think.
7    A.   (Indicating yes.)
8    Q.   Depending on the size of your thumb.
9    A.   Yes.
10   Q.   Okay.  And you had a concern about that and went
11        to Investigator June Bradley?
12   A.   Yes.
13   Q.   Okay.  Tell us about that, please.  And when I
14        say tell us about it, what was your concern?
15   A.   At the beginning of the internal investigation,
16        Captain Reilly had assured me that there was
17        going to be a forensic examination of Kendall's
18        hard drive on his computer.  And to date, I don't
19        know if it was conducted, but I was worried that
20        maybe that the jump drives were being used to
21        hide information or erase information that might
22        have been relevant to my case.
23   Q.   Okay.  And so you complained to -- or, brought

1   Q.   And then it says, uh, after we took a look at,

2        you know, the jump drives, the contents of the

3        jump drives, and, uh, he was, uh, backing up, uh,

4        I guess his, uh, hard drive, you know, with a lot

5        of, uh -- well, everything that was on his, uh,

6        hard drive I guess so --

7             Right?

8   A.   Yes.

9   Q.   Okay.  When you make reference there to we took a

10       look at the jump drives, the contents, who is the

11       we?

12  A.   I don't recall.

13  Q.   Well, we would include you, right?

14  A.   Yes.

15  Q.   So you looked at these hard drives that you saw

16       in Senior Investigator Kendall's computer?

17  A.   I must have.

18  Q.   Okay.  And did anybody know -- you say we.  Who

19       did that with you?

20  A.   I don't recall.

21  Q.   Did anybody from the state police know that you

22       were looking at the contents of the computer of a

23       fellow investigator?

376

1    A.   No.

2    Q.   You did this on your own?

3    A.   Yes.

4    Q.   Without permission?

5    A.   Yes.

6    Q.   And what did you find on the jump drive that you

7         looked at without authorization?

8    A.   Apparently he was backing up his hard drive.

9    Q.   Totally innocent activity, right?

10   A.   Yes.

11   Q.   Personal information on the computer, right?

12   A.   I don't remember everything that was on his hard

13        drive or what he was backing up.

14   Q.   Well, do you remember seeing photographs and that

15        type of thing, of his family?

16   A.   I don't recall.

17   Q.   Your looking at his jump drive without permission

18        represents another violation of state police

19        procedures, doesn't it?

20   A.   None that I'm aware of.

21   Q.   There is no restriction in the state police with

22        one investigator examining the contents of the

23        computer of another investigator?

1       that state police property or was that Kevin

2       Kendall's personal property?

3   A.  I don't recall.

4   Q.  If it was his personal property, you agree you

5       shouldn't have done it?

6   A.  I don't know if it was.

7   Q.  If it was, sir, do you agree you had no business

8       looking at it?  Or do you think that's okay too?

9       You tell us.

10  A.  I'm not sure.

11  MR. PERSONIUS:  Would you mark that, please.

12

13          (Whereupon, a Packet of four Color

14      Photocopies of Photographs was then received and

15      marked as Exhibit 11, for identification.)

16

17  BY MR. PERSONIUS:

18  Q.  Mr. Miller, I've showed you what we've marked as

19      Exhibit 11, which is a set of four photographs,

20      correct?

21  A.  Yes.

22  Q.  The first photograph was taken by you?

23  A.  Yes.

379

1   Q.   When?

2   A.   After the internal complaint was lodged.

3   Q.   By you?

4   A.   Yes.

5   Q.   How much after?

6   A.   Shortly thereafter.

7   Q.   Within days?

8   A.   I'm not sure about the time span.

9   Q.   And the picture you took, it depicts what?

10  A.   Kendall's trophy wall.

11  Q.   When you say Kendall's trophy wall, are you

12       referring to Senior Investigator Kendall?

13  A.   Yes.

14  Q.   And when you refer to a trophy wall, what do you

15       mean by that?

16  A.   I guess memorabilia from past arrests --

17  Q.   Okay.

18  A.   -- posted up on the --

19  Q.   Were you offended by that, that he did that?

20  A.   No, I was not offended by it.

21  Q.   All right.  And what you describe as this trophy

22       wall, where it is located?

23  A.   It was behind his desk.  This is actually a

380

```
 1        bookcase with books in it.
 2   Q.   And his desk would be located as you're looking
 3        at the picture?
 4   A.   No.  The desk is in front of the bookcase --
 5   Q.   Okay.
 6   A.   -- but the chair is facing away from the
 7        bookcase.
 8   Q.   Right.  So would the back of the chair face this
 9        bookcase?
10   A.   Yes.
11   Q.   All right.  And what's shown in this photograph
12        are family pictures, right?
13   A.   There are some family pictures.
14   Q.   And copies of news articles, right?
15   A.   Yes.
16   Q.   There's a picture in lower right of a person?
17   A.   Yes.
18   Q.   Looks like a member of the state police.
19   A.   Yes.
20   Q.   Do you know who that is?
21   A.   I believe that's Trooper Longobardo.
22   Q.   Okay.  And did he die in action?
23   A.   Yes.  As a matter of fact, I was in the
```

381

1           ambulance.

2    Q.   All right.  There's a picture on the right side,

3         right in the middle of the page.  It's black and

4         white.  It looks like some kind of a robot or

5         something.

6    A.   RoboCop.

7    Q.   Yes.  And do you know anything about that, where

8         that came from?

9    A.   I actually put that together after we captured --

10   Q.   Lumpkin?

11   A.   Yeah.  Lumpkin.

12   Q.   Yes.  Put it together for Senior Investigator

13        Kendall --

14   A.   Yes.

15   Q.   -- right?  Because he had gone up in a crawl

16        space and found this gentleman hidden up in the

17        attic, right?

18   A.   Yes.

19   Q.   Punched his hand through drywall and grabbed this

20        individual by his body and pulled him through the

21        drywall, right?

22   A.   I don't, I don't know if he punched through it,

23        but he was able to reach through the dilapidated

1   A.   That looks like the World's Largest Disco that

2         they have every so often at the convention

3         center.

4   Q.   All right.  And in your view, are you saying

5         Kevin Kendall, because you believe he's a racist,

6         shouldn't be able to dress up for a disco party?

7   A.   He should be allowed to dress up any way he wants

8         to.  I just said I thought it was ironic that he

9         was wearing like an afro wig when he doesn't like

10        black people.

11   Q.   Now, this person that you just had testified

12        doesn't like black people -- your sister passed

13        away in 2008, did she not?

14   A.   Yes.

15   Q.   And left behind a niece who was in her senior

16        year of high school?

17   A.   Yes.

18   Q.   And you had an interest in being with your niece

19        for the remainder of her high school year?

20   A.   Yes.

21   Q.   A period of about six or seven months?

22   A.   Yes.

23   Q.   And you went to Senior Investigator Kendall and

1      told him about that, right?

2  A.  Yes.

3  Q.  And he assisted you in getting temporarily

4      assigned to the Rochester office of the task

5      force so you could be with your niece?

6  A.  Yes.

7  Q.  This person that you describe as someone who

8      doesn't like -- clearly doesn't like black

9      people.  There was a point in time when you were

10     thinking about transferring to the Seneca Niagara

11     Casino, correct?

12 A.  On occasion, yes.

13 Q.  Well, you put in a request to be transferred, did

14     you not?

15 A.  Yes, I did.

16 Q.  And you talked to Kevin Kendall about it, did you

17     not?

18 A.  I did.

19 Q.  And your purpose in doing that was you wanted to

20     run a hot dog stand, right?

21 A.  Well, that's what I told him.

22 Q.  That wasn't the real reason?

23 A.  No.

394

1    Q.   And if I understand your testimony, you don't
2         recall why you rescinded the request.
3    A.   No.
4    Q.   Do you remember in or around January of 2012 that
5         your official vehicle was involved in an
6         accident?
7    A.   2012?
8    Q.   Yes.  Property damage accident to your official
9         assigned vehicle.
10   A.   Was that the van or the Ford Taurus?
11   Q.   Why?  Did you have accidents with both of them?
12   A.   No.  Those are the two vehicles I had when I was
13        assigned to the VFW.
14   Q.   Do you remember having an accident with your
15        service vehicle?
16   A.   I remember there was a vehicle accident.  The
17        vehicle was actually parked on the street.  It
18        might have been in the winter.  And someone
19        sideswiped it.  But I can't remember which
20        vehicle it was.
21   Q.   Well, do you remember you had damage, sir, to
22        your service vehicle that you had not reported to
23        your superiors, and Senior Investigator Kendall

395

1    took the vehicle to his home and repaired the

2    vehicle for you at no cost?  Do you remember that

3    happening?

4  A.  No, I don't recall that.

5  Q.  You're saying it didn't happen, sir?

6  A.  I'm saying I don't recall it.

7  Q.  Okay.  Again, when you say you don't recall, are

8    you saying that Senior Investigator Kendall did

9    not repair your service vehicle, or are you

10    saying he may have, but you just don't remember

11    it now?

12  A.  He may have, but I don't remember it.

13  Q.  That wouldn't stand out with you, sir, if you had

14    an accident with a service vehicle and your

15    colleague repaired it?  You wouldn't remember

16    that?

17  A.  No.

18  Q.  Now, there was an issue that you've recounted

19    where there were two Lees working on the task

20    force?

21  A.  Yes.

22  Q.  Okay.  Lee Eckenrode and Lee Miller?

23  A.  Yes.

396

```
 1   Q.   And somebody decided it would be a good idea to
 2        refer to you as black Lee and Lee Eckenrode as
 3        white Lee?
 4   A.   Yes.
 5   Q.   And you found that offensive, right?
 6   A.   When it was first said, I broached the subject,
 7        and I tried to change the perception of everybody
 8        in the task force.  And I said, well, instead of
 9        calling us, you know, black Lee and white Lee,
10        you can call him young Lee and I'll be old Lee.
11        That's what I remember from that.
12   Q.   Yes.  You were offended by being referred to as
13        black Lee, right?
14   A.   If I had agreed to saying, okay, it's okay to say
15        black Lee and white Lee, then that would have
16        given them license to say -- well, to use black
17        Lee in a negative connotation.
18   Q.   I'm going to ask my question for a third time,
19        just so we have a record.
20   A.   Okay.
21   Q.   You were offended by being referred to as black
22        Lee, were you not?
23   A.   Yes.
```

397

1   Q.  All right.  And you went to Senior Investigator
2       Kendall and you complained about it, didn't you?
3   A.  No.
4   Q.  And didn't he then go to the task force, all the
5       other members, and say, look it, Lee is
6       uncomfortable with this, stop it, and it stopped?
7       Didn't that happen?
8   A.  I don't know what he said to the other members of
9       the task force.  I know what I said to them
10      regarding black Lee and --
11  Q.  Is it your testimony you didn't have a discussion
12      with Senior Investigator Kendall about your
13      objection to being referred to as black Lee?  Is
14      that your testimony?
15  A.  Yes.
16  Q.  It didn't happen?
17  A.  Yes.
18  Q.  Did you being referred to as black Lee eventually
19      stop?
20  A.  Yes.
21  Q.  And what was the reason that it stopped?
22  A.  You would have to ask the task force members why
23      they stopped.

398

1   Q.  Do you know what the reason was?

2   A.  No.

3   Q.  And do you know whether or not it was because of

4       Senior Investigator Kendall?

5   A.  I don't know.

6   Q.  You don't know either way?

7   A.  No.

8   Q.  And with Brent Novak, you had complaints about

9       him too, right?

10  A.  Yes.

11  Q.  Okay.  We talked about him referring to you as

12      the black guy, right?

13  A.  Yes.

14  Q.  And he also had on occasion the habit of singing

15      a song called Black Betty?  Something like that.

16      Right?

17  A.  Nope.

18  Q.  No?

19  A.  No.

20  Q.  So you never had a complaint with Brent Novak

21      singing Black Betty by Bamaram (sic)?

22  A.  I explained to Kendall that the other Niagara

23      County task force officer had a habit of doing it.

399

1    Q.   Who?

2    A.   Joseph Shanley.

3    Q.   So it wasn't Brent Novak?

4    A.   No.

5    Q.   And when you talked to Senior Investigator

6         Kendall about it, what did he say?

7    A.   Actually, I don't recall what he said.

8    Q.   And do you remember there was also an instance

9         with Deputy Novak where you were out on a detail

10        and couldn't find the suspect, and that Deputy

11        Novak said, if we don't find somebody soon, we're

12        going to have to cuff up Lee?  Do you remember

13        that?

14   A.   Yes.

15   Q.   And what was your response to that?

16   A.   Actually, I don't recall.

17   Q.   You don't recall that you then talked about

18        having intimate relations with Novak's daughter?

19   A.   Novak has a daughter?  I didn't know.

20   Q.   I'll ask the question again.

21   A.   Okay.

22   Q.   Do you recall in response that you made reference

23        to having intimate relations with Deputy Novak's

403

1  Q.  Just to finish this, your belief is the person

2      who provided those photographs to you was Don

3      Rieger and not Kevin Kendall?

4  A.  Yes.

5  Q.  Okay.  Now, Kevin Kendall received an award from

6      the Bar Association.  Do you remember that?

7  A.  Yes.

8  Q.  And he was the officer of the year, law

9      enforcement officer of the year.  Do you remember

10     that?

11 A.  Yes.

12 MR. PERSONIUS:  Mark that, please.

13

14         (Whereupon, a Photocopy of a Photograph was

15     then received and marked as Exhibit 14, for

16     identification.)

17

18 BY MR. PERSONIUS:

19 Q.  And this happened in April of 2011?

20 A.  Yes.

21 Q.  All right.  There's a Law Day Luncheon put on by

22     the Erie County Bar Association?

23 A.  Yes.

404

1   Q.  And that's when Senior Investigator Kendall got

2       the award?

3   A.  Yes.

4   Q.  All right.  And his colleagues attended the

5       luncheon?

6   A.  Yes.

7   Q.  And the reason they did it was to support him?

8   A.  Yes.

9   Q.  All right.  One of those people that attended it

10      was you?

11   A.  Yes.

12   Q.  I'm showing you what's marked as Exhibit 14.  The

13      third person from the right is you, right?

14   A.  Yes.

15   Q.  And you are directly next to Kevin Kendall --

16   A.  Yes.

17   Q.  -- right?  And you didn't have to go to this

18      luncheon, did you?

19   A.  No.

20   Q.  You went voluntarily?

21   A.  Yes.

22   Q.  And do you remember what the purpose of the award

23      was?

405

1   A.   Vaguely, fairness to minorities, minority

2        arrestees, or something like that.

3   Q.   Did you find that a little bit ironic that this

4        person you claim is a known racist was getting

5        this award?

6   A.   Yes.

7   Q.   But you still went and supported him?

8   A.   In a unit where I had to get along, I got along.

9   Q.   You went to the luncheon and supported him, true?

10  A.   I went, yes.

11  Q.   And after the luncheon was over -- you had taken

12       a video of the entire presentation, right?

13  A.   Yes.

14  Q.   And after it was over, you posted that on

15       YouTube, did you not?

16  A.   Yes.

17  Q.   Nobody made you do that?

18  A.   No.

19  Q.   And this was the person you say is a known racist

20       and you videoed the award presentation and posted

21       it on YouTube for the public to see, right?

22  A.   Yes.

23  Q.   Did you find that a bit ironic?  Kind of like the

406

1       photograph of Senior Investigator Kendall with

2       the wig on?

3   A.  I found it ingratiating.  I was trying to win the

4       favor of --

5   Q.  Oh, okay.  That was your reason for doing it?

6   A.  Yeah.

7   Q.  Okay.  Were there other times when you worked

8       with Senior Investigator Kendall where you did

9       things to ingratiate yourself to him?

10  A.  Well, the picture of the RoboCop.  But beyond

11      that, I can't recall.

12  Q.  And in Exhibit 14 do you recognize other people

13      in the photo?

14  A.  Yes, I do.

15  Q.  All right.  Please, starting at the left, tell us

16      which ones you recognize and identify who they

17      are.

18  A.  For the life of me, I, I don't remember the

19      names, but they were investigators on the job who

20      retired.

21  Q.  And as you sit here now, you can't remember their

22      names?

23  A.  I know this guy is John (indicating).

1   Q.   You're pointing to the second person --

2   A.   Second from the left.

3   Q.   -- from the left?

4   A.   Yeah.  Real raspy voice.  The third person I

5        don't recognize.  To my right, that's Bill

6        Cooley, and on the very end is Rich Qualey.

7   Q.   I think I misspoke earlier and I apologize.  I

8        referred to you making a reference to dating the

9        daughter of another investigator, and I was

10       mistaken.

11            Do you recall that there was an incident

12       with an investigator named Migliore where he had

13       made a comment about a Caucasian woman who had a

14       romantic relationship with an arrested

15       African-American drug dealer?

16  A.   Um-hum.

17  Q.   Do you remember that?

18  A.   I do.

19  Q.   All right.  And you found that to be offensive?

20       He was questioning the appropriateness of the

21       Caucasian woman being with the African-American

22       drug dealer, right?

23  A.   Yes.

1  Q.  And you were offended by that, right?

2  A.  The overall context was in Cheektowaga, there was

3      another female investigator, Tina Sheer.  We were

4      working the scene at a detail.  And I don't know

5      who brought the subject up, but there was a young

6      lady who in Niagara Falls was burned badly when a

7      flash-bang grenade was thrown through a window

8      and landed on a couch where she was sitting or

9      laying down.  And Migliore and Tina Sheer pretty

10     much stated that they were disgusted that she

11     would even be with a guy like that.  And being

12     the only African-American in the room, I asked

13     the question, well, is it because, you know, he's

14     a drug dealer or because he's black?  And

15     Migliore mentioned that it was both.

16         And I said, well, you know, it's not a crime

17     or it shouldn't be illegal for two people of

18     different races to actually, you know, be

19     together.  Or it shouldn't be looked at as being

20     a negative.  And he said something about his

21     daughter, and I said, well, what if your daughter

22     came home with, you know, someone black like me,

23     would you be offended?  And he took it -- I don't

409

1          know where he got the notion that I said I was

2          going to take his daughter and have sex with her.

3          I did not say that.  I merely stated, well, what

4          if your daughter came home with someone who was

5          black like me?

6     Q.   But he -- his recollection was that you talked

7          about having intimate relations with his

8          daughter, right?

9     A.   Yes.

10    Q.   Did you ever have a discussion with him about

11         that?

12    A.   I think he ran to -- when I was at CNET, he ran

13         to the supervisor of CNET and complained that --

14         I don't know what he really complained about, but

15         he stated that I was saying or doing something

16         wrong to him based on the exchange we had at

17         Cheektowaga.  And I didn't say anything negative.

18         I just proposed, you know, an opposite view.  And

19         I never said I was going to screw his daughter.

20         And I was berated by four supervisors who said

21         that, Lee, you need to take it easy on these guys

22         because they can't handle the dozens.  And, you

23         know, I just stopped, looked at all of them and

410

```
 1        shook my head.  And, you know, here's a grown man
 2        going to the bosses complaining that he was
 3        offended because I was playing the dozens.  I
 4        don't know if my opposite view was playing the
 5        dozens, but that's the way he imparted it to his
 6        supervisors of CNET.
 7   Q.   If Migliore genuinely believed that you had
 8        talked to him about having intimate relations
 9        with his daughter, don't you agree it would have
10        been entirely appropriate for him to go to his
11        superiors about that?
12   A.   If it happened.
13   Q.   Well, right.  Right.  You'd find that very
14        offensive, wouldn't you?
15   A.   If someone said something about my niece in that
16        manner, yeah, I would find that offensive.
17   Q.   You can understand that, right?
18   A.   Yes.
19   Q.   All right.  So these four supervisors that you
20        say berated you, who were they?
21   A.   Senior Investigator Kelly, Senior Investigator
22        Michael Davis.  Wow.  The other two, the names
23        escape me but --
```

419

1        Kendall where he used the word nappy?

2    A.   I don't recall.

3    Q.   Okay.  I've got one other thing I'll cover

4         quickly.  Have you seen the censure that was

5         issued to Senior Investigator Kendall?

6    A.   I think I have.

7    Q.   I'm going to mark it.

8

9            (Whereupon, a one-page New York State Police

10        Letter dated March 14, 2014 was then received and

11        marked as Exhibit 15, for identification.)

12

13   BY MR. PERSONIUS:

14   Q.   Showing you what's marked as Exhibit 15.  Exhibit

15        15 is a letter from the state police dated March

16        14, 2014 directed to Senior Investigator Kendall

17        with a caption, letter of censure, correct?

18   A.   Yes.

19   Q.   All right.  And take a look at it.  And my

20        question is, have you seen it before?

21   A.   Yes.

22   Q.   You have seen it?

23   A.   Yes.

420

1    Q.  And so you're aware of what the basis was for the
2        censure, right?
3    A.  Yes.
4    Q.  And when did you first see this letter?
5    A.  Maybe a week ago.
6    Q.  You had never seen this letter until a week ago?
7    A.  That's correct.
8    Q.  Had you ever asked or sought to get a copy of the
9        Kendall letter of censure?
10   A.  When I was still gainfully employed by the state
11       police, I did request a copy of the investigative
12       report, which would have -- I'm assuming it would
13       have been part of it, but I never received it.
14       My attorney and I, we tried to figure out
15       logistically how --
16   Q.  Okay.  You don't need to talk about your lawyer.
17       I don't need to know that.  Let me ask a
18       question.  In the second paragraph of Exhibit 15,
19       it states, in the future, when you using such
20       inflammatory language --
21           And by the way, that's a reference to the N
22       word, right?
23   A.  Yes.

421

1    Q.   Okay.  Even when appropriate given the

2         circumstances, please be more careful that such

3         language is not attributed to an actual person

4         without clear documented permission from that

5         person to use such language.

6              Did I read that correctly?

7    A.   You did.

8    Q.   All right.  And so that clearly states what the

9         basis for the censure was, correct?

10   A.   According to the state police, yes.

11   Q.   Okay.  And it doesn't have anything to do with

12        you, does it?

13   A.   My name is not mentioned, no.

14

15             (Whereupon, a one-page Document entitled

16        Passwords & Website Address, with attachment, was

17        then received and marked as Exhibit 16, for

18        identification.)

19

20   BY MR. PERSONIUS:

21   Q.   Mr. Miller, I've given you Exhibit 16.

22   A.   Yes.

23   Q.   And the first page at the top says, passwords and

424

1      research into -- on our intranet, that's when I

2      found out the information for the protocols for

3      using like an undercover IP address.  That's

4      where I learned that there was only one laptop in

5      Batavia that was masked with that kind of IP

6      address.

7  Q.  Do you know if Senior Investigator Kendall was

8      ever sanctioned for using the -- other than

9      what's in the censure, was ever sanctioned for

10     creating the undercover Facebook page?

11 A.  I do not know.

12 MR. PERSONIUS:  Let's do one more exhibit.

13

14          (Whereupon, a New York State Police

15     Memorandum dated October 22, 2013 was then

16     received and marked as Exhibit 17, for

17     identification.)

18

19 BY MR. PERSONIUS:

20 Q.  Showing you now, Mr. Miller, what's marked as

21     Exhibit 17.  Do you recognize that document?

22 A.  Yes, I do.

23 Q.  Tell us what it is, please.

425

1   A.   This is a memo that I composed at the request of

2        the IAB captain, Kevin Reilly.  I was bothered by

3        the fact that I didn't know who the young lady

4        was, and I was concerned that she might be hurt

5        if she was local.

6   Q.   When you say the young lady, the young lady that

7        was referenced in the Facebook post?

8   A.   That he used as the avatar for his Facebook post.

9        So during searching for this young lady, I did

10       Web searches and found out that the individual in

11       the photograph was actually on a boat in

12       Cleveland, Ohio -- or, in the Ohio area.  And I

13       narrowed it down to the -- whatever the name of

14       the boat was.

15  Q.   All right.  And this memo was a summary of all

16       this work that you did?

17  A.   Yeah.

18  Q.   And how long did it take you to do all this work?

19  A.   Couple days, I guess.

20  Q.   All right.  And you say you did it at the request

21       of Captain Reilly?

22  A.   Yes.

23  Q.   All right.  When did he ask you to do this?

426

1   A.   After I advised Senior Investigator June Bradley

2        that I think the young lady is named, you know,

3        Angela Triplett.  After finding out that it was

4        an Ohio address and remembering Kendall's case

5        involving Tobias Boyland, I remembered that Ohio

6        was one of the locations that he had one of his

7        collection agencies.

8   Q.   And what you're doing now is just explaining

9        what's in the memo.  It's all in the memo.

10  A.   Yes.

11  Q.   And we're trying to cut this off if we can.

12  A.   Okay.

13  Q.   But your testimony is the reason you did this was

14       because Captain Reilly told you to.  And I think

15       my question had been, when did he ask you to do

16       this?

17  A.   Before October 22nd, 2013.

18  Q.   But what was the context?

19  A.   When he -- I wasn't asked directly by Captain

20       Reilly.  I was --

21  Q.   I thought that's what you said.  I thought you

22       said that Captain Reilly asked you to do this --

23       or, instructed you to do it.  You didn't say

431

```
 1        just let me know.  I just ask that you don't do
 2        that while a question is pending.  So if I ask
 3        you a question, answer it and then tell me you
 4        want to take a break.  Okay?
 5   A.   Yes.
 6   Q.   Great.  And you'll be happy to know that Mr.
 7        Personius is extremely thorough, and he's
 8        eliminated a lot of the questions I was going to
 9        ask.  So I'm not going to try to ask the same
10        questions he does.  Because of that, however, I
11        might have to bounce around a little, because I
12        don't have to go through the whole chronology.
13        If you understand that.
14   A.   Yes.
15   Q.   Great.  Sir, have you ever been known by any
16        other name than Lethonia Miller or Lee Miller?
17   A.   No.
18   Q.   And you currently still own the Floss Road
19        address, correct?
20   A.   Floss Ave.?
21   Q.   Floss Ave.  Yes.
22   A.   Yes.
23   Q.   I'm sorry.  I used the -- okay.  Can you tell me,
```

1      did there come a time between 2014 and today when

2      you started changing your mailing to your Georgia

3      address?

4   A.  Yes.

5   Q.  And when was that?

6   A.  I believe a couple months ago.

7   Q.  Okay.  And, currently, is all your mail being

8      sent to your Georgia address?

9   A.  Yes.

10  Q.  And the home that you live in in Georgia -- I

11     wrote down the address somewhere.  But, who lives

12     in that home?

13  A.  My mother.

14  Q.  Anyone else?

15  A.  No.

16  Q.  And does she -- is the title to that home -- it's

17     a town house?

18  A.  Yes.

19  Q.  Is the title to that town house in her name or

20     yours?

21  A.  I believe it's in her name.  Or, it should be in

22     both our names.  I believe it's in her name.

23  Q.  Okay.  Is there any kind of arrangement -- legal

1      been in the military?

2   A.   No.

3   Q.   And the Floss address, the home on Floss, is that

4        currently occupied by anybody?

5   A.   By me.

6   Q.   Anybody else?

7   A.   No.

8   Q.   Is that a double or a single?

9   A.   Double.

10  Q.   And at any time since you've owned it, have you

11       rented it out?

12  A.   I have on occasion, yes.

13  Q.   Okay.  And would that have been while you were

14       living there?

15  A.   Yes.

16  Q.   And where do you -- is it an upper and lower?

17  A.   Yes.

18  Q.   And are you upper or lower?

19  A.   Lower.

20  Q.   Have you always been lower?

21  A.   Yes.

22  Q.   Okay.  So from time to time you've rented the

23       upper?

447

1    Q.   Okay.  And so the VFW was a state police unit?

2    A.   Yes.

3    Q.   Okay.  However, it interacts with the United

4         States Marshals Task Force?

5    A.   Yes.

6    Q.   Is that the full name, United States Marshals

7         Task Force?  Or is there another --

8    A.   I don't remember what the name was.

9    Q.   Okay.  But when you refer to the task force,

10        yesterday and today and going forward, you always

11        meant the United States Marshals Task Force,

12        correct?

13   A.   Yes.

14   Q.   And the purpose of that task force is to search

15        for and find fugitives?

16   A.   Yes.

17   Q.   People who have warrants for their arrest?

18   A.   Yes.

19   Q.   Okay.  From time to time, did members of the

20        state police VFW operate independently of the

21        task force, or was every day a task force day?

22   A.   Every day was primarily a task force day, unless

23        there were like prisoner relays throughout the

448

```
 1        troops.  Like if someone had to be in court in
 2        Erie County, but the guy was caught down in
 3        Suffolk County, he would be relayed by the VFW
 4        squads in the adjacent troops up to A Troop.
 5   Q.   And by relay, as I understand it, you drive --
 6        you basically kind of -- you drive to a certain
 7        point, you're met by one car.  They drive to a
 8        certain point.  In such a way that nobody has to
 9        drive the three hundred and fifty miles or more
10        down to Suffolk County.  Correct?
11   A.   Yes.
12   Q.   You break it up into shorter travel?
13   A.   Yes.
14   Q.   Okay.  And the marshals task force includes not
15        only state police agency -- the state police VFW,
16        but also other state-level law enforcement
17        agencies?
18   A.   I think in this area the task force tried to get
19        like a Division of Parole investigator assigned
20        to the task force, but it was some kind of
21        logistical, political thing that didn't allow it.
22   Q.   I'm sorry.  I may have asked that poorly.  When I
23        say state, I mean as opposed to federal.  So, for
```

450

1      contingent, correct?

2   A.  Yes.

3   Q.  First of all, the marshals task force, do you

4       know what the regional reach of that local task

5       force is?

6   A.  I believe they call it the Western District.

7   Q.  Okay.

8   A.  But I don't know what it encompasses.

9   Q.  So you don't know if that's the Federal Western

10      District or some other Western -- strike that.

11      You don't know if that's the actual Federal

12      Western District of New York or some other

13      nomenclature?

14  A.  Correct.

15  Q.  Okay.  Let me ask you this.  Was the Niagara

16      County contingent specifically limited to Niagara

17      County?

18  A.  No.

19  Q.  Did it from time to time go into Erie County?

20  A.  Yes.

21  Q.  And the Buffalo contingent, was it -- it

22      obviously wasn't limited to the City of Buffalo;

23      is that correct?

451

1    A.   Correct.

2    Q.   Did it extend -- would they from time to time go

3         into Niagara County?

4    A.   Yes.

5    Q.   Would both contingents from time to time go into

6         the other counties of Western New York; Genesee,

7         Wyoming, Chautauqua, Cattaraugus, Allegany -- I

8         know I'm missing one -- Orleans?

9    A.   Yes.

10   Q.   Okay.  And were there only -- in this area, in

11        the western area, were there only the two

12        contingents, Buffalo and Niagara County?

13   A.   Yes.

14   Q.   Okay.  And were you always in the Niagara County

15        contingent during your time in the VFW?

16   A.   No.

17   Q.   Okay.  Was that because the contingencies didn't

18        exist or because you were transferred at some

19        point from one to the other?

20   A.   I think at one point I was, for lack of a better

21        word, transferred to the Niagara County

22        contingent.

23   Q.   Okay.

457

```
 1       ground like a discarded envelope or whatever,
 2       they would, you know, take that and put that in
 3       there, or they would write on the actual folder
 4       itself.
 5   Q.  And prior to locating and arresting a fugitive,
 6       were you expected at any time to reduce the
 7       activities of the day to a written report?
 8   A.  Only if the individual was apprehended.
 9   Q.  Okay.  So if you're looking for John Smith, and
10       you go to a house you thought he was going to be
11       there and he's not there, but his sister and his
12       mother are, and you talk to one and somebody else
13       talks to the other, you might make some notes and
14       put it in that folder; is that correct?
15   A.  Yes.
16   Q.  Especially if they gave you something interesting
17       like go -- this is where his girlfriend lives or
18       that sort of thing?
19   A.  Yes.
20   Q.  But that would never, then, be put into any kind
21       of central database until the guy was arrested?
22   A.  That's correct.
23   Q.  Okay.  And I'm assuming that from time to time
```

458

```
 1        the people you interviewed would use the N word

 2        while talking to you.  Is that correct?

 3   A.   That's correct.

 4   Q.   And is it your understanding that people who

 5        would be interviewed -- witnesses and other

 6        people who might have some knowledge would be

 7        interviewed by your co-workers and those

 8        witnesses would also use the N word?

 9   A.   That's correct.

10   Q.   Okay.  Do you remember ever correcting a witness

11        for the use of that terminology?

12   A.   Yes.

13   Q.   Do you remember any specific instance of that?

14   A.   Not specifically, no.

15   Q.   And assuming that the person who used it was

16        African-American, what would you say to that

17        person?

18   A.   I would just caution that person about their

19        language.

20   Q.   Okay.  Wouldn't that require -- well, strike

21        that.  So would you do that every time that a

22        witness would use the N word in your presence?

23   A.   Yes.
```

459

1   Q.   Did you ever correct a fugitive for using the N

2        word in your presence?

3   A.   Yes.

4   Q.   Okay.  Did you do that more than once?

5   A.   Yes.

6   Q.   Do you recall any specific instances of doing

7        that?

8   A.   No.

9   Q.   Sir, while you were working with Senior

10       Investigator Kendall, did you consider him a good

11       cop?

12  A.   Yes.

13  Q.   While you were working with Senior Investigator

14       Kendall -- well, first, let me ask you this.  You

15       were assigned to the Clarence substation,

16       correct?

17  A.   Yes.

18  Q.   I assume at the time he was Investigator Kendall?

19  A.   Yes.

20  Q.   Was he assigned there when you got there?

21  A.   That, I can't recall.

22  Q.   Okay.  Do you recall who left first?

23  A.   That, I don't recall.

460

1   Q.  And I know there was some discussion of this, but

2       I'm just going to ask it to be clear.  Did

3       Investigator Kendall ever use the N word while

4       the two of you were assigned to the Clarence

5       substation?

6   A.  Just during a conversation we had about the N

7       word --

8   Q.  Okay.

9   A.  -- and its use.

10  Q.  And was that the conversation when he was asking

11      about when it was appropriate for a white person

12      to use that word?

13  A.  Yes.

14  Q.  Okay.  But you never heard it any other time that

15      you recall while you were at Clarence out of

16      Kendall's mouth; is that correct?

17  A.  That's correct.

18  Q.  Okay.  Did he do anything else, again, while he

19      was assigned to SP Clarence with you, that you

20      would consider of a racist nature?

21  A.  No.

22  Q.  While you were at the VFW, did Senior

23      Investigator Kendall ever give you a bad

1      performance appraisal?

2   A.  No.

3   Q.  Sir, I'm going to ask you to a take a look at

4      Exhibit 1.  And look at page two, paragraph

5      sixteen.  Are you there?

6   A.  Yes.

7   Q.  Okay.  And this is the reference to an August,

8      2010, situation where Investigator Kendall

9      referred to victims of a shooting incident, all

10     of whom were African-Americans, as animals, after

11     he read those victims had police records,

12     correct?

13  A.  Correct.

14  Q.  And just for clarification, is that what's known

15     as the City Grill shooting?

16  A.  Yes.

17  Q.  Okay.  And that was an establishment right here

18     downtown?  If you recall.

19  A.  Yes.

20  Q.  Okay.  Why is that racist?

21  A.  It was my experience that some bigots actually

22     refer to people -- minorities as animals.  It's

23     basically denoting that they were subhuman.

462

```
 1   Q.   Absolutely.  I can understand that.  But, my
 2        question is, why is it that you feel that that
 3        was an example of Kendall using racist
 4        terminology in that particular context?
 5   A.   Well, the people who had been, you know, shot
 6        during that City Grill incident, they had police
 7        records.  Does it make them bad people?  That
 8        could be debated.  But animals I don't think was
 9        appropriate.
10   Q.   Have you ever dealt with a suspect whose actions
11        you felt merited the label animal?
12   A.   I've called suspects crazy, but I never called
13        suspects animals.
14   Q.   Would you say it's unusual in the law enforcement
15        community for officers to label people who are
16        involved in extreme acts of violence as animals?
17   A.   I think it's inappropriate.
18   Q.   Okay.  But does that make it racist?
19   A.   Well, when the majority of the people they are
20        referring to as animals are African-American,
21        yes, I think it is racist.
22   Q.   Had the victims in the City Grill shooting been
23        white and a black officer had made the comment,
```

463

```
 1       would you have thought that that was racist?
 2  A.   I would have thought that was inappropriate.
 3  Q.   Would you have thought it was racist?
 4  A.   Yes.
 5  Q.   Okay.  And I'm going to ask you to take a look at
 6       paragraph eighteen of the same exhibit, Exhibit
 7       number 1.  And that deals with a July 27th, 2012
 8       incident where Senior Investigator -- actually,
 9       I'm going to skip that one.
10            Actually, I'm going to refer you to Exhibit
11       19 -- I'm sorry.  Exhibit 1, paragraph nineteen.
12       It states, in the summer of that year -- and I
13       assume that's referring back to paragraph
14       eighteen, 2012 -- while working in the course of
15       their employment, Kendall, Plaintiff, and others
16       were conducting a search of a home that was
17       occupied by African-Americans.  Kendall emerged
18       from the residence and stated, they're fucking
19       animals.  How can they live in that shit?
20            Did I read that correctly?
21  A.   That's correct.
22  Q.   And did you go inside the house in question?
23  A.   No.  I was outside on the perimeter.
```

464

1   Q.   Okay.  Did anyone describe to you the condition

2        of the house inside?

3   A.   I don't recall.

4   Q.   Okay.  Have you ever been in a situation where

5        you've entered a house as part of your job that

6        was in such a deplorable condition where you felt

7        that it was only fit for animals?

8   A.   No.  I've been in houses that were deplorable.

9   Q.   I can only imagine.

10  A.   But I felt sorry for the individuals who lived in

11       those conditions.  But I never referred to them

12       as animals.

13  Q.   Have you been in houses that you felt were not

14       fit for human habitation?

15  A.   Oh, yeah.

16  Q.   Okay.  And I'm going to ask you to refer to

17       paragraph twenty-three of Exhibit 1.  January

18       14th, 2013.  And I'm reading from the exhibit.

19       Kendall and Plaintiff were working in the course

20       of their employment.  Kendall states to an

21       African-American witness that her brother and a

22       bunch of other savages beat up a retarded kid.

23            Is it necessarily racist to assert that an

465

```
 1      individual who gang assaults a developmentally
 2      disabled individual is a savage?
 3   A. I think when the term is used primarily more for
 4      like minorities, I think it is racist.
 5   Q. Okay.  But this is the one instance that you've
 6      quoted of him using the term savage; is that
 7      correct?
 8   A. That's correct.
 9   Q. And would you disagree with me that a gang
10      assault on a developmentally disabled individual
11      is an act of savagery?  Because it sounds pretty
12      savage to me.
13   A. It's criminal.  It's violent.
14   Q. But it's not savage?
15   A. I've never heard any officer refer to it as
16      savagery.  I've heard them refer to the people
17      involved, mostly minorities, as savages.  Yeah,
18      it is a violent act.
19   Q. But would you disagree with me if I told you that
20      I thought -- well, strike that.  Would you
21      disagree with me if I labeled it an act of
22      savagery?
23   A. No.
```

466

1    Q.   And in paragraphs twenty-six and twenty-seven of

2         Exhibit 1, you discuss the -- Senior Investigator

3         Kelly showing you a video called, Sweet Brown's

4         Cold Pop Escape?

5    A.   Yes.

6    Q.   Okay.  I actually Googled that and I've seen the

7         video.  And I take it you've seen it all the way

8         through?

9    A.   I don't know if I've seen the entire video, but I

10        have seen the video.

11   Q.   Okay.  And the woman in that is black, correct?

12   A.   She is.

13   Q.   Okay.  And I say the woman.  As far as I know,

14        there's only one person who's actually depicted

15        in the video.  Is that your recollection?

16   A.   Yes.

17   Q.   And I believe it was a tape from a news broadcast

18        from some area.  Is that correct?  Is that your

19        recollection?

20   A.   That is correct.

21   Q.   Okay.  What is it about that particular video

22        that you feel is racist?

23   A.   I don't feel the video itself is racist, but the

467

```
 1        mocking of the individual after the fact -- and
 2        it became something of a viral hit with this -- I
 3        forgot, I forgot what she was saying.
 4   Q.   Ain't nobody got time for that?
 5   A.   Yes.  That phrase became, you know, kind of like
 6        a viral sensation.
 7   Q.   Can I point out that even as you said that, you
 8        had a smile on your face?
 9   A.   Well --
10   Q.   Did you find that -- I mean, do you see why
11        people might find that at all amusing for
12        non-racist reasons?
13   A.   I find it interesting that it went viral.
14   Q.   But can you see why people might for non-racist
15        reasons just find that amusing?
16   A.   Yes.
17   Q.   Okay.  Sir, I think you were asked this, but I
18        want to confirm.  You did not keep a diary from
19        the period of 2010 through the period of 2014,
20        correct?
21   A.   Correct.
22   Q.   Did you keep any kind of personal log or notes as
23        to any of the things that are listed in Exhibit 1,
```

474

```
 1        of paragraphs, the idea of putting in incident

 2        and then location and then context, that sort of

 3        thing?

 4    A.  Yes.

 5    Q.  And then at some later date you entered in the

 6        information?

 7    A.  I believe so.

 8    Q.  So it was at that later date that you entered in

 9        the information that you still had in your head

10        from going through the case books and the files

11        without making any contemporaneous notes?

12    A.  Well, I had my own laptop, my personal laptop.

13    Q.  Sure.  Well, let me ask you this, then.  Is what

14        you're saying is that you went from the case book

15        then to the file then to the laptop?

16    A.  Yes.

17    Q.  Okay.  So you weren't keeping it all in your

18        head; you were just doing it individually?

19    A.  Correct.

20    Q.  Okay.  Sir, Exhibit 2.  You have the original in

21        front of you.  Was this the first time you had

22        ever complained to anyone at the state police

23        about the -- your perceived -- strike that.  Was
```

475

1       Exhibit 2 the first time you ever complained to

2       anyone at the state police about what you

3       perceived as Senior Investigator Kendall's racist

4       behavior?

5   A.  Yes.

6   Q.  Now, you had been aware, had you not, that you

7       could have made a complaint to human resources

8       earlier, prior to July 15th of 2013, correct?

9   A.  In connection with?

10  Q.  Any kind of complaint of racism.

11  A.  Yes.

12  Q.  Okay.  Sir, with regard to the Facebook page that

13      Trooper Kendall put together --

14  MR. PERSONIUS:  Investigator Kendall.

15  MR. ZIMMERMANN:  Sorry.

16  MR. PERSONIUS:  Senior Investigator.

17  BY MR. ZIMMERMANN:

18  Q.  Senior Investigator Kendall.  The use of the N

19      word.  Is it your assertion that under no

20      circumstances would it be appropriate for

21      somebody using a fake -- strike that.  Is it your

22      assertion that under no circumstances would it be

23      proper for a law enforcement officer to use the N

476

```
 1       word on Facebook -- on a fake Facebook page as

 2       part of an investigation?

 3    A.  I don't think it's inappropriate for like an

 4       undercover operation to use the common vernacular

 5       that some of the targets use.

 6    Q.  Isn't that the best way to fit in with the

 7       targets, to use their common vernacular?

 8    A.  That is correct.

 9    Q.  Okay.  Sir, I'm just going to ask you with regard

10       to Exhibit 3 -- if you could take a look at that.

11       You can feel free to go through it, but I don't

12       think you have to.  Can we agree that you

13       initialed the bottom right-hand corner of every

14       page on this transcript, aside from your

15       addendum?

16    A.  Yes.

17    Q.  And that was your indication that, again, aside

18       from the addendum, you felt that it was true and

19       accurate, correct?

20    A.  Yes.

21    Q.  Okay.  That's all the questions I have to do with

22       that.  And, you know, I told you I was going do

23       skip around.  That's what I'm doing.
```

477

```
 1        With regard to Investigator Gardner -- and
 2     it was investigator, correct, not senior
 3     investigator?
 4  A.  Yes.
 5  Q.  Okay.  Did you know him before he joined the VFW?
 6  A.  I don't think I did.
 7  Q.  Okay.  I need you to take a look at Exhibit 8.
 8     Now, I'm going to ask you to look at the
 9     twenty-third page, which the easiest way to look
10     for it is just the letter of June 16th that she
11     wrote to the division.
12  A.  Okay.
13  Q.  And this is the letter dated June 16th, 2004
14     written by Dr. Mirza, correct?
15  MR. PERSONIUS:  2014?
16  MR. ZIMMERMANN:  2014.  What did I say?
17  MR. PERSONIUS:  '4.
18  BY MR. ZIMMERMANN:
19  Q.  '4.  June 16th, 2014 by Dr. Mirza, correct?
20  A.  Yes.
21  Q.  And this was written days after you had an
22     encounter with Senior Investigator Kendall and
23     Lieutenant Ratajczak?
```

478

```
 1   A.  Ratajczak.
 2   Q.  Ratajczak.  Okay.  And did you ask her to write
 3       this letter?
 4   A.  No.
 5   Q.  Tell me about how this letter ended up being
 6       written.
 7   A.  I guess based on --
 8   Q.  Well, don't guess.  Tell me what your
 9       recollection is.
10   A.  I went in to see Dr. Mirza.  I explained to her
11       how upset I was and what had happened, and she
12       said that she would write a letter explaining
13       that I should have some time off.
14   Q.  And the second sentence of this letter says in
15       reference to you, he has been experiencing an
16       increase in symptoms of depression, experiencing
17       high levels of work related stress, and he is
18       unable to work from June 16th, 2014 through June
19       30th, 2014.
20           Correct?
21   A.  Correct.
22   Q.  Is that a true -- strike that.  On June 16th,
23       2014, was that a true statement?
```

479

1   A.  Yes.

2   Q.  And you were unable to work for those two weeks?

3   A.  Yes.

4   Q.  Okay.  What symptoms were you suffering at that

5       point?

6   A.  Depression, sleep loss, anxiety.  I was angry.

7   Q.  Were you having violent thoughts?

8   A.  Just about smashing Kendall in the face.

9   Q.  All right.  And how long did that situation last,

10      you being unable to work because of the

11      depression and the work related stress?

12  A.  Would you repeat the question?

13  Q.  How long did the situation last that you were

14      unable to work due to symptoms of depression and

15      high levels of work related stress?

16  A.  I don't think I'll ever know because I was put on

17      involuntary leave on June 17th by the New York

18      State Police.

19  Q.  Why was that involuntary?

20  A.  I don't know.  You would have to refer to their

21      documents.

22  Q.  Well, I guess what I mean is that you asked for

23      this time off and you got time off.  Correct?

480

1    A.   I asked for two weeks.

2    Q.   Okay.

3    A.   They ended my career.

4    Q.   But that wasn't the initial -- they didn't fire

5         you on the day that they received this letter,

6         correct?  They put you on leave, correct?

7    A.   Involuntary leave is akin to like a suspension

8         without pay.

9    Q.   If they had granted you two weeks off --

10   A.   Yes.

11   Q.   -- you would have had to use your accruals,

12        correct?

13   A.   Yes.

14   Q.   Vacation, sick time, whatever, correct?

15   A.   Yes.

16   Q.   And on involuntary leave, you had to use your

17        accruals, correct?  Vacation, sick time,

18        whatever?

19   A.   Yes.

20   Q.   Okay.  Did there come a time when Dr. Mirza told

21        you you were able to return to work?

22   A.   Not that I can recall.

23   Q.   Who did you give this letter to?

481

1   A.   Lieutenant Reyes.

2   Q.   And do you remember when?

3   A.   On the 16th.

4   Q.   Where was he when you gave him the letter?

5   A.   To the best of my recollection, the letter was

6        e-mailed to Lieutenant Reyes on the state police

7        intranet.

8   Q.   Is that an internal communication system?

9   A.   Yes.

10  Q.   And you e-mailed it to him?

11  A.   Yes.

12  Q.   Did you make any formal requests under the

13       Americans with Disabilities Act for an

14       accommodation?

15  A.   No.

16  Q.   Aside from the symptoms of depression and high

17       levels of work related stress, were you unable to

18       work for any other reason?

19  A.   No.

20  Q.   With regard to Deputy Superintendent Christensen,

21       it is your understanding he made the decision to

22       put you on involuntary leave?

23  A.   To the best of my recollection, yes.

482

1    Q.   Okay.  Was that wrong on his part?

2    A.   I believe so.

3    Q.   And why do you believe that?

4    A.   Because I asked for two weeks off, but I ended up

5         ending my career.

6    Q.   Let me ask you this.  When Deputy Superintendent

7         Christensen received Dr. McIntyre's report that

8         said that you were suicidal and that implied --

9         or, actually stated that you would take others

10        with you if you committed suicide, including

11        Senior Investigator Kendall, do you think he made

12        the wrong decision not to return your gun?

13   A.   I can work without a gun.

14   Q.   Okay.  How would you work without a gun?

15   A.   In the office, administrative paperwork, doing

16        reports.

17   Q.   Okay.  But your main job is running down bad

18        guys, right?

19   A.   That was one of my jobs, yes.

20   Q.   I mean, as the Violent Felony Warrant Squad,

21        right?

22   A.   Yes.

23   Q.   Okay.  And did you ever request to come back

483

1       without your gun?

2   A.  No.

3   Q.  Do you believe that Superintendent Christensen's

4       decision initially to put you on involuntary

5       leave was retaliatory?

6   A.  Yes.

7   Q.  In retaliation for what?

8   A.  For filing the internal investigation memo.

9   Q.  Do you have any reason to believe that he was

10      aware that you filed -- by the way, you're

11      referring to Exhibit 2?

12  A.  The -- yes.

13  Q.  Okay.  Do you have any reason to believe that he

14      had any knowledge that you had filed Exhibit

15      number 2?

16  A.  I'm not sure.

17  Q.  Are you aware of any evidence that indicates that

18      he was aware that you had filed Exhibit number 2?

19  A.  In his position, he should have known.

20  Q.  Are you aware of any evidence that shows that

21      Superintendent -- Deputy Superintendent

22      Christensen was aware that you filed Exhibit

23      number 2?

484

1   A.  No.

2   Q.  Are you aware of any evidence that he knew of

3       your complaints at all?

4   A.  No.

5   Q.  Do you feel that his decision following the

6       hearing to maintain you on involuntary leave was

7       retaliatory?

8   A.  Yes.

9   Q.  Again, do you have -- well, again, in retaliation

10      for what?

11  A.  Filing the internal investigation memo.

12  Q.  Okay.  Exhibit number 2, correct?

13  A.  Exhibit number 2.

14  Q.  Okay.  Do you have any -- do you feel that Deputy

15      Superintendent Christensen's decision was based

16      on your race?

17  A.  No.

18  Q.  Okay.  Do you feel Dr. McIntyre was biased

19      against you in any way?

20  A.  Yes.

21  Q.  In what way?

22  A.  His explanation of the stressors in my life were

23      inaccurate.  I think he exacerbated or

494

1   A.  Yes.

2   Q.  Okay.  And then let's see.  That was the fifth

3       page.  Sixth, seventh -- eighth.  I'll ask you to

4       turn to the eighth page.  That's the one with

5       the -- there's check marks.  Did you make those

6       checks, sir?

7   A.  Yes.

8   Q.  Okay.  And the other handwritten portions are all

9       yours?

10  A.  Yes.

11  Q.  That's all I have on that.  And, sir, you

12      referred to a Myron Brown who was on the DEA task

13      force.  Do you recall that?

14  A.  Yes.

15  Q.  Was he a state police official or DEA or some

16      other agency?

17  A.  State police senior investigator.

18  Q.  Okay.  And, sir, I want to talk to you about the

19      application that you made for outside employment

20      while you were on involuntary leave.  You said it

21      was a Delta affiliate; is that correct?

22  A.  Yes.

23  Q.  Okay.  Do you remember the name?

495

1    A.  DGS.  I don't know --

2    Q.  DGS?

3    A.  Yes.  DGS.  I don't know what it stands for.

4    Q.  And, first of all, how did you find out about

5        that job?

6    A.  I had a relative that was actually working for

7        DGS.

8    Q.  And who is that individual?  What is that

9        individual's name?

10   A.  Jalen Clark.

11   Q.  Can you spell that for the record?

12   A.  First name is spelled J as in John, A-L, E as in

13       Edward, N as in Nancy.  Clark.  C as in Charles,

14       L as in Lincoln, A as in Adam, R as in Robert, K

15       as in king.

16   Q.  And what did he do for DGS?

17   A.  He worked in baggage claim.

18   Q.  And what did he tell you?  How did it come up

19       that he told you there was a position open at

20       DGS?

21   A.  He didn't say there was a position opened.  I

22       took it upon myself to go and apply for a

23       position.

496

1   Q.   Did you apply for any particular position?  Did

2        you apply for any particular position?

3   A.   The baggage claim.

4   Q.   And did you feel that the denial of that

5        application by the New York State Police for

6        outside employment was retaliatory?

7   A.   Yes.

8   Q.   In retaliation for what?

9   A.   Submitting the internal investigation memo.

10  Q.   And I believe Lieutenant Ratajczak was the first

11       individual who was asked to approve or disapprove

12       of that.  Is that your understanding?

13  A.   Yes.

14  Q.   And you had, you had known Lieutenant Ratajczak,

15       correct?

16  A.   Known in what sense?

17  Q.   Well, you had met him?

18  A.   Yes.

19  Q.   How many times?

20  A.   Once.

21  Q.   Okay.  And when was that?

22  A.   When he accompanied Kendall at the VFW office.

23  Q.   Okay.  And we've gone through that.  You talked

497

1      about that with Mr. Personius for a long time,

2      correct?

3   A.  Yes.

4   Q.  Okay.  And did you have any reason to believe

5      that he was biased against you?

6   A.  No.

7   Q.  Okay.  Do you think his decision was based on

8      your race?

9   A.  No.

10  Q.  Do you know Major Michael Cerretto,

11     C-E-R-R-E-T-T-O.

12  A.  Cerretto?

13  Q.  Cerretto?

14  A.  Yes.

15  Q.  Okay.  How many times have you met him?

16  A.  We actually came on in the same Brockport

17     academy.

18  Q.  Oh, okay.  Did you maintain friendly relations?

19     Cordial relations?

20  A.  As far as I know.

21  Q.  Okay.  Do you have any reason to believe he was

22     biased against you?

23  A.  No.

498

1  Q.  Or that his decision was race based?

2  A.  No.

3  Q.  And, again, this is the decision with regard to

4      denying you outside employment -- or,

5      recommending that you be denied outside

6      employment.  Do you understand that?

7  A.  Correct.

8  Q.  Okay.  And how about, at the time, First Deputy

9      Superintendent Kevin Gagan, had you ever met him?

10 A.  Not to my knowledge.

11 Q.  And he was the final individual to pass on your

12     application for outside employment.  Is that your

13     understanding?

14 A.  Yes.

15 Q.  Do you have any reason to believe that he was

16     biased against you?

17 A.  No.

18 Q.  Do you have any reason to believe that his

19     decision was race based?

20 A.  No.

21 MR. ZIMMERMANN:  Sir, I'm going to show you what's --

22     actually, I should have had these marked earlier.

23        Can you mark that.

500

1       that you signed it?

2   A.  Yes.

3   Q.  And to your knowledge is it true and accurate

4       today?

5   A.  Yes.

6   Q.  Okay.  That's all I have about that.  And, sir,

7       in terms of your damages, is it your claim that

8       you were denied overtime assignments due to your

9       race?

10  A.  No.

11  Q.  Is it your claim that you were denied overtime

12      assignments due to retaliation?

13  A.  Yes.

14  Q.  And retaliation for what?

15  A.  For telling Kendall to refrain from using

16      derogatory terms.

17  Q.  Okay.  And how often did this occur?

18  A.  I don't have an exact number.

19  Q.  Do you have a dollar amount?

20  A.  No.

21  Q.  Who was it who was denying you the overtime?

22  A.  Senior Investigator Kendall.

23  Q.  And why do you feel -- well, first of all, you

501

```
 1        were -- you continued to get overtime, correct?
 2   A.   I did.
 3   Q.   Okay.  And it's your allegation you didn't get
 4        sufficient overtime; is that correct?
 5   A.   Well, in 2009-2010, I made less overtime than I
 6        was entitled to.
 7   Q.   You saw the sheets yesterday.  And I can get them
 8        out.  But, there were other members that got less
 9        than max overtime, correct?
10   A.   That's correct.
11   Q.   Okay.  Was overtime supposed to be handed out on
12        a seniority basis?
13   A.   At that point there was an allotment for each
14        task force member.
15   Q.   Okay.  But in terms of when a particular overtime
16        opportunity arose, was it supposed to be offered
17        first to the senior officer and then down the
18        line?
19   A.   As per state police, yes.
20   Q.   Okay.  And do you know where you were on that
21        seniority level in 2009-2010?
22   A.   I was the most junior.
23   Q.   And why do you feel that the perceived lack of
```

502

1      overtime was a result of retaliation on the part

2      of Senior Investigator Kendall?

3   A.  Because of me asking him to refrain from using

4      the derogatory terms.

5   Q.  Anything else?

6   A.  No.

7   Q.  Sir, in the recordings you used the expression,

8      main out.  At least that's how I heard it.  Does

9      that expression sound familiar to you?

10  A.  Main out?

11  Q.  Yes.

12  A.  Main out.  No, it doesn't sound familiar.

13  Q.  Okay.  Sir, when did you retire?

14  A.  August, 2016.

15  Q.  Okay.  And was that a disability pension or just

16     a regular retirement?

17  A.  Regular retirement.

18  Q.  And how much are you getting for your pension on

19     a yearly basis?

20  A.  I don't know exactly.

21  Q.  Do you get a check?

22  A.  I do.  I receive from the retirement system.

23  Q.  And how often do you get the check?

503

1    A.   Monthly.

2    Q.   And how much is in that check?

3    A.   Roughly six thousand maybe.

4    Q.   And how many years did you have with the state

5         police when you retired?

6    A.   Twenty-eight years.

7    Q.   And had you had any other state time, aside from

8         the state police?

9    A.   No.

10   Q.   And as I understand it, state -- or, well, strike

11        that.  Local police officers, as I understand it,

12        have a twenty-and-out situation where they can

13        retire after twenty years.  Is it the same thing

14        through the state police?

15   A.   Yes.

16   Q.   So you had stayed on another eight years after

17        you could have retired, correct?

18   A.   Yes.

19   Q.   Okay.  And how long were you planning on staying

20        with the state police until you retired?

21   A.   Until I was forced out by mandatory age

22        requirements.

23   Q.   Which would be what?

504

1   A.   Sixty-two, I believe.

2   Q.   Okay.  And how many years would you have had when

3        you were sixty-two?

4   A.   Let's see.  I believe twelve years.

5   Q.   Twelve more years?

6   A.   Yes.

7   Q.   Okay.  So you were expecting to have worked a

8        full forty years?

9   A.   No.  Just -- well, I think my math is right but --

10       so that would have been forty years?

11  Q.   Let's do it this way.  What year were you born?

12  A.   1965.

13  Q.   Okay.  And you joined in '88?

14  A.   '87.

15  Q.   '87.  Okay.  So forty would have been a hundred

16       and twenty-seven.  Okay.  Sixty-two.  Okay.  And,

17       sir, are you aware that your attorney has turned

18       over your federal tax information?

19  A.   Yes.

20  Q.   Okay.  And did you have a look at those

21       documents?

22  A.   Briefly.

23  Q.   Okay.  My reading of those documents indicated

Exhibit "B"

VOLUME I                                KEVIN KENDALL

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------

LETHONIA MILLER,

                    Plaintiff,

       -vs-

NEW YORK STATE POLICE,
KEVIN KENDALL, and
FRANCIS P. CHRISTENSEN,

                    Defendants.

--------------------------------------------------

                    Examination Before Trial of

KEVIN KENDALL, Defendant, taken pursuant to the Federal

Rules of Civil Procedure, in the law offices of PERSONIUS

MELBER, LLC, 2100 Main Place Tower, 350 Main Street,

Buffalo, New York, taken on August 16, 2017, commencing at

10:12 A.M., before VALERIE A. ROSATI, Notary Public.

2

1                          INDEX TO EXHIBITS

2

3

4    Exhibits                                    For Identification

5    19        Member Target - Non-Custodial            4
               Interrogation dated September 23,
6              2013

7    20        two-page Document entitled               4
               Enclosure #12, Marshals/VFW
8              Overtime 2010-2011

9    21        Defendant Kendall's Answer to            4
               Amended Complaint [Doc. No. 46]
10             dated November 15, 2016

11   22        Defendant Kendall's Response             4
               and Objections to Plaintiff's
12             First Set of Interrogatories
               dated January 6, 2017
13

14

15

16

17

18

19

20

21

22

23

3

1      APPEARANCES:

2      THE LAW OFFICE OF LINDY KORN, PLLC,
       By WILLIAM F. HARPER, V, ESQ., and
3      LINDY KORN, ESQ.,
       535 Washington Street,
4      Electric Tower, 9th Floor,
       Buffalo, New York 14203,
5      Appearing for the Plaintiff.

6      NEW YORK STATE ATTORNEY GENERAL,
       By GEORGE MICHAEL ZIMMERMANN, ESQ.,
7      Assistant Attorney General,
       300A Main Place Tower,
8      350 Main Street,
       Buffalo, New York 14202-3750,
9      Appearing for Defendants
       New York State Police and
10     Francis P. Christensen.

11     PERSONIUS MELBER, LLC,
       By RODNEY O. PERSONIUS, ESQ.,
12     2100 Main Place Tower,
       350 Main Street,
13     Buffalo, New York 14202,
       Appearing for Defendant
14     Kevin Kendall.

15     PRESENT:  Lethonia Miller

16

17

18          (The following stipulations were entered

19     into by all parties.)

20          It is hereby stipulated by and between counsel

21     for the respective parties that the oath of the

22     Referee is waived, that filing and certification

23     of the transcript are waived, and that all

4

1     objections, except as to the form of the

2     questions, are reserved until the time of trial.

3

4          (Whereupon, a Member Target - Non-Custodial

5     Interrogation dated September 23, 2013 was then

6     received and marked as Exhibit 19,

7          a two-page Document entitled Enclosure #12,

8     Marshals/VFW Overtime 2010-2011, was then

9     received and marked as Exhibit 20,

10         Defendant Kendall's Answer to Amended

11    Complaint [Doc. No. 46] dated November 15, 2016

12    was then received and marked as Exhibit 21,

13         and Defendant Kendall's Response and

14    Objections to Plaintiff's First Set of

15    Interrogatories dated January 6, 2017 was then

16    received and marked as Exhibit 22, for

17    identification.)

18

19  MR. PERSONIUS:  Read and sign, please.  Thank you.

20

21

22              K E V I N   K E N D A L L,

23         65 Court Street, Buffalo, New York 14202,

5

```
 1              after being duly called and sworn,

 2                  testified as follows:

 3

 4   EXAMINATION BY MR. HARPER:

 5

 6   Q.  Good morning, Senior Investigator Kendall.

 7   A.  Good morning.

 8   Q.  I'm Bill Harper.  I'll be asking you some

 9       questions today during the deposition.

10   A.  Yes, sir.

11   Q.  You were here for the previous two days of

12       deposition, right, so you're generally familiar

13       with sort of I guess the rules or procedure that

14       the attorneys outlined at the beginning of each

15       deposition?

16   A.  Yes.

17   Q.  Okay.  So I'm not going to go over in great

18       detail, you know, but, basically, I've got to let

19       you finish.  Please let me finish.  If you don't

20       understand what I'm asking you, you know, please

21       say so.  If you can't hear me, you know,

22       sometimes I'm quiet, you know, please let me know

23       that you can't hear me.  Otherwise, I'm going to
```

7

1   Q.   Okay.  SP Jamestown, was that some period of

2        years ago?

3   A.   Yes.

4   Q.   Okay.  So why don't we start with some questions

5        about your employment history.  Are you employed

6        now?

7   A.   Yes.

8   Q.   Okay.  Who are you employed by?

9   A.   The New York State Police.

10  Q.   Okay.  And how long have you been an employee of

11       the New York State Police?

12  A.   Just short of thirty years.

13  Q.   Okay.  And what is your current title?

14  A.   Senior investigator.

15  Q.   How long have you been a senior investigator?

16  A.   Since January 6th of 2000.

17  Q.   Okay.  So approximately seventeen years?

18  A.   Yes.

19  Q.   Okay.  Since you've been a senior investigator,

20       where have you been assigned?

21  A.   First, I was assigned to Zone 3 of Troop A.  At

22       that time, I had a desk at SP Falconer,

23       F-A-L-C-O-N-E-R, and a desk at SP Fredonia.  But,

10

1   Q.   Okay.  After the SP Boston assignment, where were

2        you the supervisor -- or, senior investigator, I

3        should say?

4   A.   At that point I was transferred from SP Boston to

5        the Violent Felony Warrant Squad at Buffalo, New

6        York.

7   Q.   When were you transferred to the Buffalo location

8        for the Violent Felony Warrant Squad?

9   A.   Summer of 2003.

10  Q.   Okay.  And you've been there since 2003 and

11       currently you're there, right?

12  A.   Yes.

13  Q.   Okay.  Can you describe generally your job duties

14       as a senior investigator?

15  A.   In the Violent Felony Warrant Squad, I conduct

16       warrant investigations or fugitive investigations

17       and as well as non-criminal investigations which

18       are mainly limited to trooper applicants.  And

19       there are some other miscellaneous details or

20       duties that occasionally come up.  But, for the

21       most part, it's conducting these investigations

22       on warrant subjects or fugitives as well as

23       supervising the investigators assigned to my

1        squad.

2    Q.  Okay.  Would it be fair to say, sir, then,

3        generally speaking, your job responsibilities are

4        a division between actively participating in the

5        Violent Felony Warrant Squad and apprehending

6        suspects or investigating suspects and

7        administrative duties?

8    A.  Yes.

9    Q.  Okay.  Now, when I asked that question, you

10       specified Violent Felony Warrant Squad.  Is there

11       a difference between the job duties of a senior

12       investigator generally and you as the senior

13       investigator for the Violent Felony Warrant

14       Squad?

15   A.  Yes.

16   Q.  Could you explain that, please?

17   A.  Generally speaking, the duties of a senior

18       investigator in the state police are to conduct

19       investigations and to supervise investigators who

20       are assigned to -- who are their subordinates who

21       are assigned to them.  Because I'm currently in a

22       warrant squad, that's -- my main duties are

23       warrants.  When I was stationed at Zone 3 of

```
 1        disciplinary action or not, but that's part of

 2        it.  And I really think that that's about the

 3        extent of my authority to discipline subordinates

 4        at my level.

 5   Q.   What would you do with a memorandum of counseling

 6        after you create one?

 7   A.   It's delivered to the member who's receiving it.

 8        And typically they initial and date it and it's

 9        put in their personnel file.

10   Q.   And would that be the extent of your interaction

11        with whatever led to the creation of the

12        memorandum?  And that's to say that that could be

13        the end of the disciplinary function for you?

14   A.   Yes.

15   Q.   If something required more discipline than could

16        be addressed by a memorandum, what would you do

17        in that circumstance?

18   A.   Report it to my supervisors.

19   Q.   Okay.  And what supervisors are those?

20   A.   Currently?

21   Q.   Currently.

22   A.   Brian Ratajczak, he's a BCI lieutenant; and

23        Lieutenant Martin McKee, who is the other BCI
```

32

1    A.   I don't know.  It's a box that says submit.

2    Q.   It's through the computer system?

3    A.   Yes.

4    Q.   Okay.  What do you do when you monitor overtime?

5    A.   I have an Excel spreadsheet in which I put down

6         the number of hours worked on that day.  And then

7         on a monthly basis, I look at how much was used

8         and see if that falls within reason on how much

9         is acceptable within the reimbursement program of

10        the U.S. Marshals Service.

11   Q.   What would be the criteria to determine if it

12        fell within reason?

13   A.   Just judgment.

14   Q.   Your judgment?

15   A.   Common -- yeah.  My judgment and the judgment of

16        others.  Common sense, I should say.

17   Q.   Let me ask that in a different way.  Is there a

18        policy that dictates what falls within reason

19        when it comes to someone's overtime usage?  A New

20        York State Police policy, rather.

21   A.   Just common sense.

22   Q.   Is the way that overtime is administered now, was

23        it different at any time previously?

33

1   A.   Yes.

2   Q.   When was that?

3   A.   I assume you're talking while I've been in the

4        Violent Felony Warrant Squad.  Right?

5   Q.   Yes, sir.

6   A.   In the first years, there was no reimbursement

7        program by the United States Marshals Service,

8        and overtime worked was done similar to most

9        other places in the New York State Police in that

10       overtime had to be, shall we say, pre-authorized.

11       It had to be authorized either before it was

12       worked or while it's being worked.  And there was

13       no, for lack of a better term, pre-authorization

14       of the ability to work a certain amount of

15       overtime in a certain time period.

16            Then when the U.S. Marshals reimbursement

17       program began, the old -- I guess you could call

18       it policy, but it's -- it wasn't a codified

19       policy or a -- I don't know of it being a written

20       policy.  It was just a traditional policy of the

21       way things were done.  That continued for the

22       first year in that when overtime was worked, I

23       was notified -- which in reality -- I say

1    pre-authorized or -- it really was more of a

2    notification rather than an authorization.  An

3    investigator would call me and tell me that

4    they're working overtime, and it really went

5    without saying that it was authorized.  I don't

6    know that I ever failed to authorize it.  It was

7    kind of a perfunctory.  Then the first year of

8    the overtime program, that manner continued.

9        And then the second year it changed.  The

10   way the investigators and senior investigators

11   throughout the state were told how much overtime

12   the U.S. Marshals were willing to reimburse the

13   state police on, and then basically told that --

14   I'm starting to say that what was their share,

15   but I don't want it to be misconstrued that each

16   member was entitled to that amount or guaranteed

17   that amount.  That was their equitable share, but

18   it's not -- it's using the term reasonably, not

19   in absolute terms.

20       And then that was further boiled down to say

21   so that means that to make that dollar amount

22   through the course of the fiscal year, you --

23   each investigator would be allowed to work up

35

```
 1        to -- the math was done to determine how many
 2        hours at their pay rate would equal that amount
 3        of money throughout the course of the year,
 4        divided by twelve and that gives an amount per
 5        month or which would translate to a number of
 6        hours per month, and they were expected to stay
 7        reasonably close to that amount.
 8            And that's where I spoke previously in terms
 9        of common sense and judgment.  If they were told
10        you have to -- you can average twelve hours per
11        month, they didn't have to get twelve hours every
12        month.  If -- they could get ten hours one month
13        and fourteen hours another month.  It didn't
14        matter what month it was earned.  At the end of
15        the fiscal year, each investigator knew they
16        would be allowed to work up to so many hours that
17        would result in them making that much money.
18   Q.   So as it concerns the marshals -- the U.S.
19        Marshals reimbursement program, would it be fair
20        to simplify it as the marshals would state there
21        is this amount of funding we can put towards, you
22        know, someone from the Violent Felony Warrant
23        Unit working overtime, and then it was up to --
```

37

1       detectives assigned to these task forces.  That

2       maximum amount applies to all members of -- in

3       fact, I think it applies to all members of all

4       federal task forces.

5  Q.   Okay.  So it would be a maximum dollar amount

6       that's separated by -- well, that's applicable to

7       whoever is on the task force.  So it could be

8       divided up between troopers on the Violent Felony

9       Warrant Unit or other police agencies, right?

10      Those other individuals, if they're a police

11      agency on a task force, would be eligible for the

12      same dollar amount, right?  They're competing for

13      the funds?

14 A.   No.

15 Q.   No?  Could you explain that for me?  I'm sorry.

16 A.   Yes.  You asked what the maximum that the U.S.

17      Marshals would pay, if it's dollars or hours.  I

18      said dollars.

19 Q.   Right.

20 A.   The maximum that the U.S. Marshals will pay --

21      and I think it applies to the DEA, the FBI, ICE.

22      The maximum that they'll pay to a task force

23      officer in this -- which they don't pay it to the

38

1          task force officer.  They reimburse the state for
2          it to be paid to, so I can clarify.
3     Q.   Okay.
4     A.   But, the maximum that they'll reimburse is
5          seventeen thousand seven hundred and some dollars.
6          That's -- I don't know if it's a rule or a law or
7          where they get it, but that's the maximum amount
8          that they'll pay any -- I misspoke again.  They
9          don't pay the individual.  That's the most that
10         they'll reimburse the employer for overtime --
11    Q.   Okay.
12    A.   -- for an individual.
13    Q.   That's whatever employer has an employee that
14         participated in something with the U.S. Marshals,
15         right?  So it doesn't matter if it's a trooper --
16         if the employer is the New York State Police,
17         some other local police agency, you said
18         seventeen grand for each participant, maximum
19         potential, right?
20    A.   Yes.
21    Q.   Okay.  And that's seventeen grand today, right?
22         It was less before?
23    A.   I don't know.

39

1   Q.   Okay.  You said the reimbursement program had a
2        first year when it came about.  When was that
3        first year?
4   A.   I think it was the fiscal year of 2009 to 2010.
5   Q.   Okay.  And during that first year, you said that
6        the -- for lack of a better term, the traditional
7        or previous way that overtime worked was still in
8        effect, right?
9   A.   Yes.
10  Q.   Okay.  And in the second year -- what changed
11       during the second year of the reimbursement
12       policy or plan by the U.S. Marshals?
13  A.   The second year the investigator -- well, the
14       senior investigators and then the investigators,
15       in turn, are -- I don't if it was in turn or at
16       the same time, but the membership of the Violent
17       Felony Warrant Squad was informed of the amount
18       that the U.S. Marshals would reimburse the state
19       police for overtime used by the Violent Felony
20       Warrant Squad across the state.  Previously, I
21       referred to it as an MOU, memorandum of
22       understanding.  Recently, I found out that the
23       correct term is obligation.  The U.S. Marshals

41

1  A.  No.

2  Q.  Okay.  Could you explain that again?  I'm sorry.

3  A.  The U.S. Marshals every year since the 2009-2010

4      fiscal year have provided and signed an

5      obligation, like a written form, an obligation

6      that they will reimburse the New York State

7      Police a certain amount of money for overtime

8      used by the Violent Felony Warrant Squad across

9      the State of New York.  And when I say the U.S.

10     Marshals, it's actually the New York/New Jersey

11     Task Force.  That's -- I believe that's part of

12     the U.S. Marshals, so I've been using that term

13     interchangeably.

14          The U.S. Marshals don't keep track of how

15     much each individual works or earns.  The state

16     police does.  That information is reported to the

17     U.S. Marshals, but it's -- I think we could call

18     it administered by the state police.

19 Q.  Who administers that?

20 A.  Well, it begins with the member, the

21     investigator, and then his supervisor, senior

22     investigator, and then the administrative senior

23     investigator is most deeply involved.  And then

44

1   BY MR. HARPER:

2   Q.  Distinct from their duties as an investigator?

3   A.  I don't know that I can really answer that.  I

4       would say sometimes.

5   Q.  So what would qualify something for the marshals

6       as overtime?

7   A.  Typically, it's a fugitive investigation or

8       warrant investigation.  That's the normal.

9   Q.  Would it be -- the duty that they performed,

10      would it be based on, you know, you have to work

11      so many hours and this is in excess of those

12      hours?  What would make it overtime?

13  A.  Working in excess of eight hours.

14  Q.  Okay.  On any given day?

15  A.  Or, or any hours on an off day.  A Saturday it

16      would have to be.

17  Q.  Okay.  So would it be fair to say there are other

18      ways to earn overtime, other than performing

19      overtime for the U.S. Marshals?

20  A.  Yes.

21  Q.  For example, like what?

22  A.  Most often it is -- well, it would be duties

23      unrelated to the task force.  So it would be like

45

```
 1        duties that pertained to the state police, but
 2        not to the task force.
 3    Q.  Okay.  And as you describe it, do you administer
 4        or approve any of your subordinates doing
 5        overtime, performing duties that would qualify as
 6        overtime?
 7    MR. PERSONIUS:  Object to the form.
 8    THE WITNESS:   I don't know what you mean.
 9    BY MR. HARPER:
10    Q.  Does somebody need your permission before they
11        can do things that would qualify as overtime?
12    A.  Currently?
13    Q.  Currently.
14    A.  No.
15    Q.  Was it ever different before?
16    A.  Yes.
17    Q.  When was that?
18    A.  Prior to the change in the overtime system that
19        we've been discussing.
20    Q.  The change that occurred fiscal year 2009-2010?
21    A.  Yes.
22    Q.  Okay.  So how was it different before?  They
23        required your permission?
```

46

1   A.   Traditionally, the way it worked was when an

2        investigator worked overtime, he would contact me

3        either before or during or at the conclusion to

4        inform me that he worked overtime.  It was one of

5        those things which I previously stated that he

6        was calling for my authorization, but in reality

7        it was more of a notification.  Then it changed

8        after the first year of the marshals

9        reimbursement program, and each individual was

10       informed of how much, for lack of a better term,

11       their share of the U.S. Marshals reimbursement

12       amount would be, and they were informed how many

13       hours a month they could average to earn that

14       amount.

15  Q.   Did anything else change --

16  A.   So if I could finish -- I'm sorry to interrupt

17       you, but I left an incomplete answer.  So at that

18       point they stopped calling me for advance

19       authorization or stopped calling me when they

20       worked it or at the conclusion.  They were

21       allowed to work that many hours without my prior

22       authorization.  I just monitored it on a monthly

23       basis and would make sure that they are within a

1          reasonable amount of that number of hours that

2          they should be at at that point in the year.

3     Q.   Okay.  And that changed in fiscal year 2010-'11?

4          That's when that -- well, that's when that became

5          effective, right?

6     A.   Yes.

7     Q.   Okay.  And to your knowledge, what date was that

8          effective, if it's fiscal year 2010-2011?

9     A.   I don't have a date.

10    Q.   Okay.  Between -- well, strike that.  Would you

11         have the ability in your -- in the administration

12         of overtime to try to keep everyone more or less

13         equal after the change?

14    A.   I'm sorry.  I missed the beginning.

15    Q.   Let me rephrase that.  Would you have the ability

16         after the change in the overtime system was

17         implemented in fiscal year 2010-2011, to try to

18         keep members earning roughly the same amount --

19         I'm sorry.  Subordinates earning the same amount

20         of overtime?

21    A.   To a certain extent.

22    Q.   How would you do that?

23    A.   When investigators were too far over where they

50

1    Q.    So there's only two, including you and including
2          your subordinate, members of the New York State
3          Police that are in the Violent Felony Warrant
4          Unit?
5    A.    No.   There's others across the state.   It's just
6          in my squad here in Buffalo.
7    Q.    In your squad.   I'm sorry.   There's only two?
8    A.    Yes.
9    Q.    Okay.   Have there been more members of the New
10         York State Police in your Violent Felony Warrant
11         Unit --
12   A.    Yes.
13   Q.    -- prior to this?
14   A.    Yes.
15   Q.    So the number of people that you supervise
16         fluctuates, right?
17   A.    Yes.
18   Q.    Okay.   From the period of 2008 until the present,
19         do you have an idea of how many subordinates that
20         you had?
21   A.    Yes.
22   Q.    How many?
23   A.    Seven.

51

```
 1   Q.   Seven throughout the years?  Not seven at one
 2        time, right?
 3   A.   Right.
 4   Q.   Okay.  Do you know who those seven are?
 5   A.   Yes.
 6   Q.   What are their names?
 7   A.   David Hall, H-A-L-L.  Donald Rieger, R-I-E-G-E-R.
 8        Salomon DeJesus, D-E, capital J, E-S-U-S.
 9        Lethonia Miller.  Joseph Migliore,
10        M-I-G-L-I-O-R-E.  Robert Gardner, G-A-R-D-N-E-R.
11        Darryl O'Shei.  And I forgot one.  Kelly
12        Remington, R-E-M-I-N-G-T-O-N.
13   MR. PERSONIUS:  So does that mean it's eight?
14   THE WITNESS:  Yes.
15   BY MR. HARPER:
16   Q.   And other than Remington, none of your
17        subordinates you just listed had a special duty
18        assignment such as crisis counselor, polygraph
19        operator, accident reconstruction?
20   A.   I don't think so.
21   Q.   Okay.  And Lethonia Miller is African-American,
22        right?
23   A.   Yes.
```

52

```
1   Q.  Okay.  DeJesus is Hispanic?

2   A.  Yes.

3   Q.  Okay.  What about Hall, do you know what Hall's

4       race is?

5   A.  White.

6   Q.  Okay.  Rieger?

7   A.  White.

8   Q.  Migliore?

9   A.  Yep.

10  Q.  Gardner?

11  A.  Yes.

12  Q.  O'Shei?

13  A.  Yes.

14  Q.  Remington?

15  A.  Yes.

16  Q.  Okay.  Now --

17  A.  Can I interject?  I'm sorry.  I forgot other

18      subordinates.  When Investigator James Chase,

19      C-H-A-S-E, retired in the Rochester office, I was

20      assigned to supervise that office as well.  And I

21      supervised the investigators in Rochester for I

22      think about a year.

23  Q.  Okay.  But the individuals you just listed as
```

53

```
 1        subordinates, that was your current assignment,
 2        that's -- I keep saying SP Buffalo, but it's not
 3        SP Buffalo.  But, the one that's located here in
 4        Buffalo, right?
 5   A.   Yes.
 6   Q.   Okay.  Now, going back to your employment
 7        history.  Before you were a senior investigator,
 8        were you an investigator?
 9   A.   Yes.
10   Q.   Okay.  And what was your title before you were an
11        investigator?
12   A.   Sergeant.
13   Q.   Okay.  And before you were a sergeant, what were
14        you?
15   A.   A trooper.
16   Q.   Okay.  And before a trooper -- I mean, was that
17        the first rank in the New York State Police?
18   A.   Yes.
19   Q.   Okay.  Before you became a trooper, did you
20        attend an academy?
21   A.   Yes.
22   Q.   Okay.  When was that?
23   A.   I entered the New York State Police academy on
```

54

1        September 21st of 1987.

2   Q.   Okay.  When did you complete it, do you recall?

3   A.   March of 1988.

4   Q.   Okay.  And then upon completion of the academy,

5        you were a trooper?

6   A.   Well, I, I was a trooper on September 21st.  We

7        commonly call those troopers as recruit troopers,

8        but I think you're still a trooper.

9   Q.   Okay.  What kind of training did you have at the

10       academy, generally?

11  A.   Training in the duties of a trooper.

12  Q.   Okay.  How to perform your job?

13  A.   Yes.

14  Q.   Okay.  And after you became a trooper, were there

15       training requirements that you were subject to in

16       order to advance through different ranks?

17  A.   Yes.

18  Q.   What training requirements did you have to

19       advance from trooper to sergeant?

20  A.   After becoming a sergeant, I went to supervisor

21       school.

22  Q.   Okay.  What did you have to do at supervisor

23       school?

69

1    A.   It's a categorization, exceeds -- I don't know

2         what the top is.  Exceeds standards or

3         outstanding, something to that effect,

4         satisfactory and unsatisfactory.  There's only

5         three categories.  I guess that is a rating.

6    Q.   Okay.  I want to shift away from, you know, your

7         job duties, the hierarchy, chain of command, into

8         questions regarding Investigator Miller.  So did

9         you know -- or, Mr. Miller.  Did you know Mr.

10        Miller before he was your subordinate at the

11        Violent Felony Warrant Unit?

12   A.   Yes.

13   Q.   How did you know him?

14   A.   I worked with him previously.

15   Q.   Okay.  Where did you work with him previously?

16   A.   SP Clarence.

17   Q.   How long did you work with him at SP Clarence?

18   A.   About two years.

19   Q.   Did you work with him on a daily basis?

20   A.   Yes.

21   Q.   Okay.  He was an investigator at that time?

22   A.   Yes.

23   Q.   Were you?

70

1    A.   Yes.

2    Q.   Okay.  After those two years, you didn't work

3         with Investigator Miller until the Violent Felony

4         Warrant Unit?

5    A.   Correct.

6    Q.   Okay.  And when you encountered Miller again at

7         the Violent Felony Warrant Unit, were you the

8         senior investigator at the Violent Felony Warrant

9         Unit?

10   A.   Yes.

11   Q.   And he came on as an investigator, right?

12   A.   Yes.

13   Q.   Okay.  So he was your subordinate when he came to

14        the Violent Felony Warrant Unit?

15   A.   Yes.

16   Q.   Okay.  When was that?  Do you know what year,

17        rather?

18   A.   I think it was 2008.

19   Q.   When you say I think, are you unsure --

20   A.   Yes.

21   Q.   -- about your answer?  So you don't know if it

22        was 2008?

23   A.   No.

74

1    A.   No.

2    Q.   Have you filed an internal complaint about anyone

3         else in the New York State Police?

4    A.   No.

5    Q.   All right.  I want to show you a document that's

6         been marked as Exhibit 19.  Have you seen this

7         document before?

8    A.   Yes.

9    Q.   Can you tell me what it is?

10   A.   This is a transcription of a member target,

11        non-custodial interrogation that was taken from

12        me or of me on September 23rd, 2013.

13   Q.   When did you see this document before?

14   A.   I've seen it -- I've seen maybe not this exact

15        copy, but I've seen the content of this on

16        numerous occasions in the past almost four years.

17   Q.   Okay.  Is this document -- or, this document,

18        rather, is a reflection of the statement you gave

19        pursuant to Miller's complaint?

20   MR. PERSONIUS:  Object to form.

21   BY MR. HARPER:

22   Q.   Well, let me rephrase that.  Is this your

23        statement?

76

1    A.   I don't know.

2    Q.   Who did you provide the signed copy to?

3    A.   Captain Kevin Reilly.

4    Q.   Okay.  Did you provide Captain Reilly with the

5         corrections as well?

6    A.   Yes.

7    Q.   Do you recall the nature of your corrections?

8         Were they big changes or little changes?

9    MR. PERSONIUS:   Form.

10   THE WITNESS:   At the time I suspect that they were

11        big changes to me, but in -- to other people, it

12        would probably be inconsequential.

13   BY MR. HARPER:

14   Q.   Do you recall if your changes significantly

15        changed the content of what your statement was?

16   A.   Yeah.  Yes.

17   Q.   Did they significantly change that content?

18   A.   No.

19   Q.   Have you seen this copy of your unsigned

20        statement before?

21   A.   Yes.

22   Q.   Okay.  And do you recall -- actually, strike

23        that.  When you gave the statement, who was

77

```
 1       taking your statement?
 2   A.  Captain Kevin Reilly --
 3   Q.  Okay.
 4   A.  -- and June -- and Senior Investigator June
 5       Bradley.
 6   Q.  How did they take your statement?
 7   A.  Orally.
 8   Q.  Okay.  How did they record what you were saying?
 9   A.  With a recorder of some sort.
10   Q.  Okay.  Did they take notes?
11   A.  I don't know.  I don't recall.
12   Q.  Okay.  Did you take notes?
13   A.  No.
14   Q.  So you said they recorded it.  Was it an audio
15       recording?
16   A.  Yes.
17   Q.  And after you concluded your statement, did they
18       provide you with a copy of the statement for you
19       to review?
20   A.  Yes.
21   Q.  Okay.  And after you reviewed it, you signed it
22       and sent in your corrections?
23   MR. PERSONIUS:  Form.
```

101

1   A.  So each year is different.  Each member's

2       overtime was different, but certainly there was

3       no, no shortage of overtime.  He wasn't shorted

4       overtime.

5   Q.  When you say he wasn't shorted overtime, are you

6       going by the amount he earned in dollars or the

7       amount of hours?

8   A.  Well, both.  I mean, the hours then correlate to

9       dollars, but dollars are the bottom line.

10  Q.  All right.  And individuals might have different

11      rates based on their hours, correct?

12  A.  Yes.

13  Q.  Okay.  You had a much reduced rate compared to

14      other investigators -- compared to investigators,

15      I should say.  Correct?

16  A.  Yes.

17  Q.  But the investigators' rates could vary between

18      each other?

19  A.  A small amount, yes.

20  Q.  Do you remember what the difference between what

21      Miller earned in 2009-2010 was compared to the

22      other investigators?

23  A.  Yes.

102

1    Q.   What was it?

2    A.   In that year Don Rieger made the most.  He made

3         about fifteen thousand dollars.  And then Mr.

4         Miller made about ten thousand three hundred

5         dollars.  Salomon DeJesus made ten thousand one

6         hundred dollars, and I made just under eight

7         thousand dollars in overtime.

8    Q.   Okay.  Do you recall for the next fiscal year if

9         there was a difference between the investigators'

10        amounts of overtime?

11   A.   Yes.

12   Q.   What were they?

13   A.   The next year was 2010-'11.  Mr. Miller made

14        thirteen thousand one hundred.  Rieger made

15        twelve thousand nine hundred.  Partway through

16        the year -- well, right -- pretty much at the

17        beginning of the year DeJesus retired.  And I

18        made about ten thousand dollars.

19   Q.   Do you recall what it was for the following

20        fiscal year?

21   A.   Yes.

22   Q.   What was it?

23   A.   That year Rieger retired, so he, he was much

103

```
 1        less.  And both Mr. Miller and I drew within a
 2        hundred dollars of each other at ten thousand six
 3        hundred dollars.  Right in there.
 4    Q.  And what fiscal year was that?
 5    A.  That would have been 2011-2012.
 6    Q.  Okay.  Did you have a -- did the printout reflect
 7        any other fiscal years?
 8    A.  Then I did the next year --
 9    Q.  Okay.
10    A.  -- 2012-2013.
11    Q.  Was that the last one included in the printout?
12    A.  Well, I printed them all out individually.
13    Q.  Right.  Well, when you generated the printouts,
14        was that the last year that you surveyed?
15    A.  I don't know if I printed it out.  I know I
16        looked at the following year, but I realized that
17        was the year -- 2014 was the year that he went on
18        sick leave, so I don't know if I printed it out
19        or not.
20    Q.  Okay.
21    A.  But my -- the 2012-'13 year was the last year
22        that I really -- like I calculated the dollars
23        and I found where, there again, he made three
```

```
 1        thousand dollars more than me.  We were the only

 2        two in the unit for that fiscal year.

 3   Q.   Okay.  After you printed out the documents, did

 4        you forward the documents to anybody in the New

 5        York State Police?

 6   A.   No.

 7   Q.   Did you notify anybody about your findings or the

 8        conclusions that you generated after you reviewed

 9        the documentation?

10   A.   Yes.

11   Q.   Who did you notify?

12   A.   My attorney.

13   Q.   Did you notify anybody in the New York State

14        Police?

15   A.   No.

16   Q.   When did you review those documents?

17   A.   Well --

18   MR. PERSONIUS:  You're talking about -- pardon me --

19        for the first time?

20   BY MR. HARPER:

21   Q.   When you generated the printout, yes.

22   A.   Well, I think I, I think I did it twice,

23        actually.  I did it after -- sometime after the
```

127

1   Q.   Okay.  What was the nature of Miller's complaint

2       about Novak?

3   A.   He was singing the song Black Betty.

4   Q.   Novak was?

5   A.   Yeah.  And Miller thought that he was singing it

6       because he was -- because, because of Miller and

7       because of Miller being black.

8   Q.   Okay.  What did you say to Miller when he

9       complained to you about that?

10   A.   Something to the effect that I don't know how he

11       could draw that conclusion that he was singing

12       the song Black Betty and that it had anything to

13       do with him.  I told him I didn't get it.

14   Q.   Okay.  After he complained to you about that, did

15       you do anything other than talk to him about it?

16   A.   No.

17   Q.   Okay.  When was the next complaint that Miller

18       made against Brent Novak?

19   A.   I think that was identified as being June 4th of

20       2013.

21   Q.   What was the nature of that complaint?

22   A.   He called me on the phone and then -- to talk to

23       me about the incident.  And then we spoke -- I

128

1      was at a funeral.  And we spoke in detail about

2      it in the office.  And I don't really remember --

3      I think on the phone I hurried him off and told

4      him that we can talk about it in person.  So I

5      forget what was said on the phone and what was

6      said -- I more accurately remember talking to him

7      in person.

8  Q.  Okay.

9  A.  We were at the state office building, and he told

10     me that they were working and there were -- the

11     different task force members were interviewing

12     people, and Novak was interviewing a person at a

13     house.  And the person was referring to someone

14     living at a house or apartment, and Novak in

15     trying to identify which apartment or house said,

16     you mean where the black guy is coming from?  And

17     he took exception that Novak was identifying him

18     by his color, his race.  And then he went on to

19     say that a dispute ensued between the two of them

20     in which Novak -- he made -- he complained to

21     Novak about that, and Novak and he got in an

22     argument.  And Novak accused him of not doing his

23     share of work and that he was sick of carrying

```
 1        him.  I remember that being said.
 2   Q.   Did this have to do with a witness in a drug
 3        dealer?
 4   A.   I don't know.
 5   Q.   When Novak said where the black guy is coming
 6        from, did he use the term black guy, according to
 7        Miller?
 8   A.   That's the way I remember it.
 9   Q.   Okay.  And Miller's complaint, then, was
10        generally what you just described, right?
11   A.   Yes.  He should have -- he wanted him -- he told
12        me that he told Brent that from now on he's to
13        refer to him by name, not by his race.
14   Q.   He needs to refer to who?
15   A.   Miller.
16   Q.   So was Novak's alleged statement about the black
17        guy about Lee Miller?
18   A.   Yes.
19   Q.   Okay.  Lee Miller was the black guy that Brent
20        Novak was speaking of, allegedly?
21   A.   I couldn't hear you.
22   Q.   Lee Miller was allegedly the black guy that Novak
23        was speaking of?
```

131

1     to Novak's supervisor that it would have

2     repercussions on Miller?

3  A.  For making the complaint?

4  Q.  Well, for even just speaking to Novak's

5     supervisor about it, if you did that.

6  A.  I'm not following your question.

7  Q.  Okay.  That's fine.  Did you end up doing

8     anything after Miller came to you with this

9     complaint about Novak?

10  MR. PERSONIUS:  Object to the form.

11  THE WITNESS:  I didn't do anything.  I don't -- I'm

12     not sure what you mean.

13  BY MR. HARPER:

14  Q.  Well, after you had the conversation with Miller

15     about his complaint, did you take any action

16     based on Miller's complaint, other than that

17     conversation with Miller?

18  A.  No.

19  Q.  Did you offer your opinion on Miller's complaint

20     during that conversation?

21  MR. ZIMMERMANN:  Form.

22  MR. PERSONIUS:  Form.

23  THE WITNESS:  I, I think I tried to talk to him and

132

1    said I didn't know that a comment like that by

2    Novak -- I didn't know if it was racially

3    motivated or not.  I told him that it's hard --

4    in a case like that, to me, it wasn't very

5    clear-cut.  I remember in my statement here I

6    even said to him -- it refreshes my memory that I

7    said to him that it may be a matter of I had --

8    he and I are different -- coming from different

9    backgrounds and experiences, I have a different

10   perspective.  And I created some confusion in my

11   statement because I, I used the -- I remember

12   using the words that day saying, look, Lee,

13   you've been black even longer than me.  So, I

14   don't know exactly what it's like; you know

15   better than me.

16        So we did discuss that for a while.  You

17   know, what people -- what someone says may not be

18   meant to be offensive, but it may be offensive to

19   a person.  In fact, I remember citing an example.

20   Just before that, my son was chastised in school

21   because he was referring to a set of people as

22   American Indians.  He was calling them American

23   Indians instead of Native Americans.  And I said

1      it certainly -- my son meant no offense to these

2      people.  In fact, they call themselves the Seneca

3      Nation of Indians.  But, this teacher told him it

4      was appropriate to use the word Native Americans

5      and that sometimes people may say things that

6      aren't meant to be offensive.

7  BY MR. HARPER:

8  Q.  Do you recall saying to Miller that, we all say

9      things and it's open to different interpretations?

10     Something like that?

11  A.  I think that's just what I just said.

12  Q.  Okay.  And that a lot of it depends on the

13     context of what's said?  Do you remember saying

14     that?

15  A.  I think that's consistent.  I don't know if I

16     used that word but --

17  Q.  You mention that you said to him, you said to

18     Miller that you've been black longer than me.

19     Was that you trying to lighten the mood?

20  A.  Yes.

21  Q.  You were making a joke?

22  A.  Well, I was trying to make a point but also

23     trying to make an uncomfortable conversation

1    Q.   How did you respond to that?

2    A.   Kind of, again, rolled my eyes and said, well, I

3         don't know about that Novak, he's -- I don't know

4         if I said a jerk or an asshole or something to

5         that effect.

6    Q.   Okay.  Did you give Lee your opinion about

7         whether or not that was racially motivated?

8    A.   No.

9    Q.   Okay.  Did you say anything else, other than

10        about Novak?

11   A.   No.

12   Q.   Did Lee respond with anything else after you said

13        that?

14   A.   Yeah.  He went on a little bit, laughing, and

15        saying that he was happy that he was able to

16        respond to Novak, and everybody laughed and he

17        felt like he got the best of him in that verbal

18        exchange.

19   Q.   Okay.  After he complained about that, was there

20        anything else that Miller did or you did

21        regarding that?

22   A.   No.

23   Q.   I think the next complaint that you said was that

144

```
 1        Miller made a complaint about Rash treating him
 2        unfairly because of race.  Is that right?
 3   A.   Yes.
 4   Q.   What was that?  I'm sorry.  What was the nature
 5        of that complaint?
 6   A.   That was so long ago, I really don't remember --
 7        I don't know that it was a specific instance.  He
 8        and I worked together in like 2000 -- no.  I'm
 9        sorry.  1994 and '5, '96.  And Todd Rash was the
10        supervisor.  And Rash at different times, I don't
11        know if he corrected him or -- I wouldn't say
12        disciplined.  But, complained about his --
13        aspects of his work.  And he told me he thought
14        Rash was extra critical of him because of his
15        race.
16   Q.   Was this while you were working in Clarence?
17   A.   Yes.
18   Q.   Okay.  And at that time you weren't a superior to
19        Miller, correct?
20   A.   That's correct.
21   Q.   You were both investigators?
22   A.   Yes.
23   Q.   All right.  Did he explain why he thought that
```

1       Rash was treating him differently because of
2       race?
3   A.  No.
4   Q.  Did you respond to that?
5   A.  Yes.
6   Q.  What did you say?
7   A.  I told him I thought Rash was an asshole and
8       maybe that was the problem.  Didn't know.  He was
9       just basically talking to a co-worker about his
10      supervisor, and I, and I commiserated with him.
11  Q.  Okay.  Would it be fair to say that was a short
12      conversation?
13  A.  I think so.
14  Q.  The fourth complaint you identified for Miller
15      was about Migliore; is that right?
16  A.  Yes.
17  Q.  Who was Migliore?
18  A.  Joseph Migliore was an investigator assigned to
19      the Violent Felony Warrant Squad here in Buffalo.
20      He came into the squad at the same time Miller
21      did, and they both came from CNET at the same
22      date.
23  Q.  Was Migliore a trooper?

149

```
 1   Q.   Did you say it any other time, other than the
 2        instance you described?
 3   A.   No.
 4   Q.   In your statement do you recall saying that you
 5        could have said that a bunch of savages beat up a
 6        retarded kid during the investigation of the Erin
 7        Glenn matter?
 8   A.   Yes.
 9   Q.   Okay.  Was Erin Glenn African-American?
10   A.   Yes.
11   Q.   And do you recall in your statement that there
12        was a time when the term half-nigga came up
13        during the Romel Brundidge investigation?
14   MR. PERSONIUS:  Object to the form.
15   THE WITNESS:  Yeah, I don't know what the question
16        was.
17   BY MR. HARPER:
18   Q.   Do you recall discussing that that term may have
19        come up when you gave your statement?
20   A.   No.
21   Q.   Have you ever heard that term before?
22   A.   No.
23   Q.   Okay.  And if you've never heard that term before
```

153

```
 1      question.
 2  Q.  Do you remember Miller ever complaining to you
 3      about the use of the term nappy head?
 4  A.  He did not.
 5  Q.  Okay.  Do you recall in your statement saying
 6      that you regretted using that term?
 7  A.  I don't know if I said that or not.  I don't
 8      remember saying that.
 9  Q.  Okay.  Do you recall in your statement describing
10      a video called, Sweet Brown's Cold Pop Escape?
11  MR. PERSONIUS:  Object to the form.
12  THE WITNESS:  I don't know if I described it or not.
13  BY MR. HARPER:
14  Q.  Okay.  Do you remember talking about a video
15      titled that during your statement?
16  A.  Yes.
17  Q.  Okay.  What was that video about?
18  A.  The video was a news video of a woman being
19      interviewed by a news reporter about a fire in
20      her apartment complex.
21  Q.  Do you recall if you showed that to anybody?
22  A.  No.
23  Q.  Do you remember watching it?
```

1  A.  Yes.

2  Q.  Was that at the New York State Police office?

3  A.  Yes.

4  Q.  Do you remember saying it was possible you showed

5     it to Miller?

6  A.  Yes.

7  Q.  And in your statement did you say that the video

8     was funny?

9  A.  Yes.

10  Q.  Okay.  And that the subject of the video had a

11     catch phrase, right?

12  A.  Yes.

13  Q.  Okay.  And that catch phrase was, ain't nobody

14     got time for that, correct?

15  A.  Correct.

16  Q.  Did you repeat that phrase?

17  A.  Yes.

18  Q.  To who?

19  A.  I don't know.

20  Q.  Did you repeat it to Miller?

21  A.  Excuse me?

22  Q.  Did you repeat it to Miller?

23  A.  I don't know.

1  Q.  When you repeated it, was it an imitation?

2  A.  Yes.

3  Q.  An imitation going to tone, cadence, inflection?

4      That's how it would be an imitation?

5  A.  Yes.

6  Q.  Okay.  Why would you repeat it?

7  A.  I thought it was funny.  Well, also -- I thought

8      it was funny, but also I think I said it when it

9      was, you know, also appropriate to say it, like

10     in an answer to a question or situation.

11 Q.  Could you give me an example of when it would be

12     appropriate in response to a question or a

13     situation?

14 A.  Yeah.  If I didn't want to do something or didn't

15     have time for something, for a while I used that

16     expression, you know, like as an answer.  If I

17     didn't have time to eat lunch, I'd say -- you

18     know, use that expression as an answer.  You

19     know, it answers the question, but I would also

20     try to do it in a funny way.

21 Q.  Did you stop using that phrase?

22 A.  Yes.

23 Q.  Why did you stop using that phrase?

1   A.  Because I'm being sued for it.

2   Q.  When did you stop using the phrase?

3   A.  After he complained.

4   Q.  After Miller complained?

5   A.  Yes.

6   Q.  Which complaint?

7   A.  All of them.

8   Q.  So the internal complaint would be the first

9       time?

10  A.  Yes.

11  Q.  Now, in 2013 you -- in the statement you

12      described in 2013 that there was a Facebook page

13      under a pseudonym.  Do you remember talking about

14      that?

15  A.  Yes.

16  Q.  Okay.  And did you say in your statement that

17      the -- that Facebook was useful to find suspects

18      out on warrants?

19  A.  Yes.

20  Q.  Okay.  And that this particular pseudonym was an

21      account that you had access to, right?

22  A.  Yes.

23  Q.  Okay.  And that you used it for official

1        functions?

2   A.   Yes.

3   Q.   Was it your account?

4   A.   Yes.

5   Q.   You created it?

6   A.   Yes.

7   Q.   And this Facebook account had a picture of a

8        couple African-American women as its profile

9        picture, right?

10  A.   Yes.

11  Q.   And did the account represent that the account

12       owner was one of the women depicted in its

13       profile picture?

14  A.   Yes.  Yeah.

15  Q.   Under a --

16  A.   A reasonable person would conclude that, yeah.

17  Q.   And it was a fake name?

18  A.   Yes.

19  Q.   But a real person?

20  MR. ZIMMERMANN:  Form.

21  BY MR. HARPER:

22  Q.   Right?

23  MR. PERSONIUS:  Object to the form.

158

1   BY MR. HARPER:

2   Q.   The picture was of an actual person, right?

3   A.   Two people.

4   Q.   Two people.  Okay.  And during the statement that

5        you gave, there was a particular phrase that you

6        were asked about where the N word was used,

7        right?

8   A.   Yes.

9   Q.   Okay.  And in your statement you said that you

10        used that term once, right?

11  A.   Yes.

12  Q.   Okay.  Do you recall when you made that statement

13        under that account?

14  MR. PERSONIUS:  Object to form.  I'm only objecting

15        because -- that statement.  I mean, it's just not

16        clear on the record what specific statement we're

17        talking about.  That's why I'm objecting.

18  MR. HARPER:  Okay.

19  THE WITNESS:  Generally, yes.

20  BY MR. HARPER:

21  Q.   Okay.  What do you generally remember?

22  A.   The day -- that it was the day -- I don't

23        remember the date is what I'm getting at.

159

1    Q.   All right.

2    A.   But I remember it was the day that Damone Lewis

3         was arrested.

4    Q.   Lewis was somebody that you guys were looking

5         for?

6    A.   Yes.

7    Q.   Okay.  Was the account created to facilitate

8         finding him?

9    A.   No.

10   Q.   To facilitate finding individuals generally?

11   A.   Yes.

12   Q.   Okay.  And the Facebook post where you used the N

13        word, was that directed at anyone?

14   A.   Yeah.  Yes.

15   Q.   Do you recall who?

16   A.   It was really directed at anyone who read the

17        post on his page.

18   Q.   Was it in response to a comment by anybody else?

19   A.   It was in response to several comments or posts.

20   Q.   Okay.  Was one of the things that that post was

21        responding to a comment by Lewis' girlfriend?

22   A.   Yes.

23   Q.   Do you recall generally what she said that you

161

1    account?

2  A.  Yes.

3  Q.  How would he translate?

4  A.  I'm using the -- I was using the term translate a

5     little loosely.  He was more effective in

6     deciphering the language used in the posts than I

7     was, and he basically would -- when I had trouble

8     understanding what the people were saying, there

9     were a number of them that he read and told me

10    what they meant.

11 Q.  At the time that this account was created, did

12    the New York State Police have a policy regarding

13    how such an account would be used?

14 A.  Not to my knowledge.

15 Q.  Is there a policy now?

16 A.  I don't know.

17 Q.  Would any policy by the New York State Police

18    apply to anything regarding the protection of the

19    individual who -- or individuals who were

20    depicted in the profile picture?

21 A.  You mean if there was a policy?  If there is a

22    policy?

23 Q.  Well, if any policy applies.

162

1    MR. PERSONIUS:  Object to the form.

2    MR. ZIMMERMANN:  Form.

3    THE WITNESS:  I don't know.

4    BY MR. HARPER:

5    Q.  Okay.  Would it be fair to say, then, that there

6        is no guidance from the New York State Police

7        about protecting anybody that could be identified

8        under this account?

9    A.  I don't know of any.

10   Q.  Okay.  Do you recall in your statement stating

11       that your opinion was that Miller was sensitive

12       to racial issues?

13   A.  I don't know.  I do remember it.

14   Q.  Okay.

15   A.  Yeah, I did.  I believe it is in my statement.

16   Q.  Do you recall when you formed that opinion?

17   A.  No.  Certainly I had it on September 23rd of

18       2013.

19   Q.  Do you recall in your statement saying that you

20       had heard reports regarding Miller's sensitivity

21       to racial issues?

22   A.  Yes.

23   Q.  What reports were those?

180

1    Q.   Okay.

2    A.   I don't know if it's in his, his amended

3         complaint, but there's certainly been

4         conversation about the guys on the task force

5         that for a time period referred to there being --

6         there was two people with the first name Lee, Lee

7         Eckenrode, E-C-K-E-N-R-O-D-E, and Lee Miller.

8         And for a short time period, they were referred

9         to as white Lee and black Lee.  Well, he would

10        know that.  I don't know if those correspond to

11        those dates or not.

12   Q.   Okay.

13   A.   And I don't know if it's in the complaint or not,

14        but that's the part of the -- I guess maybe that

15        answers the -- your question about the

16        oversensitivity to the racial issues and his

17        allegations of racial discrimination.

18   Q.   Do you know what knowledge William Cooley has

19        about your fairness regarding the issues of race?

20   A.   Yes.

21   Q.   Is that as you described it for Scott Baryza?

22   A.   Yes.

23   Q.   Okay.  Do you know what William Cooley knows

181

```
 1        about your leadership skills as a supervisor?
 2   A.   Yes.
 3   Q.   What does he know?
 4   A.   He knows that I'm a good, fair supervisor.  Oh,
 5        to add -- I thought of another thing.  He was
 6        present during an award presentation from the Bar
 7        Association that I received for protecting
 8        people's civil rights.  I think he would be able
 9        to offer that information as well.
10   Q.   Do you know if Scott Baryza was present for
11        anything that was in Lee Miller's internal
12        complaint to the New York State Police, or the
13        complaint that was filed by the -- in Federal
14        Court?
15   A.   I think I mentioned that that Romel Brundidge --
16        generally speaking, these people would be present
17        for these instances that were cited.  I don't
18        know specifically quite often.
19   Q.   Okay.  Do you know what Salomon DeJesus knows
20        about Plaintiff's allegations of racial
21        discrimination and your fairness regarding the
22        issues of race?  Is it anything different from
23        what you described for Cooley or Baryza?
```

196

1  A.  He would know -- I was his supervisor for a

2      period of time and worked with him, and he would

3      have firsthand knowledge of my interactions with

4      not only members of the public, but subordinates

5      and co-workers.  And my unbalanced -- I meant to

6      say unbiased -- perhaps on occasions

7      unbalanced -- but, my unbiased treatment of the

8      people, including the administration of the

9      overtime program.

10 Q.  And that's identified as Plaintiff's overtime

11     complaint.  Do you know if he knows anything

12     specific about Plaintiff's overtime complaint?

13 A.  He knows that's part of the complaint.

14 Q.  Do you know if he knows anything else about

15     Miller's overtime complaint, other than what

16     you've already discussed?

17 A.  No.

18 Q.  What does Lawrence Jackson know about your

19     accommodation of Plaintiff's personal

20     circumstances?

21 A.  He would also know that when Mr. Miller's sister

22     died, that I facilitated Mr. Miller to work out

23     of the Rochester office to accommodate his

197

```
 1        family -- I don't want to call it an emergency.
 2        But, his family situation.
 3    Q.  Okay.  Anything else that you recall?  Actually,
 4        strike that.  We can move on.  Who is Cheryl
 5        Johnson?
 6    A.  Cheryl Johnson is a retired state police
 7        investigator who was assigned to CNET and the
 8        Violent Crime Investigative Team when I was
 9        there, and then also the SIU office that we
10        shared quarters with.
11    Q.  Do you know if Cheryl Johnson was present for any
12        of the events alleged in the internal complaint
13        or the federal complaint?
14    A.  By events, I assume -- I'm going to understand
15        you to mean the specifics.  Because I keep going
16        back to the allegations of, you know, allegations
17        of my racial comments permeating the workplace
18        and the hostile workplace.  That's -- can we
19        exclude that?  I mean, because that's what I'm
20        talking about with her.
21    Q.  Right.  Other than what you've described as
22        general environmental, hostile work environment
23        things, other than that, any specific events
```

```
 1        described?
 2   A.   No.
 3   Q.   Who is Rick Rooney?
 4   A.   He was a -- I guess -- I think his title was
 5        inspector with the United States Marshals Service
 6        here in Buffalo.  He was formerly a deputy
 7        working in the task force before he was promoted
 8        to inspector.  He worked with both of us in the
 9        task force.
10   Q.   What would he know about Plaintiff's overtime
11        complaints?
12   A.   He -- one of the allegations in the complaint is
13        that in retaliation for making the personnel
14        complaint against me, Mr. Miller was deprived of
15        overtime during this sex offender detail in
16        Rochester on August 6th and 7th of 2013.  He
17        would have knowledge that that allegation is
18        groundless.
19   Q.   Do you know why he would say that?
20   A.   Because it is.
21   Q.   Do you know the factual basis for why Rooney
22        would say that?
23   A.   Yes.
```

1   Q.   What is it?

2   A.   He was present with me -- well, he administered

3        the detail in Rochester that I participated in,

4        and he was with me when Mr. Miller called me to

5        ask about participating.  It was him who -- I

6        deferred to him, asked him, because it was his

7        detail, and he told me to tell Mr. Miller that he

8        already had too many people.  And he would know

9        that that was not my decision.  It was his.  And

10       he would also know that that overtime was coming

11       out of the U.S. Marshals reimbursement program

12       and that it really didn't matter if it was worked

13       August 6th and 7th or any day prior to September

14       30th.

15  Q.   Who is George Scott?

16  A.   George Scott is a task force officer employed by

17       the federal government homeland security.  He's

18       in the task force, worked with Mr. Miller on a

19       daily basis in Niagara County.

20  Q.   Do you know what Scott would know about paragraph

21       eighteen of the complaint?

22  A.   I believe he would have been there.

23  Q.   Do you know what his recollection of those events

Exhibit "C"

MATTHEW S. RENNEMAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------

LETHONIA MILLER,

                    Plaintiff,

        -vs-

NEW YORK STATE POLICE,
KEVIN KENDALL, and
FRANCIS P. CHRISTENSEN,

                    Defendants.

--------------------------------------------------

                    Examination Before Trial of

MATTHEW S. RENNEMAN, taken pursuant to the Federal Rules

of Civil Procedure, in THE LAW OFFICE OF LINDY KORN, PLLC,

535 Washington Street, Electric Tower, 9th Floor, Buffalo,

New York, taken on November 13, 2017, commencing at 11:54

A.M., before VALERIE A. ROSATI, Notary Public.

2

INDEX TO WITNESSES

Witness:  MATTHEW S. RENNEMAN                    Page

Examination By:

   Mr. Harper                                        4

   Mr. Personius                                    51

   Mr. Harper                                       51

3

1     APPEARANCES:

2     THE LAW OFFICE OF LINDY KORN, PLLC,
      By WILLIAM F. HARPER, V, ESQ., and
3     CHARLES L. MILLER, II, ESQ.,
      535 Washington Street,
4     Electric Tower, 9th Floor,
      Buffalo, New York 14203,
5     Appearing for the Plaintiff.

6     NEW YORK STATE ATTORNEY GENERAL,
      By GEORGE MICHAEL ZIMMERMANN, ESQ.,
7     Assistant Attorney General,
      300A Main Place Tower,
8     350 Main Street,
      Buffalo, New York 14202-3750,
9     Appearing for Defendants
      New York State Police and
10    Francis P. Christensen.

11    PERSONIUS MELBER, LLC,
      By RODNEY O. PERSONIUS, ESQ.,
12    2100 Main Place Tower,
      350 Main Street,
13    Buffalo, New York 14202,
      Appearing for Defendant
14    Kevin Kendall.

15    PRESENT:  Lethonia Miller
              Kevin Kendall
16

17

18       (The following stipulations were entered

19   into by all parties.)

20      It is hereby stipulated by and between counsel

21   for the respective parties that the oath of the

22   Referee is waived, that signing, filing and

23   certification of the transcript are waived, and

4

1          that all objections, except as to the form of the

2          questions, are reserved until the time of trial.

3

4                M A T T H E W   S.   R E N N E M A N,

5                1220 Washington Avenue, Building 22,

6                     Albany, New York 12226,

7                after being duly called and sworn,

8                     testified as follows:

9

10   EXAMINATION BY MR. HARPER:

11

12   Q.   Good morning, sir.

13   A.   Good morning.

14   Q.   I'm Bill Harper.  I represent the Plaintiff in

15        this matter, and I'll be asking you a few

16        questions.

17             I want to start with, your title is

18        appropriately lieutenant colonel, correct, sir?

19   A.   That's the rank.  The title is assistant deputy

20        superintendent.

21   Q.   Okay.  I'm sorry.

22   A.   No reason to be sorry.  It's a lot to say.

23   Q.   Do you have a preference in how I address you, by

6

1   Q.  All right.  If you answer my question, I'm going

2       to assume you know what I meant or understood my

3       question.  Okay?

4   A.  Okay.

5   Q.  All right.  How long have you been the assistant

6       deputy superintendent for the New York State

7       Police?

8   A.  Just short of two years.

9   Q.  Are you assigned to a particular section?

10   A.  Professional Standards Bureau.

11   Q.  Okay.  What did you do before you were in the

12       Professional Standards Bureau as the assistant

13       deputy superintendent?

14   A.  I was assigned to field command, BCI section.

15   Q.  Could you --

16   A.  Also at division headquarters.

17   Q.  Could you tell me -- you said BCI?

18   A.  Right.  Bureau of Criminal Investigation.

19   Q.  All right.  So you -- what was your rank at BCI?

20   A.  Major.

21   Q.  Did you have a title at BCI separate from your

22       rank?

23   A.  I was, I was a major filling the vacancy of an

7

```
 1        inspector.  So it was -- the position title was

 2        inspector, field command, BCI.

 3   Q.   Okay.  Can you tell me generally what your duties

 4        are with the Professional Standards Bureau?

 5   A.   I oversee investigations of personnel complaints

 6        throughout the state and review the reports that

 7        come in and make any recommendations or suggest

 8        changes and prepare the report for the chief

 9        inspector and/or the first deputy superintendent.

10   Q.   Can you tell me a little more about what you mean

11        by the personnel complaints that you oversee the

12        investigations of?

13   A.   We oversee administrative investigations of any

14        complaints made about the conduct or allegations

15        of the conduct of members and civilian members of

16        the state police.  It could be anything from a

17        motorist calling and complaining that the trooper

18        was rude to them on a roadside when they issued a

19        ticket to a complaint about the work performance

20        of a trooper by a supervisor, and any complaint

21        or allegation of misconduct or a violation of our

22        internal rules and regulations.

23   Q.   Would the complaints about misconduct and
```

14

1    whether or not something is investigated directly

2    by PSB?

3  A.  The inspector generally would.  Sometimes it's in

4    conversation -- if it's something more serious,

5    he may be in conversation with me about it or the

6    chief inspector.

7  Q.  Okay.  When you say inspector, do you mean the

8    regional inspector?

9  A.  No.  The Professional Standards Bureau is headed

10    by a full colonel and his title is chief

11    inspector.  He has under him two lieutenant

12    colonels.  I am one of them.  I handle the

13    investigation side.  The other lieutenant colonel

14    handles the audit function and random drug

15    testing program.

16  Q.  Okay.  So who would make the decision whether or

17    not something was a level four to be investigated

18    by a Professional Standards Bureau, the chief

19    inspector?

20  A.  The inspector is able to do that.  And if --

21    because it would be his personnel who would be

22    investigating it.  If he chose to consult with

23    the chief inspector or with me, hey, what do you

32

1  Q.  Is there any other reason why a report might be

2      sent back?

3  A.  Serious typographical, grammatical errors.

4  Q.  Okay.

5  A.  It could be, could be sent back because, you

6      know, at some level of review it was felt that an

7      investigative act that wasn't conducted needed to

8      be conducted and added to the report.

9  Q.  Okay.  And that report, does it recommend a

10     conclusion be drawn?

11 A.  It includes a conclusion, yes.

12 Q.  Okay.  And that's done by the PSB member that was

13     tasked by the inspector to create the report?

14 A.  Well, anything that's, that's a level four is --

15     the inspector is involved in the conclusion, he's

16     aware of it.  He's not seeing the conclusion for

17     the first time when he reviews the report.

18 Q.  Okay.  But would the PSB member that created the

19     report, would they make a recommendation as far

20     as the conclusion?

21 A.  Yes.  As far as if there were violations of our

22     rules and regulations and specifically what, what

23     they were, down to citing the specific sections

33

1        of our manual and by what conduct, by what act

2        that section was violated.

3    Q.  Okay.  And how would that PSB member evaluate the

4        information that was collected during that

5        investigation?

6    A.  I don't understand the question.

7    Q.  Well, would it be uncommon for a complainant to

8        say one thing and then the target of the

9        investigation to disagree with that?

10   A.  No.

11   Q.  So how would the person that wrote the report in

12       making a recommendation balance two conflicting

13       statements?

14   A.  If there were no other -- if there was no other

15       information to weigh in on, they wouldn't.  That

16       situation would be noted in the conclusion.

17   Q.  What kind of recommendation would they make if

18       you have two conflicting statements with no other

19       evidence?

20   A.  And if they were two conflicting statements

21       relative to the -- specifically to the

22       allegation?

23   Q.  Yes.

34

1   A.   That would -- that specific allegation, if there

2        were no other factors, as I said, to weigh in and

3        the allegation could not be proven or disproven

4        by the facts at hand, it would be termed as

5        unsubstantiated.

6   Q.   Okay.  And if there's other evidence, the person

7        writing -- the member writing that report would

8        consider that other evidence in reaching their

9        conclusion?

10  A.   They could, yes.

11  Q.   Okay.  Would they make a determination of

12       credibility?

13  A.   If there was, if there was information available

14       to them that would, that would lend to

15       credibility and that was reflected in the report,

16       they could certainly take that into

17       consideration.

18  Q.   So how would they assess the credibility of some

19       information or evidence to reach a conclusion in

20       the report?

21  A.   Subjective determination.  There's no hard and

22       fast rule to say how to do it.

23  Q.   Would it be fair to say, for example, regardless

35

```
 1        if you're a witness, the complainant or the
 2        target, the consistency of your statements might
 3        factor into that credibility?
 4   A.   Yes.  Might factor in, yes.
 5   Q.   Would we say that common sense might factor into
 6        the assessment of credibility?
 7   A.   I'm not sure what you mean by common sense.
 8   Q.   Well, if somebody says something that's
 9        impossible, would that affect --
10   A.   If someone says something that's impossible and
11        it's demonstrably false, yeah.
12   Q.   Would whether or not somebody signed their
13        statement impact the credibility assessment?
14   A.   Are you talking about administrative -- a
15        transcript of an administrative statement?
16   Q.   Yes, sir.
17   A.   I can't think of a situation where it would.  I
18        mean, currently, as a rule, I think our union
19        that represents the investigators as a rule does
20        not have their members who give statements sign
21        them.  They'll review them, but they won't sign
22        them.
23   Q.   So the report contains a conclusion as to the
```

36

```
 1         evidence.  And when you mention that that
 2         conclusion is drawn at the regional level, is
 3         that included in their report or is the report
 4         submitted to the inspector, the regional
 5         inspector, and he makes an independent
 6         assessment?
 7    A.   Are you talking about on a level four?
 8    Q.   Yes, sir.
 9    A.   Yeah.  That's -- the conclusion is part of the
10         narrative of the report, part of the text.
11    Q.   Okay.  So there is a report, it has a conclusion.
12         Does the regional inspector review that report?
13    A.   Yes.
14    Q.   Does he make an independent recommendation?  Or
15         could he approve, disapprove, send it back?
16    A.   He could send it back.  He has, he has the
17         option.  If he feels that something needs to be
18         highlighted in it, he could, he could cover the
19         report with a memorandum --
20    Q.   Okay.
21    A.   -- to the chief inspector giving his -- you know,
22         some -- providing some other information.  But I
23         don't, I don't know that I've seen that.
```

37

| | | |
|---|---|---|
| 1 | Q. | Okay.  And after it's reviewed at the regional |
| 2 | | level, what happens to that report? |
| 3 | A. | It's sent to division headquarters in Albany for |
| 4 | | my review. |
| 5 | Q. | Okay.  And what would you do when you received |
| 6 | | it? |
| 7 | A. | I would read the narrative, read the enclosures, |
| 8 | | and make a judgment as to whether I concur with |
| 9 | | the findings and then sign and date.  We have a |
| 10 | | cover sheet that indicates that I reviewed it. |
| 11 | | Sign and date.  A space if I wanted to make some |
| 12 | | comments, I could.  And then it goes from me to |
| 13 | | the chief inspector for his review. |
| 14 | Q. | And what would the chief inspector do once he |
| 15 | | received the report? |
| 16 | A. | He would do the same. |
| 17 | Q. | And is he the ultimate decision-maker about what |
| 18 | | happens as a result of the recommendation or lack |
| 19 | | of recommendation in the report? |
| 20 | A. | About what happens?  No. |
| 21 | Q. | Okay. |
| 22 | A. | We don't, we don't dole out discipline. |
| 23 | Q. | Who does? |

42

1      hierarchy as far as, you know, who creates the

2      report, the regional inspector, you know, it goes

3      up to the chief inspector, then it goes to the

4      first deputy superintendent, you, and then the

5      deputy superintendent for any sort of

6      recommendation, does any other office or agency

7      within the New York State Police get involved in

8      an internal complaint for discrimination?

9  A.  Yes.  If it's an EEO-related complaint, after it

10     leaves the chief inspector it will go to,

11     currently, the deputy superintendent of employee

12     relations for review there regarding the EEO

13     aspect and they'll confer about it.

14 Q.  Do you know what the nature of their conferring

15     would be?

16 A.  No, I don't.

17 Q.  Outside of what you described as you understand

18     that the EEO Office might notify the Workplace

19     Development Unit, I guess, for lack of a better

20     term, or agency, department, regarding a

21     complaint of discrimination, would the Workplace

22     Development Unit/Department get involved in the

23     investigation or the conduct of that

46

1  Q.  So the writer of the report?

2  A.  By the individual or the collaboration of

3      individuals who are investigating the case and

4      doing the report.  And then at every level of

5      review, it's subject -- that's subject to

6      scrutiny.

7  Q.  What's that scrutiny based on?

8  A.  Experience and judgment and the facts in the

9      report.

10 Q.  Okay.  And for the creator or creators of the

11     report, is there a guideline or policy, anything

12     like that, that determines how they evaluate

13     whether or not a complaint is founded or not?

14 A.  Yes.  If the, if the weight of all the

15     information and evidence available to them would

16     constitute a preponderance of evidence that an

17     allegation was true.

18 Q.  Okay.  And is that in a policy, a guideline, a

19     manual that says, you know, the burden here is

20     whether or not -- if it's founded, it's only

21     founded if there's a preponderance of evidence?

22 A.  Yes.  Yeah.

23 Q.  Where is that contained?

Exhibit "D"

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---------------------------------------------------

LETHONIA MILLER,

                   Plaintiff,

    -vs-

NEW YORK STATE POLICE,
KEVIN KENDALL, and
FRANCIS P. CHRISTENSEN,

                 Defendants.

--------------------------------------------------

                Examination Before Trial of

MARCUS WALTHOUR, taken pursuant to the Federal Rules of

Civil Procedure, in THE LAW OFFICE OF LINDY KORN, PLLC,

535 Washington Street, Electric Tower, 9th Floor, Buffalo,

New York, taken on November 13, 2017, commencing at 10:10

A.M., before VALERIE A. ROSATI, Notary Public.

2

1       APPEARANCES:

2       THE LAW OFFICE OF LINDY KORN, PLLC,
        By WILLIAM F. HARPER, V, ESQ., and
3       CHARLES L. MILLER, II, ESQ.,
        535 Washington Street,
4       Electric Tower, 9th Floor,
        Buffalo, New York 14203,
5       Appearing for the Plaintiff.

6       NEW YORK STATE ATTORNEY GENERAL,
        By GEORGE MICHAEL ZIMMERMANN, ESQ.,
7       Assistant Attorney General,
        300A Main Place Tower,
8       350 Main Street,
        Buffalo, New York 14202-3750,
9       Appearing for Defendants
        New York State Police and
10      Francis P. Christensen.

11      PERSONIUS MELBER, LLC,
        By RODNEY O. PERSONIUS, ESQ.,
12      2100 Main Place Tower,
        350 Main Street,
13      Buffalo, New York 14202,
        Appearing for Defendant
14      Kevin Kendall.

15      PRESENT:  Lethonia Miller
                  Kevin Kendall
16

17

18          (The following stipulations were entered

19      into by all parties.)

20          It is hereby stipulated by and between counsel

21      for the respective parties that the oath of the

22      Referee is waived, that signing, filing and

23      certification of the transcript are waived, and

3

```
1        that all objections, except as to the form of the
2        questions, are reserved until the time of trial.
3
4              M A R C U S    W A L T H O U R ,
5        1220 Washington Avenue, Albany, New York 12226,
6              after being duly called and sworn,
7                   testified as follows:
8
9   EXAMINATION BY MR. HARPER:
10
11  Q.   Good morning, Senior Investigator.
12  A.   Good morning.
13  Q.   My name is Bill Harper.  I'll be asking you some
14       questions today for the deposition.  Before we
15       get into those questions, I just wanted to go
16       over some ground rules to start, to begin, at the
17       beginning.  We'd ask that, you know, if I ask you
18       a question, that you answer that question if
19       you're able to.  All right?  And by that I mean,
20       if you're not sure, tell me you're not sure, if
21       you don't understand what I mean or anything
22       along those lines.  If my question is vague or
23       you want me to restate it, you know, please ask
```

5

```
 1        right?
 2   A.   That's correct.
 3   Q.   What do you do for the New York State Police?
 4   A.   I am currently assigned to the Equal Employment
 5        Opportunity Office.
 6   Q.   Okay.  How long have you been in the Equal
 7        Employment Opportunity Office?
 8   A.   Since February 26th, 2015.
 9   Q.   Okay.  What do you do at the Equal Employment
10        Opportunity Office for the New York State Police?
11   A.   I assist in coordinating complaints regarding EEO
12        investigations, complaints of discrimination or
13        harassment.  I also provide training on
14        diversity, sexual harassment and discrimination
15        to civilians and state and police sworn members.
16   Q.   Is that what you've done for the Equal Employment
17        Opportunity Office since 2006 when you began
18        there?
19   A.   2015.
20   Q.   I'm sorry.  2015.  Have you been doing that since
21        2015?
22   A.   Yes.
23   Q.   Okay.  Do you have a title within the Equal
```

6

1       Employment Opportunity Office?

2   A.  Senior investigator.

3   Q.  So your title is your rank?

4   A.  Yes.

5   Q.  Okay.  When you said that you coordinate

6       complaints for discrimination and harassment

7       allegations, what do you do when you say

8       coordination?

9   A.  You have -- complaints can come in in three

10      different ways.  Someone can contact human

11      resources in writing, they can call directly, or

12      they can contact the appropriate supervisor to

13      have them contact human resources.  And once that

14      contact is made, I then meet with Professional

15      Standards Bureau to coordinate the investigation

16      of the complaint.

17  Q.  And the Professional Standards Bureau used to be

18      Internal Affairs?

19  A.  That's correct.

20  Q.  Do you know when that changed?

21  A.  I do not have an exact date, sir.

22  Q.  Okay.  Now, you described three ways that a

23      complaint could come in.  Is the manner in which

7

```
 1      a complaint is made outlined in any policy by the

 2      New York State Police, or rule?

 3   A. Yes.  That would be in your division manual,

 4      members manual.

 5   Q. The members manual?

 6   A. Yes.

 7   Q. Okay.  Is it any three of those ways that a

 8      complaint could be made are acceptable?

 9   A. Yes.

10   Q. Okay.  So you said that complaints could come in

11      any three ways, and after the contact you meet

12      with the Professional Standards Bureau.  What do

13      you do with the Professional Standards Bureau?

14   A. I just advise them that a complaint came in.

15   Q. What happens after you advise the Professional

16      Standards Bureau that a complaint comes in?

17   A. Once someone makes a complaint, it's then my job

18      to meet with the complainant alone, without

19      Professional Standards Bureau.  And we have to

20      fill out a template two form, which is a

21      discrimination form, which then gets forwarded to

22      the Workforce Development Unit, GOER, from the

23      governor's office.
```

9

```
 1   A.   Yes.

 2   Q.   What goes into the notice that they receive?

 3   A.   In the template two?

 4   Q.   Yes.

 5   A.   The complainant's name.

 6   Q.   Okay.

 7   A.   His immediate supervisor; second-line supervisor;

 8        who the complaint is made against, the

 9        respondent; what's the complaint based on, based

10        upon, whether it's race, sex, sexual orientation;

11        a brief synopsis of their complaint; and whether

12        they contacted an attorney or not.

13   Q.   Okay.  Does the template two form go to the

14        governor's office?

15   A.   Yes.

16   Q.   Okay.

17   MR. ZIMMERMANN:   Form.

18   BY MR. HARPER:

19   Q.   Okay.  So after the template two form is

20        completed and it goes, among other places, to the

21        affirmative action officer, what happens in the

22        complaint process?

23   A.   There's a conflict check to make sure -- there's
```

10

1          a person from human resources EEO Office and a

2          person from Professional Standards Bureau

3          assigned to investigate jointly.  You do a

4          conflict check to make sure you don't have any

5          conflicts with the investigation.

6     Q.   And if there are no conflicts, what happens after

7          that?

8     A.   You develop a preliminary plan of investigation.

9     Q.   What's the preliminary plan?

10    A.   Just how you're going to do your investigation

11         and what order you want to interview certain

12         witnesses or the complainant or the respondent.

13         It's like an investigative plan.

14    Q.   And who develops the preliminary plan?

15    A.   The two people assigned to investigate.

16    Q.   Okay.  One from the EEO Office and one from the

17         Professional Standards Bureau?

18    A.   Yes.

19    Q.   Okay.  And is anyone else assigned to investigate

20         at this point, other than those that you've

21         mentioned?

22    A.   Depends on the complexity of the investigation.

23         More people may be added to the investigation.

1  Q.  Okay.  And what would, for example, require more

2      people to be added?

3  A.  The complexity, the size of the investigation.

4  Q.  Okay.  Are there any standards about what size

5      would require more people to handle the case?

6  A.  No.

7  Q.  Okay.  What kinds of details go into that

8      preliminary plan?

9  A.  Can you explain what you mean by details?

10 Q.  I'm sorry?

11 A.  Can you explain what you mean by details?

12 Q.  So the preliminary plan, I think you mentioned,

13     you know, what witnesses and what order.  So what

14     else is contemplated in the preliminary plan when

15     they made that up?

16 A.  Just you review the allegations, see if you need

17     any more information from the complainant before

18     you go forward.

19 Q.  Okay.

20 A.  And what order you want to interview witnesses,

21     what documents you want to receive, whether it's

22     e-mail, phone records.

23 Q.  Is there any guidelines for creating the

1    preliminary plan?

2  A.  No.

3  Q.  Okay.  So there's no rule, statute, handbook or

4    anything that informs how the EEO and the

5    Professional Standards Bureau develops a

6    preliminary plan?

7  A.  No.

8  Q.  Okay.  How do they determine what witnesses to

9    interview first or what documents to request?

10 A.  Sir, that would depend on the investigation, the

11   allegations.  Every case is different.

12 Q.  Okay.  So as the case necessitates, they would

13   develop the plan?

14 A.  That's correct.

15 Q.  Okay.  Would, typically, a target be interviewed

16   first, according to the preliminary plan, or

17   last?

18 A.  Sir, that depends on the investigation.

19 Q.  Okay.  So what happens in the investigation after

20   the preliminary plan is developed?

21 A.  The complainant gives a formal statement.

22 Q.  What's the formal statement?

23 A.  It's a recorded statement, it's also transcribed,

13

```
 1      where they outline their allegations of
 2      discrimination or harassment.
 3   Q.  How is that statement taken?
 4   A.  It's recorded mechanically.
 5   Q.  Okay.  When you say recorded mechanically, what
 6      do you mean?
 7   A.  With a recording device.
 8   Q.  Okay.  And is this the person -- is the
 9      complainant just speaking or are they asked
10      questions?
11   A.  Both.
12   Q.  Okay.  Who asks the questions?
13   A.  The investigator from the EEO Office or the
14      commissioned officer from Professional Standards
15      Bureau.
16   Q.  Okay.  If there are two individuals assigned, one
17      from the EEO Office and one from the Professional
18      Standards Bureau, is there somebody that's in
19      charge of that investigation between the two of
20      them?
21   A.  Yes.  Usually the highest ranking member.
22   Q.  Okay.  So you said there was a commissioned
23      officer from the Professional Standards Bureau.
```

20

1   Q.   So you mentioned that the formal statement is
2        recorded mechanically, correct?
3   A.   Yes.
4   Q.   Okay.  What happens after that formal statement
5        from the complainant is recorded?
6   A.   Depending on the allegations and the evidence
7        that they presented, we would do a document
8        review which can consist of e-mails or telephone
9        records.
10  Q.   Okay.  And what would inform what documents you
11       needed to review?
12  A.   The complainant's statement, sir.
13  Q.   Okay.  So if they referred to a document, you
14       might review that document?
15  A.   Yes.
16  Q.   Is there any sort of guideline or policy about
17       what documents you would review that the
18       complainant mentions?
19  A.   All evidence and documents reviewed are collected
20       by Professional Standards Bureau.
21  Q.   Okay.  So the EEO Office wouldn't necessarily
22       review documents?
23  A.   Correct.

1   Q.   Okay.  Professional Standards would, it sounds

2        like, determine what to review and obtain those

3        documents?

4   A.   Yes.

5   Q.   Okay.  At this point could you tell me what the

6        EEO Office does -- other than what you said about

7        coordination between the notice that you had to

8        give, you know, informing the Professional

9        Standards Bureau, does the EEO -- let me stop my

10       question right there because I'm getting off

11       track.

12            During the complainant's formal statement,

13       does the EEO Office, other than potentially

14       asking questions, have any duty at that point?

15  A.   Yes.  At the end of the investigation -- at the

16       end of the statement, they read a retaliation

17       statement.

18  Q.   Okay.  And what is the retaliation statement?

19  A.   I don't know what -- verbatim, sir.

20  Q.   Well, generally.

21  A.   It's just telling the complainant that

22       retaliation is not -- it's against the law, it's

23       against division policy.  If you feel you're

22

1      retaliated against, you should contact the human

2      resources office.

3   Q.  Okay.  So after the complainant's formal

4      statement, the Professional Standards Bureau

5      reviews documents.  I assume that they also -- at

6      some point there's other witnesses that are

7      contacted.  Correct?

8   A.  Yes, sir.

9   Q.  Okay.  And the target of the investigation is, at

10     the discretion of the investigators, spoken to

11     during the conduct of the investigation?

12  A.  Could you be more clear, sir?

13  Q.  After the witnesses, after the complainant, after

14     the document review, they talk to the target of

15     the complaint, right?

16  A.  Yes, sir.

17  Q.  Okay.  And are formal statements taken from

18     witnesses?

19  A.  Yes.

20  Q.  Okay.  And do they follow in the same methodology

21     as the statement taken from the complainant?

22  A.  Not always, sir.

23  Q.  How could they differ?

1   Q.   Okay.  There's no punishment if they don't sign

2        it?

3   A.   That's correct.

4   Q.   Okay.  And going back to the preamble.  Does it

5        at least have the same preamble and additional

6        things as the complainant's formal statement's

7        preamble?  And by that I mean, you have to tell

8        the truth or --

9   A.   Yes, sir.

10  Q.   Okay.  Cooperate?

11  A.   Yes, sir.

12  Q.   Okay.  What happens after all the documents and

13       the witnesses are spoken to?

14  A.   And the respondent?

15  Q.   And the respondent.

16  A.   The person assigned from Professional Standards

17       Bureau writes the report.

18  Q.   Okay.  And they consider the statements and

19       evidence that they acquire during the

20       investigation in the report?

21  A.   Yes, sir.

22  Q.   Okay.  Do they make a recommendation, do they

23       determine an outcome?  Is there a conclusion to

28

1          that report?

2     A.   There is a recommendation and conclusion section.

3     Q.   Okay.  And that recommendation, what could that

4          recommendation state?

5     A.   Whether it's founded, unfounded, unsubstantiated.

6     Q.   Okay.  And regardless of the outcome of that

7          recommendation, does that get forwarded

8          somewhere?

9     A.   Through channels, sir, to the chief inspector's

10         office.

11    Q.   What does the chief inspector's office do with

12         it?

13    A.   Sir, I can't answer for the chief inspector's

14         office.  I'm not a part of that unit.

15    Q.   Does anything happen to it after it goes to the

16         chief inspector's office?

17    A.   He makes a decision.

18    Q.   Okay.  Is he the -- is the chief inspector's

19         office the final decision-maker as to the outcome

20         of the investigation?

21    A.   The final outcome would come from the first

22         deputy superintendent or the superintendent, sir.

23    Q.   So does it go from the chief inspector's office

Exhibit "E"

## MEMBER WITNESS – INTERVIEW



**STATE OF NEW YORK**
**COUNTY OF MONROE**
**TOWN OF CHILI**

August 1, 2013

This is an interview of Investigator LETHONIA MILLER, L-E-T-H-O-N-I-A M-I-L-L-E-R, at IAB Western Regional location on August 1, 2013, by Captain KEVIN REILLY and Senior Investigator JUNE BRADLEY commencing at 11:52AM.

The letter "Q" will denote questions asked by Captain REILLY
The letter "B" will denote questions asked by Senior Investigator BRADLEY
The letter "A" will denote answers provided by Investigator MILLER

Q.    The purpose of this interview is to inquire into um, uh this matter of racial discrimination that you're bringing forth against uh Senior Investigator KEVIN KENDALL.

You are being interviewed as a witness only in furtherance of providing necessary and relevant factual information in this investigation. You are not the target of this administrative investigation, and anything you say during this interview cannot be used against you in a disciplinary proceeding. If during the course of this interview it reasonably appears that you may be the subject of a potential disciplinary action, I will stop the interview and advise you of that, that determination and your rights under the collective bargaining agreement. Do you understand this?

A.    Yes.

Q.    This interview is being conducted pursuant to Article 16 of the collective bargaining agreement between the State of New York and NYSPA right, you're a Member of NYSPIA?

A.    Yes I am.

Q.    And the applicable Regulations of the New York State Police, including Regulations 8A3 and 8A15, pursuant to which you are required to cooperate and answer truthfully questions relating to the investigation. A refusal by you to cooperate or to answer questions, or a failure to answer any questions truthfully, may result in disciplinary action against you, up to and including the termination of your employment. Do you understand this?

A.    Yes.

Q.    You are entitled to all the rights guaranteed by the State and Federal Constitutions. As

1



this is an involuntary, involuntary interview, your responses are automatically cloaked with criminal immunity. Accordingly, neither your statements nor any information or evidence that is gained as a result of, or in reliance upon, this interview can be used by a police or prosecutorial entity against you in support of a criminal proceeding. Do you understand this?

A.    Yes.

Q.    You were advised on July 31, 2013 of the matter being investigated and that it would be necessary to interview you concerning this matter, is that correct?

A.    Yes.

Q.    I am Captain REILLY and as a supervising officer and representative of the Superintendent I am authorized to conduct this interview.  This interview is being recorded mechanically at IAB Western Regional Office.  A full transcript will be prepared and you will be provided with a copy of the recording or will be afforded an opportunity to cause a duplicate of this recording to be made for your future use. You will be given the opportunity to view the written transcript from this recording upon completion to ensure its accuracy, and will also be provided with a full copy of the transcript, subsequent to your signature.  Do you understand this?

A.    Yes.

Q.    Present in this room are myself, Senior Investigator BRADLEY, and yourself.  Do you understand this?

A.    Yes.

Q.    The record will note that you are present in response to a direct order.  Investigator MILLER, you will now be asked questions relating to this investigation and you are required to answer these questions truthfully.  If you decline or refuse to answer any questions, you will be ordered by me to answer.  If you then continue in your refusal to answer, disciplinary action will be initiated charging you with disobeying a lawful order. This disciplinary action could result in the termination of your employment with the Division of State Police.  You will be permitted during this interview to take breaks when reasonable and appropriate.  Having been advised of the above, are you now ready to proceed with this interview?

A.    Yes.

Q.    All right, please state your full name and rank.

A.    My name is uh LETHONIA MILLER, uh Investigator.

2

(8/21/2013) Lethonia Miller - Miller, Lethonia 080113 KR.doc

Page

Q.   And what is your date of entry with the State Police?

A.   03/30 of '87.

Q.   Location of your current assignment?

A.   I'm assigned to the uh Troop "A" VFW.

Q.   And where's the, where's that located the, the office?

A.   Uh 65 Court Street, Buffalo, New York, Room 317.

Q.   And who is your supervisor?

A.   Senior Investigator KEVIN KENDALL.

Q.   That's K-E-N-D-A-L-L?

A.   Yes.

Q.   And how long have you been in that unit?

A.   Since uh March of 2008.

Q.   And KEVIN, and KEVIN KENDALL'S been your supervisor the entire time?

A.   Yes.

Q.   All right who else is in the unit right now?

A.   Uh just me and him.

Q.   Just, okay, um and when you got there in 2008 were there any other uh State Police Members in the unit?

A.   Yes uh there was Investigator, now retired, uh JOSEPH MIGLIORE, um Investigator SAL DEJESUS, Investigator DAVE HALL, Investigator DON RIEGER, I believe that, that was it.

Q.   Now this, this complaint that um we're talking about involves racial discrimination by Senior Investigator KEVIN KENDALL towards yourself, is that correct?

A.   Yes.

Q.   All right now any of these other Members that we just talked about um, were any of them African/American?

3



A.     No.

Q.     No, um any other, any, any Hispanic or any other ethnicities besides white/Caucasian?

A.     Uh SAL DEJESUS, Hispanic.

Q.     The others are white/Caucasian?

A.     Yes.

Q.     And, and Senior Investigator KEVIN KENDALL is he white/Caucasian?

A.     Yes.

Q.     Um before we, before we get to far involved into your thing did you decide your issue with um racial discrimination from KEVIN KENDALL, did you see this behavior towards any of the other Members or anybody else by KEVIN KENDALL, um like toward, towards you know SAL or any other Members or is it just directed at you?

A.     Uh just directed at me.

Q.     Okay. Um Investigator MILLER, on July 15, 2013, you authored a uh, a memorandum and the subject of it was "Complaint of racial harassment," is that correct.

A.     That's correct.

Q.     Okay and I am showing you a copy right now of a memo that I received and reviewed that has your initials on it, it's about seven, seven pages that I have. Is this the memo that we are talking about?

A.     Yes.

Q.     Okay and that memo was written by you and it's true and accurate?

A.     Yes.

Q.     To the best of your knowledge?

A.     Yes.

Q.     All right so we're kinda just go through this memorandum and try to bring out some more details. Um now you said in your memo here as I'm going down reading it that your uh, that you worked with KEVIN KENDALL before prior to going to the VFW is that correct?

A.     That's correct.

4



Q.   And, and um when?

A.   Um I want to say between 1995 and '96 we were both in the backroom of Clarence.

Q.   As Investigators?

A.   Yes.

Q.   All right and those are approximate dates?

A.   Right.

Q.   All right um and during, during, during working with him you worked with him closely on cases, him personally?

A.   Yes.

Q.   Now going here and explain this um, you've had conversations with him regarding um the "N" word and that's, it's the n-i-g-g-e-r word...

A.   Um-hum.

Q.   Or, now did you wanna, can you explain that to me, like what your conversations were and how it, how you felt when you told him and what he, he said to you and this was back in, when you were first working with him.

A.   Right.

Q.   What you can recall.

A.   Uh from what I can recall um back then we had a, a good relationship you know, um we talked and you know if he asked a question you know, I know culturally, I mean people are, are curious and rather than have people you know have like the wrong impression you know I, I don't have a problem answering questions about you know being African/American or whatever. So uh he asked me in particular about using the "N" word and you know I explained to him like you can never, never ever, ever use that word you know.

Q.   You mean KEVIN KENDALL?

A.   Right.

Q.   Okay.

A.   Uh basically uh he was making you know uh a point about you know some

5

(8/21/2013) Lethonia Miller - Miller, Lethonia 080113 KR.doc

Page

African/Americans using the "N" word as slang versus you know white people using in any context. So and I, you know I, you, you can't do it and just you know I don't care what context, not unless it (inaudible) to like an investigation and you're being (inaudible) or you know a witness says something to identify some. I can understand that but you know as casual you know uh talk no. It, it is just a, doesn't work so.

Q.   Why?

A.   Well uh the word itself I mean it, it, it incites you know, well in me you know rage you know.

Q.   It's offensive to you.

A.   Yeah it's offensive.

Q.   All right.

A.   And, and given history you know I, I don't care who really says it, I mean it doesn't, it doesn't make it you know right you know if a black person says it versus a white person or whatever so.

Q.   So, so the "N" word, to you the "N" word is offensive no matter who says it?

A.   Yes.

Q.   But it's probably, and you said, I think you said it's even more offensive when a Caucasian says it?

A.   Yes.

Q.   Okay and you made that clear in your conversations with KEVIN KENDALL how you felt about that?

A.   Yes.

Q.   That you don't like it used in any sort of way um outside of like an official what you had to investigation, deposition or something?

A.   Um-hum.

Q.   Along those lines?

A.   Yes.

Q.   Is that, is that correct, I'm not putting words in your mouth?

6



A.    No that's correct.

Q.    All right.  And, and what was his, what his reaction to that?

A.    Uh he, he was okay with it, I mean he pretty much said okay I, I, I see what you're saying and uh never ever had any issues when we were in the backroom.  Never used the word at all.

Q.    Never said it and never heard it?

A.    No, nope.

Q.    All right so these conversations with him it wasn't involved case, it was just you know curiosity conversation between um LEE MILLER and KEVIN KENDALL about you know race, culture, whatever?

A.    Yeah race, Um-hum.

Q.    Now back, and you said back then you never had any issues with him, with this, you know you never heard him say the word?

A.    That's correct.

Q.    All right, did you ever hear him say any other words that would be racially offensive?

A.    Uh back then no.

Q.    Back then?

A.    No.

Q.    All right so, so back in '95 and '96 you got no, no issues with him (inaudible) race or culture you know saying things or any sort of uh him saying anything insensitive, making insensitive remarks towards you?

A.    That's correct.

Q.    All right.  Now in here you also you mention that recently you had to confront a Deputy United States Marshall in your task force?

A.    Um-hum.

Q.    Who kept offending you by always referring to you as the black guy, that's in, that's in your...all right?

A.    Yes.

7



Q.    Um explain, explain that, explain that whole interaction here.

A.    Um the US Marshalls uh they have a, in their office two sides. They have operations and they also have a the warrant side. Um guys come over from the operations uh side like on a 90 day rotation. This one particular guy um, uh BRENT NOVAK, he um, he was doing a 90 day rotation and it, it, when he, when he was you know semi-permanent he was okay, never had an issue with the guy and uh we worked well together. And uh I think I, I mentioned to you before that uh we were out on surveillance once and um...

Q.    And when you say when you mentioned to you, you were referring to Senior Investigator BRADLEY?

A.    Oh I'm sorry, Senior Investigator BRADLEY, that um we were out on surveillance and I had mentioned you know that you know I appreciated the fact that he didn't use the "N" word you know. And uh you know he acknowledged it and, and you know everything was okay. Now he became permanent um sometime after that and uh he began you know becoming like you know a bully to the general public but also full of himself. And uh he started referring to me as the black guy. Initially uh you know one or two times you know I, I kind of brushed it off and um but then he started bringing like you know civilians into uh the conversations you know, "Hey do you know this black guy." I, I could be like full pack you know fleece, dress and all, "Hey do you know this black guy," and I was like.

Q.    And you, you felt when he, when he was talking about you and when he was referring to you as the black, you found it offensive?

A.    Yes I did.

Q.    Okay.

A.    And you know it just, you know it set me apart from the rest of the group, you know it was always like, hey the black guy. So um when we went into restaurants he would say the same thing you know and you know waitresses or the owner would, "Hey you must be the black guy they're talking about." Yeah, yeah, ha, ha, whatever. So um it was an old uh I think German guy who finally uh you know said something and when he said, "Hey do you know this black guy," and that guy he started using the "N" word because he felt you know well he said the black guy you know. So afterwards...

Q.    These, these aren't people in the task force?

A.    No.

Q.    Okay.

A.    Um I confronted him uh at the station and I...



Q.   You confronted the, the Deputy Marshall?

A.   Right.

Q.   Right.

A.   And I just plainly (inaudible) that you know don't refer to me as the black guy, I'm either Investigator MILLER, Trooper MILLER or TFO MILLER and that's it.  So um...

Q.   Did it stop after that?

A.   Yeah it, it stopped.

Q.   Now you said in here um, did you talk to KEVIN KENDALL about this incident at all?

A.   Um-hum, excuse me, uh all the while even when this guy was uh you know calling me the black guy, I would go back to the station and I would tell KEVIN you know about my daily activities and you know what happened and I would mention, yeah that guy you know BRENT he still you know talking about the black guy this and black guy that.  And um you know he was like, "Eh well you know he's, he's stupid," he's this or, okay.  But you know.

Q.   Did you, did you tell him that it offended you or did you infer that it, was it clear in your conversations...

A.   Yep, yep.

Q.   That he realized that, that you, you felt offended?

A.   Yes.

Q.   All right at least you felt that way from the conversations?

A.   And, and he (inaudible) you know he basically said the guy was a, you know an asshole and he was an idiot.

Q.   So coming away from the conversation with KEVIN KENDALL, you felt that he understood where you were coming from?

A.   Yes.

Q.   All right, um did he do anything about it?

A.   No.

9



Q.  Um and I don't how the, you know I don't know how the task, explain how the task force a little bit, you're both on the, you know how it works, you're assigned to these task force?

A.  Well um the, the task force supervisor uh runs the task force, which is comprised of all the other different agency uh members. Um we're, we're all, and the (inaudible) he's the chief pretty much. So KEVIN wouldn't be considered like a supervisor in the task force, just another...

Q.  He's just a part of, he's just a, a small cog in the, the wheel of the task force?

A.  Right.

Q.  Just like you?

A.  Right.

Q.  Do you know if you ever brought it to the supervisor, his attention?

A.  I don't know, and I, I couldn't even say.

Q.  Oh, you don't, did and you never brought it to this, you just went directly to uh...

A.  To KEVIN.

Q.  While you, no when you, when you talked about it, when you went directly to BRETT?

A.  Oh yeah.

Q.  And confronted him?

A.  Yes.

Q.  Yeah.

A.  I, I don't have a problem uh confronting or defending myself you know with people uh on my you know level like Investigators or Troopers or you know other agency members. But you know talking to a supervisor is a whole different thing so.

Q.  All right but aft, you said you went to BRETT, you took care of it, didn't have any issues after that with him, um now did you, when you were talking with KEVIN about, KEVIN KENDALL about these, was it before or after you confronted BRETT?

A.  When I talked to KEVIN KENDALL about?

Q.  This part, this part about you know when you were making comments of, of when BRETT

10



was referring to you as, "The black guy," you know was this before you confronted, I guess what I'm asking is before you confronted BRETT, did, did you have these conversations with KEVIN KENDALL?

A.     About him calling me the black guy, yes.

Q.     Okay and you, you have no knowledge of him going to the supervisor or taking any action on your behalf?

A.     No, no knowledge.

Q.     No knowledge, okay. All right, um now we're going to um, on some you, you state here that you've also had conversations with KEVIN KENDALL and he's called you overly sensitive and that he, you had opportunities for earning overtime been curtailed. Is that correct?

A.     That's correct.

Q.     All right um we'll get back to the overtime but you know he, when, explain some of these conversations where he, you've been felt that he, that KEVIN said you, that you're overly sensitive?

A.     Well earlier on when, when I was working and this is probably back in 2009 maybe...

Q.     And all these incidents I mean except for what we initially talked about from (inaudible), when you were back, as a backroom investigator in '95 – '96, all these other things are since 2008 when you were assigned to the task force, is that correct?

A.     That's correct.

Q.     I just wanted to get the time frame on record. Um so now...

A.     So uh in, in 2009 there uh, um, he would repeat what you know someone in the public would say like the "N" word, and uh...

Q.     From his interactions with you know Joe public on whatever case he's working?

A.     Right and you know I know that you know telling a supervisor what to do is kinda like uh you know, not really forbidden but you know you gotta, have to do it delicate, delicately you know and uh so I, I never really said that in front of you know the group.

Q.     Said what?

A.     Uh you know, hey you, you can't say that.

Q.     Okay, you never, you never, you never, you never told KEVIN KENDALL how you felt

11



about his comments in front of the group right?

A.  That's correct.  Um so I would you know talk to him after the fact, after I calmed down you know, cooled out.  You know I would talk to him, you can't say that, you know.  and that's when I would get the uh well I'm just repeating you know what that person said and the whole um, I don't know, it, it just, it, it didn't really registered with him I guess.

Q.  Okay.

A.  You know.

Q.  And from, from what you're saying, I don't want to put any words in your mouth, some of these comments he was saying these comments of what he heard while he was interacting with people on the street?

A.  Right and, and because they said it he thought he could say it and but when I pulled him to the side or later on and told him you know you can't say that then he's like well they said it you know so.

Q.  Now you feel, and I don't, I, I'm getting that you feel it's totally inappropriate for him to say, repeat things like that at all?

A.  Yes.

Q.  All right, I mean maybe there are times for when you have to but in part of an investigation but during these comments, during these conversations were they involving any official or official action with these cases?

A.  No.

Q.  No, uh it was more like, was it banter, you know just telling you, telling you funny stories or, or situations or what happened during the day?

A.  Well if you know, uh yeah, it, it was (inaudible)...

Q.  I'm not trying to put words in your mouth, I'm trying to...

A.  More or less it was, you know it was, what was said you know or allegedly, and sometimes I, I wasn't even with him but you know if we got together in the afternoon he would say yeah we interviewed this person and blah-blah-blah.  And he would go through the whole you know, well I ain't saying that and you know the "N" word and you know he just (inaudible).

Q.  And we'll get more into some of these specific incidents in a second.

A.  Um-hum.

12



Q.    But um I, I guess what I'm saying in, in these instances that we're talking about, at least in the generic sense, it seems like there was no need, there was no operational need um, any State Police or any investigative to say these comments, they weren't part of, they were, they were just comments being said between people…

A.    That's correct.

Q.    You know there was, you could, you could basically, he could have not said them and it wouldn't have changed the functions of the State Police or your task force?

A.    That's correct.

Q.    All right um we're gonna go through these incidents one by one.  Now you, you said on June 11, 2013 at about 2:30PM, Senior Investigator KENDALL uttered the racial slur and he used the "N" word all right, um is that, is that correct?

A.    That's correct.

Q.    Explain that incident to me.

A.    Uh I think we had gone out at the location but uh we were working with parole, they had a guy who was uh at his girlfriend's house down in, in the southern tier maybe.  And we, we traveled there, we actually grabbed the guy and uh we came back to the office and as we usually do.  And you know he kind of recounted you know, you know the old uh, well he, he, he likes this phrase uh (inaudible) in the minute.  And I hear it you know quite a lot and on this day you know he said he was working on the case and he, they came across a guy you know that, old black guy, and basically you know he reminded him of like uh a colleague of ours who does like an imitation of an old black man.  And he says that, that phrase.

Q.    All right and this, this is the phrase you wrote here, and I'm gonna repeat it word for word here.

A.    Um-hum.

Q.    Um, "Awe man I ain't seen that nigger in a minute."

A.    Um-hum.

Q.    All right that's the phrase and he, that's uh, you're saying that that's uh, you're saying he's imitating an old black guy saying that phrase correct, from like an old story or something?

A.    Right you know it just uh, kinda like um from the, the old uh minstrel days you know when people were you know black faced, you know and they, they're imitating over

13



exaggerated you know uh voice or slur of speech patterns you know of...

Q.     Okay.

A.     They think black people so.

Q.     And you find that offensive?

A.     Yes.

Q.     All right.

B.     LEE, you said you heard that phrase a lot?

A.     Yes.

B.     In what context is that from, the Senior or just in general, I just want you to explain that?

A.     Uh from the Senior, I, I've never heard you know an interviewee actually say that.  Um but he's alleging that you know this happened and you know that's what he likes to say. And he, he thinks it's hilarious you know and I, I just you know I don't.

Q.     So now during your, a little side note, during your course of your, you know, of your cases, your, your, you're interviewing people either in Buffalo or Niagara Falls, wherever you are, you've never, you've never heard anybody say that?

A.     That particular phrase...

Q.     That phrase.

A.     No.

Q.     No.

A.     I've heard uh civilians use the "N" word and I've actually been with uh other you know police officers that don't repeat it.  Um, I've never really asked them though how come you didn't repeat it, he said it you know but.

Q.     KEVIN KENDALL, seems to me KEVIN KENDALL seems to be the only one whose ever repeated it...

A.     Right.

Q.     To you, is that what you're, that's what you're saying here?

A.     Pretty much.

14



(8/21/2013) Lethonia Miller - Miller, Lethonia 080113 KR.doc

Page

Q.     Um but you, you do hear it when you're out there, I mean when you're like talking street talk trying to develop information on cases?

A.     Yeah.

Q.     All right, do you ever use the word?

A.     No.

Q.     All right.  So from what, from what you're, if I, If I have this right, it seems like KEVIN KENDALL sometimes when he says this he's kind of going you know he's uh, he's, he's trying to say, be funny?

A.     Usually.

Q.     Is, is that, is that, is that accurate?

A.     Yes.

Q.     All right.  All right so this, this incident here on June 11th, you have the location here as the Troop "A" VFW office and that's 65 Court Street, Room 317?

A.     Yes.

Q.     All right.  Um were you the only one there that heard it?

A.     Yes.

Q.     So it was you and him?

A.     I think there was just me and him in the Unit.

Q.     Um do you remember what he was trying to describe when he went into this, cuz he?

A.     Just referring to like some case that he was working on and there was an old black guy involved and for some reason whenever he you know encounters like an old black guy you know this is his favorite, (inaudible), you know, it's like...

Q.     All right so whenever, whenever you guys are discussing cases where he has, has an interaction with a...

A.     Older black...

Q.     Older African/American man...

15



Page

A.    Yes.

Q.    He, he comes out, it seems to me he comes out with that phrase?

A.    Um-hum.

Q.    All right, now you, you have here, you have here in the memo, "Due to the location of the "A" VFW office within the SIU Buffalo office, Members of SIU Buffalo could also possibly be witnesses." Kind of explain that.

A.    Um...

Q.    Since I've never been there.

A.    The uh, the office um in the State Building is uh it, it used to be like an open area, the SIU office in the shape of like uh, I guess an "L". They did some remodeling, they, they put up a I guess...

Q.    Wall, partition.

A.    A wall but not a, a, a full wall, it has a threshold opening that goes to a smaller part of the office that's been sectioned off. We are in the smaller part of the office that's sectioned off. Um and his desk is right you know where the uh threshold is. SIU is right...

Q.    Right next door?

A.    Yeah.

Q.    So, and you're saying, I mean you're saying that the walls are, they aren't completely sealed off and they're thin and that some, some people may have heard some of these comments in SIU?

A.    There's a possibility or he uh, he thinks it's so funny that you know he likes to repeat himself and...

Q.    He maybe saying them to other people?

A.    Yes.

Q.    All right do you know of anybody that, that he has said this in front of?

A.    No.

Q.    Okay. Now did you confront him after he said this time?

A.    No, uh early on when you know I over time said it to uh you know fade back or um I

16



realized that you know I had to get along to get along, so uh I wasn't as vocal. You know I, I think as time went on he would say you know stuff like this and I would shake my head and just walk away. But earlier on you know I would tell him, you can't say that. You know but then...

Q.  Was there ever a time when you heard him say this exact phrase and you said yeah you can't do that, that's no, do you remember any instances of that, confront him about, cuz it seems like he does this a lot, that specific incident of like recanting the older African/American men?

A.  No I, I never really confronted him about that phrase...

Q.  That phrase.

A.  (Inaudible).

Q.  Okay. Now at that time, at this time do you remember if you just shook your head and walked away?

A.  Yes.

Q.  All right and when you say shake your head, I mean are you trying to you know, would it be obvious that you know if a, if a, a reasonable person was watching you they would find that you're, that, they, they would think that your feeling that it's either uncomfortable or inappropriate or they shouldn't have said it?

A.  Yes.

Q.  All right. Do you think he noticed you walking away and, and saw your head shaking?

A.  Yes.

Q.  All right. Am I missing anything about this incident before we move onto the next one?

A.  No.

Q.  And you said you documented it, you have it at June 11, 2013 at 2:30PM, how'd you come up with that date and time, I mean do you, do you recall how you got that specific?

A.  Uh usually we, we get back to the office in, around uh 1:00 – 2:00 and I remember there was a folder on my desk with the information from the arrest earlier so uh that's how I came with the 2:30PM time.

Q.  Okay.

A.  So.

17



Q.    How'd you get that date?

A.    I just remember the...

Q.    You remembered it?

A.    Yeah.

Q.    All right, fair enough.   All right we're moving on to your next incident here in your memorandum, which you say on May 2, 2013 at approximately 8:00AM, Senior Investigator KEN, KENDALL uttered the racial slur and he used the "N" word again, the n-i-g-g-e-r.

A.    Yes.

Q.    Um you have it as Mozelle's (inaudible) in Buffalo, New York?

A.    Yes.

Q.    All right can you describe, can you describe it?

A.    Um the guy was uh, they were looking for the target was uh Moore's Barber, and I'd done like a uh, like a rolling surveillance the day before and noticed that you know there were a bunch of people sitting on uh the, the porch or the stairs of uh the location, there like maybe five people or so.   And uh there was an older black male and you know I mentioned that to him and that's when he responded with you know his favorite uh you know...

Q.    He like, when you, when you told him that he went back into that, that phrase of the, the older African/American guy and, and that comment right?

A.    Yes.

Q.    All right and that's the, "Awe man I ain't seen that," "N" word, "In a minute?"

A.    Yes.

Q.    Um who else was there when he said it?

A.    Uh we were in the car together.

Q.    You were in the car?

A.    Yeah.

18

Page

Q.    Just you and him?

A.    Um-hum.

Q.    Nobody else, um did you say anything to him?

A.    No I just you know didn't really look at him and I was, looked out the window you know.

Q.    All right um he say anything else?

A.    No.

Q.    Now when you say you looked out the window, this is not like shaking your head, do you know, do you know if he had any idea that, if he, if he knew you were pissed or upset or that offended you?

A.    Uh...

Q.    For this incident?

A.    For this incident probably not, I, I just you know didn't really acknowledge him you know.

Q.    Okay didn't make it obvious that you were upset or?

A.    Yeah.

Q.    And you didn't tell him, all right. Anything about this incident?

A.    Uh no.

Q.    All right we'll move onto another incident here, and this one you have as an unknown date and time, sometime of this year 2013. Uh Senior Investigator KENDALL plays the racially offensive online video of an African/American female and makes fun of her. Um and you have that, it occurred in your Troop "A", your office there?

A.    Um-hum.

Q.    Okay explain to me, explain to me what happened?

A.    I was doing reports and um he called, called me over to his desk and uh he had pulled up the uh video, his computer, and uh you know he played it you know and he's like you know laughing. And then uh he starts to uh imitate her.

Q.    All right so and this was the, this was the, the video that I showed you in my office that we, that I researched on line on YouTube?

19



A.    Um-hum.

Q.    And um so he was imitating what she said?

A.    Yes.

Q.    All right, now before we, did, now from the video that I saw it was a news article, it was a news report about this, this lady who had actually, I think there was a fire in her apartment and she had to leave and they were interviewing her.   And during that interview um she made some comments?

A.    Yes.

Q.    Did you find, now you said, did you find that video itself racially offensive from the interview?

A.    Uh the, the interview itself uh...

Q.    I'm talking about the video.

A.    Right uh within the African/American community um you know there, there's some people who uh, who have uh tendencies to act negatively and you know it, it didn't strike me as like uh the greatest representation of uh African/American female.   And I didn't you know have a problem with that you know.  The video stands on it's own I mean, this is the way she is.  The fact that he pulled it up and he was making fun of it you know, oh he indicated that you know he was mocking her uh ignorance.  She, she basically was you know recalling what happened to her you know.

Q.    And you're saying it wasn't, I mean she is who she is...

A.    Right.

Q.    He wouldn't say it to you, you don't...

A.    She (inaudible) educated at Harvard

Q.    You don't...

A.    She's you know.

Q.    He don't like her you know, it sounds like what you're saying, I don't want to put any words, her, you don't like her, her interview or, or how she's acting as to be the best image of the African/American community I mean?

A.    Right.

20

Q.   But it was more of him, him bringing the, the video up and repeating it and mocking her?

A.   And mocking her, yeah.

Q.   And you felt it was inappropriate?

A.   Yes.

Q.   I'm correct in saying (inaudible)?

A.   That's correct.

Q.   Um…

B.   What was the name of the video, do you remember it?

A.   Uh sweet brown uh (inaudible) escape.

Q.   You were the only there who saw it?

A.   Yes.

Q.   Um did you, did you tell him, did you confront him over it?

A.   Well I, I told him that it's not funny you know.

Q.   You told, you told him right then and there that you didn't feel that it was, that the video was funny?

A.   Yeah.

Q.   And did he tell you why he thought it was funny?

A.   No he just you know, he just thought it was funny.   I mean he didn't you know explain why but you know.

Q.   All right so he was kinda laughing in the, kind of shrugging it off like it was no big deal?

A.   Um-hum.

Q.   And to you it, to you it's a big deal?

A.   Yes.

Q.   You said nobody else saw it and that was the, that was the extent of your confrontation that you just said you didn't think it was funny?



A.    Yes.

Q.    Am I missing anything here about this?

A.    No.

Q.    All right, we're gonna take a break the time is 12:29PM.

The time is 12:34PM, we're resuming our interview.   LEE, I think we just finished up everything on the video, um we're gonna move onto a, another, another incident.   Now you said, just going on this, this video you said it was unknown date and time and in 2013.   I think when I pulled up the video it um, I think the news article came back sometime in 2012 and I don't really recall the date but could this of, could this of occurred back in 2012 or you're sure it was this year?  It's not that big of a deal but.

A.    Yeah I, I think it was this year.

Q.    This year, okay.  Do you know, do you, do you remember anything that triggered why he was looking at the video at that time?

A.    No.

Q.    No, had nothing, as far as you know had nothing to do with any of the cases you were working or any of the cases he was working?

A.    No, so.  But that, that's not he only thing that, that's the only thing I could remember um that he pulled up but there would be uh times he would you know call me over to his desk and show me some you know, a video or picture, but for the life of me I, I couldn't remember anything else but that kind of stood out in my mind so.

Q.    Now sometimes when he called you up to show videos, were they sometimes just humorous things that had nothing to do with race you know?

A.    No um most, most of the times when I came over they were about you know, uh race, African/Americans, um I want to say maybe you know like police videos or something like that you know.

Q.    Okay.

A.    But...

Q.    Um and the police videos were about race or they were just...

A.    Uh just African/Americans being you know chased and you know just doing silly stuff.  Uh and I can't remember specifically.



Q.     Okay.

A.     But...

Q.     All right.  Um and were there any, do you remember at any times when you were talking about these videos or any other videos, did he make any other comments about race or go into these um statements that he's, he's made or used the "N" word?

A.     No.

Q.     No.  could I mean, could his, could he be just bringing you over to show you because he thinks they're funny and he's trying to kind of (inaudible), I'm not saying it's appropriate but I'm kinda saying that I'm bringing you over as a fellow Member and you know trying to you know cuz I like you and I, I think it's funny so I'm trying to show you something that's funny?

A.     Well given the fact that you know my (inaudible) with the State Police you know has been uh kind of like uh always, I wouldn't say uh things with like some kind of racial overtone or whatever but you know from my Academy days on through my uh career you know people have always labeled me as a militant you know and...

Q.     What do you mean militant?

A.     I, I have no idea but this, this is how, the, the label that was slapped on me.  Like um when I was in the Academy um there was an incident with the uh, ETOC or radar instructor where they took a, you know a group of us out and I was like the only African/American and uh we did the uh training and then uh, we broke for lunch in a restaurant.  You know the guy he starts laying it down heavy with the you know watermelon, the chicken and for that.  And uh everybody in the establishment is you know cracking up, except for me, uh I'm a recruit Trooper.

Q.     And, and the what, those are terms that have been known in the past to be used that are kind of, can be considered racially insensitive towards African/Americans?

A.     Right the, you know stero, stereotypical.

Q.     Okay.

A.     And um basically uh you know I didn't really like it.  I, I didn't know what recourse I had back then and uh I mentioned it to my counselor when we got back to the uh Academy. I, I was in the (inaudible) Academy and uh I told him that hey maybe one day I'm gonna have to you know patrol this area and you know these patrons all they're gonna remember is that day. You know they're not gonna respect me you know.  So uh that, that's when uh they called COOK, TEDDY COOK.

23



Q.    And they investigated it?

A.    Yeah and from that point you know for it you know I was labeled as a militant you know, yeah the whole um.

Q.    Do you think that, I would, I would say that you are pretty, I want to say from what you're saying that you are pretty um and I think you wrote it in your memo, no tolerance, zero tolerance when it comes to racial um, any sort of racial uh, uh word, words that can be like you said stereotypical or insensitive.

A.    Um-hum.

Q.    That, that's an accurate statement that you have a zero tolerance policy?

A.    Well I, yeah personally uh I don't, I don't do them um because I know once I open that door you know there's like a, probably like an encyclopedia of uh material for guys to, to you know go on and on about.

Q.    And you're, but you're pretty, you're pretty, I mean there's nothing wrong with it, you're pretty up front about that though right, you tell people that when, when...

A.    Oh yeah.

Q.    Okay.

A.    You know and, and you can ask anybody that you know I work with you know. I don't, I don't make (inaudible).

Q.    You don't like any, you don't like any, any comment that has any sort of negative stereotype towards African/Americans or any racial...

A.    Or any race, yeah.

Q.    Okay. All right we're gonna go back to the next incident here and according to your memo it's incident number four. On January 28, 2013 at approximately 9:00AM, Senior Investigator KENDALL uttered the racial slur and used the "N" word, the n-i-g-g-e-r word again.

A.    Um-hum.

Q.    Um and you have the location as University Plaza, Main Street in Amherst, New York. All right can you explain that to me?

A.    Uh we had uh gotten a referral from uh Investigator uh in "E" Troop regarding this uh guy DON MUMFORD. I had went over to the house a, a couple times and uh there were no

24



'answer.  So basically you know I said well...

Q.      And you were looking for DON MUMFORD?

A.      Right.

Q.      Okay.

A.      Um, "Well KEVIN let's go over there and see if we can grab him up."  So we go to the house and uh you know he's there, he won't, he wouldn't open the door initially but then he did.  He got arrested.  Um older black male, you know with the graying beard and everything.

Q.      DON MUMFORD'S an older black male?

A.      Yes.

Q.      Okay.



A.      And um so we, we took him to the University Plaza after making arrangements to uh turn him over to like an Amherst patrol.  And uh once again you know he just recalls you know the old black man you know who says, "(inaudible) I ain't seen that in a minute," you know.  The guy didn't say anything like that, you know it's just something about old black men that makes him want to say that particular phrase.

Q.      This was, this was Senior Investigator KENDALL going back into that, whatever that memory of his or whatever scene that he has in his head and he just repeated it?

A.      Yes.

Q.      Based on (inaudible) incidents besides the first two incidents we talked about?

A.      Yes.

Q.      All right, um who was there when he said it?

A.      Uh just him and myself in the car.

Q.      Okay so it was in a car?

A.      Yes.

Q.      All right.  And it was, where were you in the car, do you remember, what location?

A.      Uh in University Plaza, um probably towards the front.

Q.     Okay so you actually remember where you were?

A.     Yeah.

Q.     Park, in the parking lot of the plaza?

A.     Yeah.

Q.     So it, it stood out to you that, that much?

A.     Um-hum.

Q.     Okay.

A.     And DON MUMFORD was a nice guy too.  I mean he was, you know I mean, well after he opened the door he was cooperative and everything but you know.

Q.     All right.  Um and you remember the date and time because obviously that's the day you arrested DON MUMFORD?

A.     Um-hum.

Q.     Okay.  Anything else about that incident?

A.     No.

Q.     Did you confront Senior Investigator KENDALL about that at that time?

A.     Uh no.

Q.     Did you do anything, make any indication that you were displeased with the comment?

A.     I, I tried to ignore him.

Q.     Okay.  All right moving onto incident number five, and this is January 14, 2013 at approximately 10:00AM, Senior Investigator uttered uh, you call them racial epithets, uh savages and monkey during an interview of an African/American female.  And you have the location here as 115...

A.     Kosziuszko.

Q.     Okay Kosziuszko, K-o-s-z-i-u-s-z-k-o, Street, Buffalo, New York.  Can you explain, explain that incident to me?

A.     We were looking for uh AARON GLEN, who actually assaulted uh someone at a train station, we were working with the NFTA detectives, um...



Q. NFTA, is Niagara Falls Transit Authority?

A. Yes, and um we went to a couple locations uh prior to this and uh had negative results and then when we went to uh this house, his, this is his uh sister, ERICA (inaudible). She uh, she went, she answered the door, we went in and uh KENDALL basically uh said you know, "Ya we're looking for your brother, him and a bunch of other savages uh beat up this uh retarded kid at a train station."

Q. Now I have to, for the record, AARON GLEN and ERICA, are they African/American?

A. Yes.

Q. All right.

A. And uh as you, you know explained it to her she replies she hadn't seen him or, yeah she hadn't seen him, hadn't talked to him. And uh but she was very cooperative and we uh cleared the house and while we were away from like you know the uh detectives and her he recounted, he said um that she had a great body you know for like monkey sex you know. I mean uh not, it was inappropriate on you know two levels but you know um...

Q. And that's what he said, um you know she had a great body for monkey sex?

A. Um-hum, yeah and uh yeah I said, "Well she's not my type."

Q. What, all right going, going back to the savages, it seemed you know, were you offended because he referred to African/Americans as savages, is that what the, the offense was, kind of explain why you were offended with the words savages, or you were just, anytime any, you know is it anytime anybody uses savages as offensive?

A. Well I've noticed, I've noticed uh that a lot of people uh will, let me rephrase that, a lot of um police officers actually uh don't use like negative uh words like the "N" word. Some of them have a, you know (inaudible) to using uh other words, like savages, um animals to describe you know African/Americans or minorities. So...

B. So in your lifetime experience would say the majority of time in your personal experience that the terms savages or monkey has been used it has been used by Caucasian people to describe African/American people?

A. Yes as something you know, subhuman, less than you know an average person.

Q. And, and very disparaging, in a disparaging way?

A. Right.



Q.   All right.

B.   And when Senior Investigator KENDALL remarked at ERICA (inaudible), had a great body for monkey sex, did you interpret that as him calling ERICA a monkey because she was African/American or was there some other explanation of monkey sex?

A.   I think there was uh the fact that you know yeah he was relating the monkey to her, that in my mind that's how I, I perceived it you know.

B.   Okay.

A.   Uh I've never heard of monkey sex but.

Q.   Well that's what I, I mean that was gonna be my next question…

A.   Yeah.

Q.   I was gonna say what is monkey, what is monkey sex, is that, I mean to me it almost sounds like he's referring to sex with an African/American partner…

A.   Right.

Q.   And that, that, and just saying that kind of, I can see how that can be offensive cuz you're right off the bat separating it by racial lines.

A.   Um-hum.

Q.   You good JUNE?

B.   Yes Sir.

Q.   All right um so and who witnessed that, we had who?

A.   The uh…

Q.   The savages comment was witnessed by ERICA (inaudible) correct?

A.   And uh I want to say the uh NFTA uh detectives also.

Q.   And you have that as CHARLES LOEBERT and RICHARD LEWIS?

A.   Yes.

Q.   All right and then how about the, the monkey thing, sex comment, was that?

A.   That was made when we were away from the group.

28

Q.   Okay so, so it was just you and, you and KEVIN KENDALL?

A.   Um-hum.

Q.   All right.  Did you, did you say anything to KEVIN at that, at that time?

A.   Uh just that she wasn't my type.

Q.   Okay, now in, and I know going back in the past when you've had conversations, I know, I know, I remember we specifically said that you've had conversations about the "N" word…

A.   Um-hum.

Q.   With KEVIN, did you have any conversations about the word, the use, the use of the words savages towards African/Americans with KEVIN KENDALL?

A.   No.

Q.   All right how about the word, how about the use of the word monkey towards African/Americans with KEVIN?

A.   No.

Q.   No.  Anything I'm missing about this incident?

A.   Um no.

Q.   Did anybody else, did any of the other people there, did they, any of them seem offended by the use of the term savages or, or by, you were the only one with monkey sex but as far as you knew?

A.   Uh no the other guys they didn't seemed phased by it.

Q.   Did ERICA (inaudible)…

A.   Yeah.

Q.   Did ERICA (inaudible) did she make any comments or, or…

A.   She didn't make any comments about it no.

Q.   All right we are going to move onto the next incident, which would be number six on your memo.  You have on November 6, 2012 at approximately 1:30PM Senior Investigator

29

KENDALL uttered the racial slur and he used the "N" word, n-i-g-g-a.  Um why don't you, I know you said it occurred at the Troop "A" VFW office in Buffalo, why don't you explain that to me?

A.   Um Senior KENDALL called me over to his desk as he was using (inaudible) and uh he had a Facebook uh page pulled up and uh it was uh a fake Facebook page that he had created to uh help him investigate or find uh DAMON LEWIS, who was wanted for attempted murder.  And basically uh he would use the uh, um Facebook page to kinda befriend uh people around uh LEWIS to try to you know get some intel where he might be or even to actually find out who to interview to see you know where the guy was.

Q.   So he was using, he had a fake Facebook account as an investigative tool?

A.   Right.

Q.   To find this DAMON LEWIS.

A.   Right.


Q.   All right and as part of this Facebook account, uh which you're show, you're showing me a picture here, he, he had the, the Facebook account under the name SHANIQUA STAXX O'MAANWILLIAMS?

A.   Uh (inaudible).

Q.   (inaudible).

A.   STACKS, code name WILLIAMS.

Q.   Okay, um and he would post comments and try, like you say would try to friend people in DAMON LEWIS' I guess...

A.   Circle.

Q.   Circle, all right.  Continue with your...

A.   Um I was aware that uh the guy uh, DAMON LEWIS had been arrested, uh the day before.  Was it the day before, yeah it was the day before, cuz I heard through the other task force members that you know...

Q.   They had arrested him?

A.   They had arrested him.



Q. Do you know if Senior Investigator KENDALL knew that DAMON LEWIS was arrested?

A. Yes he did.

Q. And how do you know?

A. Uh basically uh when he showed me the, the post um and what he had uh you know put on you know the, the comment section, you know I looked at the, the date and time and it was like you know 10:30 at night, the night of the arrest.

Q. All right so and we're talking about a post that he posted under his pseudo name (inaudible) and I'm not gonna try to say the last name, um and this is where I want you to read out the comment.

A. Uh it goes uh, "Fuck you (inaudible) "N" word, I hope you rot in jail.  You just a pussy ass"B" shooting,"...

Q. Okay we didn't have any, that, that's the comment though, we don't need to get into the whole thing.  And this was posted, this looks like according to this, this was posted around November 5th at around 10:33PM.  All right um and you're saying that DAMON LEWIS was arrested prior to that?

A. Um-hum.

Q. All right how would you, how would KEVIN KENDALL know that DAMON LEWIS was arrested?

A. Well um I want, I want to say that maybe he heard it from another task force member but I, I can't say directly that he did.

Q. Did your task force arrest him, arrest him?

A. Yes.

Q. All right.

A. Uh two of our guys um BRENDEN KIEFFER and uh DOUG WILSON, and that you know the, the story was uh, I want to say that KEVIN told me how, how they had you know went to a house that the mother had rented uh and we, we had been looking for this guy and the mother wasn't, wasn't cooperative.  But the mother rented an apartment and they were in a BPD uh surveillance van or some jump out van and uh they saw the kid walk, walking down the street and uh you know they just grabbed him you know.

Q. So he told you that story of how they arrested him?

A. Correct.

31



(8/21/2013) Lethonia Miller - Miller, Lethonia 080113 KR.doc

Page 3

Q.     As far as you can recall?

A.     Yes.

Q.     So he would know he was arrested?

A.     Yes.

Q.     Okay and so then he posted that, he posted that comment on his Facebook page after DAMON was arrested?

A.     Yes.

Q.     All right.  Um so and what you're saying is on the day after, this is the day after he got arrested he called you over to show you that comment?

A.     Yes.

Q.     And did, did he repeat the comment out loud?

A.     Yes.

Q.     All right um...

B.     Did you ask your Senior why he posted that comment or did he tell you why he posted the comment?

A.     Nope uh I just shook my head and said you know, "Not cool," and then, and walked away.  I mean I, I couldn't, I was saying why would you you know post something like that and then there, there was no need for it so.

Q.     Because he, because he was already arrested?

A.     Right.

Q.     Um and I guess that will bring me to my next question, what investigative purpose would be for that, for him to put a comment on that Facebook after (inaudible) LEWIS arrested?

A.     There, there is no reason for it.

Q.     Does he still maintain that Facebook account now?

A.     Yes I, I've checked it every morning pretty much.

Q.     Um does he use that Facebook account for other cases?

A.     Not that I'm aware of.

Q.     So as far as you know there's no reason to keep that account active?

A.     Well uh not unless he's gonna you know hopefully use it for another case.  um I think we, we talked about Facebook accounts and he said uh basically that um when people look at the accounts they, they notice how many friends you have and you know if you don't have a lot of friends then it doesn't look as credible.  So...

Q.     So he could be maintaining that account as a possible future use in other investigations?

A.     Yes.

Q.     And he's maintaining an active interest in it because if you stop using the account then all of a sudden people stop thinking it's real...

A.     Um-hum.

Q.     Or stop communicating with you, is that a fair statement?

A.     Yes.

Q.     All right.

B.     Do you know where your Senior obtained the photo who the true, what the (inaudible) identity of the person depicted as (inaudible) is?

A.     No and I never really asked him.

Q.     Now the, the comment that he posted, did it antagonize people on that Facebook page?

A.     Yes um I don't know if they're like family members or friends but uh a couple girls wanted to you know beat up the young lady who posted it.

Q.     Mean, meaning they, they wanted to beat up (inaudible)?

A.     Yeah.

Q.     Which is otherwise Senior Investigator KENDALL under a pseudo name?

A.     Right.

Q.     All right um now do you know if this, if the picture that Senior Investigator KENDALL, KENDALL used is of a local girl?

Page

A.   I don't know, I, I, I couldn't tell you.

Q.   Do you, did you have concerns about it being somebody local?

A.   Well big concerns uh after uh I started talking to uh a few people about you know Facebook and images and um and I got education with uh you know um (inaudible) and photos and everything um I started to realize that you know this person could be found you know by somebody who was you know pretty savvy in computers. And um yeah I'm thinking about the, the comments that the other girls were saying well you know okay where are you you know. If they came across her and they could jump her and she wouldn't know why they were beating her up you know. And not to mention the fact that okay these are friends and relatives of like uh you know a thug who was just arrested for attempted murder or murder. So you know so they're not going to be you know nice people either so.

Q.   So you're worried about you know if this girl's local that she could be in danger?

A.   Yes.

Q.   Okay but you don't, you have know idea who, who she is?

A.   No.

Q.   Did you ever bring that, bring your thoughts or worries to Senior Investigator KENDALL about that?

A.   No.

Q.   All right so you never had a discussion about that Facebook?

A.   No.

Q.   So, so it's on November 6th when he called you, when he called you over and he repeated that comment, right he repeated it to you out loud?

A.   Um-hum.

Q.   Did he tell you why he was saying the comment or why he posted it?

A.   Not really it, it was more or less like uh he was you know satisfied that the guy got arrested you know.

Q.   Did he tell you, did, did he make any, any indication that he was trying to antagonize these people in anyway?

A.   No.

34



Q.      No he just told you, he just told you that he posted it and you didn't ask him why?

A.      No.

Q.      All right um but you, you felt that even verbalizing that comment with using the "N" word again was offensive?

A.      Yes.

Q.      All right and you, you, you also felt that him even using the comment on Facebook is offensive?

A.      Yes.

Q.      Okay because I think your, your next, the next incident number seven is pretty much the same incident with the, as with the, the Facebook but...

A.      This is the posting.

Q.      You're, you're saying with the posting itself was offensive to you and then him actually um uh articulating it to you is also offensive...

A.      Yes.

Q.      In the last two incidents?

A.      I mean if he really had a personal beef or vendetta with this guy or with the investigation, you know I don't think it's too professional to uh you know express yourself that way. Um I mean he could of said you know something you know benign like ha I heard you're in jail, whatever.

Q.      And I think, and this just this kinda goes back to the beginning that to you the use of the "N" word is inappropriate no matter where or no matter what undercover capacity or whatever you're, whatever you're doing you know even, even use street language it shouldn't ever be used?

A.      Yeah...

Q.      By anyone?

A.      And, and, and I actually uh, I worked uncover and...

Q.      And you, you worked undercover, do you, have you ever, have you been successful in being in undercover operations without using that word?

35



A.     Yes.

Q.     Okay.  All right so um did anybody, was there anybody else that heard uh, heard that comment when he over, when he basically uh articulated that comment that he put on Facebook?

A.     No and it was just the two of us there, but I'm pretty sure that he showed uh some other people.

Q.     Showed other, some people in the office?

A.     Yes and...

Q.     All right and the next incident, it's the number seven, you basically have November 5, 2012 at 10:30PM um which is when he posted it, that's also, that's what incident seven's about, it's of the offense, it's offensive to you because he posted it on Facebook?

A.     Yes.

Q.     Okay.  Um and then we have, you have the witnesses are the couple of people who made comments, who obviously read the comment, like (inaudible) and (inaudible) BUTLER and SMILEY JONES?

A.     Um-hum.

Q.     Okay.  Have you ever talked to any of those people?

A.     No.

Q.     You don't, you don't know who any of those people are?  No?

A.     No.

Q.     Okay, all right anything about that incident we're missing before we move onto number eight?

A.     No.

Q.     Okay, incident number eight, on or about July 27, 2012 at approximately 1:00PM Senior Investigator KENDALL uttered the racial slur and he used the "N" word, n-i-g-g-a, and that was at your office, the VFW office?

A.     Um-hum.

Q.     Can, can you explain that to me?

36



A.     We were looking for a, a guy by the name if RAMEL BRUNDAGE, he has a child by a, a Caucasian female uh in Lockport, excuse me Niagara Falls.  And uh we're, we're out there to uh we went to uh this young lady's house and uh there was a, the, I was on the perimeter and I think uh Senior KENDALL was outside also, but uh a couple of the guys were inside and were interviewing this young lady.  Uh one of which was uh (inaudible), from uh Buffalo PD, and he basically you know got this young lady riled up because you know they asked her well where, where's uh RAMEL and you know she started throwing "N" word around.  "Well I haven't seen him, I haven't seen that," you know "N" word.

Q.     She was using it?

A.     Right.

Q.     The, the person you were interviewing?

A.     Right.

Q.     Okay.

A.     So um then (inaudible) uh he according to you know what he said, he, he asked her, "Well why do you keep referring to him as you know the "N" word when you're, you're sitting there with a son with, and that makes him half an "N" word."  And she went ballistic and uh...

Q.     Was she using the "N" word in a insensitive tone or offensive tone?

A.     I couldn't tell ya.

Q.     Okay.

A.     Because I, I, I was, I was outside.

Q.     You weren't, you weren't, were you, you, you didn't hear it, you didn't hear her say it?

A.     Right.

Q.     Okay.

A.     But um while I was outside I did notice that uh you know I wouldn't really know what was said inside but this is BRENDEN KEIFFER uh telling the group what, what was said.

Q.     He came out and told you what happened inside?

A.     Right.

Q.     All right.

A.   But her reaction I mean she went ballistic, I mean she broke the frame on the window, you know she was screaming and yelling and her father had to try to calm her down.  Um and that's when you know he said, "Well this is you know why she's upset so."

Q.   So he came, did, so this is KEIFFER came outside and told you?

A.   Right.

Q.   All right well how did um, how did Senior Investigator KENDALL get involved?

A.   He thought it was hilarious.

Q.   How do you know that?

A.   Uh he was laughing and smiling you know and uh he, he just repeated what the guy said.

Q.   He did repeat it?

A.   Yes.

Q.   Okay to who?

A.   Uh to me.

Q.   All right.

A.   But I was there so I, I didn't you know.

Q.   Okay.

A.   ~~I didn't, I didn't see any need to uh actually hear it again.~~

Q.   Who else was there?

A.   Probably the Niagara County guys, you know JOE (inaudible), JOSEPH (inaudible).

Q.   And he is?

A.   Niagara County uh Sheriff's...

Q.   Sheriff's.

A.   Deputy.

Q.   Okay.



A.      Uh JERRY (inaudible), he's uh Niagara County Sheriff's Deputy also.

Q.      Okay.

A.      I'm trying to think if, (inaudible) who was there from the uh US Marshalls though.   There was a large group of us so.

Q.      But there were several people who overheard it?

A.      Yes.

Q.      All right.  Um do you feel BRENDEN KEIFFER should have said that?

A.      No.

Q.      No.

A.      And I, and I mean you know knowing BRENDEN uh he's, he's got a very smart mouth you know and he likes to stir you know things up.  I don't know what he said inside to that young lady but she was pretty riled up.  Um whether or not he said you know that...

Q.      Phrase?

A.      Phrase.

Q.      We're talking about the "N" word?

A.      Right.

Q.      Did you confront either BRENDEN KEIFFER or Senior Investigator KENDALL about either, about that, about what was said or how it made you feel?

A.      Um...

Q.      At this time?

A.      Well with KEIFF, uh KEIFFER no, at that time we're out in the field so.

Q.      Did you have a conversation with KEIFFER later about this or any of his comments?

A.      No.

Q.      And then you said you didn't have a, did you say anything to KEVIN KENDALL?

A.      Uh I, I tried to ignore him.

Q.     Just ignored him again?

A.     Yeah.

Q.     Okay.  All right we're gonna move onto the next incident, um incident number nine, late summer, early fall 2012, Senior KENDALL uttered the racial epithet animals, all right and you have it at 100 Dunlop Avenue in Buffalo, New York.  Can you explain that situation?

A.     We were looking for um, uh THOMAS CLARK, um I think it was a federal warrant and uh I was on the perimeter again and a group of guys went inside, one of which was Senior Investigator KENDALL.   Um you know they went in, cleared the house, uh did their interview and, and they came out.  He kind of like said you know...

Q.     And he's KEVIN KENDALL?

A.     Yes Senior KENDALL, uh said that you know, you know, "They're you know fucking animals, how can they live in this you know shit," or whatever.

Q.     And who was he referring to when he said that?

A.     Uh the occupants of the house and I, I want to say it was like a, a girlfriend of uh THOMAS CLARK, I, I can't remember her name.  And uh subsequent to this um you know we were still working the case and I went into the house and the house you know okay it wasn't clean you know.  But...

Q.     It, it was a dirty house?

A.     Yeah it was a dirty house.

Q.     Um...

A.     But you know it wasn't our place to judge you know so.

Q.     Who, who lived in the house?

A.     Um THOMAS CLARK'S girlfriend.

Q.     Girlfriend?

A.     Yeah.

Q.     Anybody else?

40



A.     I think a bunch of kids.

Q.     Bunch of kids?

A.     Yeah.

Q.     What race were they?

A.     Uh African/American.

Q.     So they were all African/American?

A.     Yes.

Q.     So when he made the comment um you took it to, you, you took it as he was inferring, it, it was a racial epithet to you?

A.     Yes.

Q.     Racial tone.  Um do you think he could of, I mean that, do you think that kinda had anything to do with the, more of the conditions you know not you know, do you think, I guess, I guess (inaudible) if it was uh same house with maybe white or Hispanic or a different, or a different uh, different race, do you think he would have said the same comment?

A.     No I don't think he would have said the same comment.

Q.     So to you the way, when he said it it was all, it was because of they were African/Americans and he was putting them down?

A.     Um-hum.

Q.     Which is derogatory towards the, the people in the house?

A.     Yes.

Q.     Um and you have as witnesses you have FRED NOWACK, NOVAK?

A.     Yeah.

Q.     And who's, and who's he?

A.     He's the uh, uh Deputy US Marshall.

Q.     Okay.

41

(8/21/2013) Lethonia Miller - Miller, Lethonia 080113 KR.doc | Page 42

A.     Uh one of the task force members so.

Q.     Anybody else?

A.     I, I couldn't remember who else was there but there was a, a group of us um...

Q.     Task force members?

A.     Yes.

Q.     Does he ever make these comments outside of the task force or outside of the State Police, general public you know, have you ever, I guess have you ever witnessed him make comments outside of your group?

A.     No.

Q.     All right so not, not when he's interacting with you know you have a witness or a suspect, you've never heard him say anything like this?

A.     No.  Except for the you know, um saying savages to the young lady.

Q.     The, the, I forget her name (inaudible)?

A.     Yeah ERICA (inaudible), yeah.

Q.     All right, okay.  All right we're gonna move onto the incident, uh you have the next incident February 17, 2011 at 2:00PM, Senior Investigator KENDALL uttered the racial slur and used the "N" word, n-i-g-g-a again.  And this was at the VFW office according to your memo.  Can you explain that um, explain that incident.

A.     Uh he was looking for uh TOBIAS (inaudible), um skipped town, I think it was a federal warrant also.  And uh I remember him telling me that uh you know everybody you know that he was talking to at, interviewees, you know African/American, they were, they were telling him you know that you know this guy's very smart, you'll never catch him you know.  And uh apparently uh he, he interviewed someone and the person said uh ya'll ain't gonna catch him cuz he, he, he a smart you know "N" word.  And...

Q.     All right so he was in, he interviewed somebody in trying to look for this TOBIAS (inaudible) and that person said you ain't gonna catch him, he's a smart n-i-g-g-a?

A.     Right.

Q.     Okay.

A.     And you know he, he repeated that to me you know.  So...

42



Q.   What, was, do you, were you there when he interviewed that person?

A.   No.

Q.   No. Do you know the race of the person that he interviewed?

A.   Uh I want to say African/American.

Q.   Okay, do you know, is, are you inferring that or is that just a guess or do you know that for sure?

A.   Well uh I don't know that for sure.

Q.   Okay.

A.   So.

Q.   But then he repeated that comment to you?

A.   Yes.

Q.   Um did you confront him about it at this time?

A.   Well um...

Q.   What'd you say?

A.   I think I said um you know it, it, it struck me as odd that you know he was um kind of like not really offended that people were saying that hey this guy's pretty smart and you, you're not gonna catch him. You know I, I said well, well why, I mean it, we talked about the smart versus you know dumb aspect and not so much the uh "N" word. And because it, it you know just made no sense that you know he's getting excited about you know people um saying that the guy is smart.

Q.   Who's getting excited?

A.   Uh Senior KENDALL, and like it was a personal challenge to catch this guy you know. So that was the, the extent of what, what I talked about that time.

Q.   Do you know if Senior Investigator, Investigator KENDALL refers to any or all African/Americans and the "N" word, n-i-g-g-e-r, n-i-g-g-a, or any sort of, something like that?

A.   I uh, I can only tell you uh what I've heard, um working...

Q.   And, and, and these are all, in everyone of these instances based in this memo?

43

A.    Right.

Q.    Right.  So outside of this memo you don't, you don't, ever, ever heard him refer to any sort of African/Americans using the "N" word?

A.    I, I've never really interacted with him beyond the job so.

Q.    Okay.  Um and you're saying when he told this last incident DONALD (inaudible) was there too?

A.    Yes.

Q.    All right and he overheard the whole conversation?

A.    Yes.

Q.    Anybody else?

A.    Not that I...

Q.    Not that you...

A.    I can recall.

B.    Did you at any point discuss with Investigator REAGER your sentiment as to what the Senior had said?

A.    No.

Q.    On that note have you ever discussed it with anybody in the unit about what KEVIN KENDALL has said with, with some of these other incidents you know when, when he's gone into his, you know that uh the old, the old African/American man and he kind of puts that comment out...

A.    Well...

Q.    You've talked it with anybody?

A.    No well as an African, African/American uh police officer within the State Police, you know I've learned that you know what's good for one person is not good for another person.  Uh it, you know I've been told that you need uh thicker skin and uh you need to be uh a little bit more tolerant you know.  And over the years you know I, I don't want (inaudible) you know, you know make a blatant statement or whatever.  But if a group has a certain uh leader or he sets the tone for the group.  I know if I had discussed you know race with anyone in the group you know I, I would be more on the outs then I was

44

already at the time.  Um I had no problem um checking uh individual investigators uh on the one and one.  Like DON REAGER, um I had no problem telling him you know how I felt about comments he made and that he's called me you know like Uncle, Uncle LEE and you know I would stop him.  I'd go, whoa what'd you mean by that you know. (Inaudible) to me it was like uh offensive because uh there, there was no reference, on a point a reference, I mean why would you call me uncle.  Um JOE (inaudible)...

Q.  So you, you've actually had conversations with people in your unit about your feelings towards any sort of these types of comments?

A.  Yeah I, I've, I've talked...

Q.  (Inaudible) it's fair, it would be fairly known in your unit of how you felt about any of these words or anything that, any type of comment that, that tends to separate you based on race?

A.  Right.

Q.  Right.

A.  But not, I, I didn't talk to them uh about uh KEVIN'S uh behavior, I talked to them on their...

Q.  Their, their own behavior...

A.  Their behavior.

Q.  Their behavior.

A.  So.

Q.  And I think you said it but pretty much after you've had these conversations with people in your unit, have you, has it pretty much ceased or has it you know you, you've cleared the air and they've not made these comments after that?

A.  Well with uh DON it was kinda like uh like a routine maintenance uh thing, you know he, he'd make one comment, I'd check him on it.  He'd make you know a different comment.

Q.  Did he apologize?

A.  Um not really but he, he would acknowledge it and it wouldn't be said again.

Q.  Okay.

A.  Um you know he, he talked like you know uh you know what you be talking about Willis and things of that nature.  And uh you know try, try to draw me into conversations with uh



um other Investigators, well African/American Investigators about you know, watermelon or you know stuff like that and I, I just wouldn't you know engage so.

Q.   But you say never talk, you've never talked to anybody about the Senior Investigator KENDALL'S behavior?

A.   No.

Q.   Or anybody, all right.

A.   But uh Senior Investigator KENDALL is a very highly regarded uh you know uh Investigator by people on the job and off the job. And I, I made the mistake uh early on, I, I mentioned something to a friend of mine, which got back to him. and it wasn't racial in, in nature but um it was just you know, just an observation that I made about you know Senior KENDALL and shortly after I you know, I'd talked to that person I became like you know ostracized you know kinda of on the outs. And uh I couldn't you know remember why but then it you know dawned on me, oh yeah I talked to this person about you know something you know innocuous. But you know just my observation of something that you know he was doing so.

Q.   How were you put outside the group?

A.   Well uh I, I, I know it might seem kind of petty but you know say if you're, you're outside, you're doing a briefing, uh you got a guys and um everybody comes together to take a look at the photos or the pedigree and uh you know I, I mean I could be you know inside you know like the circle you know and uh Senior KENDALL would make it a point to stand right in front of me you know.

Q.   Okay.

A.   You know, I mean to me I, I perceived it as being you know shut out so.

Q.   Oh he would, he would stand in front of you like kind of blocking your view?

A.   Yeah.

Q.   I gottcha.

A.   You know I, I know it seems kind of petty but you know it, it still registers with me so.

Q.   After, after he, and do you remember who you talked to regarding that incident?

A.   Uh I, I didn't talk to anybody about that incident but...

Q.   No I mean like when you actually confronted the guy and then it got, you, you're saying that you, you talked to some, you made an observation about Senior Investigator

46



KENDALL...

A.   Oh well yeah uh no I never uh, uh talked to that person only because uh it, it'll get back to Senior KENDALL basically.

Q.   And did you ever confront Senior KENDALL about, about that feeling that you got ostracized or?

A.   Uh no.

Q.   No.  At some point did you ever get back in the circle, I mean it was?

A.   Yeah it was shortly after that, I mean it was like he reacted to whatever, whatever I said, he was upset for I don't know a couple of weeks or whatever and then everything kinda went back to normal.

Q.   And you never, and you never talked to the person you talked to to find out if he told KEVIN KENDALL, you're just making the assumption?

A.   Right.

Q.   All right, not saying it's, it's inaccurate I'm just trying to get your knowledge on it.

A.   Yes.

Q.   All right, I'm gonna move on, did we get, did I cover that incident, (inaudible) talked about, the whole KEVIN feeling, pushing you on the outside?

A.   Yes.

Q.   All right I'm gonna move onto the next incident here.  Um I think we talked about that one, so I think we're onto the last one, number eleven.  Okay on August 2010, Senior Investigator KENDALL uttered the racial epithet animals and you said it was also at the VFW office according to your memo?

A.   Um-hum.

Q.   Um and can you explain that please?

A.   Um there was an article in the Buffalo News uh regarding uh the victims involved in the shooting.

Q.   The Buffalo City Grill shooting?

A.   Yes.

47



Q.     All right.

A.     And uh...

Q.     And you're saying, and all of them were African/Americans?

A.     African/American and they uh, the, the news piece actually put out that you know some of them had uh police records you know and Senior KENDALL you know basically said well they're, they're all animals you know.  and uh I, I, I think I was a little bit more vocal with that you know and I, I want to say that DON was there and uh you know I just said, well why, why, why do they have to be animals you know.  I mean these are victims of uh you know a violent crime.  I mean if you take race away, away from it I mean...

Q.     They're still victims.

A.     Yeah.

Q.     What did he say to that?

A.     He just shrugged it off you know like it is what it is you know.

Q.     Did, did he make any, do you think he would, I mean I'm trying to, trying to, did he refer when he said animals, do you think he was referring because to you they were, because they were, he was referring to them as African/Americans, is that correct?

A.     That's correct.

Q.     All right.

A.     I mean there've been highly publicized uh incidents where uh you know people uh group a lot large, groups of people have been you know shot or killed and I've never heard, once heard them referred to you know, you know Caucasians or you know another race as animals.  So...

Q.     So it's only, it's only and you know as far as, as far as you can recall with Senior Investigator KENDALL, he, he only refers to uh African/Americans as animals, you know if it's, if it's a Caucasian shooter he doesn't say it, you know they're animals, he would refer to them as something else?

A.     Yes.

Q.     And who witnessed that, who witnessed overhearing that comment?

A.     Um DON RIEGER.

Q.     DON RIEGER, anybody else?



A.    Um not (inaudible).

Q.    Not that you can recall?

A.    No.

Q.    Okay, um all right I'm gonna move onto the next incident number 12.  June 2010, Senior Investigator KENDALL uttered the racial slur and he used the n-i-g-g-e-r slur, um and you said this is in the vicinity of Shepherd Street and Catchall in Buffalo, New York?

A.    Um-hum.

Q.    Can you explain the incident please?

A.    Uh we were looking for GREGORY SHAW on a warrant and we went to that location, uh that area and I want to say his girlfriend was over there in that area.  And we checked the house, that was negative and we're, we're just milling around in that neighborhood and there was like a husky uh Caucasian woman who uh was crossing the street and uh she had a biracial son.

Q.    Biracial uh, African/American correct?

A.    Right, and uh I think she asked us uh basically you know who we're looking for and you know we told her and uh she didn't have any knowledge about the guy.  But then uh her son uh was kind of like in the street also and she said something like uh you better get over there before they get ya "N" word ass too.

Q.    N-i-g-g-e-r a-s-s.

A.    And uh you know I can't control what other people say, well civilians you know say so you know I, I, I just gave her...

Q.    You felt it was offensive what she said?

A.    Yeah you know and I (inaudible) you know and I just you know didn't say anything to her you know didn't uh acknowledge it or respond to it.  But uh Senior KENDALL uh had to repeat it and you know.

Q.    Any reason to repeat it?

A.    No, no reason at all.

Q.    Was, he was, was he repeating it in front of the woman?

A.    Yeah.

49



Q.    Yeah?

A.    Yeah.

Q.    Okay.

A.    So...

Q.    How many times, do you know how many times he repeated it?

A.    Uh I think just the, the one time.

Q.    Just once?

A.    Yeah just I mean like placing emphasis on it you know I mean I, I already heard it, I mean it doesn't have to be repeated I mean.

Q.    You didn't think it was funny the comment and what, what she said?

A.    No it, it wasn't, it wasn't funny, um.

Q.    But you felt Senior Investigator KENDALL did think it was funny?

A.    Yeah he, he did think it was funny.

Q.    And how do you know this?

A.    Uh the smile and the laugh you know pretty much.

Q.    All right um, I think that's it with all of our incidents.  These all, the only incidents that you can recall?

A.    These are like um the quantifiable incidents that, that there've been other things that didn't you know (inaudible).  I felt like you know I've been treated like a second class citizen within the group, you know whatever.  You know I, I don't really care as much but.

B.    When you say by the group you've been treated as a second class citizen, do you mean your peers as well when there were other Members of the unit or do you mean simply by the Senior?

A.    Uh my peers as, as well.

B.    Okay.

A.    And not saying that you know it's right, I mean I've been on the job for 26 years, I know



how to you know go home safely, I get along you know. (Inaudible) a, a lot of dumb stuff you know, racial stuff, um not even stuff that you can really define. Just feelings or whatever you know I, I've endured and uh I've you know developed like a certain kind of like uh coping mechanism for it. So uh these, these things stand out only because of uh you know they were associated with cases and you know and I, I remember and they, they stick out in my mind. But other little things that probably wouldn't meet the, the standard of a harassment or whatever you know occur you know on a, on a daily basis. And like I said you know I, I wouldn't put those to paper so.

Q.   Do you think or feel Senior Investigator KENDALL has a problem with African/Americans?

A.   I'm gonna say he has a problem with this African/American. Um...

Q.   Okay.

A.   I think you know anyone who uses that word uh in any, any racial slur, like if I had a you know, well as a matter fact um, um BRENT uh NOVAK, he has daughters uh that are uh actually mentally challenged. I have never used you know anything uh inappropriate terms to describe you know people with you know that kind of disability. You know I, I would never do that but apparently when people do use um racial slurs or phrases that are inappropriate you don't respect the person. So I, I don't think he respects me you know as a person. I mean regardless of what you know I've accomplished or what I bring to the table but.

Q.   Um now he's been your, he's been your supervisor for five years, approximately since 2008?

A.   Yes.

Q.   Has he given you, how have your performance reviews been?

A.   Um just average.

Q.   Average.

A.   You know I mean...

Q.   None of them, none of them have been unsatisfactory?

A.   Right.

Q.   Okay um and that's, has he given you, has he ever, has he ever had to talk to you and I don't want to say, you know I don't want to say negative but has he ever had to hey you know you gotta to work, work on something or you're, you're not meeting expectations, ever had a counseling session with you?

51



A.   No.

Q.   No, did he ever have a discussion where hey that was a good job, LEE you did a really good job on this, I'm impressed by this, any good, good conversation, good counseling sessions?

A.   No.

Q.   No, so you just complete like, I don't want to say average but satisfactory?

A.   Yes.

Q.   You mention in here that you felt that your overtime was curtailed because of, because of KEVIN KENDALL?

A.   Um-hum.

Q.   Can you explain that?

A.   Um earlier on uh when I was a little bit more vocal about you know him saying the "N" word...

Q.   And this was back in your early years, first couple of years in the unit?

A.   Right.

Q.   2008- 2009?

A.   Yes, um he was more or less uh kinda, I, I wouldn't say shut me down but you know cut me back.  I mean there were details that were uh conducted where you know I would come in the next day and find out that everybody went out you know to look for like a, a warrant suspect but I wasn't called.

Q.   So when you say everybody you're talking about every other Member of the task force or other Members of the State Police that were on the task force?

A.   Uh the task force in general, including the State Police guys.

Q.   Okay, so there were a couple of times where you didn't get called for, for overtime to go, to, to go arrest some of these, whoever, whoever you're looking for?

A.   Correct.

Q.   Do you have any, can you recall any specific dates or times?



A.    No.

Q.    About how many times do you think this occurred?

A.    I don't know maybe three, four times.

Q.    Three or four times.  Do you know if there was any other reasonable explanation of why you didn't get called?

A.    No.

Q.    Were you on annual leave, um you know was it in an area that you normally don't patrol, I mean that's uh, I, I wasn't there I'm just trying to?

A.    No, no but I do remember uh after you know uh coming in one day and not being part of the detail you know I explained to him that hey you know I'm here, I mean I'd like to go out and work the overtime.  I'm, I'm not crazy about overtime, you know I'm not you know trying to abuse the system or anything but you know I mean if you guys are earning overtime I, I want to go too.  So...

Q.    What did he say to that?

A.    Oh okay, no, no problem.

Q.    After that conversation did you have anymore issues?

A.    Uh no not really, no.

Q.    Not really or no?

A.    Uh I can't recall specifically if it, the, the thing corrected itself but I do remember having that, that conversation with.

Q.    I'm just trying to see maybe he had a false perception maybe you didn't want overtime and that's why he didn't call you?

A.    Yeah well that, that's why I put it out there so and it just seemed like you know it...

Q.    So it's...

A.    There was a correlation between you know me being vocal and the overtime not being you know the same as the other people in the unit.

Q.    Did at anytime um, anytime prior to when you first got to the, when you first got to the detail when the overtime started becoming available, did he ever have a conversation with you saying hey do you want to work these details or do you not want to work or you

53



(8/21/2013) Lethonia Miller - Miller, Lethonia 080113 KR.doc

Page 5

know was there ever any conversation about that?

A.    No.

Q.    Do you know if you ever gave him an impression that you didn't want to work the overtime?

A.    No.  I mean I pride myself on the fact that I'm always there for you know the detail for the job.  I mean if someone calls me and says you know hey lets go do this or you know, you know even for the smallest things, even for other agencies you know.  You know call me I, I'm working, I'm there for you so.  You know for them not to call me you know it just didn't make any sense.

Q.    So base, so from what you're telling me is your, your feeling your overtime got curtailed three or four times um in these I don't know four or five years, is that the only, only times that you can recall?

A.    Yes.

Q.    All right, and you think it's cuz of race?

A.    Because I reacted to something he had said.

Q.    (Inaudible), all right, could it have been, is it possible it could have been something else, had nothing to do with race?

A.    There's a possibility but uh it was never made known to me.

Q.    Okay but he never made any indication, he never, he never actually made any indication that it was because of race either, and you, you never had a conversation about it except for you offered out there saying you wanted to work the details and after you confronted him everything seemed normal after that?

A.    Yes.

Q.    I'm gonna take a break the time is 1:36PM.

The time is 1:44PM, um LEE we just got a couple more questions, um do you have you know, do you have, outside of working at, at the uh, the VFW, have you ever attended any sort of State Police functions outside the job?

A.    Yes.

Q.    You know like retirements, you know social events?

A.    Um-hum.

54



(8/21/2013) Lethonia Miller - Miller, Lethonia 080113 KR.doc

Page

Q.   Um have you ever been, have you ever been to um any, any type of gatherings where Senior Investigator KENDALL has been there?

A.   Yes.

Q.   Has he made any sort of these comments there?

A.   No.

Q.   No. um have you heard anybody else, have you ever been anywhere else where you've heard somebody refer to a comment that KEVIN KENDALL'S made that involved race or any, any, anything that's derogatory towards African/Americans?

A.   No.

Q.   Um, going back to your incidents where um KEVIN imitates you know he's got that uh imitation of the old African/American making that comment using the "N" word...

A.   Um-hum.

Q.   I think you described it somewhere as KEVIN is imitating another Caucasian person who imitates an old African/American person saying this kind comment?

A.   Yes.

Q.   Is that accurate?

A.   Yes.

Q.   All right, who is that Caucasian person?

A.   Uh Detective uh BRENDAN KIEFFER from Buffalo PD.

Q.   BRENDAN, so BRENDAN KIEFFER is the one who you, from the way it sounds, the way you're explaining it actually came up with the initial um he's the one who talks about this old African/American man and makes that comment?

A.   Right but I...

Q.   And KEVIN, KEVIN has repeated BRENDAN KIEFFER'S (inaudible) imitation of that (inaudible)?

A.   But I've never seen KIEFFER actually do it so.

Q.   No it was, it was just KENDALL told you it was from KIEFFER?

55

A.   Right.

Q.   Right, did you ever talk to KIEFFER about it?

A.   No.

Q.   No.

A.   When it, when it comes to like uh people outside my agency, um I can either you know check them or ignore them all together and KIEFFER uh I, I've ignored all together.  You know there's, there's some people who uh you just can't talk to so.

Q.   So you, you just, you don't even, you don't talk to him, confront him, you just ignore him completely?

A.   Yes.

Q.   Okay.  Um...

B.   I asked you the other day when we spoke what for lack of a better word was the straw that broke the camels back that made you uh finally disclose what's been transpiring over the, this period of time with your Senior?

A.   I think um, well KEVIN uh was actually uh kicked out of uh the task force.  you know I had been you know maintaining in the task force you know day to, day by day and I didn't realize how miserable I was until you know they actually uh you know kicked him out and there was, there was a, a chance that I could actually be free of uh you know the racial comments.  And...

Q.   Do you know why he was taken out of the task force or kicked out of the task force?

A.   Uh insubordination and well the task force supervisor at the time, DAN LARISH and uh KEVIN never got along.  Um KEVIN'S a good cop, uh DAN LARISH was not a good cop.  But DAN LARISH was uh the supervisor so pretty much you know he wanted people to follow his lead you know.  Um...

Q.   And KEVIN didn't want to follow his lead?

A.   No.

Q.   So they butt heads and that (end of part 1)

   Okay the time is 1:52PM, we're resuming our interview with Investigator LEE MILLER, uh

it appeared our battery died out at the end of the last conversation.  Um we were talking about uh KEVIN KENDALL being kicked out of the, or being, or being asked to leave or being, or left the task force.  Can you start, kind of start over with the story, he got kicked out...

A.    Yeah.

Q.    For insubordination, and kind of butting heads with the...

A.    The supervisor of the task force.

Q.    The supervisor.

A.    And um it uh, he got kicked out on I believe it was like a Friday and he was about to go on like a two week vacation.  And uh I kind of like a you know exhaled and you know didn't realize how bad it was you know that you know I had been you know sitting there you know taking all this, excuse me, until I realized I could probably be free of him you know.  And you know I just you know came forward and.

Q.    All right so you're saying, he was, he was taking out of the task force for how long?

A.    It, it was uh, well (inaudible) took him off the task force, they just you know yanked his credentials and you know the equipment and I guess while he was on vacation there was a two week period where they you know made phone calls you know, try to smooth it over.  And uh when he came back they had a meeting and he was reinstated so.

Q.    Did, did you come forward before he was reinstated or after his reinstatement?  You came, you came, when, when did you come forward with this complaint because you at some point...

A.    It was after.

Q.    It was after?

A.    Yeah.

Q.    All right so and I think from what you're saying I just want to make sure I have this right, you know when KENDALL was taken off the task force you realized how bad you were feeling because he was there...

A.    Um-hum.

Q.    And when he, when he was put back in the task force that's when you decided to come forward?

A.    Yes.



(8/21/2013) Lethonia Miller - Miller, Lethonia 080113 KR.doc

Page

Q.  Because, because of that?

A.  Yes.

Q.  Okay.  So when you came forward with it, um I believe, who'd you talk to first?

A.  Uh I called uh Captain LYONS.

Q.  Okay.

A.  And uh you know I asked him uh if I could you know buy him a cup of coffee and uh...

Q.  You discussed it with him?

A.  I discussed it with him.

Q.  And he's a, I mean he's, a counselor at one point wasn't he?

B.  (inaudible) still is.

Q.  Still is, EEO, all right, so then as part of, part of that process he contacted somebody else who contacted you is that correct?

A.  Right uh Senior JEROME JOHNS.

Q.  All right and you had a conversation with him about all this?

A.  Yes.

Q.  All right and then that was referred to Senior Investigator BRADLEY?

A.  Yes.

Q.  And you are, you are, you talked to her yesterday about all this or two days ago?

A.  Tuesday?

Q.  Sometime this week you talked to her?

A.  Yeah.

Q.  All right.  So and in, in all these conversations you pretty much went over the same stuff that's going on?

A.  Yes.

58

(8/21/2013) Lethonia Miller - Miller, Lethonia 080113 KR.doc

Page 5

Q.     That, that you put in this memo?

A.     Yes.

Q.     All right so there's, there's nothing, they know everything that, they know everything in this memo?

A.     Yes.

Q.     There's no other, no other incidents out there that we're not aware of?

A.     Yeah, yes.

Q.     All right.

B.     I just want to clarify something Investigator MILLER, when you met with Captain LYONS, you verbally discussed your issue, is that correct?

A.     That's correct.

B.     Okay he referred the information as far as you to Senior Investigator, the Office of Human Resources and you next spoke with Senior Investigator JEROME JOHN?

A.     Yes.

B.     Senior Investigator JEROME JOHN instructed to provide our office with a memorandum detailing the allegations you have against Senior Investigator KENDALL?

A.     Yes.

B.     And you supplied myself with this memo when we met earlier this week?

A.     Yes.

B.     So the only one who has the memo in our office is myself, uh Investigator, Senior Investigator BRADLEY, who supplied it to IAB and my Colonel.

Q.     All right so the, the only person who saw the memo would these two people in this room right here?

A.     Yeah, yes.

Q.     I want to actually, it went, you, you gave it to JUNE and JUNE gave it to us so IAB has it now. Um Investigator MILLER, do you have any other, in all these incidents do you have any sort of other written documentation or any recorded observations, recorded

59



statements or anything that can help me, assist us in the investigation?

A.    No.

Q.    All right, um have we discussed all these incidents, is there anything we're missing?

A.    No.

Q.    Is there anything you would like to add?

A.    Um I think uh initially when I talked to uh, I think uh Captain LYONS also uh Senior JOHN, they asked me you know what, what did I want the EEO office to do for me. And I'm not you know a vindictive person, I mean I don't care what happens to KENDALL as long as he's away from me.  And...

Q.    You don't want to work with him anymore?

A.    No I don't want to work with him anymore.

Q.    And you don't want to, you don't want to be supervised by him anymore?

A.    That's correct.

Q.    Okay.  All right, anything else?

B.    When we spoke the other day you uh observed something going on in the office that made you think that Senior KENDALL was aware of you coming to us cuz you noticed something with his computer, could you explain that?

A.    Oh yeah um there are a couple uh jump drives in his uh tower as a computer at, at work and I'd never seen the jump drives before.  So uh I, you know I thought maybe you know your office had gotten involved and was, was doing something but it didn't make sense that they would leave something there and not be there.  So I called Senior BRADLEY and I you know told her about it and uh she didn't know of any ongoing investigation by your office so.  Uh after we took a look at you know the jump drives, the contents of the jump drives and uh he was uh backing up uh I guess his uh hard drive you know with a lot of uh, well everything that was on his uh hard drive I guess so.

Q.    Why would he do that?

A.    I don't know.

Q.    Don't know.

B.    But I remember you called me that he just thought that was unusual being it was so...

60



Q.   The timing?

A.   Yeah.

B.   Yes Sir.

Q.   Okay.  Um JUNE, do you have anything else?

B.   Um today when I told you you needed to come to this office to be interviewed...

A.   Um-hum.

B.   Uh you said something transpired with Senior Investigator KENDALL today, could you just articulate that?

A.   Oh uh I kind of uh pulled him away from the group and you know I just plainly told him that uh I had to talk to Senior Investigator BRADLEY so I, I had to leave the detail and uh he very cavalierly said uh, "You're not making a complaint against me are you?"  And he was kind of like you know smiling and uh, and I, I kind of like said, "Well," and he goes, "Oh don't, don't, don't say anything about it," you know.  And I was about to say that you know I've been ordered not to say anything about you know an ongoing investigation so.

Q.   Do you think he knows about the investigation or about you coming forward?

A.   I think so.

Q.   Okay.

A.   I don't know if he knows specifics but uh I guess uh Senior JOHNS, uh when I met with him um Friday, uh had to leave a detail that he was actually at also and uh but I, I used the rouse uh that you know I was feeling ill and I was gonna go to a station I, I had ~~diarrhea and I was gonna sit at the station and take care of it.~~  And um Senior JOHNS called uh "A" Troop, spoke to uh the First Sergeant who said, "Okay, uh no problem," cuz Senior JOHNS said, "Well I'm putting LEE special assignment, he's gonna be uh talking to me."  And the first shirt said that basically, "Okay I'll call KEVIN and tell him."  So, and I got a phone call from that evening from KEVIN, "Hey is everything okay," you know.  That was about it.

Q.   All right um, JUNE all set?  LEE, have anything else you want to add?

A.   Um no I guess not.

Q.   You sure?

A.   Yeah.



Q.    The time is 2:02PM, I'm ending this interview.

I have read this statement consisting of 61 pages and it is true to the best of my knowledge. I have placed my initials on the bottom of each page and next to each correction and I have signed it below.

REFER TO ATTACHED ADDENDUM FOR CORRECTIONS.

Signed this ___21st.___ day of ___August_____, 2013

SIGNATURE

62

# ADDENDUM

### MEMBER WITNESS – INTERVIEW                CORRECTIONS

1. Page 6 – end of first line – insert "it" between "using" and "in".
2. Page 6 – end of line (7) – change "rage" to "enrage".
3. Page 8 – beginning of line (18) - insert "in" in front of "full pack"
4. Page 8 – beginning of line (25) – insert "to" between "thing " and "you"
5. Page 9 – beginning of line (4) – change "inaudible" to "said"
6. Page 9 - beginning of line (21) – change "inaudible" to "said"
7. Page 10- end of line (5) – change "inaudible" to "Indians"
8. Page 10- end of line (16) – change "BRETT" to "BRENT"
9. Page 10- beginning of line (22) – insert " on my" between "know" and "level"
10. Page 10- middle of line (24) - change "BRETT" to "BRENT"
11. Page 10- end of line (26) – change "BRETT" to "BRENT"
12. Page 10- end of line (28) – change "BRETT" to "BRENT"
13. Page 11- middle of line (2) – change "BRETT" to "BRENT"
14. Page 12 – middle of line (4) – quotation marks – "well I'm just repeating you know what that person said"
15. Page 12 – middle of line (28) – change to "well I ain't seen that N-word"
16. Page 12 – beginning of line (29) – change "inaudible" to "laughed"
17. Page 13- middle of line (18) – change "inaudible" to " aw man I ain't seen that N-word"
18. Page 14 - middle of line (1) – change "slur" to "slurred"
19. Page 15 – middle of line (22) – change "inaudible" to "saying"
20. Page 18 – middle of line (10) – change "Mozeell's (inaudible)" to "Moselle Street"
21. Page 18 – end of line (13) – change "Moore's" to "Morris"
22. Page 20 – middle of line (15) – change "uh" to "an"
23. Page 20 – beginning of line (23) – change "inaudible" to "wasn't
24. Page 21- end of line (9) – change "inaudible" to " cold pop"
25. Page 22 – middle of line (17) – change "he" to "the"
26. Page 23- middle of line (12) – change "inaudible" to "career"
27. Page 23 – end of line (18) – change "ETOC" to "EVOC"
28. Page 23 – middle of line (26) – change "stero" to "stereo"
29. Page 23 – beginning of line (30) – change "inaudible" to "Brockport"
30. Page 24 – end of line (18) – change "inaudible" to "racial jokes"
31. Page 25 – middle of line (14) – change "inaudible" to " aw man"
32. Page 26- - middle of line (26) – change "AARON" to "ERIN"
33. Page 27 – end of line (3) – change "inaudible" to "THREATT"
34. Page 27 – beginning of line (5) – change "Ya" to "Yeah"
35. Page 27- middle of line (7) – change "AARON" to "ERIN"
36. Page 27 – beginning of line (13) – change "recounted" to "remarked"
37. Page 27- middle of line (24) – change "inaudible" to "resorted"
38. Page 30 – end of line (4) – change "inaudible" to "his Division computer"
39. Page 30 – middle of line (6) – change "DAMON" to "DAMONE"
40. Page 30 – middle of line (12) – change "DAMON" to "DAMONE"
41. Page 30 – middle of line (24) – change "DAMON" to "DAMONE"
42. Page 31 – end of line (1) – change "DAMON" to "DAMONE"
43. Page 31 – middle of line (10) – change "inaudible" to "killin"
44. Page 34 – end of line (4) – change "inaudible" to "metadata"
45. Page 37 – middle of line (1) – change "RAMEL" to "ROMEL"
46. Page 37 – end of line (5) – change "inaudible" to "BRENDAN KIEFER"

1

47. Page 37 – middle of line (7) – change "RAMEL" to "ROMEL"
48. Page 38 – end of line (19) – change "inaudible" to "SHANLEY"
49. Page 39 – beginning of line (1) – change "inaudible" to "GRANTO"
50. Page 41 – end of line (22) – change "FRED NOWACK" to "NOVAK"
51. Page 42 – end of line (14) – change "inaudible" to "THREATT"
52. Page 42 – middle of line (19) – change "inaudible"  to "BOYLAND"
53. Page 44 – middle of line (14) – change "REAGER" to "RIEGER"
54. Page 45 – middle of line (2) – change "REAGER" to "RIEGER"
55. Page 45 – beginning of line (5) – change "inaudible" to "Because"
56. Page 49 – end of line (3) – change "Catchall" to Gatchell"
57. Page 51 – end of line (1) – change "inaudible" to "put up with"
58. Page 57 - beginning of line (15) – change "inaudible" to " the Chief"

2

Exhibit "F"

Enclosure #14

## MEMBER TARGET - NON-CUSTODIAL INTERROGATION

**STATE OF NEW YORK**
**COUNTY OF MONROE**
**TOWN OF CHILI**                                    **September 23, 2013**

This Statement is taken from Senior Investigator KEVIN KENDALL at IAB Western Regional Office on September 23, 2013 by Captain KEVIN REILLY and Senior Investigator JUNE BRADLEY commencing at 2:24PM.

The letter "Q" will denote questions asked by Captain REILLY
The letter "B" will denote questions asked by Senior Investigator BRADLEY
The letter "A" will denote answers provided by Senior Investigator KENDALL

Q.    The purpose of this interrogation is to inquire into your activities as a Member of the New York State Police. Specifically, it has been alleged that for the last several years you have made insensitive comments regarding race in the presence of Investigator MILLER. You have also alleged to have discriminated against him by withholding overtime from him because he is African/American.

This interrogation is being conducted pursuant to the Article 16 of the current NYSPIA Collective Bargaining Agreement and the Regulations of the New York State Police, including 8A3 and 8A15.

You have the right to contact and consult with a union representative or attorney before being interrogated, and to have a union representative or attorney of your choosing present during the interrogation. Do you understand this?

A.    Yes.

Q.    You are not under arrest. However, Article 16 and the applicable Regulations require you to cooperate and answer truthfully questions relating to the allegations. A refusal by you to cooperate or to answer questions, or a failure to answer any questions truthfully, may result in disciplinary action against you, up to and including the termination of your employment. Do you understand this?

A.    Yes.





1

Q.   You are entitled to all the rights guaranteed by the State and Federal constitutions. As this is an involuntary statement, your responses during this interrogation are automatically cloaked with criminal immunity. Accordingly, neither your, neither your statements nor any information or evidence that is gained as a result of, or in reliance upon, this interrogation can be used by a police or prosecutorial entity against you in support of a criminal proceeding. Do you understand this?

A.   Yes I do.

Q.   Are you being represented at this time and if so, by whom?

A.   Yes I am, MICHAEL RAVALLI.

Q.   Okay and you also have your NYSPIA?

A.   And, and my union representative yes.

Q.   Which is RICHARD QUALEY?

A.   Yes it is.

Q.   Okay. You were advised on September 13, 2013 of the matter being investigated and that it would be necessary for you to give a statement concerning this matter, is that correct?

A.   Yes.

Q.   I am Captain REILLY and as a supervising officer and representative of the Superintendent I am authorized to conduct this interrogation.  This interrogation is being recorded mechanically at IAB Western Regional Office.  A full transcript will be prepared and you will be provided with a copy of the recording or will be afforded an opportunity to cause a duplicate of, of this recording to be made for future use. You will be given the opportunity to view the written transcript from this recording upon completion to ensure its accuracy, and will also be provided with a full copy of the transcript subsequent to your signature. Do you understand this?

A.   Yes.

Q.   Also present in this room are your Attorney MICHAEL RAVALLI, R-A-V-A-L-L-I, your delegate, RICH QUALEY, uh Senior Investigator BRADLEY, myself and yourself.  Do you understand this?

A.   Yes I do.

2

| | | |
|---|---|---|
| 1 | Q. | The record will note that you are present in response to a direct order.  Senior Investigator |
| 2 | | KENDALL, you will now be asked questions relating to the performance of your official |
| 3 | | duties and you are required to answer these questions.  If you decline or refuse to answer |
| 4 | | any questions, you will be ordered by me to answer.  If you then continue in your refusal to |
| 5 | | answer, disciplinary action will be initiated charging you with disobeying a lawful order.  This |
| 6 | | disciplinary action could result in the termination of your employment with the Division, with |
| 7 | | the Division of State Police.  You will be permitted during this statement to take breaks when |
| 8 | | reasonable and appropriate.  Having been advised of the above, are you now ready to |
| 9 | | proceed with this interrogation? |
| 10 | | |
| 11 | A. | Yes. |
| 12 | | |
| 13 | Q. | Please state your full name and rank, and spell your last name for me please. |
| 14 | | |
| 15 | A. | KEVIN S. KENDALL, K-E-N-D-A-L-L, I'm a Senior Investigator. |
| 16 | | |
| 17 | Q. | What is your date of entry with the Division of State Police? |
| 18 | | |
| 19 | A. | September 21, 1987. |
| 20 | | |
| 21 | Q. | Okay KEVIN, have you ever received training on the prevention of sexual |
| 22 | | harassment/discrimination? |
| 23 | | |
| 24 | A. | Yes. |
| 25 | | |
| 26 | Q. | Do you remember when? |
| 27 | | |
| 28 | A. | I think it was just a few weeks ago. |
| 29 | | |
| 30 | Q. | Okay, um do you, do you have his training record? |
| 31 | | |
| 32 | A. | Online. |
| 33 | | |
| 34 | Q. | Got, you, you did the online training? |
| 35 | | |
| 36 | A. | Yeah. |
| 37 | | |
| 38 | Q. | I bet you have it, I mean I think you (inaudible), you have actual, you have here, you did the |
| 39 | | online People Employment Opportunity Rights and Responsibilities, that was the online |
| 40 | | course, looks like you completed back in June. |
| 41 | | |
| 42 | A. | Okay. |
| 43 | | |
| 44 | Q. | And then you also got the pending one, the Sexual Harassment In the Workplace in August, |
| 45 | | I don't know if that's… |
| 46 | | |

3

| 1 | A. | That's the one I just did. |
| 2 | | |
| 3 | Q. | You just finished the Sexual Harassment In The Workplace also, this is, this is printed back |
| 4 | | in August? |
| 5 | | |
| 6 | A. | Yes. |
| 7 | | |
| 8 | Q. | Okay. Also looking at your training record looks like you got some sexual harassment back |
| 9 | | in 1998, do you recall? |
| 10 | | |
| 11 | A. | No I don't recall but I'm sure that's accurate. |
| 12 | | |
| 13 | Q. | Sure. But you're not disputing your training records? |
| 14 | | |
| 15 | A. | No I'm not. |
| 16 | | |
| 17 | Q. | Okay. Have you attended Basic Leadership School, do you recall? |
| 18 | | |
| 19 | A. | I, Sergeant, Sergeant School? |
| 20 | | |
| 21 | Q. | I think so, I think that's what they... |
| 22 | | |
| 23 | A. | I believe I went to Sergeant School in the mid '90's. |
| 24 | | |
| 25 | Q. | Mid '90's, all right.   Do you recall training on the prevention of sexual |
| 26 | | harassment/discrimination during Basic Leadership School? |
| 27 | | |
| 28 | A. | No. |
| 29 | | |
| 30 | Q. | No, okay. Now we, we just said you just completed the online training and the EEO Rights |
| 31 | | and Responsibilities and you said that was affirmative? |
| 32 | | |
| 33 | A. | Yes. |
| 34 | | |
| 35 | Q. | All right. According to your training record in 1992 you received training on understanding |
| 36 | | people in cultural differences... |
| 37 | | |
| 38 | A. | I remember that. |
| '39 | | |
| 40 | Q. | You remember that, okay. |
| 41 | | |
| 42 | A. | Yep. |
| 43 | | |
| 44 | Q. | From the above training and experience uh do you understand that certain comments in the |
| 45 | | workplace can be considered offensive? |
| 46 | | |

4

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 3 | Q. | Okay. And do you also understand that it is not the intent of the person making the comments that matters but how the person receiving the comments is impacted? Do you understand the question? |
| 7 | A. | Yes I do. |
| 9 | Q. | Okay, uh but do you under, do you understand that that's um, do you understand from the training that that's important? |
| 12 | A. | Yes. |
| 14 | Q. | All right. What's the location of your current assignment? |
| 16 | A. | The Violent Felony Warrants squad under Troop "A" in, my office is located in Buffalo, New York. |
| 19 | Q. | Who else is assigned there from the State Police? |
| 21 | A. | Investigator LETHONIA MILLER and Investigator ROBERT GARDNER. |
| 23 | Q. | GARDNER? |
| 25 | A. | Yes. |
| 27 | Q. | Did he just get transferred in? |
| 29 | A. | Last week. |
| 31 | Q. | Last week, all right. |
| 33 | A. | Two weeks ago. |
| 35 | Q. | KEVIN, you're also assigned to the US Marshal's Task Force is that correct? |
| 37 | A. | Yes. |
| 39 | Q. | All right. Do you know the address of that location? |
| 41 | A. | 2 Niagara Square, Buffalo, New York. |
| 43 | Q. | Buffalo. Who are the other Members of the task force? |

5

| 1 | A. | Deputy Marshal BRENT NOVAK, uh SCOTT BRYZA, CHRIS, CHRISTOPHER SNACK, and |
| 2 | | uh I think they're all the, I think those are all the US Marshals.  And there's two Buffalo |
| 3 | | Police Detectives assigned, BRENDAN KIEFER and WILLIAM COOLEY.  The, the State |
| 4 | | Police personnel that we mentioned from VFW, the three of us, um two Niagara County |
| 5 | | Sheriff's personnel, uh JERRY GRANTO and JOSEPH SHANLEY.  A uh, I think he's a |
| 6 | | Deportation Officer is his title from uh ICE, um… |
| 7 | | |
| 8 | Q. | Is that GEORGE SCOTT. |
| 9 | | |
| 10 | A. | GEORGE SCOTT, yep.  Um and then there's some part time, there's a DMV Investigator |
| 11 | | JAY um, JAY SEXTON and then on a part timer basis uh, I don't know if they're officially |
| 12 | | members of the task force but they're involved part time um Erie County Sheriff's Detectives |
| 13 | | DJ GRANVILLE and uh TIM CARNEY.  I think that's everybody. |
| 14 | | |
| 15 | Q. | Is there a, is there a FIALKIEWICZ? |
| 16 | | |
| 17 | A. | Oh yeah but he's just being rotated through. |
| 18 | | |
| 19 | Q. | Okay. |
| 20 | | |
| 21 | A. | He's assigned to operations where they handle the prisoners but he's currently uh working |
| 22 | | on rotation with the warrant squad, the task force. |
| 23 | | |
| 24 | Q. | All right is he a Marshal? |
| 25 | | |
| 26 | A. | Yes. |
| 27 | | |
| 28 | Q. | All right, and then uh the actual Marshal himself is? |
| 29 | | |
| 30 | A. | CHARLES LEE. |
| 31 | | |
| 32 | Q. | (Inaudible) and who was the previous supervisor there? |
| 33 | | |
| 34 | A. | DANIEL MARISH, he retired in June. |
| 35 | | |
| 36 | Q. | Uh NOVAK'S actually… |
| 37 | | |
| 38 | A. | He's the acting. |
| 39 | | |
| 40 | Q. | Acting? |
| 41 | | |
| 42 | A. | Yeah. |
| 43 | | |
| 44 | Q. | How long have you been assigned to the VFW? |
| 45 | | |
| 46 | A. | A little over 10 years. |

6

Q.    And you are the currently ranking State Police Member in that assignment correct?

A.    Yes.

Q.    Do you supervise Investigator MILLER?

A.    Yes.

Q.    Up until this year the VF unit was a Headquarters unit is that correct?

A.    Yeah up until January of 2013.

Q.    2013, okay.  Can you explain the rank structure prior to transferring those troops just quickly?

A.    Previous to January um of this year there was a state wide detail uh under a Headquarters squad, which was situated in Montrose, New York.  The detail commander, um is, was a Captain.  For my entire tenure it was JAMES MCDOWELL and then in that Headquarters office there were Senior Investigators, traditionally there was one administrative Senior and then a field Senior.  But with retirements um they retired.  And then in each city uh, major city in the state there was a squad set up with a Senior Investigator and Investigators under him um and then we all reported to Captain MCDOWELL as the central point of command.

Q.    So you were the, you were the, in charge of the Buffalo, the western office?

A.    Yes.  Uh just to clarify uh, upon the retirement of JAMES CHASE, he's the Senior Investigator in the VFW squad in Rochester, I did also supervisor the Rochester squad for a year or maybe even, prob, maybe more.

Q.    That was, until they transferred back into the troop?

A.    Until it went into the troops yeah.

Q.    And now, now you report to Troop "A"?

A.    Troop "A", right.

Q.    Who was supervisor before it back to, was it Captain MCDOWELL?

A.    Yes.

Q.    All right and now it's, is it Captain NIGRELLI?

A.    Captain NIGRELLI and obviously the BCI Lieutenants, REYES and SCHMITT.

7

Q. Do you know, when did Investigator MILLER transfer into the unit approximately?

A. I believe it was uh the summer of 2008.

Q. Since 2008 who else was assigned to the VFW unit task force from the State Police?

A. Um...

Q. If you recall?

A. (Inaudible) in 2008 there were myself, Investigator DONALD RIEGER, Investigator DAVID HALL, Investigator SALAMONE DEJESUS, and then when Investigator MILLER transferred in so did Investigator JOSEPH MIGLIORE. We went from four to six with their assignment.

Q. MILLER, did he retire?

A. He made the complaint.

Q. Oh LEE, LEE MILLER, okay, gotcha and he came in with MIGLIORE?

A. Yes.

Q. All right and then that was in the, that was in your office correct, the western, the Buffalo office?

A. Yes.

Q. How about, (inaudible) know who was in the uh, uh Rochester office?

A. JAMES CHASE, JIM, JAMES CHASE was the Senior, um (inaudible), uh TOM, BOBBY JOHNSON, LOUIE RODRIGUEZ and then when MILLER and MIGLIORE came at that time into Rochester went uh TOM HAND and LARRY JACKSON.

Q. Okay. Senior Investigator KENDALL you are Caucasian correct?

A. Yes.

Q. And Investigator MILLER'S African/American, is that correct?

A. Yes.

Q. All right um just briefly the, what are the races/ethnicities of the other members of the unit since 2008? MIGLIORE, Caucasian?

A. Um yes.

8

1   Q.   Okay.

3   A.   All, all Caucasian, Investigator DEJESUS is uh Hispanic.

5   Q.   Hispanic so RIEGER was Caucasian, HALL was Caucasian?

7   A.   Yep.

9   Q.   (inaudible) was Caucasian, HAND was Caucasian, JACKSON was African/American is that
10      correct?

12   A.   Yes.

14   Q.   Okay and you actually supervised him for a brief period of time?

16   A.   (inaudible) year, a year or two yeah.

18   Q.   About a year and a half.  How long have you known Investigator MILLER?

20   A.   Just short of 20 years.

22   Q.   Besides in the VFW did you ever work with Investigator MILLER?

24   A.   Yes.

26   Q.   Okay can you explain like when, when your paths crossed?

28   A.   It, I believe, as I recall that's when I got to know him is when I was uh assigned an
29      Investigator at SP Clarence in uh September of 1994, I was there for two years.  So it'd be
30      '94 or '95, '90, '94 – '96 two year period.  Um and he I actually shared an office, the two of
31      us were in one office in the BCI offices at SP Clarence.

33   Q.   That the only time you worked with him since, until the VFW?

35   A.   Until, until he came to the VFW yes.  Well there different, that's (inaudible) only time we
36      worked right together in the same squad obviously in the State Police I had peripheral
37      contact with (inaudible).

39   Q.   You run into him on cases or when the units, wherever you were, you were, you had…

41   A.   The PHILLIPS Detail we worked together and kind of in passing.

43   Q.   While working with him during the 1990's and this, this is going back to when you worked
44      with him in Clarence, did you ever have a discussion with him regarding race?

46   A.   Yes.

9

Q.   Can you explain that, what, what it was about?

A.   I remember he uh, he complained in, like in private to me that he uh, uh felt that the Senior Investigator there, his name was TOM RASH, treated him unfairly and he uh told me that he thought it was based on his race.

Q.   Okay. did uh, you had, you had a chance to observe that interaction between the Senior Investigator and did you feel it was, do you feel LEE, do you feel Investigator MILLER'S um feelings were, had some merit?

A.   I told him that I thought that TOM was just a jerk and that was the problem, I didn't, wasn't aware of any substance to LEE'S uh feelings that he was, (inaudible), was based on his race.

Q.   You just thought it was a personality that it, it didn't what it, didn't matter what LEE'S race was?

A.   TOM RASH was not a very personable person.

Q.   Okay. Did you, did you have any other discussions with him regarding race?

A.   Well on the same, I, yeah I know I did, uh it was kind of an related issue but I remember we talked in the office, there was another Investigator named RANDY INNES and he uh told us that uh one day uh Senior Investigator RASH asked him if he wanted to come over to the house and play basketball after work. And we kinda laughed about it um and I don't know if uh RASH come out and said it or if it was implied or what but I think uh the idea was that he was uh trying to impress that he wasn't a racist. And I was pretty good friends with RANDY and it was a matter of uh we kind of, he joked about there, how inappropriate, how weird it was that he goes and plays basketball at RASH'S house.

Q.   Who, who joked about it?

A.   RANDY INNES joked with me and I know LEE was there, um but then it really was kind of a conversation about race. I know it stuck with me because that's what I mean about RASH uh not being the most personable uh he just wasn't a people person. I mean he couldn't even get it right being nice to someone.

Q.   Okay so was it, RASH made the comment about the basketball?

A.   To Investigator INNES.

Q.   All right yeah, all right.

10

| | | |
|---|---|---|
| 1 | A. | And RANDY came into the office where me and LEE were and he said, "You wouldn't |
| 2 | | believe it, RASH just asked me if I wanted to go play basketball at his house after work." |
| 3 | | And the idea was trying to, I think the idea was because it would be, he picked basketball |
| 4 | | because RANDY'S a great big black guy and thought that it would you know be up RANDY'S |
| 5 | | alley kind of thing. I mean it really had nothing to do with me but there was a conversation |
| 6 | | about race and I was there and we talked about it. |
| 7 | | |
| 8 | Q. | Okay so the comment could have been perceived, the comment with uh, the basketball |
| 9 | | comment could have been perceived inappropriately by INNES or LEE? |
| 10 | | |
| 11 | A. | Yep. |
| 12 | | |
| 13 | Q. | Is that, is that what you're saying, I know that (inaudible)… |
| 14 | | |
| 15 | A. | Well I think yeah I mean RANDY laughed it off and, and his spin on it was what a jerk this |
| 16 | | guy is, what a goof. I mean he wasn't upset about it, he didn't, he just kind of shook his |
| 17 | | head. |
| 18 | | |
| 19 | Q. | Now if he said that comment to LEE, that, that and I, I, was it NASH, RASH? |
| 20 | | |
| 21 | A. | RASH. |
| 22 | | |
| 23 | Q. | RASH, if RASH said that comment to LEE, how would LEE take that, do you have any idea? |
| 24 | | |
| 25 | A. | Well he was sitting, I remember we were in the office, he was sitting next to me, um I think |
| 26 | | there again he just, I mean this was 19 years ago or whatever… |
| 27 | | |
| 28 | Q. | I, yeah. |
| 29 | | |
| 30 | A. | I think we all just shook our head and laughed. |
| 31 | | |
| 32 | Q. | Okay, he didn't make, as far as you know LEE didn't make any comments or complain about |
| 33 | | to you or anything? |
| 34 | | |
| 35 | A. | No. |
| 36 | | |
| 37 | Q. | Okay. |
| 38 | | |
| 39 | A. | We, we in fact through the years though after that when RANDY'S name would come up or |
| 40 | | RASH it would be, "Remember the time when RASH actually wanted to play basketball with |
| 41 | | RANDY," and it was a matter of laughing about the old days. |
| 42 | | |
| 43 | Q. | Okay. |
| 44 | | |
| 45 | A. | That's probably why I remember it because it's been you know. |
| 46 | | |

11

Q.  Do you recall if Investigator MILLER ever had a discussion with you for the use of the, and I, I'm gonna say the nigger word came up, the, the use of it?

A.  Yes.

Q.  Okay can you explain your conversation with, with Investigator MILLER (inaudible)?

A.  Yes, yeah. Um to set the stage a little bit...

Q.  Go ahead.

A.  Um Investigator MILLER in the past couple of years had two uh conflicts with uh other people in which he, I don't want to say conflicts, um interactions...

Q.  Okay.

A.  Were negative in nature in which he uh believed that he was dealt with unfairly because of his race. Um and we talked about both of them. Uh not only was I his supervisor but there was only the two of us in the unit for the past two years or so. Um and before uh it was obviously a small unit, we're together everyday, we talk everyday. Um it wasn't like an arms length supervisor/subordinate relationship, we talked a lot. Um he brought both of those incidents uh to my attention, no actually there's three, because when he came in he was in the middle of a dispute with uh Investigator MIGLIORE. So we went from one you know when he came in and then subsequently there was two others and they had, had nothing to do with me. Um but I believe it was the most recent conversation I had with him, he was real, really upset, I was able to um establish the date that was June 4th to the best, best of my, the way I remember it was June 4th of this year. He was very upset because he had a uh conflict with uh BRENT NOVAK, the Deputy US Marshal and it was actually the third, he had three separate little incidences where he had brought into my attention that he had uh worked with Deputy NOVAK and in this one he was upset. And we talked for quite a while, I asked him how, what happened and he told me about the interaction between the two of them. Um and essentially um I didn't really see, I wasn't so sure that BRENT'S comments were, had anything to do with LEE'S race.

Q.  So, so and just to, what we're talking about there was a conflict between BRENT NOVAK and LEE?

A.  Yes.

Q.  And LEE felt it was, LEE felt it had some, the conflict somehow involved his race?

A.  Yes.

Q.  All right.

12

| | | |
|---|---|---|
| 1 | A. | So later in the day, that was in the morning, in the afternoon it was just the two of us in our |
| 2 | | office. |
| 3 | | |
| 4 | Q. | Did you observe the conflict? |
| 5 | | |
| 6 | A, | No I wasn't there. |
| 7 | | |
| 8 | Q. | Okay. |
| 9 | | |
| 10 | A. | The, the reason I remember the date is because I was at FRANK VITKO'S father's funeral |
| 11 | | when he called me upset and I talked to him briefly on the phone and I said, "Well we'll catch |
| 12 | | up in the office there, we'll see what's up." So that's how I know the date, it was the date of |
| 13 | | a funeral. |
| 14 | | |
| 15 | Q. | Okay. |
| 16 | | |
| 17 | A. | And I looked in my red book and that's the date it was.  And as we were talking, we talked |
| 18 | | at, at length about not only what BRENT said um but just like he, he, BRENT, I don't have, in |
| 19 | | what LEE told me BRENT didn't say anything that are, are red flags, that was race related. |
| 20 | | It was LEE'S interpretation.  And at the time I said to LEE, I go, "You know what the problem |
| 21 | | is, I, I don't see like black and white put your finger on it thing that he said.  And we all say |
| 22 | | things and it's open to different interpretations and so much of it depends on the context of |
| 23 | | what's said."  Um and I used the word that you just brought up, but I said it in a context, |
| 24 | | which is similar to the way you just asked me about it.  I used it in a context of in talking to |
| 25 | | LEE what I said was, "You know on one hand we all," I said, "We all know that it's not right to |
| 26 | | call another person that no matter what the circumstances are." |
| 27 | | |
| 28 | Q. | And when you, when you, when you asked, when you told LEE that did you, did you actually |
| 29 | | say the use of the "N" word? |
| 30 | | |
| 31 | A. | Yes. |
| 32 | | |
| 33 | Q. | Okay you said… |
| 34 | | |
| 35 | A. | Yes. |
| 36 | | |
| 37 | Q. | You said nigger? |
| 38 | | |
| 39 | A. | Yes. |
| 40 | | |
| 41 | Q. | Okay. |
| 42 | | |
| 43 | A. | And I said, "We all know that that's not cool."  And then I said, "But you know if the words |
| 44 | | used a different way," and then I said, I went in using a, make an example and I said, "Pick |
| 45 | | the deck of BRENDAN KIEFER," because BRENDAN has a, a, a trait where he's good at uh |
| 46 | | imitating people and he's a funny guy if, if you know, if he goes and interviews someone |

13

who's obese next thing you know he's you know imitating the guy in like Fat Albert's voice. Or a skinny person you know, an old person, whatever, um a Hispanic he'll use a Hispanic uh, um accent. But I used an example with BRENDAN and I, and I said, "But if BRENDAN comes out and you say to him what did you," because when we, we go to a house and we hit it looking for a fugitive typically we surround the house, people go in, search the house but if you don't find them we also obviously interview the occupants to find out where the guy is you're looking for. So then its norm the routine is when the people come out they guys on the outside are always, well what did they say. And uh, and I said, I used BRENDAN, "If BRENDAN does an interview and he comes out and he quotes someone," I said, "That's a different, (inaudible) that person used that word in the interview," um i said, "BRENDAN'S you know he may be making light of it using a voice and saying that he hasn't seen him in a minute you know and talking like that person talked. But BRENDAN isn't calling someone that." And I said, "You know it's a different context."

Q.    The context he's repeating what somebody else said....

A.    And quoting someone.

Q.    He, he's not using it in any of his own conversations and he's not using it directed at anybody.

A.    And that's what I said to LEE, and I, this is a, I, this is why I remember this so vividly. As I'm sitting there talking to LEE about this, and I'm trying to counsel him on him being so upset because of a, a dispute he got in with another person. I, I looked at him and, and I tried to lighten the mood a little and I said, "LEE, look it, you've been black even longer than me, you"...

Q.    I'm sorry you said, "You've been black"...

A.    "Longer than me."

Q.    Black LEE, or black, you've been black longer than, I, I didn't...

A.    I said, I go, "LEE, you've been black even longer than me."

Q.    Okay.

A.    And I was a little trying to attempt to be light hearted and I said to him, "When is it appropriate to use the word," and I remember it so vividly because he sat there, he glared at me and he said, "Well I don't think it ever is." And what I remember is, this is, it's engraved in my memory because I sat there and I looked at him and I thought to myself, well I just used it. and I'm like, humm, and then I, and I really, on one hand it's in my nature to clarify and talk about things but I didn't know what more to say because I was wondering in my mind well did he just take offense that me and my choice of that word. But I'm thinking in my mind like how do you talk about this without talking about it. It's impossible. It's the context in which it's used and you know what I really thought it was appropriate, I thought I was

14

1    helping the guy talking to him about his problem he was having with other people. And
2    never did I think I would be sitting in Internal Affairs talking about it.
3
4  Q.  Okay.
5
6  A.  And I never, if, I have, I know I certainly wouldn't of broached the topic if I could read the tea
7    leaves.
8
9  Q.  All right, after that conversation, did you ask him, did you ask LEE if he, if he was offended
10    by your use of the uh...
11
12  A.  No.
13
14  Q.  The "N" word, no okay. Um that's your only discussion where the use of the nigger word
15    came up?
16
17  A.  Yeah I, I've been racking my brains obviously knowing the context of this complaint. That's
18    the only thing I can think of.
19
20  Q.  The, did you ever, do you remember, do you recall if you ever had a conversation regarding
21    uh the use of the nigger word, and I apologize, I'm gonna, if I start saying the "N" word, it's
22    just cuz I'm used to saying it (inaudible) but if uh, do you ever remember having a
23    conversation with the use of the, the "N" word back in, back when you were in Clarence? I
24    know you may...
25
26  A.  No, I, I don't know.
27
28  Q.  Okay. um all right, I am actually going to go back, you said you brought up three incidences
29    with uh LEE and one, one included, uh one was, one involved MIGLIORE, one involved
30    GRANTO, one involved NOVAK, NOVAK right?
31
32  A.  Yes.
33
34  Q.  Why don't you, why don't you explain them all starting with NOVAK, what you know about it
35    because I have questions on it at some point so lets.
36
37  A.  Most recently uh NOVAK'S, that's the three instances, they're three separate days I
38    remember LEE saying something to me about NOVAK. The first one was LEE, (inaudible)
39    uh explain this, typically LEE and I for the past year, I think closer to two years, Investigator
40    MILLER has been working mornings in Niagara County with the Niagara County detectives
41    and deputies, it's like two separate teams with Niagara County it's him and me in Buffalo.
42    So he would work out of my presence in the morning and then we typically we'd see each
43    other in the afternoon in the office. Um and I remember him coming the first time he was
44    complaining because uh NOVAK was singing the song, "Black Betty," by Pearl Jam from or
45    uh Ram Jam from like the '70's. And Investigator MILLER thought that he was only singing it
46    because he is black. And I, and I just said that, I, I mean I listened to LEE and I'm like, "All

15

1   right well what makes you think it has anything to do with you and that it has anything to do
2   with your race?" And he really could not articulate any basis to it. He just, that's what he
3   thought.
4
5   Q.   Okay.
6
7   A.   And the second incident is the one, I think it's the second incident is the one that I, where we
8        had this talk in the office, he was really upset. And then it was, I, the way I remember it was
9        only like a week later that uh he was with NOVAK and NOVAK uh, and I got this from
10       investigator MILLER, he said that they went to a, a whole bunch of houses one morning,
11       went after, after another after another. Didn't come up with any arrests and then late in the
12       morning NOVAK made a comment like to the group, made a, apparently a joke, that if they
13       didn't get someone soon they would just have to cuff up LEE. And LEE felt that he chose
14       him because he was the only black person in this group. And at that LEE uh responded to
15       him by I think he said, "No BRENT what we're gonna have to do is cuff up the first asshole
16       we see and that would be you." And the guys laughed and they went on and LEE was uh
17       kinda happy that he was able to give away rebuttal. But I mean obviously I saw the, behind
18       it was the fact that he took it that that comment was made based on his race. Those are the
19       three instances I remember uh him talking to me about NOVAK.
20
21   Q.   Okay. Did you talk to NOVAK about it at all?
22
23   A.   Not until this complaint came up.
24
25   Q.   Okay.
26
27   A.   And to, and to be, and to clarify that, the reason I didn't, I asked LEE if I should talk to him
28        and I even said, "Hey look it, I'm not really pals with BRENT but you want me to talk to him?"
29        I go, "I don't know what you want me to do about this, I mean you're telling me, I'm your
30        supervisor but it has to do with another department that I don't control." Not only don't I
31        control but my relations with the supervisor were...
32
33   Q.   Were (inaudible) at the time correct?
34
35   A.   Which were (inaudible), which was atrocious and I said, "You, you, I, I don't know LEE, you
36        want me to talk with BRENT," I go, "We both know I can't talk to DAN." Um and then I even
37        said, "Or for that matter they have to have some uh some mechanism in the US Marshals to
38        deal with racial issues," I go, "Go look on their website, is, I don't know they in Washington."
39        And he, and I didn't get an answer from him, um, um and I didn't go to NOVAK. A lot of it
40        was because in LEE telling me the circumstances of their argument NOVAK made
41        comments that he's sick of carrying LEE. LEE doesn't do his work and complained about
42        his work ethic and not doing a good job. And I thought to myself well if I go solicit NOVAK,
43        he's gonna obviously tell me that LEE isn't doing a good job and do I want to hear that and
44        then what am I gonna do about that. Do I, he's my subordinate, the relations with the US
45        Marshals are terrible. I just saw that as a for the best to not go seek out Deputy NOVAK and
46        solicit a complaint about LEE.

16

Q.   Do you know if LEE and NOVAK ever worked, worked through it?

A.   I don't believe, I, I think I know the answer and I don't believe they have. I believe that there's a simmering issue there.

Q.   Okay, you don't know if they ever sat down and talked it out or anything?

A.   I think I would of, I don't think they did. I think I would know if they did.

Q.   Okay. What about the other two instances?

A.   Before that um I'm guessing it was two years ago, I don't, I don't know if he first called me and told me on the phone...

Q.   We're talking about LEE calling?

A.   Yeah I'm sorry, Investigator MILLER.

Q.   That's all right.

A.   But I, I remember talking to him in the office about it. I think he called me first and then we talked about it similar to the issue with NOVAK. But we talked about it in the office. Um he told me that it was one morning about two years ago, maybe three, I don't know, he was driving, it must have been two years because he's been working in Niagara County like two years. So whatever, and uh he got stopped for, he got stopped by a Niagara County Sheriff's Deputy.

Q.   Traffic stop right?

A.   Traffic stop, and then in his interaction with the deputy he felt the deputy gave him a hard time. And he thought that the basis for this was his race.

Q.   Basis for?

A.   And so I asked him, "You mean the stop or the getting jerked around." And he told, "Both." So then I'm like, "Well what, what'd he stop you for?" And, and he uh told me speeding. Then I said, "Well were you speeding," and he says, "Yeah." And I'm like, "Well maybe he stopped ya, he got, for speeding," I go, "In fact LEE, you've got tinted windows, I don't even know that he would know your race when he stopped ya. But nonetheless you were speeding, that's his job. I don't see where, what," and then I asked him what he did, what the deputy did to jerk him around. And he told me that he had his driver's license and wouldn't give it back. Which led me to ask, "How did he get your driver's license?" And he told me that he uh, he gave it to him. I asked him why and he said, "Well because he asked me for my license and registration." And I said, "But LEE, you're a police officer on duty driving a police car, it really doesn't apply." I go, "Did you tell him you were a police officer

17

000663

1    and show him identification?" And he said, "Yes," that he had. And I said, "Well why did,
2    then why did you get your, how did he get your license, why did you give it to him?" And he
3    basically he didn't have, his only answers were because the guy asked for it and he, and he
4    gave it to him because he asked. So then I asked, "Well what do you mean he jerked you
5    around?" And he said, "Well it took him a long time to give it back to me. He went back to
6    his car, I think he was running my license." And then he told me while the deputy was in his
7    car he called JOE SHANLEY, the Sheriff's, Niagara County Sheriff's Deputy that works on
8    the task force to say hey JOE, this Niagara County Sheriff has me stopped, and I don't know
9    how he knew who it was but in any event SHANLEY called the deputy and told him that he's
10   a, oh and also LEE said that he uh thought it was also based on the fact that he, he didn't
11   think the deputy believed that he was a police officer. And I said, "Well what makes you
12   think that," he goes, "Well my looks," and at the time LEE had dreadlocks and he was very
13   undercover. But I said, "Yeah but LEE I can see if you're like driving by he would not think
14   you're a police officer but when you have your ID and you showed him your ID right?" And
15   he said, "Yeah." Then I'm like, "Wow did he say anything to lead you to believe that it was
16   based on your race," and he looked at me and like said, between his look and what he said
17   it was like, you know he was incredulous that I would think it would be anything else. And I
18   said, "I don't know, did he say anything, what, how, what can you base this on because if he
19   did there's an issue you, we can, you can call the Sheriff." I go, "That's the only, the thing
20   it's another police department you wanna you know make a complaint against him." But
21   LEE was not able to articulate any basis for it based on race. And then I told him, I go, "Well
22   not for nothing LEE, I just got stopped like a couple weeks ago by a female officer in
23   Hamburg and I had to sit there for 15 minutes. I'm not black, I don't know why she did it. I
24   mean I was driving an undercover vehicle, I think she didn't think I was a police officer,
25   probably running the plate, getting no hit and didn't get that it was a police car." I said, "I
26   don't know maybe he doesn't like Troopers, maybe uh, maybe she doesn't like Troopers. I
27   don't, maybe, I don't know," I go, "Did you say anything to you know to make him think that
28   you were a jerk and so he," so the whole issue was left. He couldn't articulate any real basis
29   for it but he believed that it was race based and I just looked at him, "Well I, I don't know
30   LEE, I wasn't there, I didn't see it. But if you want to make a complaint to the Sheriff' let me
31   know so I can make a call and let our people know."
32
33   Q.   And LEE'S car that he drives, what kind of car is it?
34
35   A.   Currently he's driving a silver minivan but he wasn't driving that when that stop (inaudible).
36
37   Q.   Back, back at, back at the time when the stop occurred?
38
39   A.   It was a, it was a, either a Taurus or, I think it, it was a Taurus, a cranberry colored Taurus
40        with tinted windows.
41
42   Q.   How, how, how dark were the windows, could you, could you see inside?
43
44   A.   They were pretty dark.
45
46   Q.   Pretty dark. And LEE admitted that he was speeding?

18

A. .   Yeah.  And then this, I keep referring to this person as a deputy, ironically that deputy then was selected by the Sheriff's Department to work in their task force, which put him into the US Marshals Task Force and it's JERRY GRANTO, who is now in the task force.  In fact when his name was, when he was like nominated or mentioned, put in consideration for the position Investigator MILLER went to DAN LARRISH, told DAN that GRANTO was a racist and he didn't think he should be in the task force and tried to block his appointment.  But then they looked into it and um found that it was baseless and then subsequently LEE I, I think they, they've ironed it out I believe.  My understanding is LEE apologized to him and said that he now knows he isn't a racist and sorry about the fuss in trying to keep him off the task force.

Q.   Okay.  Based on what you know from LEE or every, did you feel that when LEE got stopped it was in your opinion was it because of race?

A.   No I, my understanding is he was going 70 in a 35 and that's a pretty good reason to stop a car and, but you know what I remember in a conversation with LEE then, I, I said to him that, "LEE, I'm not naive here, I understand that if my mother is driving along at, at the same speed, do the, does the same act as person of color who has dreadlocks and tinted windows," I go, "The reality is a lot of police officers would be much quicker to pull over the other person instead of the 70 year old woman."  And I, I told him, "I, I can understand that there's that issue but when you're going so fast um you know I think the likelihood is that's why you were stopped."

Q.   Did you do anything with that, that stop or anything?

A.   No.  There again I knew if I went and, I would end up soliciting a personnel complaint on LEE, he comes to me with a problem and I didn't think it was a good idea.  I mean I felt like I would be stuck with this issue that the guys going in uh unwise speeds and then what do I do, do I initiate a personnel complaint when he came to, I just saw it as a disaster.

Q.   You felt, you, did you feel that if you brought, brought it forward and looked into it officially that LEE would of got, that LEE could have had some repercussions himself?

A.   Yes.

Q.   All right.  So, and what you're saying is you choose not to because you didn't want, you were protecting him to a degree?  (Inaudible).

A.   Um I wouldn't choose those words but I, yeah I didn't want to go out and solicit a personnel complaint on one of my subordinates.  I, I, I felt there was no basis for his belief that he was racially profiled for lack of a better term.  But I also told him, "Hey if you, if you think you were call the Sheriff but let me know first so I can let our job know."

Q.   Okay.

19

1  A.   Um cuz I don't think I, I don't think I convinced him.

3  Q.   He didn't get a ticket at, on that stop correct?

5  A.   No, no.

7  Q.   And eventually like you said um Deputy GRANTO and uh, um LEE eventually sat, they
8       worked it out somehow?

10 A.   Yes.

12 Q.   Do you know, do you know how it happened or any part of that, part of it, how they worked it
13      out?

15 A.   Well it started out, it continued to be a problem for a while because um LEE told me that
16      when I would get together every morning he would like glare at GRANTO and...

18 Q.   When GRANTO first came on the?

20 A.   Yeah and uh this went on for a while and then he just told me that he talked to him and that
21      he talked it out and resolved their issue.  And I, the way I understand it is he got to know
22      GRANTO and decided that he was wrong.

24 Q.   Okay.  What was the issue with uh MIGLIORE?

26 A.   It, when they came into uh VFW, the two of them were in the midst of a, a conflict.  I sat
27      down with LEE, asked what the deal was and he told me that he overheard MIGLIORE
28      talking to another Investigator in CNET, because they were both in CNET together before
29      coming to VFW.  They uh, he overheard MIGLIORE make a comment to someone else
30      about a very attractive female, a white female, something to the effect, "What is she doing
31      with him." The him being her boyfriend who CNET arrested for a narcotics case.  Um he is,
32      he was black and LEE took that to mean that JOE was voicing that uh he had an issue with
33      an interracial couple.  When I talked to MIGLIORE he said, "No I had issue with this
34      attractive, nice, seemingly nice girl," I don't know if they were living together but they were
35      dating, a drug dealer.  "What's she doing with this garbage, he's a drug dealer." LEE
36      interpreted it as being racially motivated, MIGLIORE said it's just a comment about what's
37      this nice girl doing with this piece of garbage drug dealer.  Well and what LEE did to retaliate
38      against MIGLIORE, JOE had pictures of his family up and he knew that, everyone knew that
39      JOE had a daughter who was then about 17, so LEE decided the best way to get back at
40      him would be to make comments about his daughter and he began making statements to
41      JOE about dating his daughter, "It's gonna be great when I pull up in your driveway with your
42      daughter in the car with me.  What are we gonna have dinner on Sunday JOE, your
43      daughter's great.  I can't wait to get together with her." I don't think he was, ever came out
44      and actually made actual like, I'm gonna have sex with your daughter but he's gonna
45      establish a romantic relationship with MIGLIORE'S daughter.  JOE took at that this guy is
46      making uh inappropriate comments about my love of my, my child, my love of my life and he

20

1     wouldn't stand for it.  JOE, uh they had words, they shouted and yelled and um so when
2     they came to the VFW I, LEE still was of the opinion that JOE was a racist because he made
3     this comment about an interracial, interracial couple.  JOE'S version was that, "LEE is a jerk.
4     I can't, you know he's wrong, he's said these things, they're wrong."  And there I am
5     saddled with his leftovers coming from CNET and I talked to both of them and said, "Well
6     wait, I don't know what we're gonna resolve your dispute here.  Can you work together?"
7     Both of them said yes and they did without any uh further issues.  In fact it became a, a, I
8     don't know if you can call it a joke but a, a, made light of it a little bit by referring to the, LEE
9     had an order of protection uh that, that there was an order of protection against LEE.  He
10    couldn't go near JOE or his family or the neighborhood, the stay away order.  Um and LEE
11    quite often, not quite often, several times through the years if there was something in Eaton
12    he would say, "I can't go there because of the stay away order.  And I would laugh and I said
13    similar things to be honest with ya.  Um tried to (inaudible)...
14
15  Q.   Lighten the mood?
16
17  A.   Mood a little.
18
19  Q.   Okay when you say the stay away order, that, that was, that was a façade, that wasn't a real
20       stay away order?
21
22  A.   No.
23
24  Q.   It was just a joking?
25
26  A.   It was a uh, a characterization of a real keep your distance, be careful, don't talk, don't talk
27       to him unless it's business.  Um...
28
29  Q.   Okay.  Based on, I mean most of your interactions you said the MIGLIORE thing was when
30       he first came on the unit?
31
32  A.   Yes.
33
34  Q.   So that's about 2008?
35
36  A.   Yes Sir.
37
38  Q.   Uh the GRANTO, Deputy GRANTO stop that's a couple of years ago?
39
40  A.   Yes.
41
42  Q.   And then the NOVAK, that was about June, about, around, around?
43
44  A.   About mid May, I would say May and June yeah.
45
46

21

1 Q.  (Inaudible) All right, based on those three incidents, would you have, I don't want to put
2     words in your mouth but what is your opinion on LEE regarding race and racial relations?
3
4 A.  Well I believe that he's sensitive to, sensitive to, I don't know how to say it either, he's, he's
5     sensitive to those issues.
6
7 Q.  Over sensitive?
8
9 A.  Sitting in this seat absolutely.
10
11 Q.  Before those three incidents, would you be able from your history, from recall, would you be,
12     would you have any knowledge of, of, of him being sensitive on race relations or overly
13     sensitive?  Did you know that when, like when the MIGLIORE incident popped up did you
14     go, did it pop in your head, oh this LEE just being over sensitive again or never, like oh my
15     God this, this could be true or, you know what, you know what, I'm trying to get at if you had,
16     if you had any of these feelings before any of these incidents?
17
18 A.  Yeah I did but um I had heard uh reports but I, I don't know, I don't uh how accurate they
19     were.  I had heard reports um that he had made uh complaints alleging racial discrimination
20     when he was a recruit in the Academy, when he was a Trooper on the road about his
21     supervisor.  Um he was, he, he was in CNET Western a few years, I don't know how many
22     years ago, and then he transferred to DETF and then transferred back to CNET and he
23     didn't get along with his co-workers there.  Um I think that if the comment that he made
24     about uh RASH, yeah I, I knew that he was sensitive or over sensitive, hyper sensitive to uh
25     race and I, he had, he's had run ins or encounters with people and accused them of it.  And I
26     know first hand on these occasions and then I've heard through, from others about previous
27     ones.
28
29 Q.  All right I'm gonna go, now we've explained a couple of things, I'm gonna ask you, did
30     Investigator MILLER ever or did you ever ask Investigator MILLER why it, why it was okay
31     for black people to say nigger and/or nigga and wrong for white people to say it?  Do you
32     ever recall a conversation like that?
33
34 A.  I think, I don't know that that's verbatim uh but I think that I, in that conversation in June 4th, I
35     think that was part of what I said to him about the circumstances of uh how the words used.
36
37 Q.  Okay.
38
39 A.  And I, I think in addition to um me starting out saying we all know that it's inappropriate for
40     you to, for one person to call another person and I think I elaborated and said, "You know
41     you hear it all the time in, in, in rap songs and it's an issue BILL COSBY stands up and tries
42     to point out that it's inappropriate."  And I think I said that and it's even more so I mean you
43     know, oh I did because that's when I went into KIEFER, I think that's when I went into
44     KIEFER using that mimicking.  I says, now, it is because I said, "If one black person says it
45     about another while they're being interviewed," I said, "There's, we all know that one person
46     you can't say it about another but then you get in the middle you know we'll do an interview

22

1  and one black person will speak of another black person." And I said, "Well you know that
2  doesn't seem very right either. But a lot of people in the, that we gotta talk to in their houses
3  seem pretty comfortable calling each other it. But then to go another step further, what if
4  BRENDAN simply quotes that person?" And I said to LEE, "At what point does it become
5  inappropriate?" And that's when I said, "You've been black longer that me, you tell me."
6

7  Q.  And that's when LEE said, "It's never appropriate?"
8

9  A.  Yeah in my point of, I mean that was a light hearted comment and attempt at it to say that
10  he's been black longer than me, be, and my reason, the basis for me saying that was
11  because I was kinda putting myself in those shoes. Like he and I were talking together and
12  you know and that he's even more of an expert than me. You know I tried to make light of it
13  but there is a reason for it.
14

15  Q.  All right. Now LEE says um, LEE says it's, it's never appropriate for anyone to use the
16  nigger word, correct?
17

18  A.  Yes, yes.
19

20  Q.  Would you ever use the nigger word?
21

22  A.  Would I, no never.
23

24  Q.  All right but, but prior to your conversation with LEE, where you, where you used it back in
25  June and you were trying to explain it to him, have you ever used the nigger word?
26

27  A.  I'm sure I have and I don't know when, I can't, but I find it hard to believe I never said the
28  word aside from uh you know in that uh room with him it's either, I don't know when but I
29  certainly don't call people it. I mean it...
30

31  Q.  So what context would you use it?
32

33  A.  Well like the context with LEE.
34

35  Q.  Okay.
36

37  A.  When I talked to him that day.
38

39  Q.  And you're, you're repeating it and you're using it as an example?
40

41  A.  Yeah.
42

43  Q.  All right.
44

45  A.  And I'm sure as a child, as a teenage I must have said it but as an adult, as a Senior
46  Investigator in the State Police, no I don't say it.

23

Q.   Do you use it when you interview people like uh street, street language people would know?

A.   Me say it to them?

Q.   Yes.

A.   No.

Q.   Okay. um have you ever used it in the workplace, ever recall it except for that one when you were talking to LEE, do you recall any instances?

A.   No.

Q.   Um Prior to, prior to your conversation in June, did you ever, did you recall any other conversations with LEE uh regarding the use of the, the nigger word?

A.   That word no, I, I was talked about, well we talked about the, we discussed here today the racism. I think that's the only time that word was talked about that word.

Q.   Okay. Have you ever heard Investigator MILLER use or utter the word "nigger" or "nigga"?

A.   I don't, I don't think so.

Q.   And I think you answered this but I'm gonna ask, do you know if Investigator MILLER feels it's inappropriate for black people to utter the word nigger?

A.   Based on his response to my question it's never appropriate, that to me would mean...

Q.   For anyone?

A.   For anyone.

Q.   Okay.

A.   Yeah.

Q.   Have you ever heard anyone use or utter the word "nigger" or "nigga" in Investigator MILLER'S presence, anyone else?

A.   I don't remember specifically but when we interview people they say it, I don't want to say a lot but it's not unheard of either and it wouldn't surprise me.

Q.   Okay so it's common in your interviews when you (inaudible)...

A.   I wouldn't say common.

24

Q.   But uh it is not uncommon?

A.   It's not uncommon.

Q.   So it would, it would, it would, it's happened several times, is it mostly, is it mostly, is there anybody in your office that's using the word?

A.   No this would be people being interviewed on the street, um you know not on the street, in their homes.

Q.   Okay.

A.   But I don't know if he, I can't think of times when he has been there to hear it.  I don't know if he's outside, inside, I can't remember any specific times.

Q.   All right let me ask you, let me ask you this, and this is maybe a little um, cuz you're not everywhere.  If, when a couple of task force guys go in and they're interviewing somebody and they um during that conversation the suspects used that word, you know to describe it. Then like you said they come outside and they tell the, the rest of the group what's going on um and would they repeat that use of that word during the context?  Has, would that happen?

A.   It could, uh it could.

Q.   It could.

A.   I don't remember any specific instances.

Q.   Okay.  Do you, does LEE, does LEE confront people about race stuff or about use of, use of words being inappropriate?

A.   Well he did NOVAK.

Q.   All right.

A.   But he didn't, no I mean other than that no he never brought it up to me and I'm sitting here with these allegations.

Q.   Okay.  LEE never came to you and said hey I have a problem with you using the "N" word?

A.   No.

Q.   Um…

25

A.  Uh no and not only, not only didn't he bring it up, but the only time I ever used the word with him was that onetime in the office.

Q.  All right.

A.  And he certainly had an opportunity because the two of us were in a, a frank, honest, constructive conversation about race relations. And he had every opportunity, in fact you know in that, in that same conversation I even said to LEE, I go, in, in meaning the context in and I said, and, and I said to him two things, I used another example, I said how my uh, one of children used the term in school, um American Indians and the teacher corrected him and said they're to be referred to as Native Americans. And I said how culture changes, what's appropriate changes and it changes with different people at different rates. Um and I said everybody's background is different. And he, he and I we know, he's been to my house, he knows me, he knows my wife, he knows where I grew up. Um and I said to him at the time, this would have been this June 4th date, "Well LEE, I hope you know that you know me well enough and could ever say to me, say something to me if I say or do something that you find inappropriate." And I opened the door for him right then and there and he didn't, didn't say anything.

Q.  He didn't come up and say stop doing this or I feel this is offensive?

A.  No, no.

Q.  So LEE never came to you and said there was anything that you know of that you were doing that was offending him?

A.  By even, to answer your question no he did not.

Q.  Okay.

A.  But I even invited him to, I said, "If I ever do say or do anything," because I said, "You know not for nothing you can say something innocently and mean no offense." And I go, "If, if you ever take offense, well you know me well enough that you know you can talk to me and I mean nothing by it." We talked, that was like, we talked for like an hour that day.

Q.  Okay. Have you ever observed Investigator MILLER confront anyone regarding any use of the nigger or nigga word?

A.  I don't think so.

Q.  You ever hear any rumors about him confronting anyone about the use of the nigger or nigga?

A.  Well just, I don't know that, if, if it was for that word or not um but the instances that I cited about him having problems with people, I don't know if it was that word or what.

26

| | | |
|---|---|---|
| 1 | Q. | In none, in none of those instance, in, in GRANTO… |
| 3 | A. | No. |
| 5 | Q. | NOVAK or MIGLIORE I don't think he ever, he never mentioned that they… |
| 7 | A. | No, no they didn't, I mean when he was a recruit in the Academy. |
| 9 | Q. | Recruit, okay. |
| 11 | A. | When he was a Trooper on the road. |
| 13 | Q. | You heard rumors but you didn't have any firsthand knowledge if that's correct? |
| 15 | A. | I know I, I had heard that it was an issue that he made complaints that he was treated unfairly due to his race or people said inappropriate comments. I don't know what specific words were. |
| 19 | Q. | Okay. In your, did, and maybe this is the same part of the incident with DAN NOVAK, NOVAK but do you know about the incident between NOVAK and Investigator MILLER, which involved Investigator MILLER being called the black guy? |
| 23 | A. | It's uh BRENT, BRENT NOVAK. |
| 25 | Q. | BRENT NOVAK. |
| 27 | A. | And that was the, what initiated their big blowout on June 4th, he, LEE heard NOVAK refer to him as the black guy. |
| 30 | Q. | Okay and that was also something with being arrested or something? |
| 32 | A. | No that was a different. |
| 34 | Q. | That was a different, that was a different thing. |
| 36 | A. | In this here… |
| 38 | Q. | I apologize, maybe I'm getting confused. |
| 40 | A. | Yeah, in this one here that the black guy, LEE told me that NOVAK was interviewing a citizen and he asked MILLER, I don't know who MILLER was with, a couple of white guys, I don't know who. He said that the guy was talking to the guy and referred to Investigator MILLER as the black guy. And that's the, and LEE then took issue with it and told him he's to refer to him as Investigator MILLER and NOVAK replied, "How am I gonna refer to you as Investigator MILLER, the guy doesn't know your name. I was just saying who you are in reference because that's what made you different from the two other guys there." And LEE |

27

continued to take issue with it and then that's when NOVAK blew up and told him he was sick of his not pulling his weight and he's been covering for him for a year and um and that and jumped into NOVAK making allegations of against LEE in their argument back and forth.

Q. Was there ever um, was there ever a time in your office where there were two LEE'S in the, in the task force?

A. Yes.

Q. Okay, was one a white LEE?

A. Yes.

Q. A white, a white guy, Caucasian? Um did it ever become common in the office for one LEE to be referred to as the white LEE and one to be referred to as the black LEE?

A. It wasn't common but for about two days they uh guys did that.

Q. Okay why'd it stop or why'd it start?

A. Because one day I saw Investigator MILLER um, I just got a feeling that based on his reaction, he didn't say anything, based on his reaction I could tell that he wasn't happy with it. So later in the day I approached him in the office and asked him what he thought about the uh black LEE/white LEE and he said, "I don't like it." and I knew he meant it and I told him that I'm sure the guys meant no disrespect and I'm sure that it will end pretty quick. And then I called the guys or maybe I didn't, maybe I saw them in person but I told them that LEE took issue, Investigator MILLER took issue with it and to stop referring to them as white LEE and black LEE.

Q. Okay and it stopped?

A. Immediately, the, all the guys they're like well we didn't mean anything by it, it was just kind of a salt/pepper, white cop/black cop. And I said look it, just don't.

Q. So you, so you actually saw an issue that was a problem for LEE and you took action with it?

A. Yes.

Q. Okay. That was or involved, involved race?

A. That was I think last summer, yeah.

Q. Okay. You didn't start, you weren't the one...

A. No I didn't...

28

1  Q.    That started calling them white or black?

3  A.    No.

5  Q.    Okay.  Did you ever call Investigator MILLER the black guy?

7  A.    No I don't, no that I, no.

9  Q.    Have you ever, have you ever observed Investigator MILLER being discriminated against
10       because of his race?

12 A.    Nope.

14 Q.    Do you know of anytime when Investigator MILLER was discriminated against because he
15       was African/American?

17 A.    I don't have firsthand knowledge, he's told me.

19 Q.    Okay but taking, taking all the, everything that you, we've talked about off the table, you
20       never observed, you never heard anything else?

22 A.    No.

24 Q.    Did you ever, and I know we talked about it before, you know you kinda feel that Investigator
25       MILL, MILLER maybe sensitive about race, race relations.  In your conversations with him
26       did you ever tell him that you thought he was sensitive about?

28 A.    I don't know if I used those words or come out and said it but I, I do, I do know that when he
29       made those uh complained about those other officers to me I said things like, "Gees LEE, I
30       don't know, I just don't see it."  I don't know that I told him that he was overly sensitive.

32 Q.    And maybe that, maybe overly sensitive may not been the right (inaudible) of words but
33       would you, would you have given him the impression that you think LEE you're full of shit or
34       something along those lines, they didn't mean it, did you ever convey an attitude similar to
35       that?

37 A.    Well I wouldn't say that um...

39 Q.    And I, I'm not putting words in your mouth.

41 A.    Right, I mean certainly I conveyed to him, "LEE, I just, I don't see it.  I don't see what they,
42       that what they did or said or whatever is based on race."  So that to me, I left it unsaid that
43       it's, you know it's baseless.  I, I, in fact I think I kinda gave him wiggle room and said things
44       like, "But I wasn't there."  And I don't think I ever come out and told him that, I, perhaps you
45       know in my, what I said it was insinuated that I didn't see the base, well I, I come out and
46       said I didn't see the basis.  If that insinuates that he's wrong, I don't, I don't know.

29

Q. Going back to your conversation um where you, you know we discussed about the nigger word, um it was just you and LEE right, nobody else was around during that conversation?

A. That's correct.

Q. Going to take a break, the time is 3:38PM

The time is 3:51PM, we're resuming our interview.  KEVIN, I, I think you answered the question, have you ever uttered the word "nigga" or "nigger" in the presence of investigator MILLER and you explained you had that one conversation back in June and beyond that you don't believe you've ever used that word.

A. Correct.

Q. Is that correct?

A. Correct.

Q. All right have you ever uttered the phrase, "Awe man I ain't seen that nigger in a minute?"

A. I don't, I don't believe I've ever said that, certainly have heard it.

Q. Do you know when, who, where you've heard it?

A. Well as I uh mentioned earlier doing interviews of people who we look for that are fugitive, that's a pretty common um…

Q. Phrase?

A. Yeah uh phrase, haven't seen him in a minute. And it's also, like I went around in circles not saying it's common but it's not uncommon with the use of that other word.  You put the two together, I'm sure I've heard it.  Um and there again you asked about people coming out, who, who we work with and repeating it. I don't know, I don't remember ever coming out and uh quoting someone.  But if it had ever been said, I don't think I did it.  That's the, the thinking out loud again (inaudible).

Q. Is it possible somebody in the office repeated it?

A. Well that's what I'm getting at, yeah that's exactly what's possible is someone uh, you come out and say well what did, what did she say and you say it verbatim what they said.

Q. Okay.

A. That could have happened.  Uh I, I don't remember specifically.

30

1  Q.   In any of your recollections if, if that phrase was used is there, is there any, did anything pop
2       in your head going oh that, that's, that's bad he shouldn't have said that?  Like it was never
3       used in any con, well I guess what I'm asking is whoever said it, it, it never popped and, it
4       never popped into your head that this, the use of that saying, if it, if you heard it that it was
5       meant, directed in, in a derogatory way against African/Americans?
6
7  A.   Well that's kind of a hypothetical, um if it had that would be going right to the point of my
8       conversation with LEE when I said on one extreme the words used this way, in the middle is
9       this way and then the third example is if BRENDAN repeats what someone says.  And I, and
10      I kind of differentiated about the levels of badness and I asked him you know what, what, at
11      what point is it inappropriate.  And he said it never is.  Um so yeah at that, you know it's like
12      well he doesn't think it ever is.
13
14 Q.   But I guess what I, what I'm saying is you were able, you were just able to describe to me
15      that you know there are certain context where these phrase…
16
17 A.   Yeah.
18
19 Q.   Could be considered bad.
20
21 A.   Um-hum.
22
23 Q.   It never, you never heard it, it never, if you ever heard it in, in that bad sense you don't,
24      you're not recalling any, any sort of instance where you, that's in your opinion would have
25      been second in the bad sense?  It was always in that sense where it was just maybe
26      somebody repeating…
27
28 A.   Yeah.
29
30 Q.   That's what I'm trying to get at.
31
32 A.   Okay, (inaudible) you can, you can…
33
34 Q.   (Inaudible) I know I'm, I'm not being clear but you can differentiate between the difference of
35      somebody repeating it and somebody actually using it…
36
37 A.   Yeah.
38
39 Q.   And if somebody actually, I guess what I'm asking you is you don't remember anybody ever
40      using that phrase in the, the sense where it wasn't just repeated?
41
42 A.   Only the people we're interviewing yeah.
43
44 Q.   Correct.
45
46 A.   Yeah.

31

Q.    Right.

A.    None of, not, not me…

Q.    None of, not you or the task force members?

A.    Not me, right.

Q.    Investigator MILLER states that BRENDAN KIEFER recounts an imitation of an old black guy who states in a minstrelsy voice, "Awe man I ain't seen that nigger in a minute." Have you ever heard BRENDAN KIEFER do something similar to that or that exact thing?

A.    I don't remember that exact thing but that's exactly what I was referring to when I talked to LEE and um Detective KIEFER is a pretty good uh imitation of people included in which would be like an elderly people including black people. What I, I know I've heard him say something like uh, usually it consist of like oh shit and that would be about it. Um…

Q.    Okay. You don't, you don't specifically remember him saying that phrase thought, "Awe man I ain't seen that nigger in a minute?"

A.    No.

Q.    Okay. Do you recall ever repeating that phrase or telling, telling, well first of all do you ever, do you ever recall repeating that phrase to Investigator MILLER?

A.    No.

Q.    Okay do you ever recall repeating or explaining BRENDAN KIEFER'S imitation or, or BRENDAN KIEFER saying that phrase to Investigator MILLER? Do you ever recount telling MILLER that story about that?

A.    The one I talked about yeah.

Q.    Correct but you, you don't, you don't remember BRENDAN ever saying the, "Awe man I ain't seen that nigger in a minute," correct?

A.    Well I think that might be what I used as an example, I think we're talking about the same thing when I said that we, I on June 4th when we had that conversation about race and the use of the word and whatnot and I used BRENDAN…

Q.    You used BRENDAN as the example?

A.    Yeah.

Q.    Right.

32

000678

1
2    A.    I think that's…
3
4    Q.    Okay. So I guess I mean just to clarify, did you ever, did you ever hear BRENDAN KIEFER
5          say that, "Awe man I ain't seen that nigger in a minute," in your, from your recollection?
6
7    A.    No I, I think I made that up as an example of like being like if BRENDAN like interpretation…
8
9    Q.    Okay.
10
11   A.    Not interpretation, his imitation.
12
13   Q.    You've never heard BRENDAN say that but what I'm saying is you may have made that up
14         in your trying to make an example of when you were talking to LEE?
15
16   A.    Um-hum.
17
18   Q.    Okay.
19
20   A.    BRENDAN it's, to, to, to put it in context you know every year we make like 500 arrests and
21         we probably look for as many people and we don't catch, so that's a 1,000 people. And we
22         got to multiple houses for the people. So now you're up to a couple, uh you know thousand,
23         like whatever, 3,000 interviews a year, been doing it for 10 years. 30,000 interactions is
24         just…
25
26   Q.    (Inaudible)?
27
28   A.    Exactly it's so many and, and you know if you pick out one quote from onetime out of the
29         tens of thousands, you know I, you know I just I don't know what, they've all run in together
30         and if I, if he's ever said that particular thing at onetime, I just don't know.
31
32   Q.    Okay.
33
34   A.    If he's come out and said that statement.
35
36   Q.    Did you ever have a conversation with Investigator MILLER regarding Investigator MILLER
37         being offended by your use of the word "animals?"
38
39   A.    (Inaudible).
40
41   Q.    Okay, do you know, let me, let me rephrase it, do you know if you've ever offended
42         Investigator MILLER by your use of the word "animals?"
43
44   A.    No.
45
46

33

1   Q.   Okay. Do you remember ever having a conversation with Investigator MILLER regarding
2       your use of the word "animals?"

3

4   A.   No.

5

6   Q.   How, and I'm going to, I'm changing the word here but the same, same context, did you
7       ever have a conversation with Investigator MILLER regarding your use of the word
8       "savages?"

9

10   A.   No.

11

12   Q.   Do you remember if, did you ever have a conversation where Investigator MILLER was
13       offended by your use of the term "savages?"

14

15   A.   No.

16

17   Q.   Okay how about the term "monkey" did you ever have a conversation with Investigator
18       MILLER about your use of the term "monkey?"

19

20   A.   No.

21

22   Q.   Do you, do you ever have a conversation with Investigator MILLER regarding him being
23       offended by your use of the term "monkey?"

24

25   A.   No absolutely not.

26

27   Q.   Okay, how about the term "monkey sex" have you ever had a conversation with Investigator
28       MILLER regarding the term "monkey sex?"

29

30   A.   No.

31

32   Q.   Have you ever had a conversation about Investigator MILLER being offended by your use of
33       the term "monkey, monkey sex?"

34

35   A.   No.

36

37   Q.   Okay. Have you ever used the term "monkey sex?"

38

39   A.   No.

40

41   Q.   Okay. Have you ever used the term "monkey" in an outside of describing the actual animal
42       monkey? Do you have any, do you have any recollection?

43

44   A.   No.

45

46

34

1    Q.   I have a couple of specifics here, which I think I know the answers but on June 11, 2013 at
2          approximately 2:30PM in the Troop "A" VFW office did you say, "Awe man I ain't seen that
3          nigger in a minute?"  This might have been that conversation?

5    A.   The only way is if it's the conversation we talked about and I thought it was June 4th.

7    Q.   Okay.

9    A.   But that's the only way is if it is me talking to Investigator, all right just the one we talked
10         about.

12    Q.   Okay that conversation we talked about, all right.  Um and that's the only time you would
13         have ever used that phrase?

15    A.   Yes.

17    Q.   (Inaudible) all right so on May 2, 2013 near Mazelle Street, did you say the phrase, "Awe
18         man I ain't seen that nigger in a minute," you would say no?

20    A.   I'd say no.

22    Q.   All right.  On January 28, 2013, at University Plaza did you utter the phrase, "Awe man I ain't
23         seen that nigger in a minute?"

25    A.   No.

27    Q.   All right on January 14th of this year, 2013, approximately 10:00AM uh around 115
28         (inaudible) Street, Buffalo, while searching for AARON GLENN, you interviewed ERICA
29         THREATT, all right did, did, I'm trying to bring back your recollection of the, of the
30         interaction.  Did, do, first of all do you recall, do you recall searching for AARON, AARON
31         GLENN?

33    A.   Yes.

35    Q.   All right, do you remember interviewing ERICA THREATT, or THREAT, T-H-R-E-A-T-T?

37    A.   Do you know where?

39    Q.   Uh (inaudible) Street in Buffalo.

41    A.   I think so, I think that...

43    Q.   She, she's the, I think she's...

45    A.   A sister?

35

1   Q.   A sister.

3   A.   Yes.

5   Q.   All right, during that interaction did you tell her and you're talking to ERICA THREATT, THREATT, did you tell her that her brother, AARON GLENN, and a bunch of other "savages" beat up a retarded kid at a, at a metro rail station?

9   A.   I don't remember saying that.

11   Q.   Could you have said that?

13   A.   Yes.

15   Q.   All right.  If you, if you did use that term "savages," what would you have referred to?

17   A.   I think beating a retarded kid into unconsciousness is an act of savagery.  What, whatever, I remember AARON GLENN and he was black, and I, I, if I, I don't know if I said that or not but if I did it's because of what he and his friends did not on the basis of his color.

21   Q.   So it was more of the, more of the um...

23   A.   That they delivered savage beating on this guy...

25   Q.   Yeah I'm trying to come up with another word so that the, but it, it was what they did not, not because of their race?

28   A.   Absolutely.

30   Q.   Okay so uh you were not being derogatory towards African/Americans?

32   A.   No.

34   Q.   Have you used that term "savages" for other suspects?

36   A.   May of, I don't know.

38   Q.   Okay.  In your use of the term has it, have you ever used it in a derogatory way towards African/Americans?

41   A.   If I, I don't know, if they were, it wouldn't of, if I had it wouldn't be because they're African/American. It, I mean to me if you commit an act of savagery then you're justified to, I'm justified to call the person a savage whether they be white/black.

45   Q.   You're using it on the basis of the behavior?

36

| | | |
|---|---|---|
| 1 | A. | Absolutely. |
| 3 | Q. | Not the race? |
| 5 | A. | Absolutely. |
| 7 | Q. | After that interview did you tell Investigator MILLER that ERICA, and we're talking about ERICA, ERICA THREATT, had a great body for "monkey sex?" |
| 10 | A. | No. |
| 12 | Q. | So you're denying you said that to Investigator MILLER? |
| 14 | A. | Yeah I, I remember her and I remember the interview and I can't imagine me saying that. |
| 16 | Q. | Okay so you didn't say it? |
| 18 | A. | No not that, no. |
| 20 | Q. | Okay during that interview do you know if there were, is anyone else around?  Was there anyone else with you who was there? |
| 23 | A. | We were there, the task force, we were there as, there were others there, other task force members, I don't remember who. |
| 26 | Q. | Okay.  How about uh was do you remember, do you recall if CHARLES LEWBERG or RICHARD LEWIS were there?  Do you know who they are first of all? |
| 29 | A. | RICH LEWIS is an NFTA Detective. |
| 31 | Q. | And that's Niagara Frontier Transit Authority? |
| 33 | A. | Yes. |
| 35 | Q. | Okay. CHARLES LEWBERG or LOWBERG? |
| 37 | A. | There was another, there was another NFTA Detective, I don't know his name though, I can't remember it. |
| 40 | Q. | Do you know if those two were there during the, that conversation when you were looking for AARON GLENN? |
| 43 | A. | I don't remember. |
| 45 | Q. | Have you ever heard the term "monkey" used in reference to African/Americans? |

37

1  A.  Uh not that I can think of.
2
3  Q.  Okay.  On or around July 27, 2012, did your unit search for RAMAEL BRUNDAGE?
4
5  A.  I don't know.
6
7  Q.  You don't recall?  All right, I'm going to explain the situation then, you may not recall it.  um
8      during your, during the search for RAMAEL BRUNDAGE um BRENDAN KIEFER may have
9      interviewed the girlfriend and may have asked her something similar to, why do you keep
10     referring to BRUNDAGE who is African/American as that nigger, so that and then he was
11     explaining that you're, to her that means that you, meaning the, the girlfriend is sitting there
12     with his baby that's half a nigga, did you ever hear that phrase or any, does that recall, do
13     you have any recollection of anything similar to that?
14
15 A.  I wasn't present but I remember hearing what you're talking about.
16
17 Q.  Okay explain what you know or what you heard.
18
19 A.  I had heard, I don't remember the names but it's got to be the same case, I don't know
20     RAMEAL BRUNDAGE.  But I remember hearing that they were looking for a guy on a
21     warrant, in fact I think I was at the house, at, doing like a perimeter and uh I remember and
22     my co-workers there on the task force, I think it was KIEFER, sounds familiar, was
23     interviewing this girl.  She kept referring to the father of her child with that word and at one
24     point, now I didn't hear it but I remember hearing that BRENDAN either asked her why she
25     was saying it or told her to stop.  And he, and he said something to the effect, my God, um
26     you know what it was the child was sitting on her lap and he said something to the effect
27     "You got, you got a half sitting on your lap, how can you say that," something to that effect.  I
28     wasn't there but I heard about it.
29
30 Q.  Do you recall if you ever repeated that story to anyone?
31
32 A.  No.
33
34 Q.  No you don't recall?
35
36 A.  No I don't recall.
37
38 Q.  Okay.  Is it possible you did repeat the story?
39
40 A.  I guess it's possible I, but I don't know why I would of or who to or.
41
42 Q.  If you did would you have used, would you have used it uh the "nigga" term or no?
43
44 A.  I don't, I don't know, it's all hypothetical…
45
46 Q.  Okay.

38

A.   So I, I don't think that's something I would do.

Q.   Okay.  We'll move on.  during the search for THOMAS CLARK, which is sometime 2012, and I don't know if you'll recall it but after searching CLARK'S residence did you come out of the residence and tell other task force members that, "They are fucking animals, how do they live in that shit?"

A.   I don't recall.

Q.   Don't recall.  Have you ever referred to African/Americans as "animals?"

A.   There again if I called someone an animal it would have been because they did something animalistic.  I certainly don't select black people to use that word to refer to them.  Um, no.

Q.   Has nothing to do with race?

A.   Exactly.

Q.   Going back in time, February 17, 2011, while telling your unit about the search for TOBIASZ BOYLAND, did you utter, utter the phrase "You ain't, ya'll ain't gonna catch him he's a smart nigga?"  Does that sound familiar, do you have any recollection?

A.   I, I think that's what Investigator MILLER told me that a guy told him at the barber shop.

Q.   So you, you, you're recalling it that MILLER told you that?

A.   Yeah.

Q.   Okay.

A.   And I think after I caught him I said to Investigator MILLER, so much for your guy at the barber shop, that's why  I, it makes a, you know rings a bell for me.  But I, I don't, I don't know if he used that word or not though.

Q.   Okay.  You prob, sometime in August 2010, did you tell members of the task force that the victims of the City Grill shooting were animals after you learned that some of them had records?

A.   I don't remember that.

Q.   And I'm going to go back and said, your use of the term animals would, has nothing to do with race, this would all be based on their behavior or whatever you, ever, whatever criminal acts they have done?

A.   If I said it, I don't, it's 2010...

39

1
2    Q.    Right, I, I...
3
4    A.    I don't know, if, if I had, on any, a blanket statement I mean ironically the last time I think I
5          used, called someone that was just a short time ago, my 17 year old wasn't cutting his meat
6          up, stuffing big pieces of steak in his face.  And as I sit here I don't know if it referred to him
7          as a barbarian or a savage or an animal, but this is my son, you know it's not based on he's
8          sitting there eating like a, an animal, I, you know it has nothing to do with the person's color.
9
10   Q.    Gonna give you another, uh this is back in 2010, another scenario, sometime June 2010
11         while looking for GREGORY SHAW, did you ever come across a Caucasian woman who
12         told her biracial son that, "You better watch out before they come get your nigger ass?"  You
13         ever have, you ever have...
14
15   A.    Me say that to someone?
16
17   Q.    No did you ever come across a Caucasian woman who said that, did you ever hear that?
18
19   A.    Uh-huh, she said that?
20
21   Q.    Yes that's...
22
23   A.    I don't, I don't remember that.
24
25   Q.    You don't recall?
26
27   A.    No.
28
29   Q.    Gonna take a break, the time is 4:15PM.
30
31         The time is 4:17PM, we're continuing our interview.  DAN LARRISH, briefly describe your
32         relationship with him.
33
34   A.    DAN LARRISH was the supervisory Deputy in charge of the Marshal's task force in Buffalo
35         uh when, and 10 years ago when the task force was created that's when I, it started like a
36         month before I came into the VFW and onto Marshal's task force.  So essentially when it
37         was created it was 10 years ago, uh he was the supervisor.  Um he remained the supervisor
38         there until June 30th of this year, uh upon his mandatory retirement.  Um I worked in the task
39         force there and uh did you ask about our relationship, is that?
40
41   Q.    Yes.
42
43   A.    Our relationship, it started out pretty good but in the past uh I don't know that I can set a
44         timeline when it went south but toward the end here it deteriorated and uh a week before his
45         mandatory retirement he uh got the US Marshal to dismiss me from the Marshal's task force
46         and that was his act in his last week.  So I was out of the task force for I think till the end of

40

1       July, so for a month thereabouts, five weeks maybe.  And uh when I, or after his retirement I
2       was then put back in the task force.

4  Q.   Okay so pretty much you worked with him your entire time you were in the, you were in the
5       task force until he retired?

7  A.   Worked with him, early on yeah we worked together, we worked, rode in car everyday and
8       saw each other.  Toward the end I can't say we worked together.  Um in the last few months
9       before his retirement I don't think I even saw him.  I, our relationship deteriorated to the point
10     where um I just avoided contact with him and then actually used that against me to, as a
11     reason for dismissal, cuz I wasn't around.

13 Q.   Did you ever, did you ever have any discussions with Mr. LARRISH regarding Investigator
14     MILLER and any type of racial incidents with him?

16 A.   Yeah I know we spoke about um the incident with GRANTO, um because LEE went to DAN
17     to try to block GRANTO'S uh transfer into the warrants for the Marshal, uh Sheriff's
18     Department Warrant Squad and by such into the Marshal's Task Force.  So we certainly
19     talked about that, that incident.

21 Q.   Okay.  And during, so LARRISH was well aware of the GRANT, of Deputy GRANTO pulling
22     over Investigator MILLER?

24 A.   Yes.

26 Q.   All right.  And LARRISH was, uh DAN LARRISH was okay with GRANT, GRANTO coming
27     onto the unit at some point?

29 A.   Yeah he did, he called it an investigation, I think that consisted of interviewing MILLER and
30     GRANTO and then he, he decided that based on his investigation uh there was no grounds
31     that, to hold it against GRANTO.

33 Q.   Did, did your, did you, after he was done with his investigation did LARRISH come and talk
34     to you about his results do you recall?

36 A.   But he didn't come to me, but I think he told me of it.  I think in his office he told me.

38 Q.   Okay. during that conversation, maybe it was in your office, um was there, did LARRISH tell
39     you that, while he was bringing GRANTO into the unit but he would have to work in Niagara
40     County, obviously he, he's from Niagara County so he would have to work in that section?

42 A.   I don't know if he told me that but it would, it, it would go without saying.

44 Q.   Did you ever have a discussion of, did he ever ask you or have a discussion if you were
45     okay with, with GRANTO coming on the unit or if maybe LEE MILLER should be moved to
46     Erie County, do you recall any sort of conversation about that?

41

A.    I just don't remember.

Q.    You don't recall?

A.    No.

Q.    Okay. Did you ever tell Mr. LARRISH that, and you were referring to Investigator MILLER, "The nappy head will work wherever I tell him?"

A.    No.

Q.    Okay, how about this, did you ever tell Mr. LARRISH that, and you were referring to Investigator MILLER, "His nappy head will be in Niagara County?"

A.    No.

Q.    Have you ever had any type of conversation where you referred to Investigator MILLER with or as, "nappy head?" Did you ever use that term?

A.    Yes.

Q.    Can you explain that?

A.    I kind of forgot about it but long, like five years ago I, I do these wanted posters of the 10 most wanted and distribute them around Buffalo and I wanted LEE to come with me so he knew who I gave them to and procedure. And we uh, one of the stops was in City Hall because I had established a point of contact with them, like a coordinator of the black clubs in Buffalo. And I remember we went there, LEE and I were going to this persons office and there was a girl, or a lady, a woman, who, I don't know she was like outside the office and she was a real tall attractive woman and, and I like asked, looking, I'm here for whoever I was looking for and LEE was like ogling her, looking at her and said, "My aren't you," something to the effect, "My aren't you a willowy one." And she said, "Excuse me?" And he repeated it again and she looked at him again and acted offended like willowy, and he looked at her and he's like surprised and startled and he looked, "Yeah you know like tall," cuz she was tall, like six foot, the heel was probably like six foot. And she just looked at him and said, "I know I'm tall." And then there I was, we were representing the State Police and I'm looking at, observing this conversation in which LEE has walks up to this strange, stranger, this woman and offended her. Then after we left he said to me something to the effect, "What, what was her problem," and I think we were in the elevator going down and I said, "LEE, you're, what are you doing, you can't talk to people like that. How would you like it if she walked up to you and said," I said something to the effect, "Isn't, boy isn't your head hair nappy?" I go, "I mean think about that." And uh he looked at me uh startled and I go, "Wouldn't, wouldn't be cool would it." And then that was, then I think he was kind of (inaudible) quiet. And I think that's the only time I've used that word in my life.

42

| | | |
|---|---|---|
| 1 | Q. | And your use of the term at that point was for why? |
| 2 | | |
| 3 | A. | To try to uh convey upon him the inappropriateness of his comment to this woman who, she |
| 4 | | knows that she's tall and maybe very well self-conscious of being tall and just to say, put you |
| 5 | | know like the uh, to give him a perspective from her perspective. |
| 6 | | |
| 7 | Q. | But you're describing, you described LEE as the, as his nappy, nappy head or something |
| 8 | | like that, I'm not trying… |
| 9 | | |
| 10 | A. | I, I said you know, "How would you like it if she said that to you?" |
| 11 | | |
| 12 | Q. | And what was the nappy referring to on LEE? |
| 13 | | |
| 14 | A. | Well his hair. |
| 15 | | |
| 16 | Q. | Dreadlocks or, or just? |
| 17 | | |
| 18 | A. | I, I think he would have had dreads then, I think, I, I , I, I gotta think that's what I… |
| 19 | | |
| 20 | Q. | But you were using the term to refer to his hair? |
| 21 | | |
| 22 | A. | Yeah. |
| 23 | | |
| 24 | Q. | All right it had nothing to do with his race? |
| 25 | | |
| 26 | A. | No he's, he had dreadlocks in his, he's had different hairstyles, a lot of times they're pulled |
| 27 | | into short dreads.  Um I mean he could have been a white person with dreadlocks uh but I |
| 28 | | just picked, certainly at this point it's a poor choice of things to, I, I wish I said to him how |
| 29 | | would you like it if she called you short.  Sitting here I wish I picked on him being short |
| 30 | | instead of his hairstyle. |
| 31 | | |
| 32 | Q. | But the, the term… |
| 33 | | |
| 34 | A. | But it still had nothing to do with his race it's just. |
| 35 | | |
| 36 | Q. | Do you know if LEE was offended by that at all? |
| 37 | | |
| 38 | A. | Well he was awful quiet afterward and I think, I think he was. |
| 39 | | |
| 40 | Q. | He never, he never said? |
| 41 | | |
| 42 | A. | He didn't say anything he just was, wouldn't talk to me. |
| 43 | | |
| 44 | Q. | KEVIN, have you ever shown any type of videos to anyone in the Troop "A" VFW or the, |
| 45 | | and/or the task force? |
| 46 | | |

43

1  A.  Yes.
2
3  Q.  What type of videos do you show?
4
5  A.  I showed the uh, a couple of years ago, 2011 I was awarded a Police Officer of the Year
6      Award by the Bar Association of Erie County, we were very active arresting a lot of people
7      for uh, um in my award it, the statement thing is is that I balanced the rights of the accused
8      against the rights of society, whose (inaudible) their luncheon was given this award and
9      made a presentation and I took it and I gave a brief speech.  Investigator MILLER uh
10     recorded it and put it on YouTube and I remember we uh watched it um several times,
11     showing it to the others.
12
13 Q.  Okay.
14
15 A.  The other time I can think of is the video that you showed me earlier of the girl getting
16     interviewed in a newscast.
17
18 Q.  And we're talking about the video that was uh Sweet Brown's Cold Pop Escape on the
19     YouTube, that, that...
20
21 A.  It is, did that yes.
22
23 Q.  Is that, is that video that we showed you prior coming in here that's the video you showed
24     that?
25
26 A.  I don't know if I showed it but I remember watching it, yep.
27
28 Q.  Okay.  Those the only two videos you recall?
29
30 A.  Well there's a lot of other you know police videos that you, you know.
31
32 Q.  When you say police videos are we talking about videos that either we make as a police
33     agency we're showing to describe suspects or are we talking about like police videos like
34     YouTube versions of Cops you know where you're, you're showing them around the office?
35
36 A.  I was talking about like job related of what you're supposed to watch all the time that I don't
37     think we, has any relevance to the...
38
39 Q.  Okay.
40
41 A.  This here, those are the two...
42
43 Q.  Non, I would say non-police?
44
45 A.  Non-police, not job related.
46

44

1    Q.    Okay.

2

3    A.    I can't think of any others.

4

5    Q.    Okay.  Do these videos involve African/Americans?

6

7    A.    The Bar Association that may, there's only the two videos.

8

9    Q.    Two videos, okay.

10

11   A.    The, the Bar one I mean LEE'S African/American and he made the video and he put it up

12         and it was of me but he did it.

13

14   Q.    Okay.

15

16   A.    And it wasn't at my request he just gratuitously did this, which is not to repeat the obvious

17         but I was there getting an award for protecting the constitutional rights of the black people

18         that we arrest so, not just black people but we arrest so many.  And he's there eating lunch,

19         because part of this video taping it and putting it up and now a year later, you know I'm

20         asking the questions of well...

21

22   Q.    I, I don't think we have to worry about the Bar Association video.

23

24   A.    Yeah sorry.

25

26   Q.    That's all right, um all right lets go back to the, the other video the, the Sweet Brown video.

27

28   A.    Um-hum, Sweet Brown, yes.

29

30   Q.    All right why'd you show that video?

31

32   (?).   I think, I think he said he's not sure if he showed the video or not.

33

34   Q.    Oh okay, I'm sorry.  You, do you recall seeing that video?

35

36   A.    I remember seeing it.

37

38   Q.    All right, do you, you don't recall if you showed it?

39

40   A.    No.

41

42   Q.    Do you recall having any discussions of it with Investigator MILLER?

43

44   A.    No.

45

46   Q.    Could you of shown that video to Investigator MILLER?  Is it possible?

45

| | | |
|---|---|---|
| 2 | A. | Possible, yep. |
| 4 | Q. | Do you recall, do you recall Investigator MILLER having any conversation with you regarding any type of, sort of videos?  Taking away the Bar Association one. |
| 7 | A. | No. |
| 9 | Q. | Do you recall if Investigator MILLER ever came to you and was offended by you showing or by any sort of videos in the office? |
| 12 | A. | No absolutely not. |
| 14 | Q. | What did you think of the, the video, the Sweet Brown Cold Pop Escape? |
| 16 | A. | I think she's pretty funny, animated person. |
| 18 | Q. | Do you think the video, do you think that video portrayed African/Americans in a negative light? |
| 21 | A. | No. |
| 23 | Q. | Did you think that video was funny? |
| 25 | A. | Yeah. |
| 27 | Q. | Did you ever mock the woman in the video? |
| 29 | A. | No I, I, to clarify though I think there were times I used her catchphrase in there that "Ain't got, ain't nobody got time for that." |
| 32 | Q. | Why? |
| 34 | A. | I think it's a, kind of a catchy um phrase. |
| 36 | Q. | Did you ever imitate the woman in the video? |
| 38 | A. | I think that's, that's exactly what I'm talking about. |
| 40 | Q. | You imitated and say that phrase when you're? |
| 42 | A. | "Ain't nobody got time for that," yeah. |
| 44 | Q. | Okay.  Are you making fun of her? |
| 46 | A. | No. |

46

Q.    Did you think the video was funny because the woman was African/American?

A.    No.

Q.    Would the video be funny if the woman was Caucasian?

A.    Could be, depend on the video I guess.

Q.    If, if it was, if the same, if the woman was the same video happened and she was Caucasian would it be funny?

A.    Yeah I guess so.

Q.    All right we're going to move onto the Facebook page. As part of your duties at VFW do you have a Facebook page for SHANIQUA STACKS (inaudible)?

A.    Yes.

Q.    Why do you have a Facebook page?

A.    Cuz uh Facebook is used by just so many people including the people we're looking for with warrants and it became useful to have a page to assist in investigating their, to, to find them.

Q.    It's a useful investigative tool?

A.    Yes.

Q.    Okay. You use it for official functions?

A.    Yes.

Q.    Do you ever use it for unofficial functions?

A.    No.

Q.    Is that your account?

A.    Yes.

Q.    All right. Are you the only person that has access to the account?

A.    I gave Investigator MILLER access, I don't know if he used it or not though.

Q.    When did you give him access?

47

1  A.  A long time ago, I, I don't know, (inaudible) years ago.

3  Q.  Okay. Besides him is there anybody else that would have, you've given access or would
4      have access to that?

6  A.  I don't think so.

8  Q.  Who is the girl depicted in the, in the profile?

10  A.  It's a girl from, I don't remember her name, it's a girl from Cleveland that uh had a romantic
11      relationship with TOBIAS BOYLAND, who was a fugitive that you asked me about earlier.

13  Q.  How do you know her?

15  A.  I don't really know her, I interviewed her, I had the Marshal's interview her in Cleveland and I
16      subsequently followed up with phone calls in which spoke to her um and she sent me the
17      pictures so, cuz she was with the other girl that's in one of the pictures.

19  Q.  Okay so she sent you the pictures for you to, to, to identify him?

21  A.  No for his girlfriend.

23  Q.  For his girlfriend?

25  A.  Yeah.

27  Q.  Okay did she consent to you to use her image on the, on the Facebook?

29  A.  I don't remember.

31  Q.  Do you remember...

33  A.  I certainly, I certainly didn't get like a written consent or anything. (Inaudible) talking to her
34      on the phone, I think told her and she laughed and...

36  Q.  You think you told her that you were using her?

38  A.  That I was, I didn't have, that's what I used subsequent. I, I just don't remember.

40  Q.  I, I guess is she aware that you used her images on, on your Facebook page?

42  A.  I don't know at this point.

44  Q.  Okay. While using the Facebook have you ever, for (inaudible) uh that's, we'll call it that.

46  A.  All right.

48

Q.   With that profile, have you ever used the word "nigger" or "nigga" in any of your posts?

A.   Once.

Q.   Okay.  Do you remember when you did it?

A.   Um-hum, yes.

Q.   Okay can you describe it, do you remember?

A.   While looking for DAMONE LEWIS, I about a year ago right now, was wanted for I don't know how many shootings, four or five shootings.  His and, the warrants were two, two separate warrants, they were both indictment warrants.  One for murder, one for attempted murder for separate shootings.  I found his page and sent him a friend request and he's a 17 year old who...

Q.   TOBIAS was a 17 year old?

A.   No, no, no.

Q.   No, okay.

A.   DAMONE LEWIS.

Q.   DAMONE, I'm sorry, DAMONE was a 17...

A.   17 year old who was just, the summer of 2012 was like a terror and shot, I think it was five separate shootings off of Walden Avenue, on like Wood and, one of which was ANGELICA SOTO, who was 15 years old.  ANGELICA'S brother was another one he shot.  But with ANGELICA she had gotten in a altercation with DAMONE LEWIS' girlfriend and he, they saw each other on the street and he uh starting shooting, he shot five times.  Hit her in the leg and she fell down in the street and he went over and shot her in the chest and the bullet went through her chest and uh severed her spine and so she can't walk.  Um and in a posting and cuz uh we're friends so I could see him and all his friends I got them to, with these friend requests so I could be included in their conversations.

Q.   (Inaudible).

A.   Which subsequently led me to do two search warrants on Facebook to get the content that wasn't um you know that the private kind.

Q.   It's not, yeah it's private so you can't see view it.

A.   Private messages, correct.

49

000695

Q.   Right.

A.   He had a (inaudible) register on his Facebook page included in which was a picture of him wearing a body armor and holding a handgun taunting the police, uh I forget what he said, some, some taunting comment. In any event in a posting I remember referring to him and I, and at this time period this is when I know, I don't know if he ever used it with the page but I gave LEE access to it, cuz he was, the things that these people were saying, posting on his friends, they were saying things that I didn't understand.   They were using all this terminology and verbiage that, all right so he was helping me a fair amount reading these posts and for lack of a better term, translating the meaning to me.  And there was a time that I know when I made a post and I used the word, "n-i-g-g-a" and catchphrases like "put a cap in his ass," and his girl, at that time his girlfriend I think was using his page too and wanted to like, wanted to fight me, call me out. And I remember in the office, I'll be honest I gotta little bit of a laugh out of it that she's calling out SHANIQUA WILLIAMS, not knowing that SHANIQUA WILLIAMS is a 48 year old middle aged white Investigator in the State Police sitting at his desk in the office. It, it fooled her and I was happy that my undercover account was working so well.  You know and, and I used that "n-i-g-g-a" I used it just as you know when in an undercover capacity to use the words that they use.  Um just as if you're in an undercover on a computer account and you're posing as a 12 year old girl to lure a pedophile, you have to talk like a 12 year old girl.  If a narcotics investigator goes into buy dope he has to play the role of a dope user.  I mean, but I remember I, I got, I was kind of tickled with my uh um fooling them and that it was working.  And I remember uh telling LEE, "Look it I, look at her postings they uh took it like hook line and sinker."

Q.   Okay.

A.   And I did use that word then.

Q.   Is that, that the only time you ever used it?

A.   (Inaudible) that's all I can remember.

Q.   All right, so at the time when you posted it were you still looking for him?

A.   No that's why his, that's why his girlfriend wanted to fight me cuz we just arrested him and I was continuing the uh, continuing the uh Facebook profile.  That's why it was her instead of him on there.

Q.   If you already arrested him why'd you continue, why'd you make the post, why'd you continue with it?

A.   Just continued that personality, I, I don't have a, I mean he, he just plead guilty like three weeks ago to the attempted murder.  The case isn't over until you know the conviction and whatnot and I just continued to solicit more statements, see what they're saying.  Um and I guess I got a little rapped up that it was working well.

50

| | | |
|---|---|---|
| 1 | Q. | I'm gonna show you a post that was made on November 5th at 10:33PM, um by SHANIQUA |
| 2 | | STACKS, which was your pseudo name um where the word is used, is that the comment? |
| 3 | | Do you recall if that's the comment? |
| 5 | A. | That's, that's exactly it. |
| 7 | Q. | That's exactly it? |
| 9 | A. | Yeah. |
| 11 | Q. | Okay. |
| 13 | (?). | Oh do you have picture on it? |
| 15 | Q. | Um I just gonna (inaudible) look at in a second.  Um and the comment here is, "Fuck you |
| 16 | | killing nigga, I hope you rot in jail you just a pussy ass bitch shooting ho's while they lay in |
| 17 | | the street hoping you get some."  That's, I just read that word for word. |
| 19 | A. | Yep. |
| 21 | Q. | Okay, um so you're, that's the, that's the comment you posted? |
| 23 | A. | Yes. |
| 25 | Q. | All right and it's posted on there as November 5th at 10:33PM, would you, do you have any |
| 26 | | reason to say that that time is wrong? |
| 28 | A. | I don't know why 10:33PM, I don't know. |
| 30 | Q. | Could you have posted it at 10:33PM? |
| 32 | A. | That's what I'm thinking, could of, I, I, it's not normal but maybe. |
| 34 | Q. | But it was after you, it was after you arrested um DAMONE right? |
| 36 | A. | Yes. |
| 38 | Q. | Okay.  Were you trying to incite them or inflame the people who read it, the post? |
| 40 | A. | You know I, well it, it did but I got, I think that's why I was happy with the results because |
| 41 | | holy cow you know maybe I didn't get a pertinent information about the shootings but there's |
| 42 | | certainly think I'm SHANIQUA WILLIAMS. |
| 44 | Q. | Were you attempting to taunt them, the family and friends of DAMONE LEWIS? |

51

| | | |
|---|---|---|
| 1<br>2<br>3 | A. | The intent was to continue the you know info gained, gain information on him um as, I guess through taunting so the, its, the answer is a qualified yes. |
| 4<br>5<br>6 | Q. | Okay. You said, now you said that um the lady whose picture that is, she lives in Cleveland, all right? |
| 7<br>8 | A. | Yes. |
| 9<br>10<br>11<br>12<br>13<br>14 | Q. | Would you have any, there was a fear from Investigator LEWIS that she maybe in danger because of some of these comments of inciting, you know getting all these people worked up, would there, was, was there any chance that this woman would have come to Buffalo, the actual, the act, the real person and SHANIQUA, who, who SHANIQUA I guess or whatever her name is? |
| 15<br>16 | A. | No. |
| 17<br>18<br>19<br>20 | Q. | No, um so you wouldn't have to worry about, he was worried that if anybody ran across her, say some, you know obviously it's a year later but if, if, if all these people got all incited and all angry, if they saw her on the street they could, that they would do something. |
| 21<br>22 | A. | Well if he's concerned about her safety what did he do? |
| 23<br>24 | Q. | Did, did he ever come to you? |
| 25<br>26 | A. | No. |
| 27<br>28 | Q. | Did he ever have a conversation with you about it? |
| 29<br>30 | A. | No. |
| 31<br>32 | Q. | Okay, um on the, did you ever show him that comment? |
| 33<br>34<br>35<br>36 | A. | I think when he was, when I, the way I remember it I was at my desk and I read their, these replies that are there and I, he was walking by and I, and he had been helping me read, if you read the replies you know what I'm talking about that (inaudible)… |
| 37<br>38 | Q. | (Inaudible) tough, tough to describe some of the language. |
| 39<br>40<br>41<br>42<br>43<br>44<br>45<br>46 | A. | And he had been all through uh this investigation and I, there maybe others though I can't remember, help me read them and I think he was walking by and just as I had on other occasions, you know I exclaimed, "Holy cow look at this, I really got them," I don't know what I said, "I really got them fooled." Um and I, I don't know I think he even, he came around my desk or I turned the screen and I showed him the replies. That, what I posted to get the replies is right there, I didn't show him mine with the intent of, I didn't show him the screen with the intent of him seeing my post, I showed him with the intent of him seeing the replies. But I didn't hide my posting I just, it was just, to me it was an, an innocent posting I did in |

52

1   this other, undercover personality.  Talked just the way they talk.

2

3   Q.   Did LEE ever, or did, did he ever make any comments about the, the use of the, the "nigger"

4        word in the comment (inaudible) word?

5

6   A.   No.

7

8   Q.   No.  You had no idea, you had no idea he was offended by it?

9

10  A.   If he was he didn't show it, no i don't know to answer your question.

11

12  Q.   Could you have achieved the same goals of your investigation or what you did there by not

13       using the nigger word?

14

15  A.   I don't know, I mean if I would of used the, the queens English in that posting it would of not,

16       it would of blown uh, they would of known that it wasn't SHANIQUA.  But here, sitting here, a

17       year later to be honest with ya I don't know that the posting accomplished anything.  So I

18       mean you know I don't know how to answer the question.

19

20  Q.   Some of it's hindsight?

21

22  A.   Absolutely I mean I, I wouldn't, you can't use different language but if I had known now I

23       would certainly wouldn't have done it.

24

25  Q.   Do you know if Investigator, when you showed Investigator MILLER the quotes or the, the

26       replies do you know if he, do you remember him saying, "Not cool?"

27

28  A.   No I don't remember.

29

30  Q.   And you said that's the only time you've ever used the, "n-i-g-g-a" or the "n-i-g-g-e-r" word or

31       actually it's the only time you used the "n-i-g-g-a" word in any posts?

32

33  A.   Yes.

34

35  Q.   Okay.  Now I guess my, my questions gonna be is if this is the only time you used that word

36       have you ever used that word when you're interviewing suspects or when you're talking

37       street language?

38

39  A.   No, no.

40

41  Q.   Okay.

42

43  A.   Because when I interview suspects or interviewees it's me, I don't, I'm not in an undercover

44       persona so.

45

46  Q.   You're acting...

53

A.    (inaudible).

Q.    You're acting as KEVIN KENDALL the State Police (inaudible)?

A.    I'm KEVIN KENDALL I'm not SHANIQUA.

Q.    Is SHANIQUA the only account, Facebook account you use in the Troop "A" VFW?

A.    Yes.

Q.    And just to go back um the woman whose picture lives in Cleveland, um as far as you know she doesn't come to Buffalo?

A.    Correct.

Q.    Are any safeguards in place for having this person, which I guess would be (inaudible) protected from anyone that used any of these posts?

A.    Just, it has nothing to do with Cleveland or her, it's two separate you know (inaudible)...

Q.    The time is 4:54PM taking a break.

      The time is 5:09PM, we're continuing our interview. Um KEVIN, I'm gonna, gonna go back to the Facebook post, is there anything you want to clarify?

A.    Yes, I didn't do a good job answering your question, you asked about safety precautions for SHANIQUA. This, this girl gave me her, emailed me her images um years ago and in talking to her I broached the topic of using them on this Facebook page and she said okay. I didn't get a written consent, I didn't formalize it but I asked her, she said okay. Her name is not SHANIQUA WILLIAMS, I made that up. So I guess to answer the question about the safeguards is that I chose a person from Cleveland who was okay with it. She didn't know nothing about Buffalo, no ties here and I made up a phony name and it's just a couple snapshots. And I think that's sufficient protection for this person. No one's gonna see her on the streets of Buffalo and seek retribution. They don't, there's no retribution to seek anyway because you know there, there's one instance in which this guy's girlfriend uh was upset with her. But you know what it isn't like there's a some big issue.

Q.    It was just that one, one post...

A.    One post.

Q.    After, once that threat died down there has there been any other issues?

A.    One post that came to the, we were looking at it here, one day in all these you know years gone by.

54

Q.   And you said that she, she was um, and you asked her, you, you advised her that you were gonna use her pictures?

A.   I asked her if, I don't know, I, I never thought I'd be sitting here and revisiting this issue but it was something along the lines of that would be great for my Facebook page and whatever, put it on Facebook page and she laughed and said, "Oh yeah okay." I'm like well but...

Q.   Okay so she, so she's aware, she was aware that you may use the pictures in a, in a fake account?

A.   Yes, yes.

Q.   Okay do you know what her name is?

A.   I don't remember.

Q.   Okay.  Could you get it if you needed to?

A.   I don't, I think the files been, no it was long, I mean it's, no.

Q.   No.  And you're saying SHANIQUA'S not her real name?

A.   No it's not.

Q.   You made that up?

A.   I made that up.

Q.   Is there anything else you want to clarify with the Facebook page?

A.   No thank you.

Q.   Okay.  KEVIN, as a supervisor of the VFW it is your job to assign and approve overtime, is that correct?

A.   Yes.

Q.   Can you explain how overtime is distributed and incurred by Members of your unit?

A.   Every year the US Marshals signs a memorandum of understanding with the Division on how much money they will reimburse the Division in overtime expenses.  Fiscal year runs October 1st every year and...

Q.   To September 30th?

55

1   A.   To September 30th…

3   Q.   (Inaudible).

5   A.   A year.  Um that's done through Division or at least detail level.  It's signed by uh Division
6        level and then that amount goes to the uh detail.  It's gonna change this year because now
7        we're under the Troop structure but traditionally that's the way it's always, it's always
8        happened.  and the Captain or uh his designated, the administrative senior, I think it was
9        always the Captain though would say all right you know this is how much money we got for
10       the year, this is the detail.  There is 28 VFW Members so you divide that amount into the
11       pot, that's how much per person and that's how much is authorized for that fiscal year.  My
12       job would be more to supervise it, administer it on a local level and make sure the guys are
13       um using it appropriately and uh staying on a pace where it's not used up to early and last a
14       year but yet um it was very clear that the US Marshals didn't want any, it all should be used.
15       So to use it all but to budget it across the year accordingly.

17  Q.   Was there any overtime outside of what the federal government reimbursed that was ever
18       used?  I guess what, I guess the simple question is all your overtime in the unit always all
19       reimbursed?

21  A.   I can only remember one exception um every April 1st or I'm sorry, October 1st the prior fiscal
22       year ends September 30th, come October 1st we'd say okay, no overtime is authorized until
23       this MOU is signed.  So you knew we know, until they then approve it.  Last year beginning
24       of October 2012 Investigator MILLER and I worked overtime.

26  Q.   What day was it (inaudible)?

28  A.   It was the beginning of October of 2012, almost a year ago.  I don't remember what it was
29       but we had to come in on a pass day but this, this uh, but we weren't authorized to you know
30       work Marshals under the…

32  Q.   The agreement wasn't signed yet?

34  A.   Work overtime yet, we weren't authorized to work overtime under the Marshals
35       reimbursement program but it was something, I don't remember what it was, we had to
36       come in.  I wanted to advert any uh um issues or problems so and I, and I just worked a full
37       day and changed my schedule from a pass day to…

39  Q.   A work day?

41  A.   A work day to avoid overtime.  I asked Investigator MILLER if he wanted to change his um
42       pass days to work that pass day and he said no I called him in for overtime he wanted to be
43       paid overtime.  And I said, "Well you've got that right, I'm authorizing your overtime."  So I
44       know it was four hours he was paid in addition to the Marshals reimbursement program.
45       That's the only…

56

1    Q.    That's the only (inaudible)?

2

3    A.    (Inaudible) I can ever remember.

4

5    Q.    As far as the, and I'm gonna probably say grant for better terms that the federal government
6          gives us the money, um does the Admin Senior does he tell you about approximately how
7          many hours that is per, per month, is it, do, do they break it down that, how detailed do they
8          get when they give it?

9

10    A.    Yes.

11

12    Q.    All right so I mean every, does he, does he do it monthly or is it quarterly or?

13

14    A.    Monthly.

15

16    Q.    Monthly.

17

18    A.    This, this, this year was, I was told in October seven hours a month for Investigators and 14
19          hours a month, uh he told me 13 or 14 for me because I being a Senior Investigator my
20          overtime rate is about half of an Investigators.

21

22    Q.    You, you get, you get a lower overtime rate then a, a typical Investigator?

23

24    A.    Like half.

25

26    Q.    Right so to get the same amount of money you have to work...

27

28    A.    Twice the hours.

29

30    Q.    Twice as many hours?

31

32    A.    Correct.

33

34    Q.    So you'll generally to, to make the same amount of money per month that everybody else
35          does will work twice the amount of overtime hours?

36

37    A.    Yes.

38

39    Q.    Okay, uh just trying to explain that.

40

41    A.    Yep.

42

43    Q.    And then, and that's in addition you also have to work your eight hours flex every month...

44

45    A.    Yes.

46

57

1    Q.    To (inaudible)?

3    A.    The same as an Investigator.

5    Q.    Same as an Investigator.

7    A.    Yeah.

9    Q.    Okay so um and at the end of every month do you um, do you tell your Admin Senior how
10           many hours you and LEE or everybody in your unit worked (inaudible)?

12    A.    Yes.

14    Q.    So that information is constantly getting fed back to the Admin Senior and they're constantly,
15           do they change those, do the allotments change at all?

17    A.    Yes uh it has, it but it's quite often, this year it's the Admin Senior, ETHAN FERGUSON,
18           Troop NYC.  Prior years, sometimes it was the Admin Senior but quite it was the Captain.

20    Q.    Okay.

22    A.    But yeah and then they changed it this year, they changed it a lot.  It went way up right at the
23           end of the year.

25    Q.    But now they, they tell you like it's you need to, they give you more hours or they pull hours
26           back, is that?

28    A.    Yeah they've never pulled it back but it's happened a couple times end of the fiscal year.
29           What happened, it's happened in the past is I, I don't know if it's because of retirements or
30           what but they underestimated the hours…

32    Q.    Per month?

34    A.    To be worked per month so then at the end of the year we gotta use this stipend up, you
35           guys gotta work "x" number of hours to use it and I've uh, been put in a position where you
36           look for details to do to put the overtime to use.

38    Q.    Now how, now on a local level how does the over, like how do you, what constitutes when
39           you use overtime, like is there, like do you just decide on a, on a day like tomorrow we're
40           gonna stay over and continue working or as details come up?

42    A.    Either.

44    Q.    Either?

46    A.    Yeah.

Q.   Are there, when you had uh, when, when you were in, you know right now it's just you and LEE so it's, it's probably very easy to, to kinda manage the overtime.  Is there, before when you had multiple people were there times when uh maybe LEE might get some overtime and maybe MIGLIORE didn't or vice versa?

A.   All the time yeah.

Q.   All the time, okay.

A.   At the end of the year it all was even.

Q.   All right so at the end of the year you made, you made sure or you at least made sure that everybody had earned the same amount of overtime at least money wise?

A.   Yes with one exception.

Q.   Okay.

A.   Me, there were times where I, at my reduced rate I found it where I couldn't work enough hours...

Q.   To get it.

A.   To get all their money.

Q.   So, so you manage, now you managed the overtime, that's also, you also sent in the hours to either your Captain or your Senior at some point and they're actually sending those figures up somewhere else to probably, probably somebody in budget or you don't know?

A.   I don't know, well I think that they get it through LATS.  I think that was for the Captain to know they were, filling his orders and I'm where we should be.

Q.   Okay.  So you, are you the only one that can approve overtime in the western, in Buffalo, in this area?

A.   The way I've done it, I approve it in LATS.  It isn't like Investigator MILLER, I didn't require him to call me and ask.  I would monitor it more on a monthly basis and it goes back to where there were more people in the squad.  So it isn't a matter of reaching out for me and asking me for authorization to stay an hour.  That happens some, I mean that would happen.  If we're together and we're working on a case and you know it's clear I'm, but there are other times where you know I know he would start early and I know he continued to work late but he didn't ask me.  But I knew he was in a position where he was not in danger of working too many hours.  So it isn't like specifically requested it all the time.  I would authorize it on LATS and more monitor it um over the course of time.

59

Q. All right. Were there ever, was there ever, did, did you and LEE ever have an issue regarding the overtime?

A. No.

Q. Okay, you and anybody in your unit have an issue regarding the overtime?

A. Yes, there, there were times where guys used too much overtime um and I told them that I wouldn't authorize anymore, they're not to work any overtime until they, until I tell them they're, they worked too many hours for where they should be in the year like on a prorated basis and I told them no more you're shut off till further notice. Um I can remember two, two individuals, one was RIEGER and one was DEJESUS.

Q. Okay.

A. I told them no, no overtime, no (inaudible), in fact with RIEGER his, I guess it was a, I think you asked if it was a (inaudible) word you used but I don't think you said dispute but a issue with him.

Q. Issue, yeah.

A. With RIEGER he, he was working too many and he said, "Well that's all right I'll just get it used up by May," and I go, "No you won't." And he said well, he said he'd rather work it in May then December. And I said, "Well I don't really care when you want to work it, it's when it's needed to be worked." And it was, I, there was an issue, I mean I had to watch him and monitor him to make sure he didn't work too much.

Q. And you, and you managed it until he obvious, until he got to a point where he did get overtime again?

A. And then (inaudible).

Q. And you turned it back on?

A. Back in where he should be, yeah.

Q. Captain or anybody above you ever call down and say hey we've got issues with the overtime kind of you know somebody's got too many or too little or anybody's complaining?

A. Well in the spring ETHAN FERGUS called uh, I don't know, I think he called, I don't know if he called or an email but he told everyone that we're over what we should be, it was for the first quarter so it would have been in January. He said for the first quarter we should be at such and such a amount, we're way over, you guys gotta knock it off. And it wasn't just me or just LEE it was…

60

| | | |
|---|---|---|
| 1 | Q. | He kinda said the whole region, whole, okay.  The time is 5:26, gonna take a, a break. |
| 2 | | |
| 3 | | The time is 5:32PM, we're resuming our interview.  KEVIN, you explained how the overtime |
| 4 | | works up there on the unit, um I'm gonna show you some numbers, which were compiled uh |
| 5 | | based, uh from your reports that you send up to uh, up to your Captain and Senior about, |
| 6 | | regarding how much, how much people earn and these are, these are totals for the fiscal |
| 7 | | years.  And we're going from the fiscal years uh that start in October and end in September |
| 8 | | and I have you know the four years here from 2009 to 2010, '10 to '11, '11 to '12, and 2012 |
| 9 | | to 2013.  can you explain why in 2009 and 2010 Investigator RIEGER made approximately |
| 10 | | 15K in overtime while MILLER only made about $10,000 and um uh SAL DEJESUS made |
| 11 | | only about $10,000, why is RIEGER so much more than? |
| 12 | | |
| 13 | A. | I don't know. |
| 14 | | |
| 15 | Q. | You don't, you don't recall? |
| 16 | | |
| 17 | A. | No, I, this was a, the figure of $15,000 was a surprise on me. |
| 18 | | |
| 19 | Q. | All right. |
| 20 | | |
| 21 | A. | I made $7,000, I don't know why he's so high.  I can't remember, can't explain it. |
| 22 | | |
| 23 | Q. | Um Investigator, Investigator MILLER is the, besides yourself, is the low one at least in |
| 24 | | terms of hours for that year is that correct?  He's the lowest one? |
| 25 | | |
| 26 | A. | Yes. |
| 27 | | |
| 28 | Q. | Is there any reason, do you recall any reason why he, he would be the lowest one the, for |
| 29 | | the year? |
| 30 | | |
| 31 | A. | Well the hour, the hourly rate, only a little bit of a difference um but I, I don't think those |
| 32 | | numbers, MILLER and DEJESUS' rate are only $2.00 apart but yet their hours are 20 hours |
| 33 | | and yet their pay is within a few hundred dollars, is that right? |
| 34 | | |
| 35 | Q. | Yeah about four or five hundred yeah with the $2.00. |
| 36 | | |
| 37 | A. | Yeah I guess with two, two, 20 hours times… |
| 38 | | |
| 39 | Q. | I think the, the numbers would be close. |
| 40 | | |
| 41 | A. | Wait a minute now, it's 20, 20 hours times $2.00, that would be only be $40 but yet it's $400. |
| 42 | | |
| 43 | Q. | Yeah but it's, two, it's $2.00 per hour, I don't know… |
| 44 | | |
| 45 | (?). | That'd be $40. |
| 46 | | |

61

| | | |
|---|---|---|
| 1<br>2 | Q. | $40, okay, like I said the numbers aren't, aren't, aren't a hundred percent correct. Investigator... |
| 4 | A. | And I think those hour's are, that, that can't be right. I know I, I know I don't know. |
| 6<br>7<br>8<br>9 | Q. | Okay let's, let's look at on the, the hour's basis. Um Investigator MILLER had the, the least amount of hour's for the um, for the year according to this. Is there any reason why, he's alleging that he didn't get, he didn't get overtime and you, you cur, curtailed his overtime that year. I'm, I'm asking for an explanation, do you have any recollection of that? |
| 11<br>12<br>13<br>14 | A. | Well that's wrong, first of all I, I, these num, these numbers are new to me, I don't have an explanation for them. I, they don't look right and secondly I don't think that he would, his hours were curtailed and if he did work less hours it was not due to any retaliation or basis of race, that's not, it's not, that's not the case. |
| 16<br>17 | Q. | Now looking at these numbers from 2010 and 2011, who was the one who had the most, who received the most amount that year? |
| 19 | A. | MILLER. |
| 21 | Q. | MILLER, um... |
| 23 | A. | See the, right. |
| 25<br>26 | Q. | All right so and he had the, except for yourself, because obviously you made, have to work more hours... |
| 28 | A. | Right. |
| 30 | Q. | He worked the most hours that year? |
| 32 | A. | Right. |
| 34<br>35<br>36 | Q. | Right. Um I guess my question is if, you know is there any, if you don't have a reason for 2009, I guess if the, if you were really, if you were trying, if you were trying to curtail his overtime he shouldn't be the number one overtime guy from 2010 to 2011 is that correct? |
| 38 | A. | That's correct. |
| 40<br>41 | Q. | Who had the most amount of overtime from 2012 – 2013, this present fiscal year, up, up until? |
| 43 | A. | This year MILLER, I mean we both, I think he's made more than me, a lot more than me. |
| 45<br>46 | Q. | And from 2011 to 2012 it appears that, with the exception of Investigator RIEGER, who I believe retired that year, um everybody pretty much made very close similar amounts? |

62

A.   Yes.

Q.   And MILLER'S towards the top if not the top, he's close to the top?

A.   Yeah.

Q.   They're all, they're all within…

A.   JACK, ironically JACKSON'S the top, who is also happens to be a man of color.

Q.   He, so, so Investigator JACKSON is also African/American?

A.   Yes.

Q.   Okay.   So Investigator MILLER'S lack of overtime for 2009 – 2010 had nothing to do with you penalizing him for anything is that correct?

A.   If there was a lack of overtime, it, I mean I reported right to the Captain, I don't know how that would have happened.   If it did, I don't know why, it certainly didn't have anything to do with the race or retaliation or anything like that.   That's a surprise to me, I've, I've got no ·explanation. .

Q.   Investigator MILLER stated that the reason that his overtime was curtailed from 2009 – 2010 is because that he brought to your attention that he was um complaining to you about your use of the "nigger" or "nigga" word, is that correct?

A.   No.

Q.   You're denying that correct?

A.   I absolutely deny it.

Q.   How is Investigator MILLER as a worker?

A.   Okay.

Q.   Satisfactory?

A.   Satisfactory.

Q.   As a supervisor you completed several performance evaluations on Investigator MILLER is that correct?

A.   That's correct.

63

Q.  Have you ever, how, how have you rated Investigator MILLER?

A.  Satsifactory.

Q.  Have you ever rated him unsatisfactory?

A.  No.

Q.  Do you feel you rated Investigator MILLER appropriately?

A.  Yes.

Q.  Have you ever helped Investigator MILLER?

A.  Yes.

Q.  Can you explain?

A.  I, I, he's, I think I've been a source, I don't know, I thought I'd been a source of uh consult to him through the years, you know I don't know how long it was after he came he asked me if, for a time period he could uh park his car in Rochester, uh like in 2009, and I, because or, or would he have to submit a memo requesting to house his vehicle in a different location. He wanted to know if he could do it, how he could do it, what not. And I asked why and he told me that his sister had just died. And I don't know, I know he, I remember when he went to Atlanta his sister took sick and it was so long ago I don't remember the details but in any event it was then that he told me that his, it's his only sister who had one child who at that time was a senior in high school and he's the only family member up here, the rest are in Atlanta and he wanted to stay at his sister's house so his niece could finish high school. And he wanted to know if he could drive his work car back and forth from Rochester.  So instead of just getting an, uh coming up with an answer on that question you know I felt what a tragedy for this family and for this girl who lost her mother, and it tough for LEE as well. Um so I called Senior Investigator CHASE and asked him if uh he would have a problem uh having LEE work out of his office and just temporarily being assigned to "E" VFW, the Rochester squad because I think it was like, it was in the winter time and she was gonna graduate in June so it was like six months.  He, of course JIMMY'S a nice guy, he said absolutely.  And I then called uh Captain MCDOWELL and told him that what the situation was and that CHASE agreed that he could work there.  And I said you know not for nothing we, it's the right thing to do.  so for the six months and, and I don't know if that encompasses that time period with the overtime but he worked out of Rochester um and I think that was a source of (inaudible) helped him.

Q.  You said that was around or, was around 2009, 2010?

A.  His niece just graduated from college in May so it'd be, we're in '13 so that would put it in 2009.

64

| | | |
|---|---|---|
| 1 | Q. | Could be, all right. Do you feel you've treated Investigator MILLER fairly? |
| 3 | A. | Yes, well beyond fair. |
| 5 | Q. | Do you feel that you've treated Investigator MILLER differently because he's |
| 6 | | African/American? |
| 8 | A. | No. |
| 10 | Q. | Did you ever intend to offend investigator MILLER? |
| 12 | A. | No. |
| 14 | Q. | Did you know that you ever offended Investigator MILLER? |
| 16 | A. | No. |
| 18 | Q. | If you did know that you offended him what would you have done? |
| 20 | A. | Apologize and, and explain what I meant and that you know what, what, in any event |
| 21 | | apologize for anything that I would ever say or do to offend him or hurt him. |
| 23 | Q. | When did you learn of this complaint? |
| 25 | A. | August 1st at 4:00. |
| 27 | Q. | Okay since then have you treated Investigator MILLER differently since learning of this |
| 28 | | complaint? |
| 30 | A. | Yes. |
| 32 | Q. | How, how so? |
| 34 | A. | I, I don't, I stay away from making small talk with him and try not to, I mean I… |
| 36 | Q. | Have you treated him professionally? |
| 38 | A. | Oh yeah. |
| 40 | Q. | Job wise, treated him the same? |
| 42 | A. | Absolutely, yeah. We used to chitchat and make same talk and be friendly and I really am |
| 43 | | very uh, uh cautious, I say hi to him goodbye to him, I'm polite to him but I really don't um, I |
| 44 | | haven't been making chitchat and. |
| 46 | Q. | Why? |

65

1

2   A.   I, I, I don't want to make matters worse, I've been warned by, ordered by you not to discuss
3        this matter. I'm, I'm very upset that the allegations been made. I feel like I've been betrayed
4        um it's hard for me to really uh be friendly with him and chitchat and jovial the way I used to
5        be with him.

6

7   Q.   Have you retaliated against Investigator MILLER in anyway?

8

9   A.   Absolutely not.

10

11   Q.   According to Regulation 8A19 of the New York State Police Manual a Member shall not
12        engaged in conduct towards any employee of the Division which constitutes retaliation for a
13        complaint of discrimination filed by such persons with the Division's office of Human
14        Resources or with any agency. Do you understand this?

15

16   A.   Yes.

17

18   Q.   Senior Investigator KENDALL, do you racially discriminate against African/Americans?

19

20   A.   No.

21

22   Q.   How about any other race, ethnicity or gender?

23

24   A.   No.

25

26   Q.   To your knowledge have you ever made any type of insensitive comments that would offend
27        African/Americans?

28

29   A.   Well I typed that Facebook comment, that's in insensitive terminology but I think I did it for
30        an investigative purpose and...

31

32   Q.   Your intent, your intent when you typed it was not to offend African/Americans?

33

34   A.   Absolutely not.

35

36   Q.   How about any other ethnicities, races or gender?

37

38   A.   No, no.

39

40   Q.   Have you been racially harassing Investigator MILLER?

41

42   A.   No.

43

44   Q.   Do you feel you've discriminated against Investigator MILLER?

45

46   A.   No.

66

Q.    Is there any information that I may have missed that is pertinent to this investigation?

A.    Can I, I...

Q.    You can, why don't, why don't we do this, why don't we take a break.

A.    Yeah.

Q.    Take a break at 5:46PM.

      The time is 5:55PM um KEVIN, I said you, you wanted to go back about that question about how you ever helped LEE...

A.    Yes.

Q.    There was some, there was some more information you wanted to add.  Go ahead.

A.    Yeah you know we've worked together a total of seven years so um when you work, see someone on a daily basis for seven years you just, there's a lot of things, a lot of interactions and sometimes it's hard to put your finger on every little thing that you've done for another person. But and one that was uh relatively significant and should probably be uh brought up is actually I think it was 2010 Investigator MILLER submitted a memorandum requesting transfer to the Casino Detail and I, I forwarded his request for transfer, endorsed it and sent it up but you know I uh, I didn't know why he was doing this, I couldn't imagine and I waited until we were alone and asked him if everything was okay here.  If there's something wrong, the reason he wanted to leave, typically people do not leave the Violent Felony Warrant squad until they retire.  And if there's something wrong I wanted to address it.  Well what he told me was that he had intentions of opening a hotdog stand and working the hours that we work would make it difficult for him to run a hotdog stand.  But he figured if he went to the Casino Detail he would work um night, night time, which would allow him to sell hotdogs during the day.  And he said, specifically said C-Lines so I said to him, I go, "Well not for nothing LEE but they would free you up to work lunch time selling hotdogs but you wouldn't be able to work dinner time.  If you're here you can work dinner time but not lunch."  But then I paused and I said to LEE, "We just started getting the stipend for the Marshals, you would be defectively taking a cut in pay of at least $10,000 a year by going to the Casino Detail."  And I told him that I really, it was none of my business but he might want to reconsider this because he was, would be taking a big cut in pay if he left VFW.  And I pointed out not only is it a stipend an immediate benefit of the overtime but it would reflect in with his pension as well.  And I said in fact if you just did three years at our and I think the least we ever got was $10,000, add his years of service he could retire out making an extra $6500 a year for the rest of his life and that would be pretty financial, you'd have to sell a lot of hotdogs, I think I said, "You'd have to sell a lot of hotdogs to," I go, "You do what you want but I think you're making a mistake here.  You're gonna cheat yourself."

Q.    Why would you say that if you're trying to curtail his overtime?

A.   Not only that but if I was a racist (inaudible) created a hateful environment wouldn't I be glad to see him go?

Q.   Fair enough.

A.   And that's why it goes to why I uh you know I, I, I don't, I don't get it. You know I, I'm the one who talked him into staying in this squad for his own benefit and uh I don't understand.

Q.   I have one other question on the overtime.

A.   Yeah.

Q.   Why would, why would some members of the, of the unit get overtime on one day and some members not, I mean what, how, how is it differentiated?

A.   Well be, sometimes everybody got the same amount, if everybody was working together doing the same thing or whatever. But quite often we're doing different things and the thing that comes to mind most uh, you know clearly is we arrest someone and they have to be transported across the state we, we use two Investigators to do it. And at one time there was as many six of us in the squad, well everybody doesn't stay till 8:00 at night because two guys stayed at 8:00 at night to drive somebody across the state. So there's a, that's the most and also I mean he works in Niagara County, I'm in Buffalo, it depends on you know there's a lot of different reasons but that's...

Q.   They have, they have different cases going on there? (Inaudible).

A.   Yeah doing things, different times, they start at different hours, they finish at different hours. It's just too...

Q.   But you said that every month you, you watch to make sure everybody is getting, putting in their required hours according to the grant and if they're low do you tell them to, hey you need to make more hours or if they're high you need to tell them back?

A.   Ironically the only person that who really ever fell behind was LEE and I'd say, "LEE, not for nothing but you're a little low here you might want to find some cases to work and (inaudible)."

Q.   You, you told him to work more overtime?

A.   Yeah it's happened through the years on several occasions.

Q.   When you say several can you put a number on it? Are you talking between 5 and 10, 10 to 15?

68

1    A.    No, no, no a few times, I know for, I remember last year when I, it was at the same time that
2           DEJESUS was way over and I told him that there's no overtime authorized for the next three
3           months.  I remember the contrast LEE was low and I said, I remember saying, "Hey look it,
4           this guys got, is going nuts and LEE you're, want to step it up a little bit if you want."
5

6    Q.    So it's happened a couple times?
7

8    A.    Yeah.
9

10    Q.    Probably should, okay.
11

12    A.    And over the course of the years he's, he's the one who seemed to be less interested then
13           RIEGER and DEJESUS who were clawing for every hour.  With him I had to encourage him
14           to work it.
15

16    Q.    Okay.  Is there any type of paperwork, document or recording that you are aware of that
17           would have any bearing on this investigation?
18

19    A.    Just what you've presented me with.
20

21    Q.    Okay.  I have no more questions at this time, is there anything further that you would like to
22           add?
23

24    A.    I, I did, thank you.
25

26    Q.    All right, okay JUNE do you have anything?
27

28    B.    No I'm okay.
29

30    Q.    The time is 6:02PM, we are ending this statement.


I have read this statement consisting of 69 pages and it is true to the best of my knowledge.
I have placed my initials on the bottom of each page and next to each correction and I have
signed it below.


Signed this _____day of _____, 2013


_____
SIGNATURE


69

# Exhibit G

GENL. 30 REV. 12/93

**NEW YORK STATE POLICE**

**COVER PAGE**

| TITLE OF CASE | REPORTING TROOP | MANAGING TROOP | DATE OF REPORT |
|---|---|---|---|
| **Title:** Senior Investigator Kevin Kendall EOD: 09/21/87 Troop A Violent Felony Warrant Squad | A | IAB-WRO | 11/14/13 |
| | DATE OCCURRED | TZS | CTV CODE |
| | June 4, 2013 | A028 | A1501 |
| | INVESTIGATIVE PERIOD | | TYPED BY |
| **Complainant:** Investigator Lethonia Miller EOD: 03/30/87 Troop A Violent Felony Warrant Squad | July 31, 2013 thru November 14, 2013 | | Kmr |
| | REPORT OF | | SHIELD |
| | Captain Kevin M. Reilly | | 3813 |

| CHARACTER OF CASE - (CC CODE) | STATION | CASE# |
|---|---|---|
| COMPLAINT AGAINST PERSONNEL (PCT0100) | IAB-WRO | 20130377 |
| | STATUS OF CASE | |
| | ( ) CA   ( ) C/EC   ( ) C/INV   ( ) C/UNF   ( ) OPEN   (x) C/FND | |

REFERENCE:   Report of Personnel Investigation #20130377.

ENCLOSURES:   To Division Headquarters:
1. Memorandum of Lethonia Miller dated July 15, 2013.
2. Facebook post of Shaniqua Staxx O'MaanWilliams dated November 5, 2012.
3. Statement of Lethonia Miller dated August 1, 2013.
4. Memorandums of Laughton, Conte, Turton, Braun, Lubecki, Caicedo, Alicea, Galanti, Hejza, Dunlap, and Vitko dated August 16, 2013.
5. Statements of United States Marshal Task Force members Fialkiewicz, Snack, Baryza, Cooley dated August 26, 2013.
6. Statement of United States Marshal Task Force Supervisor Brent Novak dated August 26, 2013.
7. Memorandums of Kennedy, Blizzard, Kujawa, Urbanski dated August 26, 2013.
8. Statements of Green, Dejesus, Migliore, and Rieger dated August 27, 2013.
9. Statement of David Hall dated August 28, 2013
10. Statement of Lawrence Jackson dated August 28, 2013.
11. Statements of United States Marshal Task Force members Shanley, Scott, Kiefer and Sexton dated September 3, 2013.
12. Overtime Records for VFW Grant, including charts, compact disk, and explanation of Overtime Grant procedures for the unit.

| DISTRIBUTION | FOR TROOP/DIVISION HEADQUARTERS USE ONLY |
|---|---|
| ( ) DHQ   ( ) TROOP   ( ) OTHER. | |

| APPROVED: | DESTROY IN 20_____   INITIALS |
|---|---|
| STATION: | PERMANENT RETENTION |
| TROOP: | INITIALS |

ENCLOSURES (cont.)

13. Statement of Niagara County Sheriff Deputy Gerald Granto dated September 12, 2013.
14. Statement of Senior Investigator Kevin Kendall dated September 23, 2013.
15. Compact Disk containing video of "Sweet Brown's Cold Pop Escape".
16. Memorandum of Investigator Lethonia Miller dated October 22, 2013.
17. Federal Complaint regarding discrimination
18. Overtime Records for Troop A VFW from July 15, 2013 through November 4, 2013.
19. Memorandum of Senior Investigator Kevin Kendall dated November 13, 2013.

**SYNOPSIS:**  On July 15, 2013, Investigator Lethonia Miller, Troop "A" Violent Felony Warrant squad authored a memorandum to human resources stating an on-going pattern of racial harassment by his superior Senior Investigator Kevin Kendall.  Several months later, the Division of State Police received a complaint of a federal lawsuit regarding the above as well as another allegation where Investigator Miller alleged that he has been retaliated against for filing the original personnel action. The specific allegations are as follows:

Allegation #1:  That Senior Investigator Kendall has uttered the racial slur "Nigger" (or "Nigga") in the presence of Investigator Miller several times over the last several years.  This allegation is unsubstantiated.

Allegation #2:  That Senior Investigator Kendall played an offensive online video of an African-American female in the presences of Investigator Miller. Senior Investigator Kendall also poked fun at the African-American female of the video.  This allegation is unfounded.

Allegation #3:  That Senior Investigator Kendall has uttered the word "Animals" in the presence of Investigator Miller and used it to describe African-Americans in a derogatory manner.  This allegation is unsubstantiated.

Allegation #4:  That Senior Investigator Kendall has uttered the word "Savages" in the presence of Investigator Miller and used it to describe African-Americans in a derogatory manner.  This allegation is unsubstantiated.

Allegation #5:  That Senior Investigator Kendall has uttered the word "Monkey" in the presence of Investigator Miller and used it to describe African-Americans in a derogatory manner.  This allegation is unsubstantiated.

Allegation #6:  That Senior Investigator Kendall has a facebook account under the name "Shaniqua Staxx O'MaanWilliams, sanctioned by NYSP for investigative leads, where he posted the word "Nigga" on the page.  This allegation is Founded.

Allegation #7:  That Senior Investigator Kendall had curtailed Investigator Miller's overtime in 2009 after Investigator Miller had attempted to explain (to Senior Investigator Kendall) that the above remarks and use of the "nigger" word were unwelcome.  This allegation is unsubstantiated.

Allegation #8:  That Senior Investigator Kendall has retaliated against Investigator Miller for filing this personnel complaint by denying him overtime.  This allegation is unfounded.

Recommend appropriate administrative action.

**DETAILS:**

1)     On July 31, 2013, Senior Investigator June Bradley reported to Staff Inspector Steven White, IAB-WRO that Investigator Lethonia Miller, Troop A VFW, had reported to her a complaint of racial discrimination by Senior Investigator Kevin Kendall, Troop A VFW.  Senior Investigator Bradley was in receipt of a memorandum authored by Investigator Miller detailing the racial discrimination. Staff Inspector White advised Colonel Daniel Penny and assigned me to investigate.

2)      On July 31, 2013, Senior Investigator Bradley electronically sent Investigator Miller's memorandum detailing the racial harassment. In sum and substance, Investigator Miller alleges:

1)      That Senior Investigator Kendall has uttered the racial slur "Nigger" (or "Nigga") in the presence of Investigator Miller several times over the last several years.

2)      That Senior Investigator Kendall played an offensive online video of an African-American female in the presences of Investigator Miller. Senior Investigator Kendall also poked fun at the African-American female of the video.

3)      That Senior Investigator Kendall has uttered the word "Animals" in the presence of Investigator Miller and used it to describe African-Americans in a derogatory manner.

4)      That Senior Investigator Kendall has uttered the word "Savages" in the presence of Investigator Miller and used it to describe African-Americans in a derogatory manner.

5)      That Senior Investigator Kendall has uttered the word "Monkey" in the presence of Investigator Miller and used it to describe African-Americans in a derogatory manner.

6)      That Senior Investigator Kendall has a facebook account under the name "Shaniqua Staxx O'MaanWilliams, sanctioned by NYSP for investigative leads, where he posted the word "Nigga" on the page.

7)      That Senior Investigator Kendall had curtailed Investigator Miller's overtime in 2009 after Investigator Miller had attempted to explain (to Senior Investigator Kendall) that the above remarks were unwelcome.

Investigator Miller continued in his memorandum that he has been assigned to Troop "A" VFW since 2008. He is African-American and has worked with Senior Investigator Kendall (Caucasian) since he has been assigned to the unit. Senior Investigator Kendall is the unit supervisor.

Investigator Miller stated that he has also worked with Senior Investigator Kendall in the past and has had conversations with him about race. Investigator Miller advised that he has made it clear to Senior Investigator Kendall that any use of the word "Nigger (Nigga)" is derogatory and that no person, especially a Caucasian person, should ever utter the word. Investigator Miller feels the use of the "Nigger" word is the most hateful and offensive slur in the English language.

Investigator Miller stated that Senior Investigator Kendall has used the word "Animals" and "Savages" to describe many of the African-Americans that the Troop "A" VFW unit has been in contact. Conversely, Senior Investigator Kendall refers to Caucasians merely by their alleged crimes (i.e. Murderers, Rapists, etc).

Investigator Miller states that members of the United States Marshal Squad (of which both Senior Investigator Kendall and Investigator Miller work together) may have overheard these comments and behaviors. Investigator Miller also advised that several members of SIU-West may also have overheard these comments and behaviors.

Detailed Memorandum of Investigator Lethonia Miller is attached as Enclosure#1. Investigator Miller also provided a facebook post from Shaniqua (Senior Investigator Kendall's alias) which states "Nigga" in the post, which is attached as Enclosure #2.

3)      On August 1, 2013, Senior Investigator Bradley and I interviewed Investigator Miller regarding his allegations. Investigator Miller re-counted all of the allegations in his memorandum in

4

detail. Investigator Miller was also concerned about the female that is depicted in the facebook account. Investigator Miller stated that the use of the "Nigga" comment in the post was inflammatory and he was worried that if the actual female depicted in the facebook account was ever seen by any of the people who could view the post that she may be in danger. Statement of Investigator Miller is attached as Enclosure #3.

4)      On August 16, 2013, Senior Investigator Bradley and I interviewed the following members of SIU-West:

> Lieutenant Eric Laughton (Hispanic/ African-American)
> Senior Investigator Neil Conte
> Investigator Michael Turton
> Investigator Mark Braun
> Investigator John Lubecki
> Investigator Shales Caicedo (Hispanic)
> Investigator Hector Alicea (Hispanic)
> Investigator James Galanti
> Investigator Brian Hejza
> Investigator Andre Dunlap (African-American)
> Investigator Frank Vitko

All of the above members have known Senior Investigator Kendall for several years and have worked with him in various capacities. None of the above members have ever observed Senior Investigator Kendall treat anyone disrespectfully. They have not observed Senior Investigator Kendall ever utter any type of racial slur. They have never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time. They also have never heard him utter the words "Animals, Savages, or Monkey" in any derogatory way towards any minority class. None of the above members have ever been shown any type of videos that were derogatory towards African-Americans. Memorandums from each of the above members are attached as Enclosure #4.

5)      On August 26, 2013, Senior Investigator Bradley and I interviewed the following members of the United States Marshal Task Force located in Buffalo[1]:

> United States Deputy Marshal Mark Fialkiewicz
> United States Deputy Marshal Chris Snack
> United States Deputy Marshal Scott Baryza
> Buffalo Police Department Detective Bill Cooley

All of the above task force members have known Senior Investigator Kendall for several years and have worked with him. None of the above members of the task force have ever observed Senior Investigator Kendall speak in a derogatory tone towards African-Americans. They all felt that he is very professional with the public and with his co-workers. They have never heard him utter the

---

[1] Where Senior Investigator Kendall and Investigator Miller are assigned.

5

words "Animals, Savages, or Monkey" in any derogatory way towards a minority class. They have never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time. They never have been shown any type of videos that were derogatory towards African-Americans or any minority class.[2] Statements from the above witnesses are attached as Enclosure #5.

6)      On August 26, 2013, Senior Investigator Bradley and I interviewed United States Deputy Marshal Brent Novak who is the acting supervisor in charge of the task force. Deputy Novak stated that he has known Senior Investigator Kendall for nine years and has worked with him for two years. He advised that Senior Investigator Kendall has always treated suspects and colleagues professional and that he has never observed him treat anyone in a negative way. He felt that he is very professional with the public and with his co-workers. He has never heard him (Senior Investigator Kendall) utter the words "Animals, Savages, or Monkey" in any derogatory way towards a minority class. He believed that Senior Investigator Kendall has used the words "Animals and Savages" to describe criminals but never to describe African-Americans. He has never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time. He has never observed Senior Investigator Kendall utter the phrase "Aw man, I ain't seen that nigger in a minute". Deputy Novak stated that he has heard the above phrase before from people that he has interviewed when looking for suspects but never from Senior Investigator Kendall.

Deputy Novak stated that he has never been shown any videos from Senior Investigator Kendall and that he has never heard him utter any type of racial slur or joke.

Deputy Novak stated that he has known Investigator Miller for approximately six years. Deputy Novak advised that there was an incident involving Investigator Miller several years ago. Deputy Novak stated that Jerry Granto, who is a Niagara County Sheriff's Deputy, had made a traffic stop on Investigator Miller several years ago after Investigator Miller had come into the task force. Deputy Granto was on the list to be assigned to the task force detail. Investigator Miller had made a claim that Deputy Granto had made a racist remark during the stop or that he had pulled Investigator Miller over because of his race. Deputy Novak stated that it became an issue when Deputy Granto was trying to be assigned to the task force. A supervisor (Dan Larish) sat both Investigator Miller and Deputy Granto down to work out the issue and that later Investigator Miller had apologized to Deputy Granto.

Deputy Novak also advised that at one time during an interview of a suspect, he had identified Investigator Miller as "the Black guy". Investigator Miller later approached him and told him that he did not like to be referred to as the "Black guy". Deputy Novak stated that he apologized to Investigator Miller for offending him[3].

Deputy Novak also advised that Investigator Miller once told him that he appreciated that Deputy Novak has never used the "N" (Nigger) word. Investigator Miller never really explained what he meant by it.

Deputy Novak feels that Investigator Miller is treated as everyone else is treated at the task force. He feels that everyone in the task force is professional. Statement from United States Deputy

---

[2] Detective Cooley did mention an incident with Investigator Lee Miller where Investigator Miller was stopped by a Niagara County Deputy (Deputy Granto, who has since joined the U.S. Marshal task force) where there was some "discourse on dialogue" regarding race during the traffic stop. Detective Cooley also mentioned that Investigator Miller was "sensitive" about race.

[3] Deputy Novak felt that Investigator Miller may have a "chip on his shoulder" regarding race.

Marshal Novak is attached as Enclosure #6.

7)      On August 26, 2013, Senior Investigator Bradley and I interviewed United States Marshal Charles Salina, who is the Marshal in charge of the task force. Marshal Salina stated that he knows both Senior Investigator Kendall as well as Investigator Miller. Marshal Salina felt that Senior Investigator Kendall was a good, knowledgeable worker. He never observed any type of behavior that he would consider inappropriate from Senior Investigator Kendall.

Marshal Salina stated that when he became the Marshal for the district he was made aware of a problem between Investigator Miller and Niagara County Sherriff's Deputy Granto. Marshal Salina advised that Deputy Granto had executed a traffic stop in Investigator Miller and that Investigator Miller had advised that he was stopped because he was racially profiled. Deputy Granto was being considered to become a member of the task force and that Investigator Miller did not want Deputy Granto on the task force. Marshal Salina had one of his Deputy Marshal's sit down with both Investigator Miller and Deputy Granto and attempt to work out the problem. After the meeting, Investigator Miller apologized to Deputy Granto and the matter was considered closed. Deputy Granto then came on to the task force and works in Niagara County with Investigator Miller. There have been no further complaints. No Deposition obtained.

8)      On August 26, 2013, Senior Investigator Bradley and I interviewed the following members of SIU-West:

Senior Investigator David Kennedy
Investigator Curt Blizzard
Investigator Jeffrey Kujawa
Investigator Mark Urbanski

All of the above members have known Senior Investigator Kendall for several years and have worked with him in various capacities. None of the above members have ever observed Senior Investigator Kendall treat anyone disrespectfully. They have not observed Senior Investigator Kendall ever utter any type of racial slur. They have never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time. They also have never heard him utter the words "Animals, Savages, or Monkey" in any derogatory way towards any minority class. None of the above members have ever been shown any type of videos that were derogatory towards African-Americans. Memorandums from each of the above members are attached as Enclosure #7.

9)      On August 27, 2013, Senior Investigator Bradley and I interviewed the following retired members of the State Police:

Eldred Green, (retired from SIU, African-American).
Salomon DeJesus, (retired from VFW, Hispanic)
Joseph Migliore, (retired from VFW)
Donald Rieger, (retired from VFW)

All of the above members have known Senior Investigator Kendall for several years and have worked with him in various capacities. They all hold Senior Investigator Kendall in very high regard. None of the above members have ever observed Senior Investigator Kendall treat anyone

7

disrespectfully.  They have not observed Senior Investigator Kendall ever utter any type of racial slur.  They have never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time.  They also have never heard him utter the words "Animals, Savages, or Monkey" in any derogatory way towards any minority class.  None of the above members have ever been shown any type of videos that were derogatory towards African-Americans.

### Eldred Green

Mr. Green had nothing further to add to the above comments.

### Salomon DeJesus

In addition to the above, Mr. DeJesus advised that during his tenure at the VFW squad, that overtime was distributed evenly.

He also advised that his relationship with Investigator Miller was mostly a professional relationship.  He stated that he never joked around with Investigator Miller because you would never know what type of mood Investigator Miller was in at the time.  If Investigator Miller was in a bad mood, then Investigator Miller could get "all bent out of shape".  Mr. DeJesus stated that Investigator Miller can be sensitive about things, including race.  He advised that Investigator Miller would be offended by any use of the "Nigger" word even if it was used in a type of joke.  Mr. DeJesus stated that it was common knowledge around the unit that you did not joke with Investigator Miller and that he was easily offended when it came to racial stuff.  Mr. DeJesus had nothing further to add.

### Joseph Migliore

In addition to the above, Mr. Migliore explained that he retired from the unit back in 2009 before the Federal Government began paying a stipend for overtime.  He advised that overtime was scarce but that he felt it was evenly distributed.

Mr. Migliore also advised that he has known and worked with Investigator Miller for several years.  He described him as a "free spirit" and "a different kind of bird".  He felt that Investigator Miller had some "personality issues".  He stated that on some days Investigator Miller would not talk to you and other days that "you can't shut him up".  He stated that you never joked with Investigator Miller about anything that involved race[4].  Mr. Migliore had nothing further to add.

### Donald Rieger

Mr. Rieger did not have any further details.

Statements from the above members are attached as Enclosure #8.

10)    On August 28, 2013, Senior Investigator Bradley and I interviewed retired member David Hall.  Retired Investigator Hall advised that he has known Senior Investigator Kendall for several

---

[4] It was alluded to that Investigator Miller was very sensitive about racial equality.

8

years and worked with him and was supervised by him. He holds Senior Investigator Kendall in very high regard. He has never observed Senior Investigator Kendall treat anyone disrespectfully. He has never observed Senior Investigator Kendall ever utter any type of racial slur. He has never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time. He also has never heard him utter the words "Animals, Savages, or Monkey" in any derogatory way towards any minority class. He was never shown any type of videos that were derogatory towards African-Americans.

Mr. Hall advised that overtime was distributed fairly and equitably while he was in the unit.

Mr. Hall stated that he has known Investigator Miller for several years. He stated that Investigator Miller had some strange personality quirks and that it was rumored that he was sensitive about issues involving race. As such, he was careful discussing things around Investigator Miller. Mr. Hall did not know of any specific events that supported the above rumors. Statement of retired Investigator Hall is attached as Enclosure #9.

11)     On August 28, 2013, Senior Investigator Bradley and I interviewed Investigator Lawrence Jackson[5]. Investigator Jackson stated that he has known Senior Investigator Kendall for approximately four years. He advised that Senior Investigator Kendall was his supervisor for approximately a year and a half prior to the VFW Unit being transferred to the troops. Investigator Jackson felt that Senior Investigator Kendall was a good friend and always very professional. He never observed any type of inappropriate behavior towards suspects, defendants, co-workers, and/or subordinates. He never heard Senior Investigator Kendall use any type of ethnic, gender and/or racial slur no did he ever observe Senior Investigator Kendall tell any type of racial joke. He has never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time. He also never heard him utter the words "Animals, Savages, or Monkey" in any derogatory way towards any minority class. He was never shown any type of videos involving African-Americans.

Investigator Jackson advised that while Senior Investigator Kendall was supervising him, he felt that the overtime was equally distributed. He stated that there were times that members of the unit were called in for overtime on details where he was not requested. He also advised that he was assigned overtime details where other members of the unit were not. Overall, he said that the overtime balanced equally over time. He felt that the overtime was always distributed due to job related circumstances and that it had noting to do with race.

Investigator Jackson felt that Senior Investigator Kendall does not discriminate on the basis of race. He advised that he had a discussion about race during the presidential election where Senior Kendall told him that the people should elect the president on the merits and that race should not be a part of the decision.

Investigator Jackson has known Investigator Miller for approximately twelve to fifteen years. Investigator Jackson advised that he has had conversations with Investigator Miller involving race, fairness and discrimination. Investigator Jackson stated that Investigator Miller has explained some situations to him where, based on Investigator Miller's explanation, he (Investigator Jackson) has felt that Investigator Miller was treated differently because of being African-American. Investigator Jackson also stated that there were several situations explained to him by Investigator Miller, where Investigator Jackson felt that Investigator Miller was "oversensitive" and that Investigator Miller was not treated any differently because of his race. Investigator Jackson felt that the majority of the time,

---

[5] Investigator Jackson is an African-American.

9

Investigator Miller was "oversensitive" about being treated differently because he is African-American.

Investigator Jackson explained that Investigator Miller advised him that he (Miller) felt that he was being treated unfairly by Senior Investigator Kendall because he felt that he was not receiving the same amount of overtime as the other people in the unit. This conversation occurred during the onset of the Federal overtime funding[6]. Investigator Miller complained to him that he felt that other guys in the unit were being called out for overtime more that he (Investigator Miller). Investigator Jackson told him (Investigator Miller) that sometimes you get called out on overtime for some details and not others as not every detail needs every member of the unit. Investigator Jackson told Investigator Miller that over time, the "overtime" will be equally distributed around the unit.

Investigator Jackson explained a recent conversation that he had with Investigator Miller. Investigator Jackson was assigned to a sex offender detail in Rochester. Investigator Miller called him and told him that he did not know about the detail. Investigator Jackson explained to Investigator Miller that the detail is in Rochester and that Investigator Miller is assigned to Buffalo. Investigator Jackson also explained that he had worked with the Marshal who had set up the detail before and that the Marshal had come to him (Investigator Jackson). Investigator Jackson explained that the detail was overly staffed with people so no other members were needed. Investigator Jackson explained that these are the type of situations that Investigator Miller would be overly sensitive about. Investigator Miller was questioning that he did not receive overtime because of his race but in reality it was just the logistics of the detail.

Investigator Jackson stated that he still felt that overtime was equally distributed around the unit and that Investigator Miller was incorrect in his feelings about not receiving the same amount of overtime.

Investigator Jackson stated that Investigator Miller sometimes takes things personally that have nothing to do with him. Investigator Jackson explained that sometimes in the course of business a "bad guy" may say something and that later someone from the group (task force) would go back and explain what the "bad guy" had said. Investigator Jackson explained that Investigator Miller would react as if what was said was about him or directed at him when in reality whoever made the comment was just repeating what the "bad guy" said to him. Investigator Miller would be offended when no offense was ever intended. Investigator Jackson advised that situations like the above occurred all the time but that he did not have any specific example. Because of the above, Investigator Jackson advised that everyone avoided subjects like race with Investigator Miller as they would not know how he would react.

Investigator Jackson concluded his statement by saying that he has never heard Senior Investigator Kendall say anything derogatory towards any person including another member. Investigator Jackson stated that he would be shocked if the allegations against Senior Investigator Kendall were true.

Statement of Investigator Jackson is attached as Enclosure #10.

12)    On August 28, 2013, I telephonically interviewed retired Senior Investigator James Chase who retired from Troop "E" VFW in 2011. Senior Investigator Chase stated that he did know Senior Investigator Kendall from working with him in the VFW. He stated that he did not know him well

---

[6] The Federal Government began to reimburse the State for United States Marshal Task Force Overtime in 2009.

but has never heard anything negative regarding him. He has never observed Senior Investigator Kendall treat anyone disrespectfully. He has never observed Senior Investigator Kendall ever utter any type of racial slur. He has never heard Senior Investigator Kendall say anything that could be derogatory towards any member of a minority class.

He advised that he knew Investigator Miller while he was assigned to the Troop "A" VFW. Senior Investigator Chase advised that Investigator Miller was temporarily assigned to Troop "E" VFW after Investigator Miller's sister died and left his niece alone without any support. Investigator Miller was allowed to work at Troop "E" VFW for several months to look out for her. No deposition obtained.

13)    On September 3, 2013, Senior Investigator Bradley and I interviewed the following United States Fugitive Task Force Members:
    Jay Sexton
    Brendan Kiefer
    Joseph Shanley
    George Scott

### Niagara County Sherriff's Deputy Joseph Shanley

Deputy Shanley has known Senior Investigator Kendall for two years. He has never observed Senior Investigator Kendall treat anyone disrespectfully. He has never observed Senior Investigator Kendall ever utter any type of racial slur. He has never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time. He also has never heard him utter the words "Animals, Savages, or Monkey" in any derogatory way towards any minority class. He was never shown any type of videos that were derogatory towards African-Americans.

Deputy Shanley stated that he has known Investigator Miller for two years. He advised that he is very sensitive to people using the "Nigger" word. Deputy Shanley stated that he has heard Investigator Miller tell people[7] that he doesn't appreciate them using the "Nigger" word. Deputy Shanley stated that Investigator Miller confronted a task force member regarding some type of racial gesture about six or seven months ago but could not recall the details or who was the task force member that was confronted. He was sure that it was not Senior Investigator Kendall. Deputy Shanley has nothing but the utmost respect for Senior Investigator Kendall.

### Homeland Security Immigration and Customs Enforcement Agent George Scott

Agent Scott has known Senior Investigator Kendall for nine months. He has never observed Senior Investigator Kendall treat anyone disrespectfully. He has never observed Senior Investigator Kendall ever utter any type of racial slur. He has never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time. He also has never heard him utter the words "Animals, Savages, or Monkey" in any derogatory way towards any minority class. He was never shown any type of videos that were derogatory towards African-Americans.

---

[7] Deputy Shanley stated that Investigator Miller has confronted civilians on their use of the "Nigger" word. He has never heard any members of the task force utter the word.

11

Agent Scott stated that he has known Investigator Miller for nine months also. Agent Scott advised that he knew of an incident where Investigator Miller confronted Deputy Novak about being called "the black guy" at the office. Agent Scott stated that he did not know all of the details regarding the incident but felt that the incident was blown out of proportion by Investigator Miller. Agent Scott advised that Investigator Miller kept telling Deputy Novak that he was "watching him". Agent Scott advised that this incident was known throughout the office and that since the incident, Agent Scott is guarded when he talks with Investigator Miller.

Agent Scott also stated that Investigator Miller was involved in an incident with Deputy Granto where Deputy Granto pulled Investigator Miller over during a traffic stop. Investigator Miller felt he was racially profiled but the two of the task force members worked out the issue when Deputy Granto was assigned to the task force.

### Department of Motor Vehicles Agent Jay Sexton

Agent Sexton stated that he has known Senior Investigator Kendall for approximately a year and a half. In all of his dealings with him, Agent Sexton felt that Senior Investigator Kendall was very professional. He has never observed Senior Investigator Kendall treat anyone disrespectfully. He has never observed Senior Investigator Kendall ever utter any type of racial slur. He has never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time. He also has never heard him utter the words "Animals, Savages, or Monkey" in any derogatory way towards any minority class. He was never shown any type of videos that were derogatory towards African-Americans.

### Buffalo Police Detective Brendan Kiefer

Officer Kiefer stated that he has known Senior Investigator Kendall for approximately 5 years. In all of his dealings with him, Officer Kiefer felt that Senior Investigator Kendall was very professional. He has never observed Senior Investigator Kendall treat anyone disrespectfully. He has never observed Senior Investigator Kendall ever utter any type of racial slur. He has never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time. He also has never heard him utter the words "Animals, Savages, or Monkey" in any derogatory way towards any minority class.

Officer Kiefer recalled being involved in the Mel Brundage arrest and also recalled that during the interview with his girlfriend, the girlfriend used the "Nigger" word. Officer Kiefer stated that one of the task force guys again repeated what the girlfriend stated (use of the "Nigger" word) and the girlfriend became irate. Officer Kiefer stated that Senior Investigator Kendall was not present during the interview of the girlfriend and that he (Kendall) was not the task force member who repeated the phrase the girlfriend of Mr. Brundage used.

Officer Kiefer did not recall any events of the Tobias Boyland arrest but stated that Mr. Boyland had made videos of himself and posted them on the "youtube" website. Officer Kiefer stated that Senior Investigator Kendall showed him the videos of Mr. Boyland from "youtube" when they were looking for him. Officer Kiefer stated that Senior Investigator Kendall showed him the videos because he believed the videos were comical. In no way, did Officer Kiefer feel that the videos were demeaning towards African-Americans, but were comical because of Mr.

Boyland's actions on the videos.

Officer Kiefer stated that he has known Investigator Miller for approximately 5 years. He feels that Investigator Miller is "sensitive" at times. Officer Kiefer provided an example of why he felt that Investigator Miller could be considered "sensitive" at times. He continued that at one point there was a Caucasian task force member with the first name of "Lee" working in the unit. At the time, there was then a "White Lee" and a "Black Lee" working in the unit. During this time, several of the task force members began to refer to the "Lee's" as either the White or Black Lee. Investigator Miller did not like how he was being referred to as the "Black Lee" and brought it to the attention of the unit. The unit then ceased to refer to the task force members in that way.

Officer Kiefer also had third hand knowledge of an incident with Deputy Granto and Investigator Miller where Deputy Granto stopped Investigator Miller for a VTL stop.

Statements of the above task force members are attached as Enclosure#11.

14)     On September 4, 2013, with Senior Investigator Bradley, interviewed Dan Larish, who was the previous member in charge of the task force and retired in June of 2013. Mr. Larish stated that he has known Senior Investigator Kendall for approximately nine years. Mr. Larish felt that Senior Investigator Kendall was a hard worker and a good investigator. He felt that Senior Investigator Kendall did not like the United States Marshal's rules/guidelines and felt that on numerous occasions Senior Investigator Kendall went outside the guidelines. As such, Mr. Larish did not like Senior Investigator Kendall and felt that the two men would frequently be in conflict[8].

Mr. Larish stated that in the numerous years that he has worked with Senior Investigator Kendall, he found that he always treated everyone professionally. Mr. Larish could not recall any time where Senior Investigator Kendall uttered the terms "Animal, Savages or Monkey" in any way derogatory towards African-Americans. He has never observed Senior Investigator Kendall utter the words "Monkey Sex". He has never heard Senior Investigator Kendall utter the "Nigger and/or Nigga" word. He never observed Senior Investigator Kendall use the phrase "I ain't seen that "Nigga" in a minute". Mr. Larish did state that he has observed numerous people that he has interviewed in the streets of Buffalo to use these words and terms. He also stated that sometimes it is appropriate for task force members to use the above street language to develop a dialogue with people.

Mr. Larish stated that he did observe Senior Investigator Kendall show videos to the unit. Mr. Larish stated these videos were humorous videos which were usually funny criminal and/or traffic stop videos. Mr. Larish did not feel any of the videos were derogatory towards African-Americans.

Mr. Larish stated he has known Investigator Miller for several years. Mr. Larish stated that Investigator Miller has addressed issues in the office that may have racial implications one or two times. Mr. Larish stated that Investigator Miller came to him and addressed an issue with Deputy

---

[8] As a result of the conflict, Senior Investigator Kendall was removed from the Task Force for several weeks during the summer of 2013. Upon Mr. Larish's retirement as well as several meetings between U.S. Marshal Salina and Troop A Commander Major Cerretto, the issues between the agencies and Senior Investigator Kendall were worked out and he was reinstated to the task force.

13

Granto when Deputy Granto was in the process of coming into the task force.  Investigator Miller advised him that he had been stopped in his vehicle by Deputy Granto and that he felt that he was racially profiled by Deputy Granto.  Mr. Larish stated that he brought in both Deputy Granto and Investigator Miller and discussed the incident with both of them.  Deputy Granto and Investigator Miller gave very similar stories about the incident (See Deputy Granto's statement).  Mr. Larish stated that after hearing both sides of the story, he felt that Investigator Miller was not pulled over because of his race and attributed the disagreement to both Deputy Granto and Investigator Miller having "Type A" personalities.  At the end of the discussion, both Investigator Miller and Deputy Granto stated they said things that may have been taken out of context.

Deputy Granto was allowed in to the unit and worked with Investigator Miller for two years.  Both Deputy Granto and Investigator Miller are both fine with each other and they get along well.

Mr. Larish stated that after he had decided to allow Deputy Granto onto the task force, he approached Senior Investigator Kendall and inquired if he felt that Investigator Miller could work with Deputy Granto in Niagara County.  He wanted to know if Senior Investigator Kendall wanted to move Investigator Miller off the Niagara county unit.  Senior Investigator Kendall stated to him that "his (Miller's) "nappy" head will be in Niagara County.  Mr. Larish declined to provide a written statement.

15)   On September 4, 2013, received the Troop A, VFW overtime reports from Lieutenant Jeffrey Dorward.  Lieutenant Dorward worked with Michelle Thomas from Finance who oversees the Marshal Overtime grant.  Ms. Thomas provided Budget reports for the Fiscal Years beginning in 2009.  Lieutenant Dorward also provided an overview summary of how the overtime is distributed for the VFW Unit.  Lieutenant Dorward created a table of VFW Members and their overtime earnings.  See below:

| MARSHALS/VFW OVERTIME | | 2009-2010 | |
|---|---|---|---|
| S/I KENDALL | Rate: 46.44 | Hours: 164.5 | $7,639.38 |
| INV MILLER | Rate: 84.90 | Hours: 109 | $9,654.68 |
| INV RIEGER | Rate: 86.25 | Hours: 174.5 | $15,522.43 |
| INV DEJESUS | Rate: 86.62 | Hours: 129.5 | $10,009.24 |

14

MARSHALS/VFW OVERTIME            2010-2011

| | | | |
|---|---|---|---|
| S/I KENDALL | Rate: 49.47 | Hours  195 | $9,646.65 |
| INV MILLER | Rate: 90.23 | Hours  144.5 | $13,038.24 |
| INV RIEGER | Rate: 90.71 | Hours  140.5 | $12,744.76 |
| INV DEJESUS | Rate: 98.00 | Hours  14.5 | $1,421.00 |

MARSHALS/VFW OVERTIME            2011-2012

| | | | |
|---|---|---|---|
| S/I KENDALL | Rate: 49.47 | Hours  218.5 | $10,809.20 |
| INV MILLER | Rate: 90.23 | Hours  119 | $10,737.37 |
| INV DECILLIS | Rate: 91.77 | Hours  117.5 | $10,782.37 |
| INV HAND | Rate: 91.46 | Hours  108.5 | $9,923.41 |
| INV JACKSON | Rate: 91.52 | Hours  118 | $10,799.36 |
| INV RIEGER | Rate: 91.52 | Hours  61.5 | $5,578.67 |
| INV DEJESUS | Retired | | |

15

| MARSHALS/VFW OVERTIME | | 2012-2013 | |
|---|---|---|---|
| S/I KENDALL | Rate  49.49 | Hours: 145 | $7,176.05 |
| INV MILLER | Rate  91.61 | Hours: 114.5 | $10,489.35 |
| INV RIEGER | Retired | | |
| INV DEJESUS | Retired | | |

A review of the Overtime shows that in 2009 to 2010, Investigator Rieger earned the most amount of overtime in the unit while the other three members of the unit earned similar amounts (substantially less than Investigator Rieger). In the other years, Investigator Miller appears to receive similar amounts of overtime as the other members in the unit. In 2010 to 2011, Investigator Miller earned the most amount of overtime in the unit. In the following year, 2011 to 2012, Investigator Miller (and Investigator Jackson, another African-American) were within a few hundred dollars of earning the most amount of overtime in the unit. There appears to be no pattern of Investigator Miller receiving less overtime than the other members of the unit. The 2009 to 2010 year appears to be an exception.

Senior Investigator Kendall also provided me with spreadsheets that he maintains for each member of the unit to document when overtime is earned.

Lieutenant Dorward's explanation of the VFW overtime process, copies of above Overtime tables, Overtime Billing statements from Michelle Thomas, and compact disk of Senior Investigator Kendall's spreadsheets are attached as Enclosure #12.

16)    On September 12, 2013, Senior Investigator Bradley and I interviewed Niagara County Sheriff's Deputy Gerald Granto who is assigned to the United States Marshal Task Force in Buffalo. Deputy Granto advised that he has known Senior Investigator Kendall for approximately 1 and a half years but has not worked with him that frequently. In all of his dealings with him, Deputy Granto felt that Senior Investigator Kendall was very professional. He has never observed Senior Investigator Kendall treat anyone disrespectfully. He has never observed Senior Investigator Kendall ever utter any type of racial slur. He has never observed Senior Investigator Kendall utter the word "Nigger (or Nigga)" at any time. He also has never heard him utter the words "Animals, Savages, or Monkey" in any derogatory way towards any minority class. He has never heard Senior Investigator Kendall utter the words "Monkey Sex". He has never observed Senior Investigator Kendall utter the phrase "Awe Man, I ain't seen that nigger in a minute". He has never heard him utter the phrase "You better get you nigger ass over here before they come get you". Deputy Granto was never shown any type of videos by Senior Investigator Kendall.

Deputy Granto stated that he has known Investigator Miller for approximately 2 years and works with him almost daily. Deputy Granto advised that he first met Investigator Miller under unusual circumstances. Deputy Granto stated that before he was on the task force, he was assigned as a road deputy at the Niagara Sheriff's Department. Approximately two years ago, Deputy Granto

16

stopped a car that was speeding in the county. Deputy Granto advised that Investigator Miller (whom he did not know yet) was operating the vehicle. Deputy Granto approached the vehicle and advised Investigator Miller that he had stopped him for speeding as well as for failing to wear his seatbelt. Investigator Miller flashed his badge briefly and provided Deputy Granto with his license. Deputy Granto asked if he could look at Investigator Miller's badge again so he could verify the name on the badge and the license and Investigator Miller refused to show it to him again. Deputy Granto stated that Investigator Miller became angry and the argument began to escalate. Deputy Granto backed off when he was contacted by Detective Shanley who advised him that Investigator Miller was on the task force. Deputy Granto released Investigator Miller but was so upset by the incident that he advised his Captain and documented the incident.

Deputy Granto continued that several months after the traffic stop he had the opportunity to work on the task force. While he was interviewing for the unit, Deputy Granto had to explain the above traffic stop to the supervisor of the task force, Dan Larish. It was explained to Deputy Granto that Investigator Miller had a problem with Deputy Granto due to the traffic stop. Deputy Marshal Larish explained to him (Granto) that Investigator Miller explained the traffic stop to him (Larish) almost exactly as Deputy Granto described it with the exception that Investigator Miller felt he was pulled over for being an African-American. Deputy Granto explained that it was impossible for him to have stopped Investigator Miller due to his race because Investigator Miller was operating a vehicle with dark tinted windows and he could not see into the interior of the vehicle[9]. Marshal Larish allowed Deputy Granto onto the task force where he began to work with Investigator Miller on a daily basis.

Deputy Granto advised that since he has been in the task force, Investigator Miller and him have become friends and that Investigator Miller apologized for "thinking he was a racist". Deputy Granto stated that he feels that Investigator Miller is sensitive with the race issue. He explained that Investigator Miller once became defensive with a civilian who told Investigator Miller that he did not realize he was a police officer because he was African-American (and apologized for it). Investigator Miller became aggressive with the guy. Deputy Granto stated that Investigator Miller is usually a much laid back person. Deputy Granto concluded that he has observed nothing that would lead him to believe that Senior Investigator Kendall has ever discriminated against Investigator Miller. Statement of Deputy Granto is attached as Enclosure #12.

17)     On September 23, 2013, Senior Investigator Kevin Kendall responded to IAB-WRO for the purpose of providing a mechanically recorded statement. Present for the interrogation were Senior Investigator Bradley, NYSPIA Delegate Richard Qualey, Attorney Michael Ravalli, Senior Investigator Kendall and myself.

Senior Investigator Kendall acknowledged that he has received training on the Prevention of Sexual Harassment and Discrimination. He also acknowledged that he has recently received online training on Equal Employment Opportunity Rights and Responsibilities as well as Sexual Harassment in the workplace. Senior Investigator Kendall acknowledged that he believed he attended Basic Leadership School (i.e. Sergeant's School) and that he has received training on Understanding Cultural Differences in people. Senior Investigator Kendall acknowledged that from

---

[9] Deputy Granto pulled Investigator Miller over for speeding 70mph in a 45mph zone and upon approach to the vehicle observed Investigator Miller, through the now open window, without his seatbelt affixed.

the training he understood that certain comments said or heard in the workplace could be considered offensive. He also understood that it was not the intent of the person making the comments that mattered, but the impact the comments had upon the receiver.

Senior Investigator Kendall stated that he is currently the member in charge of the Troop A Violent Felony Warrant (VFW) Squad located in Buffalo. He currently supervises Investigators Lethonia Miller and Robert Gardner. Investigator Miller has been assigned to the VFW since 2008 and Investigator Gardner was just recently assigned to the unit.

Senior Investigator Kendall stated that the members of the Troop A VFW Unit are assigned to the United States Marshal's task force in Buffalo. Senior Investigator Kendall provided the names of the current members assigned to the task force under the direction of Marshal Charles Salina.

Senior Investigator Kendall advised that the VFW unit was a Headquarters unit until January of 2013. Up until that time, the detail was run under the direction of Captain James McDowell. There was a VFW Unit in each of the major cities in the state. Each unit was composed of a Senior Investigator, who supervised the unit, with several investigators. In January of 2013, the VFW detail was transferred back into each troop under the supervision of the BCI-Captain. Throughout the last several years, the Senior Investigator position at each VFW unit was slowly eliminated through attrition. As such, prior to 2013, Senior Investigator Kendall supervised both the Buffalo VFW Unit and the Rochester VFW Unit, upon Senior Investigator James Chase retirement in 2011.

### Previous Discussion's of Race with Investigator Miller

Senior Investigator Kendall stated that he has known Investigator Miller for approximately twenty years. Senior Investigator Kendall advised that he previously worked with Investigator Miller in the mid 1990's, when they were both Investigators at SP Clarence.

Senior Investigator Kendall stated that he had a discussion about race with Investigator Miller back in the mid 1990's. Senior Investigator Kendall stated that Investigator Miller complained to him that Senior Investigator Thomas Rash had treated him unfairly and felt that the treatment stemmed from Investigator Miller being African-American. Senior Investigator Kendall advised that he told Investigator Miller that Senior Investigator Rash was a "Jerk" and that his poor treatment of Investigator Miller at the time was due to that personality trait and not because Investigator Miller was African-American.

Senior Investigator Kendall stated that he did not recall any conversation with Investigator Miller regarding using the "Nigger' word while he was stationed with Investigator Miller in the 1990's.

### Senior Investigator Kendall's recent Discussions with Investigator Miller about Race and Treatment from other People

Senior Investigator Kendall stated that he can recall several instances where Investigator Miller believed that he was treated unfairly because of his race. These incidents involved Deputy Marshal Brent Novak and Niagara County Deputy Sheriff Granto from the Marshal Task force as well as Investigator Migliore from the State Police.

Senior Investigator Kendall stated that Investigator Miller had discussed several incidents with him where Investigator Miller was offended by Deputy Marshal Novak's behavior and that

Investigator Miller felt that the behavior was caused because of Investigator Miller's race.

The first incident involved Investigator Miller complaining to him that Marshal Novak kept singing the song "Black Betty" by Pearl Jam. Investigator Miller felt Marshal Novak was singing the song only because Investigator Miller was African-American. Senior Investigator Kendall stated that he told Investigator Miller that he could see no connection with the incident and race and stated that Marshal Novak singing the song may not have anything to do with him.

The second incident involving Marshal Novak occurred in June where the task force had went to numerous houses one morning with no arrests. At one point, Marshal Novak stated to the group that "if they did not get anyone soon that they would have to cuff up Lee". Investigator Miller advised that he felt that Marshal Novak chose him because he was the only African-American in the group. Investigator Miller responded to Marshal Novak by making a flippant rebuttal.

The third incident involving Marshal Novak also occurred in June and started when Mr. Novak referred to Investigator Miller as "the black guy". Mr. Novak was interviewing some people and referred to Investigator Miller as "the black guy" during the interview. Investigator Miller talked to Marshal Novak and requested that he be referred to as Investigator Miller. Mr. Novak replied that during the interview he referred to him as "the black guy" because he was identifying Investigator Miller to the person that was being interviewing and used the "black guy" term for identification. Investigator Miller and Deputy Novak became involved in a heated argument over the issue.

Senior Investigator Kendall advised that he also discussed Investigator Miller's car stop by Deputy Granto. Investigator Miller told him that approximately two years ago he was stopped by Deputy Granto and that he felt he was stopped by him because he is African-American. Investigator Miller explained the story to Senior Investigator Kendall and advised him that Deputy Granto stopped him for speeding (70mph in a 35mph zone)[10]. Investigator Miller admitted that his division vehicle had tinted windows but felt that Deputy Granto gave him a "hard time". Senior Investigator Kendall explained to Investigator Miller that Deputy Granto was doing his job for pulling over Investigator Miller based on the circumstances of the stop. Senior Investigator Kendall also stated that if he (Investigator Miller) felt that he was not treated properly during the stop that he (Investigator Miller) could file a complaint with the Sheriff's Department.

Senior Investigator Kendall continued that when Deputy Granto attempted to come into the task force that Investigator Miller went to Dan Larish (Deputy Marshal in charge at the time) and told him that Deputy Granto was a racist. Senior Investigator Kendall advised that Mr. Larish looked into the matter and found it baseless. Senior Investigator Kendall advised that Investigator Miller and Deputy Granto have since worked the issue out.

Senior Investigator Kendall advised that he discussed the matter with Investigator Miller and took no further action.

Senior Investigator Kendall also described another incident between now retired Investigator Migliore and Investigator Miller. Senior Investigator Kendall advised that when both Investigator Migliore and Miller joined the VFW unit in 2008 they were in the midst of a dispute. Investigator Migliore had made a comment about an attractive Caucasian woman who was dating a drug dealer. Investigator Miller overheard the comment and believed that, because the drug dealer was African-American, that Investigator Migliore had a problem with interracial couples. In retaliation, Investigator Miller made some comments about himself dating Investigator Migliore's 17-year-old

---

[10] Senior Investigator Kendall's version of the story is similar to Deputy Granto's version of events.

daughter.   Investigator Miller felt that Investigator Migliore was a racist and that Investigator Migliore felt that Investigator Miller was a "Jerk".   Senior Investigator Kendall discussed the incident between the two members and was able to resolve it.  The two members were subsequently able to work together in the unit.

Senior Investigator Kendall also described a situation where at one time at the task force there were two members of the task force (one Caucasian and one African-American) that had the first name of "Lee".  During this time period, each of the task force members named "Lee" was referred to as "the White Lee" and "the Black Lee".  Senior Investigator Kendall stated that this occurred for approximately two days until Senior Investigator Kendall discussed it with Investigator Miller.   Senior Investigator Kendall stated that he approached Investigator Miller about the comments and Investigator Miller told him that he did not like being referred to as "the Black Lee".  Senior Investigator Kendall stated he then discussed the issue with the task force members and the issue stopped.  Senior Investigator Kendall denied that he was the person that began the "White Lee/Black Lee" issue.

Senior Investigator Kendall also stated that he had heard rumors about Investigator Miller alleging racial discrimination complaints when he was a recruit in Albany and also against his supervisor on the road when he was a Trooper.

As a result of all of the above incidents including personal interaction with Investigator Miller, Senior Investigator Kendall feels that Investigator Miller is over-sensitive about racial incidents.

### Conversation with Investigator Miller in June of 2013

Senior Investigator Kendall advised that on June 4, 2013, and after the latest issue between Deputy Marshal Novak and Investigator Miller, he had a conversation with Investigator Miller. Senior Investigator Kendall told Investigator Miller that he did not see any red flags on what Deputy Marshal Novak stated that he would consider race related.  He told Investigator Miller that many of the incidents/conversations that he has discussed with him can be open to different interpretations and so much of it depends on the context of what was said.  Senior Investigator Kendall stated that he tried to explain his position by using an example. He told Investigator Miller that "We all know that it's not right to call another person a "Nigger" no matter what the circumstances are".  He then continued that if another person is relating information from an interview and states that the interviewee used the "Nigger" word that the person is just repeating the word and not actually using the word themselves.  Senior Investigator Kendall was trying to show that the word was used in a different context.  (Senior Investigator Kendall gave the example of Brendon Kiefer imitating a guy based on the person's characteristics).

Senior Investigator Kendall stated that he then asked Investigator Miller "When is it appropriate to use the "Nigger" word?" Senior Investigator Kendall stated that Investigator Miller just glared at him and told him that it is never appropriate to use the word.  Senior Investigator Kendall stated that at the time of the conversation, and after Investigator Miller's above reply, he wondered if he had offended him by the use of the word.  Senior Investigator Kendall stated that at no time was he trying to offend Investigator Miller, just discuss the use of language and context. This was the only time that Senior Investigator Kendall ever used the "Nigger" word in a

20

conversation with Investigator Miller[11]. Senior Investigator Kendall advised that he does not use the "Nigger" word.[12]

Senior Investigator Kendall stated that Investigator Miller has never told him that he was ever offended by anything that he has said.

Senior Investigator Kendall stated that outside of possibly using the phrase "Awe Man, I ain't seen that Nigga in a minute" in his conversation with Investigator Miller as described above on June 4, 2013, he has never used it at any other time. He stated that he has heard that phrase numerous times when he has done interviews with people in Buffalo. He also said that it is possible that people in the task force have used the phrase. He does not recall any specific instance of a task force member using the phrase. During his June 4, 2013 conversation with Investigator Miller, Senior Investigator Kendall may have used that phrase as an example.[13]

Senior Investigator Kendall did acknowledge that Brendan Kiefer from the task force does imitations of people including of an old African-American male. Senior Investigator Kendall advised that every year the unit makes numerous arrests which involved thousands of interactions with people. He continued that it is hard to recall every specific comment that is spoken.

### The Savages, Animals, and Monkey Statements

Senior Investigator Kendall stated that he has never had a conversation with Investigator Miller regarding his use of the terms "Savages, Animals, Monkey or Monkey Sex". Senior Investigator Kendall stated that he has never used the term "Monkey Sex". He also advised that he has never used the terms "Monkey, Savages, and Animals" in any sort of derogatory way towards African Americans. Senior Investigator Kendall stated that he may have called criminals "Savages" and/or "Animals" but that he was labeling the behavior and that the terms had nothing to do with anyone's race and/or ethnicity.

Senior Investigator Kendall acknowledged that he may have used the term savages when he talked with Erica Threatt on January 14, 2013. He stated that it is possible that he told her that "her brother and a bunch of other savages beat up a retarded kid" but he does not specifically recall making the statement. Senior Investigator Kendall stated that if he made the statement, he used the term "savages" due to the nature and "savagery" of the attack and that the use of the term had nothing to do with the race of the suspects. Senior Investigator Kendall also denied that after the interview, he told Investigator Miller that Ms. Threatt had a great body for "Monkey Sex".

Senior Investigator Kendall does not recall ever stating the phrase "They are fucking animals, how do they live in that shit".

Senior Investigator Kendall does not recall ever telling members of the task force that the victims of the City Grill shooting were animals.

---

[11] During this conversation, Senior Investigator Kendall believes that he asked Investigator Miller "Why was it ok for Black people to use the "nigger" word, and why it was wrong for White people to use it."

[12] Senior Investigator Kendall stated that he may have used the N-word as a kid but not as an adult and never in the workplace.

[13] Senior Investigator Kendall was trying to explain context to Investigator Miller and used the example of Brendan Kiefer imitating someone that they interviewed repeating the phrase. Senior Investigator Kendall stated that it was an example and that he has never actually heard Kiefer using that specific phrase. This was the only recollection Senior Investigator Kendall has of ever using the phrase.

Other Phrases involving the "Nigger" Word

Senior Investigator Kendall advised that he recalled an incident where Brendan Kiefer was interviewing a person that was carrying a bi-racial son on her lap. The lady kept referring to the father of the child as a "Nigga". At one point, Mr. Kiefer asked the woman, "How can you call the baby's father a "Nigga" when you have a half "Nigga" sitting on your lap". Senior Investigator can not recall being at the site of the interview but does know the story. He advised that he does not recall repeating the phrase to anyone.

Senior investigator Kendall does not recall ever stating the phrase "You all ain't gonna catch him, he's a smart Nigga". He does believe that he heard the phrase from Investigator Miller who was telling him about an interview at a barber shop.

Senior Investigator Kendall advised that he could not recall any incident where a Caucasian woman told her biracial son that "You better watch out before they come get your nigger ass".

"Nappy" Head Comment

Senior Investigator Kendall stated that he knows Dan Larish as the previous supervisor of the Marshal task force. He worked with him since Senior Investigator Kendall was transferred into the unit until Mr. Larish's retirement on June 30, 2013. Senior Investigator Kendall stated that he did have a discussion with Mr. Larish regarding Deputy Granto and Investigator Miller.[14]  Senior Investigator Kendall stated that he has never used the term "Nappy Head" with Mr. Larish in referring to Investigator Miller. Senior Investigator Kendall stated that he had used the term in a conversation he had with Investigator Miller.

Senior Investigator Kendall explained a situation where he was with Investigator Miller and Investigator Miller made a comment directly to an attractive woman they were talking with. Senior Investigator Kendall felt the comment (which involved how tall the woman was) was inappropriate and it appeared to him that the woman was offended. Senior Investigator Kendall attempted to explain to Investigator Miller that the comment was inappropriate by using the example of Senior Investigator Kendall telling Investigator Miller "Boy isn't your head hair nappy"[15].  Senior Investigator Kendall stated that he was referring to Investigator Miller's hair, which was in dreadlocks at the time, and that the comment was not racial in nature.

Videos

Senior Investigator Kendall stated that he shows police related videos to members of the task force and Troop A, VFW. He advised that these videos are mostly videos that are used to describe suspects. He also stated that he has shown the video of himself receiving Police Officer of the Year Award by the bar Association of Erie County to the task force members. Senior Investigator Kendall

---

[14] Senior Investigator Kendall discussed the Investigator Miller and Deputy Granto issue which was eventually worked out between everyone.
[15] Senior Investigator Kendall statement, page 42. Senior Investigator Kendall was asking "how would Investigator Miller feel if he asked him about his nappy hair".

22

stated that he has seen the video "Sweet Brown's Cold Pop Escape". He is uncertain if he has ever shown the video to anyone.

Senior Investigator Kendall stated that he does not recall having any type of conversation with Investigator Miller regarding the video. He advised that he has seen the video and that he thought the person in the video was a funny, animated person. He advised that he has used her catchphrase "Ain't nobody got time for that" several times. He uses the catchphrase because he thought it was a catchy phrase. He did not feel the video portrayed African-Americans in a negative light and that he never makes fun of the woman in the video. He stated that he has imitated the woman in the video because he believes she is funny.

<u>Facebook Post</u>

Senior Investigator Kendall stated that he has a facebook page for "Shaniqua Stacks O'MannWilliams". He advised that is a fictitious page used as an investigative tool. He stated that he only uses the page for official functions and has given Investigator Miller access to the page.

Senior Investigator Kendall stated that the woman that is portrayed in the facebook page is actually a girl from Cleveland that had a romantic relationship with Tobias Boyland. Senior Investigator Kendall stated that while looking for Mr. Boyland, he interviewed the woman and she sent the pictures (these are the profile pictures for the facebook page) to him (to identify Mr. Boyland's girlfriend). Senior Investigator Kendall stated that he asked the woman if he could use the pictures of her on his facebook page and that she consented. He never obtained written consent. He stated that the woman had no ties to Buffalo, and that he used a fictitious name on the page. He felt that these were adequate precautions to prevent anyone from identifying the woman via facebook.

Senior Investigator Kendall stated that he used the term "Nigga" once in one of the posts under this fictitious facebook page. Senior Investigator Kendall advised that last year the unit was looking for a Damone Lewis. Mr. Lewis was wanted for several shootings in Buffalo. Senior Investigator Kendall used his fictitious facebook name (Shaniqua) to "friend" Mr. Lewis and several of his friends. Senior Investigator Kendall was later able to obtain search warrants on all of the private messages of Mr. Lewis and his friends which ultimately assisted in locating and arresting Mr. Lewis.

Senior Investigator Kendall stated that on November 5, 2012, he did post the following comment under Shaniqua's facebook page, "Fuck you killing nigga, I hope you rot in jail you just a pussy ass bitch shooting ho's while they lay in the street hoping you get some". Senior Investigator Kendall stated that Mr. Lewis had been arrested earlier that same day but that he posted the comment to keep gaining information on Mr. Lewis that could be used to prosecute him. Senior Investigator Kendall also advised that he may have gotten carried away with the façade. He continued that Mr. Lewis' girlfriend at the time posted some replies on the page that led him to believe that she wanted to fight with him (aka Shaniqua). Senior Investigator Kendall stated that this it the only time that he used the word "nigga" on facebook.

Senior Investigator Kendall advised that he gave access to Investigator Miller for the facebook page and that Investigator Miller was helping him with understanding and translating all the language that the people were discussing on Mr. Lewis' page. Senior Investigator Kendall stated that he read Investigator Miller the replies to the post. He also stated that he showed the computer screen with the replies to Investigator Miller at which time Investigator Miller could see what was

posted.

Senior Investigator Kendall stated that at no time did Investigator Miller make a comment about the post. He also advised that he had no knowledge of Investigator Miller being offended by the post.

Senior Investigator Kendall stated that he used the "nigga" comment in his undercover identity. He stated that as a part of his cover, he has to play the role of an African-American woman. He subsequently used the "nigga" comment because that is a common term used by some African-Americans in Buffalo. Senior Investigator Kendall stated that is the only reason that he used the term "nigga" in the post. He advised in hindsight, he is uncertain if he could have used a different term to achieve the same results.

Overtime

Senior Investigator Kendall stated that as part of the Marshal Task force, each member of the task force receives overtime that is reimbursable from the federal government. Each year, the Marshals sign a memorandum of understanding with the Division on how much money they will reimburse the Division in overtime expenses. This pot of money is then divided among the members of the VFW evenly. Senior Investigator Kendall stated that the administrative Senior Investigator would advise each unit the amount of overtime (in dollar terms) that each member was allowed. Senior Investigator Kendall stated that it was his job to make sure to supervise it, make sure it is used appropriately, and make sure that the members do not over or under use it.

Senior Investigator Kendall advised that as a Senior investigator in the State Police, he makes a reduced rate for overtime. As such, he is allowed to work more hours of overtime than a normal investigator in order to make the same amount of money from the overtime. Senior Investigator Kendall stated that the administrative Senior Investigator tells him approximately how much overtime each member is allowed each month. At the end of every month, Senior Investigator Kendall then reports to the administrative Senior Investigator the amount of overtime each member utilized.

Senior Investigator Kendall stated that it is his job to monitor and approve overtime for the Troop A task force members. He advised that the task force members are allowed to work overtime without approval from him. He stated that sometimes they would ask him for approval and that sometimes he was aware that the members had worked extra hours. It was an honor system that Senior Investigator Kendall kept track of each month.

Senior Investigator Kendall had no explanation as to why in Fiscal year 2009-2010, that Investigator Rieger had a substantial amount of overtime as compared to the unit (approximately $15,000)[16]. He also had no explanation as to why Investigator Miller and Investigator Dejesus had lesser amounts of overtime (approximately $10,000). Senior Investigator Kendall stated that Investigator Miller had the most amount of overtime money for the following two years (2010-2011 and 2011-2012). Senior Investigator Kendall denied that he ever curtailed Investigator Miller's overtime. He also denied that he curtailed Investigator Miller's overtime because Investigator Miller

---

[16] Senior Investigator Kendall advised that he routinely had to watch Investigator Rieger and DeJesus as they would work excessive amounts of overtime. He would have to cut them off. On the contrary, he would have to advise Investigator Miller that he was short on overtime and that he needed to work more.

24

had complained to him about his (Senior Investigator Kendall's) use of the "nigger" word. Senior Investigator Kendall stated that if he wanted to penalize Investigator Miller for his race, he should not have received the most amount of overtime for the subsequent years. Senior Investigator Kendall stated that Investigator Jackson (Troop E, VFW), who is also African-American, was also near the top in overtime earnings.

Miscellaneous

Senior Investigator Kendall stated that he completes performance evaluations for Investigator Miller. He continued that he has always rated Investigator Miller as satisfactory. He advised that he has never rated him as unsatisfactory.

Senior Investigator stated that he has helped Investigator Miller in the past. He advised that sometime around 2009, Investigator Miller advised that his sister had died. The woman had left one child who was a senior in high school in the Rochester area. Investigator Miller advised him that he wanted to stay at his sister's house in Rochester so his niece could finish school. Senior Investigator Kendall stated that he made the necessary arrangements for Investigator Miller to temporarily work out of the Rochester VFW office[17].

Senior Investigator Kendall stated that he also believed he helped Investigator Miller in 2010. Investigator Miller advised that he was thinking of transferring out of the VFW and into the casino detail. Investigator Miller wanted to open up a hotdog stand and earn extra money. Investigator Miller wanted to work afternoons to sell hotdogs during lunch. Senior Investigator Kendall discussed this with Investigator Miller and told him that in either unit, he would miss out on a meal time (either lunch or dinner) to sell hotdogs. Senior Investigator Kendall also stated that if Investigator Miller left the unit, he would loose the overtime stipend which would be hard to recoup by selling hotdogs. He also explained to him that the stipend money will boost his retirement pension. As a result of the discussion, Investigator Miller decided to remain in the unit. Senior Investigator Kendall advised that if he truly was a racist, he would have took this opportunity to allow Investigator Miller to leave.

Senior Investigator Kendall believes that he has treated Investigator Miller fairly. He stated that he does not treat him differently because he is African-American. Senior Investigator Kendall advised that he has never intended to offend Investigator Miller and that if he did offend Investigator Miller he would have apologized as soon as he became aware of the offense. Senior Investigator Kendall stated that he was never aware of anytime that he offended Investigator Miller.

Senior Investigator Kendall stated that since he became aware of the personnel complaint on August 1, 2013, he has treated Investigator Miller professionally but cautious. He advised that he has not been making "chit-chat" with him. Senior Investigator Kendall advised that he is very upset by the allegations and has felt betrayed by Investigator Miller. He stated that it is very hard to be friendly with Investigator Miller at this time but stated that he has not retaliated against Investigator Miller in anyway.

Senior Investigator Kendal concluded that he does not discriminate against African-Americans. He denied racially harassing Investigator Miller and does not feel that he has discriminated against Investigator Miller. Senior Investigator Kendall stated that he understands that

---

[17] This was incidentally the time period that Investigator Miller was low on overtime.

25

the facebook post could be considered insensitive but stated that his intent with the remark was for an investigative purpose. His intent was not to offend African-Americans. Unsigned Statement of Senior Investigator Kendall is attached as Enclosure #14.

18)     On September 27, 2013, I received a compact disk from Troop E Computer Crimes Unit. The disk contains the video of "Sweet Brown's Cold Pop Escape" downloaded from the "youtube" website, which is the video that Senior Investigator Kendall allegedly showed Investigator Miller. The video is an interview of an African-American woman who had to evacuate her apartment due to a fire[18]. Compact Disk of the video is attached as Enclosure #15.

19)     On October 25, 2013, I received a memorandum from Investigator Miller. Investigator Miller advised that he believes the woman in the fake facebook page (Shaniqua Staxx O'MannWilliams) is actually Angela Triplett. In his memorandum, Investigator Miller describes how he came to that conclusion. Memorandum of Investigator Lethonia Miller is attached as Enclosure #16.

20)     On November 6, 2013, I was advised that Investigator Miller had filed a federal lawsuit for Discrimination against the Division of State Police. In his complaint, Investigator Miller states that he has been retaliated upon for filing this complaint. He advised that he has been denied overtime in the document since he had officially made the personnel complaint. As such another allegation is adopted in this investigation:
Allegation #8:  That Senior Investigator Kendall has retaliated against Investigator Miller for filing this personnel complaint by denying him overtime.
        A check of the Troop A VFW Overtime records showed that since July 15, 2013 (original date of Investigator Miller's original memorandum) he has earned 107.50 hours of overtime ($9,848.08). Senior Investigator Kendall has earned 154.5 hours of overtime in this period ($7,646.21). There appears to be no evidence of any denial of overtime. Federal Complaint form is attached as Enclosure #17.  Overtime records for Troop A VFW from July 15, 2013 through November 6, 2013 are attached as Enclosure #18.

21)     On November 10, 2013, I electronically sent a message to Angela Triplett via Facebook to contact me regarding the fictitious website. Ms. Triplett has failed to reply. I was unable to locate any further contact information regarding her whereabouts.

22)     On November 12, 2013, telephonically interviewed Richard Lewis who is a detective from the Niagara Frontier Transportation Authority Police. Detective Lewis was involved in the search for Erin Glenn with Senior Investigator Kendall and the Marshal Task Force. Detective Lewis stated that he has never heard Senior Investigator Kendall utter the "Nigger and/or Nigga" word in any conversation. He also advised that Mr. Charles Loubert does not work for the NFTA anymore. No deposition taken.

---

[18] It should be noted that the remarks of this woman on tape were humorous to many people. Several phrases that the woman used in her interview such as "I ain't got no time for that" went viral on the internet and the phrase has been used in pop culture. There are numerous parodies of the video on the youtube website and other internet sites.

23)     On November 13, 2013, I received a memorandum from Senior Investigator Kendall. Senior Investigator Kendall explained further about his fictitious facebook page. Senior Investigator Kendall stated that on the home page of the account that there are two photographs displayed. One photograph shows two females and the other shows one female. Senior Investigator Kendall explained that Ms. Angela Triplett is in the picture with the two females and that he believed her to be the female with the pink tank top (left woman). Senior Investigator Kendall stated that the other woman, the one with the white tank top, is the person that he spoke with that provided him with the photographs for the account. Senior Investigator Kendall searched his files and could not find a name or contact information for the other woman. Senior Investigator Kendall provided possible phone numbers for Ms. Triplett as: 216-244-6862, 216-394-3813, and 216-370-0486. Memorandum of Senior Investigator Kendall is attached as Enclosure #19.

24)     On November 14, 2013, I contacted the above phone numbers in an attempt to contact Ms. Triplett with negative results.  See following:
                        216-244-6862 – no answer, male voicemail message.
                        216-394-3813 – male voice answered, wrong number.
                        216-370-0486 – no answer, male voicemail message.
All investigative leads about contacting Ms. Triplett and the unknown female have been exhausted[19].

**CONCLUSION:**
    A major part of this investigation involves Investigator Miller's sensitivity/perception towards racial disparity. Investigator Miller has been involved in several incidents that he has perceived to have occurred due to his race. While some of the incidents that Investigator Miller has perceived involving racial overtones probably do have some flavor of racial bias, it was also readily apparent that several of the incidents were "overblown" by Investigator Miller. Many of Investigator Miller's co-workers believe that Investigator Miller is "over-sensitive" when it comes to racial issues. Many are afraid to discuss any type of racial incident with him. Many of his co-workers admit they are at least guarded when they are with him for fear that they will "set him off". African-American co-workers (Investigator Lawrence Jackson) of Investigator Miller also agree with this statement. The Deputy Granto traffic stop is a prime example of Investigator Miller feeling that he was stopped due to his race, when the facts as stated by Investigator Miller himself show that he was stopped lawfully for violating the Vehicle and Traffic Law. Since many of the allegations involve this above perception, this is an important component in evaluating the allegations.

**Allegation #1:** That Senior investigator Kendall has uttered the racial slur "Nigger" in the presence of Investigator Miller several times in the last several years.
    Investigator Miller claims that Senior Investigator Kendall has repeated the "Nigger" word in his presence several times in the last several years. He advised that this occurred in the presence of several task force members. Interviews of all members of SIU as well as United States Marshal Task

---

[19] I was unable to locate and interview the unknown female (with the white tank top) that provided the photographs for the fictitious facebook account. There was no evidence to refute Senior Investigator Kendall's claim that he had permission to use her photographs in the facebook account.

27

Force Members could not substantiate this claim.   None of the witnesses ever heard Senior Investigator Kendall ever utter the words "Nigger" and/or "Nigga".  The previous supervisor of the Marshal Task Force, Dan Larish, and who admittedly claims is not a friend of Senior Investigator Kendall, did not ever hear Senior Investigator Kendall utter the word.

Investigator Miller claimed that he has had several previous conversations with Senior Investigator Kendall regarding the use of the "Nigger" word in his (Investigator Miller's) presence. Senior Investigator Kendall denies that he ever had a previous conversation with Investigator Miller regarding the word's use except for June 4, 2013 in which he did use the "Nigger" word in a conversation with Investigator Miller.

Senior Investigator Kendall did admit to using the "Nigger" word in Investigator Miller's presence on June 4, 2013.  He stated that he was using the word in the context of providing an example when Investigator Miller and Senior Investigator Kendall were discussing an incident that Investigator Miller felt may have a racial basis (regarding Marshall Novak).  At no time did Senior Investigator Kendall ever use the "Nigger" word to describe Investigator Miller (which Investigator Miller never alleged).

Senior Investigator Kendall stated that during the same conversation with Investigator Miller where he admitted using the "Nigger" word, he indicated that it is inappropriate to use the "Nigger" word[20].  Senior Investigator Kendall admitted that he was attempting to explain that if a task force member is repeating the substance of an interview to other task force members, and in that conversation uses the "nigger" word because it was mentioned during the interview of a suspect, that the task force member is not using the "nigger" word in any negative racial sense but was just repeating what the suspect said in his interview.  Senior Investigator Kendall admitted that it was during this conversation with Investigator Miller that he learned that Investigator Miller does not believe the "Nigger" word should ever be used.

All of the allegations that Investigator Miller allege use of the "Nigger" word are based on Senior Investigator Kendall repeating phrases that other task force members or suspects have used, such as "I ain't seen that Nigga in a minute"[21].  Senior Investigator Kendall denies that he has ever used these phrases, with the exception of allowing that he may have used the phrase during his June 4th 2013 conversation with Investigator Miller.  All task force members deny ever hearing Senior Investigator Kendall ever uttering these phrases[22].

As such, this allegation is unsubstantiated.[23]

---

[20] In Senior Investigator Kendall's statement, he admits that he began the conversation with Investigator Miller as "We all know that it's not right to call another person a "Nigger" no matter what the circumstances are…", Kendall statement, page 13.

[21] As learned in this investigation, Investigator Miller alleged that he was offended when Senior Investigator Kendall repeated the above phrase in his presence.  Investigation has shown that Brendon Kiefer was usually the person who originally stated the phrase that Senior Investigator Kendall was alleged to have uttered.  There is no complaint against Mr. Kiefer or any of the task force members.

[22] It should be noted that many of the Buffalo Task Force members as well as members of SIU all claim that they have heard these phrases and the use of the "nigger" word from many civilians/suspects in the inner city area of Buffalo.  They are not uncommon terms.

[23] The "nigger' word is still very offensive and as such should not be used in a professional environment.  In hindsight, Senior Investigator Kendall agrees that the word should not be used at all in any capacity.  Senior Investigator Kendall was counseled as to never use the word in the workplace.

28

**Allegation #2:**  That Senior Investigator Kendall played an offensive online video of an African-American female in the presence of Investigator Miller.  Senior Investigator Kendall also poked fun at the African-American female of the video.

Senior Investigator Kendall admits that he has seen the video "Sweet Brown's Cold Pop Escape".  He is uncertain if he has ever shown the video and/or if he has ever had a discussion of the video with Investigator Miller.  Senior Investigator Kendall admits that he thinks the video is humorous and that the person in the video is a funny, animated person.  He denies that he ever has made fun of the women in the video.  He does not feel the video portrays African-Americans in a negative way.

Many of the Buffalo Task Force members, as well as Members of SIU, deny that Senior Investigator Kendall has ever shown them videos.  Detective Kiefer and Mr. Larish both state that Senior Investigator Kendall has shown videos in the past to them that were comical.  They deny that the videos were ever demeaning towards African-Americans.

Investigator Miller feels that the video "Sweet Brown's Cold Pop Escape" portrays African-American's in a negative light.  It should be noted that the video subsequently went "viral" in 2012 and there are numerous parody's of it on the internet.  The catch phrase "I ain't got no time for that" became very popular in society and has been used in numerous venues including television.  While Investigator Miller feels that the video portrays African-Americans in a negative way, a large portion of the country genuinely thinks the video and the woman on the video as a funny, witty person.  As such, this allegation is unfounded.

**Allegation #3:**  That Senior Investigator Kendall has uttered the word "Animals" in the presence of Investigator Miller and used it to describe African-Americans in a derogatory manner.

Senior Investigator Kendall does not recall any instances of him using the term "Animals".  He does admit that if he used the term when describing suspects, that he used the term to describe the behavior and nature of the crimes that the suspects had committed.  He denies that he ever used the term "Animals" in any derogatory manner towards African-Americans.  None of the members of the Buffalo Marshal Task Force as well as Members of SIU could ever recall any time where Senior Investigator Kendall used the term "Animals" in a derogatory way towards African-Americans.  As such, this allegation is unsubstantiated.

**Allegation #4:**  That Senior Investigator Kendall has uttered the word "Savages" in the presence of Investigator Miller and used it to describe African-Americans in a derogatory manner.

Senior Investigator Kendall does not recall any instances of him using the term "Savages".  He does admit that if he used the term when describing suspects, that he used the term to describe the behavior and nature of the crimes that the suspects had committed.  He denies that he ever used the term "Savages" in any derogatory manner towards African-Americans.  None of the members of the Buffalo Marshal Task Force as well as Members of SIU could ever recall any time where Senior Investigator Kendall used the term "Savages" in a derogatory way towards African-Americans.  As such, this allegation is unsubstantiated.

**Allegation #5:**  That Senior Investigator Kendall has uttered the word "Monkey" in the presence of Investigator Miller and used it to describe African-Americans in a derogatory manner.

Senior Investigator Kendall does not recall any instances of him using the term "Monkey".

000039

He does admit that if he used the term when describing suspects, that he used the term to describe the behavior and nature of the crimes that the suspects had committed. He denies that he ever used the term "Monkey" in any derogatory manner towards African-Americans. None of the members of the Buffalo Marshal Task Force as well as Members of SIU could ever recall any time where Senior Investigator Kendall used the term "Monkey" in a derogatory way towards African-Americans. Senior Investigator Kendall denies that he has ever used the term "Monkey Sex". As such, this allegation is unsubstantiated.

**Allegation #6:** That Senior Investigator Kendall has a facebook account under the name "Shaniqua Staxx O'MaanWilliams, sanctioned by NYSP for investigative leads, where he posted the word "Nigga" on the page.

      The main component to this allegation is whether there is ever any acceptable use of the "Nigga" comment in the workplace.

      Senior Investigator Kendall admits that he has a facebook account under the name of "Shaniqua Staxx O'MannWilliams" that he uses for investigative leads. He also admitted that on November 5, 2012, he posted the "Nigga" comment in the account. The actual quote was "Fuck you killing nigga, I hope you rot in jail you just a pussy ass bitch shooting ho's while they lay in the street hoping you get some". Senior Investigator Kendall stated that he posted the comment while in his undercover persona. His intent was to continue to gather information regarding the suspect that he had just arrested for further prosecution. He did admit that he may have "gotten carried away" with the post but was uncertain if he could have achieved the same results without using the "nigga" comment.

      As such, this allegation is founded.

**Allegation #7:** That Senior Investigator Kendall had curtailed Investigator Miller's overtime in 2009 after Investigator Miller had attempted to explain (to Senior Investigator Kendall) that the above (use of "Nigger") remarks were unwelcome.

      Investigation has shown that Investigator Miller did receive less overtime in 2009 than Investigator Rieger. At the same time, he had similar amounts or more overtime than the other members of the unit. In subsequent years, Investigator Miller led the unit, or was near the top, in total amount of overtime earned. Senior Investigator Kendall denies that he curtailed overtime for Investigator Miller and also denied any knowledge of any conversations with Investigator Miller about any his use of the "Nigger" word in 2009. Other members, including Investigator Lawrence Jackson, another African-American Investigator, all state that the overtime was distributed evenly. The system also has several checks and balances from an Administrative Senior to a Finance Budget Analyst ensuring that the overtime grant is managed fairly and evenly. There is no evidence to substantiate that Investigator Miller's overtime was curtailed in 2009[24]. This allegation is unsubstantiated.

**Allegation #8:** That Senior Investigator Kendall has retaliated against Investigator Miller for filing this personnel complaint by denying him overtime.

---

[24] Incidentally, this was the same time period that Investigator Miller was temporarily transferred to Troop 'E' VFW, to look after his niece.

A check of the Troop A VFW Overtime records showed that since July 15, 2013 (date of Investigator Miller's original memorandum) he has earned 107.50 hours of overtime ($9,848.08). Senior Investigator Kendall has earned 154.5 hours of overtime in this period ($7,646.21). There appears to be no evidence of any denial of overtime. Senior Investigator Kendall has denied that he has retaliated against Investigator Miller. This allegation is unfounded.

By his actions, Senior Investigator Kendall violated the following Regulation:

Regulation 8A4:  In dealing with the Public, a Member must act in a courteous, dignified, and businesslike manner.  Senior Investigator Kendall acted in an unprofessional and un-businesslike manner when he posted a comment which contained the word "Nigga" under his fictitious facebook account, where the use of the comment was not needed to achieve the needed results. This comment became known to Investigator Miller who found it offensive.

Recommend appropriate administrative action.

31

# Exhibit H

TRANSCRIPTIONS OF AUDIO RECORDINGS IN THE CASE OF **MILLER VS. NEW YORK STATE POLICE, ET.AL.,** DOCKET NO: 14-CV-00393.

TRANSCRIBED BY:     Kelly Hairston

```
 1                RECORDING 140723-0098
 2                    *    *    *
 3        MR. MILLER:   He hasn't come.
 4        DR. MCINTYRE:  He had your cell phone number though?
 5        MR. MILLER:  Yeah.
 6        DR. MCINTYRE:  Okay.  Good, have a seat.
 7        MR. MILLER:  I think I've seen you before you ever
 8    do John Jay?
 9        DR. MCINTYRE:  No.
10        MR. MILLER:  College?  No?
11        DR. MCINTYRE:  You're from out in Buffalo, right?
12        MR. MILLER:  Yes.
13        DR. MCINTYRE:  John Jay's a long ways from
14    Buffalo.
15        MR. MILLER:  I was stationed out in Long Island and
16    I worked in Manhattan.
17        DR. MCINTYRE:  Okay.  I mean, it's possible that in
18    my travels doing evaluations for state police, you may
19    have seen me in the barracks someplace because I've
20    been down to Troop NYC, you know.
21        MR. MILLER:  I was stationed --
22        DR. MCINTYRE:  Up when they were at the Maritime
23    College and you know, since they've moved over by the
24    hospital.
25        MR. MILLER:  I stayed at the Maritime College.
```

```
 1          DR. MCINTYRE:  Did you?

 2          MR. MILLER:  Yeah.

 3          DR. MCINTYRE:  And then I've been out to Batavia.  I

 4      don't know if you're located in the headquarters there

 5      in Troop A or --

 6          MR. MILLER:  No.  I never -- well, I did work in

 7      Batavia as a trooper.  That was a while ago, long time

 8      ago.

 9          DR. MCINTYRE:  Okay.  So somewhere along those

10      lines.

11          Let me explain who I am and why you're here and what

12      we're going to do.  I'm a psychologist and I specialize

13      in the area of police and public safety psychology.

14          MR. MILLER:  Um-hmm.

15          DR. MCINTYRE:  What I do is evaluations of either

16      people applying for police officer jobs or people who

17      are currently police officers who have some sort of

18      psychological issue going on that we have to be, you

19      know, concerned about and evaluate, okay?

20          MR. MILLER:  Um-hmm.

21          DR. MCINTYRE:  This is an evaluation requested by

22      division.

23          MR. MILLER:  Um-hmm.

24          DR. MCINTYRE:  So this is not for your use or

25      purposes or to help you, right?  This is to help the
```

```
 1        division in making their decision about when and if you
 2        are ready to come back to work, okay?  So from this
 3        interview and evaluation today, I'll be sending a
 4        report back to division.
 5            MR. MILLER:  Okay.
 6            DR. MCINTYRE:  Okay?  And you're not going to get a
 7        copy of it, all right?  I'll share my opinions with
 8        them, you know.  But again, it's not for your benefit
 9        so I'm not going to be giving you feedback as we go.
10            The evaluation consists of obviously an interview,
11        review of any relevant records and I understand there
12        are some medical records, but I have not received them.
13        Yet you're under a -- all I got was a letter, the
14        letter from your doctor saying you're out of work.
15            MR. MILLER:  I went to the doctor's office
16        specifically to make sure that the records were here.
17        I -- they had the release and --
18            DR. MCINTYRE:  With the number to call here?
19            MR. MILLER:  Yep.
20            DR. MCINTYRE:  To fax them here?
21            MR. MILLER:  And the fax number, the --
22            DR. MCINTYRE:  Okay?
23            MR. MILLER:  The office number and the fax number.
24            DR. MCINTYRE:  Okay.
25            MR. MILLER:  I apologize.  I had no idea.  You want
```

```
 1        me to give them a call?
 2            DR. MCINTYRE:  Sure, if you happen to know the
 3        number.
 4            MR. MILLER:  Yeah.  And I explained the situation to
 5        them, too.
 6            DR. MCINTYRE:  Okay.
 7            ON PHONE:  Good afternoon, Dr. (inaudible) office.
 8            MR. MILLER:  Yes, hi.  This is Lee Miller.
 9            ON PHONE:  Yes.
10            MR. MILLER:  Hi.  I'm in Albany talking with Dr.
11        Mcintyre and he said he hasn't reached the medical
12        records.
13            ON PHONE:  We faxed them yesterday.  Let me grab
14        your chart, hold on one second.
15            MR. MILLER:  Okay.  The receptionist says she faxed
16        them yesterday.
17            DR. MCINTYRE:  Let me check.  Yes, they did.
18            MR. MILLER:  Oh.
19            DR. MCINTYRE:  My mistake.
20            MR. MILLER:  No problem.
21            DR. MCINTYRE:  My secretary's out and they've been
22        sitting on her desk.
23            MR. MILLER:  Okay.  I have to -- she's away from the
24        phone right now.
25            ON PHONE:  Okay.
```

1          MR. MILLER:  Yep, you did and he was able to find

2     them so --

3          ON PHONE:  Okay, great.

4          MR. MILLER:  I apologize.

5          ON PHONE:  (Inaudible) find the fax number because I

6     have the report here that it transmitted successfully.

7     I'm like oh, God, (inaudible).  Okay, great.

8          MR. MILLER:  All right.  Thank you very much.  Bye.

9          I think my escort got lost.

10          DR. MCINTYRE:  Well, he got you here the first time.

11          MR. MILLER:  Well, I was using my GPS on my phone

12     so --

13          DR. MCINTYRE:  Oh, well, he can always call you if

14     he gets somewhere in the neighborhood so --

15          MR. MILLER:  I turned the thing off.

16          DR. MCINTYRE:  Feel free to turn it on in case he

17     does call.

18          MR. MILLER:  Okay.

19          DR. MCINTYRE:  All right.  So the report goes to

20     division, not to you.

21          MR. MILLER:  Um-hmm.

22          DR. MCINTYRE:  The evaluation consists of interview,

23     review of medical record, may include psychological

24     test.  I may have to contact collateral sources like,

25     you know, people that you work with or know or stuff

1          like that just to try to get an understanding about

2          what's going on.  It is not a very fast process, I got

3          to tell you, okay?  Because I have to collect all this

4          information, sort through it all and then write a

5          coherent report and get it to division.  So it's not

6          like I'm going to have everything done for you by

7          tomorrow or something like that.  I know sometimes the

8          guys are like, I want to get back, I mean, you know,

9          and -- you know, I want to get back tomorrow.  So just

10         so you know on that, all right?

11             This document here kind of explains most of -- just

12         about everything I just mentioned but in written form,

13         so I need you to read it over.  You'll fill in the top.

14         Read it all carefully.

15             MR. MILLER:  Um-hmm.

16             DR. MCINTYRE:  Ask any questions you have, sign it,

17         then on the back there's some legal stuff that I have

18         to have you initial and sign.

19             MR. MILLER:  Okay.

20             DR. MCINTYRE:  In order to release the information

21         to division, okay?

22             MR. MILLER:  Now this is a separate release from the

23         one I did before or --

24             DR. MCINTYRE:  Yeah, the one -- the release you

25         signed before is for your medical records to come to

 1           and -- first few times I pulled him to the side and
 2           respectfully said yeah, hey, not for nothing, you know,
 3           you really can't say that, you know.  And I don't know,
 4           it just --
 5                DR. MCINTYRE:  But that didn't seem to sink in for
 6           him?
 7                MR. MILLER:  No.  And it continued and, you know,
 8           the division would probably -- they would argue that,
 9           you know, he didn't retaliate back then, but he did.
10           And he actually cut my overtime in half.  We received
11           like an allotment from the U.S. Marshals.  It was
12           supposed to be $16,000 a man in overtime.  And my white
13           male counterpart, Don Rieger, he was able to, you know,
14           get his allotment.
15                DR. MCINTYRE:  Okay.
16                MR. MILLER:  Sal DeJesus, I believe he got his
17           lion's share, maybe 13-, 14,000, and I, I was limited
18           to like 7,800.  Some -- it was almost like half, so --
19           or less than half, you know.  I complained to people I
20           knew within the task force, you know.  I didn't go to
21           like a supervisor and complain about it because nobody
22           in division was making overtime.  He's 1.9 miles
23           away.
24                DR. MCINTYRE:  Okay.  Well, tell -- or text him or
25           whatever that when he comes in, just to come upstairs

```
 1        and we'll -- maybe we'll hear him.
 2            MR. MILLER:  Okay.  I'm not the greatest text person
 3        either.
 4            DR. MCINTYRE:  Faster than I am.
 5            MR. MILLER:  So --
 6            DR. MCINTYRE:  So I mean, so he was the supervisor
 7        of the investigators on the warrant squad.
 8            MR. MILLER:  Um-hmm.
 9            DR. MCINTYRE:  Okay.  Who was above him?
10            MR. MILLER:  Captain McDowell.
11            DR. MCINTYRE:  Okay.  And did you ever say anything
12        to Captain McDowell?
13            MR. MILLER:  No.
14            DR. MCINTYRE:  Did you ever complain to anybody else
15        about Kevin's use of the N-word?
16            MR. MILLER:  I complained to the people we worked
17        with.
18            DR. MCINTYRE:  In effect, your peers?
19            MR. MILLER:  Yeah.
20            DR. MCINTYRE:  I mean, did you ever go to -- I don't
21        know what it's called --
22            MR. MILLER:  Human resources?
23            DR. MCINTYRE:  Human resources or whatever, yeah.
24            MR. MILLER:  No.
25            DR. MCINTYRE:  Okay.
```

1          MR. MILLER:  And I didn't go to them because over

2     the years I've had dealings with human resources or

3     whatever, you know, name they went by throughout the

4     years and they pretty much, you know, gave me lip

5     service.

6          DR. MCINTYRE:  Okay.

7          MR. MILLER:  And, you know, since I got on this job,

8     you know, it's been difficult for me to -- just to be,

9     you know, myself, you know.  I mean, I was labeled a

10    militant right out the academy and that kind of stuck

11    with me and -- you know.  During my entire career, you

12    know, I encountered, you know, nothing but a lot of

13    racist attitudes on the job, you know.  But I put my

14    head down, kept my nose clean and did my work.  But

15    until I get, you know, harassed, so --

16         DR. MCINTYRE:  Did you ever, you know, file any

17    formal, you know, complaints about anything on the

18    racial -- you know, even with the U.S. Attorney's

19    Office or --

20         MR. MILLER:  Well --

21         DR. MCINTYRE:  -- State -- it's the human rights

22    commission or whatever it is?

23         MR. MILLER:  Well, my understanding of how division

24    works and how human resources only protects division, I

25    knew that if I complained, I would be, you know, kicked

1          out of the unit and I was carrying like three mortgages
2          at the time because my sister had passed away.  And so
3          I decided to, you know, just document, you know, the
4          instances where he used the N-word or referred to, you
5          know, minorities in a negative light.  I mean, he would
6          call, you know, call them savages or animals, you know.
7          So after a while, I had, you know, documented quite a
8          few instances from like 2010 until about the present.
9          And I actually, I was working one day, it was November
10         5th -- well, actually, November 6th.  We were working a
11         case -- well, the task force was looking for this guy
12         by the name of Damone Lewis.  He was wanted for
13         attempted homicide.  I mean, a girl disrespected him.
14         You know, he ended up, you know, shooting her while she
15         was on the ground.  And she's a paraplegic now, but he
16         was also wanted in questioning for like some other
17         homicides, so this was a bad guy.  And so we're looking
18         for him and Kevin Kendall --
19              DR. MCINTYRE:  This is last year?
20              MR. MILLER:  This would have been 2012.
21              DR. MCINTYRE:  Okay.
22              MR. MILLER:  So he, he made up a fake Facebook page
23         with, you know, a black female as his, you know, avatar
24         or whatever.  And so he would befriend like all these
25         people in Damone Lewis's circle to try to get intel

1          about where he might be.  And, you know, sound
2          principle, you know, investigative technique.  But, you
3          know, on 11 -- well, November 5, 2012, they arrested
4          him -- we arrested him or part of the task force did.
5          A couple guys saw him walking down the street and took
6          him into custody.  This is like at 3:00 in the day.
7          And so later on that evening, he went on his Facebook
8          page presume --
9              DR. MCINTYRE:  Fake Facebook page.
10             MR. MILLER:  Yeah.  And he posted, you know, you
11         know, this thing saying, you know, at 10:30 at night,
12         you know, fuck you, you killing nigger.  Hope you rot
13         in jail.  Shooting hoes and saying -- you know.  And
14         then the next day he came in and I'm sitting at my
15         desk.  And what he usually does is call me over and I
16         know it's for, you know, just something stupid that he
17         wants to show me that's ignorant, you know.  And so I
18         went over and he showed me, and he's reading this like
19         it's a big joke, you know.  And I think he saw the
20         expression on my face, you know, and I was like yo,
21         that's not cool.   And, you know, he kind of like, you
22         know, shut it down and then he, you know, walked out.
23             Well, I printed off, you know, the Facebook page and
24         I didn't know if I had any real recourse because I've
25         dealt with like our HR.  And quite frankly --

1    The detail is what it is, you know.  You, you work

2    your -- you kick in doors through a certain period, you

3    go back to the office.  You work up cases for the next

4    day.  You have lunch.  You work up more cases and

5    that's it.

6        So he's trying to tell me I was supposed to be in

7    Niagara County with no resources, you know, for the

8    entire 8 hours, you know.  And I just looked at him

9    like, you know what, this is ridiculous, you know.

10       So I called my doctor and I told her that, you know,

11   yo, they're stressing me out.  And she said well, your

12   appointment's on Tuesday, but we can move it up to

13   Monday.  And I was, I was fine with that.  I went in,

14   talked to her.  She, she actually increased my Zoloft

15   from 100 to 150 milligrams.  And then she gave me the

16   name of a counselor to talk to.  And -- oh, and she

17   gave me the letter that I think you got a copy of.

18       DR. MCINTYRE:  Just saying you're out of work for a

19   week or something like that?

20       MR. MILLER:  Yeah.  And, you know, I gave that to

21   Lieutenant Reyes.  And the very next day, I get a call

22   from Reyes, well, we need to get together and talk

23   about this letter from your doctor.  And all they did

24   was like ambush me, you know.  And oh, we need -- we're

25   putting you on involuntary leave and here's the letter,

1    blah, blah, blah.  And you know, they took my gun, my
2    shield, my ID, my phone, my car, you know.  I didn't
3    see the point in taking the phone and the ID, but it is
4    what it is.  And they were laughing while they were
5    doing it.  But according to them, they were laughing
6    about football so -- just total disrespect.

7        DR. MCINTYRE:  So what happened when you went to the
8    doctor that you felt -- I mean, you must have told the
9    doctor I, I can't work for her to take you out, right?

10       MR. MILLER:  I told the doctor that they were
11   stressing me out and, you know, I don't, I don't really
12   care for Kevin, you know.  But I'm a professional and
13   I've been doing this job long enough to know, you know,
14   where the boundaries are and -- you know.  But at that
15   point, I mean, I -- I really felt like smashing him in
16   the face, you know.

17       DR. MCINTYRE:  Did you tell the doctor that?

18       MR. MILLER:  Yes.

19       DR. MCINTYRE:  Okay.  So is that why she took you
20   out?

21       MR. MILLER:  Probably, yeah.  And you know, it just,
22   it just irks me that, you know, these people, they hide
23   behind this, you know, this job, this authority, you
24   know.  I mean, a bunch of, a bunch of cowards, you
25   know.  I mean, all things, you know, level and equal,

1      you know.  I mean, just -- it just irritates me, the
2      whole -- I used to believe in the state police.  I, I,
3      I've always been a principled person, you know.  I
4      collect comics.  I always believe in heroes and doing
5      the right thing.  But man, these people, they just --
6          DR. MCINTYRE:  Well, what else did you tell the
7      doctor that day besides you felt like smashing Kevin in
8      the face?
9          MR. MILLER:  That's all I can really remember
10     telling --
11         DR. MCINTYRE:  Any -- you tell her anything about
12     yourself, about wanting to harm yourself?
13         MR. MILLER:  Not that, not that I got -- I can
14     recall.
15         DR. MCINTYRE:  Have you thought about killing
16     yourself, have you thought about it?
17         MR. MILLER:  I have thought about it.
18         DR. MCINTYRE:  When?
19         MR. MILLER:  From time to time.  It just -- you
20     know, it's like beating your head against a brick wall
21     with -- working with these people and -- you know, and
22     it, and it's just not like white people.  It's the
23     entire organization, you know, just filtered down.  It
24     just -- there's something wrong with it, you know.  And
25     yeah, I think it would probably be easier, you know, if

```
 1          DR. MCINTYRE:  Which one's underwater, the one
 2     you're living?
 3          MR. MILLER:  No, the one in Atlanta.  So --
 4          DR. MCINTYRE:  Well, you -- are you in debt on other
 5     things?  You know, credit card debt out there?
 6          MR. MILLER:  No.  I, I don't do credit cards.
 7          DR. MCINTYRE:  Okay.  Any other debts you're
 8     carrying besides the mortgage?
 9          MR. MILLER:  Just the usual stuff.  I mean, I got a
10     Home Depot card that I'm paying on.  My mother made me
11     buy a sofa.  So I'm paying on that.  I pay my mother's
12     car lease, the Honda.
13          DR. MCINTYRE:  You up to date with that?
14          MR. MILLER:  Yes.
15          DR. MCINTYRE:  Up to date with the cell phone and
16     the power bill and all that stuff?
17          MR. MILLER:  Yeah.
18          DR. MCINTYRE:  Yeah?
19          MR. MILLER:  Yeah, as far as I know.  Not unless you
20     know something I don't know.
21          DR. MCINTYRE:  No, just checking.  You told the
22     doctor that you wanted a -- I forget what phrase was,
23     you want to punch him -- Kevin in the face or something
24     like that?
25          MR. MILLER:  Yeah.
```

```
 1          DR. MCINTYRE:  Okay.
 2          MR. MILLER:  You know.  And honestly --
 3          DR. MCINTYRE:  You would ever do it?
 4          MR. MILLER:  If he said the wrong thing, yeah, I
 5      would.  You know, and rules and regs be damned, I mean,
 6      I mean, I just think he's a coward and he's hiding
 7      behind, you know, his rank and his authority.
 8          DR. MCINTYRE:  So if he said the wrong thing, what
 9      would you do to him?  Like, what would you prefer --
10      you know, punch him in the nose, is it kick him in the
11      balls, is it -- you know, what, what is it?
12          MR. MILLER:  I haven't thought that, that through.
13      You know, but I know I'm not going to take any of his
14      shit anymore.  You know, or anybody else on the job for
15      that matter.  I'm tired.  I'm old.  I'm done, you know.
16      I mean, I think I've shown that I have been a loyal
17      company man for 20 some odd years and my reward is, you
18      know, me coming to Albany.
19          DR. MCINTYRE:  Have you thought about hurting
20      yourself?
21          MR. MILLER:  I have.  You know, and I think if I can
22      get back to work, you know, because I got too much time
23      on my hands and -- you know.  If I can get back to
24      work, that distraction would, you know, stop me from
25      thinking about hurting myself.
```

```
 1        DR. MCINTYRE:  Have you thought about how you
 2    would --
 3        MR. MILLER:  That I -- I know that fantasies, you
 4    know, I just, I just know that if, if I have to go, you
 5    know, you know, I don't -- I don't know, I don't know.
 6        DR. MCINTYRE:  What do you think you'd do, you know,
 7    drive your car into the bridge or you know, put the gun
 8    in your mouth or overdose?  What would do you?
 9        MR. MILLER:  I don't think.  I don't know.  I just
10    think that if I have to go, then I'm not going alone.
11        DR. MCINTYRE:  Who do you want to take with you,
12    Kevin?  Other people?
13        MR. MILLER:  I haven't -- well, Kevin, that's a
14    given.  I mean, but I don't trust anybody on the job.
15    I mean, the guy who brought me up, decent enough guy,
16    you know.  But this whole ordeal has shown me that this
17    job does not care about me and for the life of me, it's
18    all I got.  It's like a bad marriage, you know.  So I
19    don't know.  I, I just, I have no idea from day to day
20    what I'm supposed to do next.
21        DR. MCINTYRE:  Have you ever tried to do anything,
22    ever tried to hurt yourself?
23        MR. MILLER:  No.  I, I think about how it would be a
24    lot easier, you know, but I've never tried.
25        DR. MCINTYRE:  Big impact on your mom though.
```

144

```
1       STATE OF NEW YORK)
                         )    ss.
2       COUNTY OF ERIE   )

3
        I, Kelly S. Hairston, Notary Public, in and for the County
4       of Erie, State of New York, do hereby certify:

5
            That the recording taken down by me was thereafter
6       transcribed into typewriting, and I hereby certify the
        foregoing proceedings are a full, true and correct
7       transcription of my shorthand notes so taken.

8
            I further certify that I am neither counsel for nor
9       related to any party to said action, nor in any way
        interested in the outcome thereof.
10

11          IN WITNESS WHEREOF, I have hereunto subscribed my
        name and affixed my seal this 30th day of October, 2017.
12

13
14      _____
        Kelly S. Hairston
15      Notary Public,
        State of New York, County of Erie
16      My commission expires 08/13/19.

17

18

19

20

21

22

23

24

25
```

# Exhibit I

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | **525-2013-00798** |

**New York State Division Of Human Rights** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Lethonia Miller** | **(716) 895-7340** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **60 Floss Avenue, Buffalo, NY 14211** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe
Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **NEW YORK STATE POLICE** | **500 or More** | **(716) 853-2290** |

| Street Address | City, State and ZIP Code |
|---|---|
| **65 Court Street,  Buffalo, NY 14202** | |

RECEIVED

SEP 0 9 2013

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

E.E.O.C. BULO

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest                          Latest
                                        **06-11-2013**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am Black (African-American).  Because of this I have been discriminated against.

I began my employment with the above-named organization on March 30, 1987, as a Recruit Trooper.  I am currently an Investigator in the Bureau of Criminal Investigation.  Since March 2008, I have been assigned to the Violent Felony Warrant Squad.

Senior Investigator Kevin Kendall (White/Caucasian) became my supervisor in 2008. I have worked with Mr. Kendall since 1995.

Between 1995 and the present, Mr. Kendall and I have had numerous conversations regarding the use of the word "nigger".  Through our conversations, I have repeatedly told him that the use of the word is inappropriate in any context and that I find it offensive.

In or about 2008/2009, I complained about Mr. Kendall's use of the word "nigger".  I was subsequently denied over-time opportunities.  I believe that I was denied overtime opportunities in retaliation for complaining about racial discrimination.

Since becoming my supervisor, Mr. Kendall has frequently used the word "nigger" in my presence, most recently on or about June 11, 2013. Because he understands that I find the word offensive, I believe that Mr. Kendall is using the word to discriminate against me and demean me.

Additionally, Mr. Kendall frequently refers to Black individuals we come in contact with on our job as "savages" and "animals", while not similarly referring to White individuals we come in contact with on our job as "savages" and "animals". Mr. Kendall has used the term "monkey" in reference to an African-American individual.

On July 15, 2013, I filed an internal race discrimination/retaliation complaint with the organization's EEO office.

I believe that I have since been denied overtime opportunities in retaliation for complaining about discrimination.

Based on the above, I believe that I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964 and other applicable Federal, state and local anti-discrimination statutes. I further believe that I have been retaliated against in violation of these statutes.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements *** |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 09/06/13 _____ X _[signature]_ <br> Date        Charging Party Signature | X _[signature]_ <br> SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE 9/6/13 (month, day, year) <br><br> EDWIN J. RASINSKI, JR. <br> Notary Public, State of New York <br> Qualified in Erie County <br> My Commission Expires 9-25-13 |

CP Enclosure with EEOC Form 5 (11/09)

PRIVACY ACT STATEMENT: Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.  FORM NUMBER/TITLE/DATE.  EEOC Form 5, Charge of Discrimination (11/09).

2.  AUTHORITY.  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.  PRINCIPAL PURPOSES.  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.  ROUTINE USES.  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.  WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# Guidelines For an Effective Position Statement

### *How the EEOC uses employer position statements*

EEOC is an objective fact finding agency. We have heard what the Charging Party has to say about what happened and why Charging Party believes it happened.  Now we encourage you to provide a detailed response to these allegations.  A well drafted and supported position statement can help us to accelerate the investigation and may limit requests for further information.

### *Is a brief statement drafted by a representative without supporting evidence sufficient?*

NO; an effective position statement should be accompanied by supporting evidence which authenticates the truthfulness and accuracy of the response and should be sworn to by a company official.  You should provide any evidence which supports your position.  Our investigators are trained to review and analyze evidence, and the recognize that a lawyer's or company official's conclusions about the motives, intentions, or events do not constitute the evidence needed to resolve most cases.  While we encourage you to provide us with any legal defenses you may have, we also need to have you present your evidence of the facts relating to the merit of the charge.

### *What should a position statement include?*

At a minimum, it should include **specific, factual** responses to every allegation of the charge.  The position statements should clearly explain the respondent's version of the facts and identify the specific documents and witnesses supporting the position.  Keep the following points in mind as you prepare the response to the charge:

- ✓ Address each alleged discriminatory act and your position regarding it.  Indicate which of the Charging Party's allegations are disputed.

- ✓ Provide a description of the company; include legal name and address, name, address, title and phone number the person responsible for responding to the charge, primary function of the business, and the number of employees.  A staffing or organizational chart is also useful in helping to focus the investigation.

- ✓ Provide copies or descriptions of any applicable practices, policies or procedures.

- ✓ Identify any other individuals who have been similarly affected by these practices, policies, or procedures; describe the circumstances in which the practices, policies, or procedures have been applied.

- ✓ Explain why individuals who were in a similar situation to the Charging Party were not similarly affected.

- ✓ Identify official(s) who made decisions or took action relating to the matter(s) raised in the charge

- ✓ Be specific about date(s), action(s), and location(s) applicable to this case.

- ✓ Provide copies of internal investigations of the alleged incidents or grievance hearing reports.

- ✓ Inform EEOC if the matter has been resolved or can be easily resolved; if it can be resolved, please indicate your proposal for resolution.

An effective position statement is clear, concise, complete, responsive and is sworn to by a company official..

### *How much time is normally allowed for preparation of a position statement*

Two weeks is normally allowed for responding to the charge.  A brief extension of time may be allowed in particular cases where extensive interviews need to be conducted or documents reviewed, but only when it is clear that the employer is working in good faith to supply all of the necessary information.