UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LETHONIA MILLER,

                        Plaintiff,

              v.

NEW YORK STATE POLICE,
KEVIN KENDALL, and
FRANCIS P. CHRISTENSEN,

                        Defendants.
_____

                                               REPORT
                                          and
                                  RECOMMENDATION

                                        14-CV-00393A(F)

APPEARANCES:        LAW OFFICE OF LINDY KORN
                             Attorneys for Plaintiff
                             LINDY KORN, and
                             WILLIAM F. HARPER, V, of Counsel
                             535 Washington Street
                             9th Floor
                             Buffalo, New York  14203

                             LETITIA JAMES
                             ATTORNEY GENERAL, STATE OF NEW YORK
                             Attorney for Defendants
                              New York State Police and Christensen
                             GEORGE MICHAEL ZIMMERMANN
                             Assistant Attorney General, of Counsel
                             350 Main Street
                             Suite 300A
                             Buffalo, New York  14202

                             PERSONIUS MELBER LLP
                             Attorneys for Defendant Kendall
                             RODNEY O. PERSONIUS, of Counsel
                             2100 Main Place Tower
                             350 Main Street
                             Buffalo, New York  14202

## **JURISDICTION**

This case initially was referred to the undersigned by Hon. Richard J. Arcara on

October 29, 2014, and recommitted on August 25, 2016, for all pretrial matters including

preparation of a report and recommendation on dispositive motions.  The matter is presently before the court on motions for summary judgment filed by Defendants New York Sate Police and Francis P. Christensen on November 18, 2018 (Dkt. 74), and by Defendant Kevin Kendall on November 19, 2018 (Dkt. 76).

## **BACKGROUND**

On May 23, 2014, Plaintiff Lethonia Miller ("Plaintiff"), an African American male, commenced this employment discrimination action alleging Defendants, including his former employer New York State Police ("State Police"), and his supervisor, State Police employee Kevin Kendall ("Kendall"), engaged in discriminatory conduct with regard to Plaintiff's employment based on Plaintiff's race and disability.  On August 15, 2014, the State Police filed an answer (Dkt. 8), and on September 5, 2014, Plaintiff filed an amended complaint (Dkt. 9) ("First Amended Complaint"), naming as Defendants the State Police and Kendall, as well as State Police employee Francis P. Christensen ("Christensen") (together, "Defendants").  A motion to dismiss the First Amended Complaint was filed on September 24, 2014, by Defendants State Police and Christensen (together, "State Defendants"), in which Defendant Kendall joined on November 24, 2014 (Dkt. 22), with Plaintiff moving to file a further amended complaint on October 31, 2014 (Dkt. 19) ("first motion to amend"), and February 15, 2016 (Dkt. 27) ("second motion to amend").  In a combined Report and Recommendation/Decision and Order filed May 17, 2016 (Dkt. 32) ("R&R"), the undersigned dismissed as moot Plaintiff's first motion to amend, granted in part and denied in part Plaintiff's second motion to amend, and recommended the motion to dismiss be granted in part and denied in part.  In a Decision and Order filed August 25, 2016 (Dkt. 37) ("D&O"), District

Judge Richard J. Arcara adopted the R&R save for the recommendation that Plaintiff's claim under the Americans with Disabilities Act be dismissed.  Thereafter, on October 25, 2016, Plaintiff filed his Second Amended Complaint (Dkt. 46) ("the Second Amended Complaint"), asserting 14 claims for relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C. § 1983 ("§ 1983"), 42 U.S.C. § 1981 ("§ 1981"), Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12201 et seq. ("ADA"), the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ("Rehabilitation Act").  Respectively, Plaintiff's First, Second, and Third Claims allege against Defendant State Police disparate treatment, retaliation, and hostile work environment on account of Plaintiff's race in violation of Title VII ("Title VII Claims"); Plaintiff's Fourth, Fifth, and Sixth Claims allege against Defendant Kendall disparate treatment, retaliation, and hostile work environment based on Plaintiff's race in violation of § 1983 ("§ 1983 Claims"); Plaintiff's Seventh, Eighth, and Ninth Claims allege against Defendant Kendall disparate treatment, retaliation, and hostile work environment because of Plaintiff's race in violation of § 1981 ("§ 1981 Claims"); Plaintiff's Tenth Claim alleges against Defendants he was suspended without pay after presenting a physician's note excusing him from work because of stress, in violation of the ADA ("ADA Claim"); Plaintiff's Eleventh and Twelfth Claims allege against State Defendants discrimination in the form of denial of leave and retaliation in violation of the FMLA ("FMLA Claims"); and Plaintiff's Thirteenth and Fourteenth Claims allege against Defendant State Police discrimination and retaliation by suspending Plaintiff without pay

and denying Plaintiff's request for outside employment in violation of the Rehabilitation Act ("Rehabilitation Act Claims").

On November 18, 2018, State Defendants filed a motion for summary judgment (Dkt. 74) ("State Defendants' Motion"), attaching the Statement of Undisputed Facts (Dkt. 74-1) ("State Defendants' Facts"), the Memorandum of Law in Support of Defendants New York State Police and Francis P. Christensen's Motion for Summary Judgment (Dkt. 74-2) ("State Defendants' Memorandum"), the Declaration of Francis P. Christensen (Dkt. 74-3) ("Christensen Declaration"), with exhibits ("Christensen Declaration Exh(s). __"), and the Declaration of Kevin Gagan, Esq. (Dkt. 74-4) ("Gagan Declaration"), with exhibits ("Gagan Declaration Exh(s). __"), and the Declaration of Alicia Tarantino (Dkt. 75) ("Tarantino Declaration"), attaching exhibits A through G (respectively, Dkts. 75-1 though 75-7) ("Tarantino Declaration Exh(s). __").  On January 29, 2019, State Defendants filed the Declaration of Assistant New York Attorney General ("AAG") George Michael Zimmermann (Dkt. 85) ("Zimmermann Declaration"), attaching exhibits A through I ("Zimmerman Declaration Exh(s). __").[1]

On November 19, 2018, Defendant Kendall filed a motion for summary judgment (Dkt. 76) ("Defendant Kendall's Motion"), attaching the Attorney Declaration of Rodney O. Personius, Esq. ("Dkt. 76-1) ("Personius Declaration"), the Affidavit of Defendant Kevin Kendall (Dkt. 76-2) ("Kendall Affidavit"), with exhibits A through G (Dkt. 76-3) ("Kendall Affidavit Exh(s). __"), the Affidavit of Lawrence Jackson (Dkt. 76-4) ("Jackson Affidavit"), the Affidavit of James McDowell (Dkt. 76-5) ("McDowell Affidavit"), the

---

[1] The Zimmermann Declaration with its attached exhibits was, with the court's permission (Dkt. 84), belatedly filed *nunc pro tunc* after AAG Zimmermann discovered it was inadvertently omitted from the other papers filed on November 18, 2018 in support of State Defendants' Motion.

Affidavit of Richard Rooney (Dkt. 76-6) ("Rooney Affiavit"), and Defendant Kendall's

Memorandum of Law Supporting Summary Judgment (Dkt. 76-7) ("Defendant Kendall's

Memorandum").  Also filed on November 19, 2018, were two volumes of exhibits to the

Personius Declaration (Dkts. 77 and 78) ("Personius Declaration Exh(s). __"),

containing, respectively, Personius Declaration Exhs. A though F and G through L.  On

November 20, 2018, Defendant Kendall filed Defendant Kendall's Statement of Material

Facts Not in Dispute (Dkt. 79) ("Defendant Kendall's Facts").

On February 4, 2019, Plaintiff filed Plaintiff's Memorandum of Law in Opposition

to Motion for Summary Judgment by Defendants New York State Police and Francis P.

Christensen (Dkt. 86) ("Plaintiff's Response – State Defendants"), attaching Plaintiff's

Response to Defendant NYSP Rule 56 Statement (Dkt. 86-1) ("Plaintiff's Facts – State

Defendants"), Plaintiff's Memorandum of Law in Opposition to Motion for Summary

Judgment by Defendant Kevin Kendall (Dkt. 87) ("Plaintiff's Response – Kendall"),

attaching Plaintiff's Response to Defendant Kendall Rule 56 Statement (Dkt. 87-1)

("Plaintiff's Facts – Kendall"), and the Affidavit of William F. Harper V, Esq. (Dkt. 88)

("Harper Affidavit"), attaching exhibits A through F (Dkt. 88-1) ("Plaintiff's Exh(s). __").

On March 15, 2019, State Defendants filed the Memorandum of Law in Further

Support of Defendants New York State Police and Francis P. Christensen's Motion for

Summary Judgment (Dkt. 91) ("State Police Reply"), attaching the Declaration of Jason

D. Hughes, Esq. (Dkt. 91-1) ("Hughes Declaration"), and the Declaration of AAG

George Michael Zimmermann (Dkt. 91-2) ("Zimmermann Reply Declaration").  Also filed

on March 15, 2019 were Defendant Kendall's Reply Memorandum Supporting Summary

Judgment (Dkt. 93) ("Kendall Reply"), and the Supplemental Attorney Declaration of

Rodney O. Personius, Esq. (Dkt. 94) ("Personius Reply Declaration"), attaching exhibits A through C (Dkt. 94-1) ("Personius Reply Exh(s). __").  Oral argument was deemed unnecessary.

Based on the following, State Defendants' Motion should be GRANTED; Defendant Kendall's Motion should be GRANTED; the Clerk of Court should be directed to close the file.


**FACTS**[2]


Plaintiff Lethonia Miller ("Plaintiff" or "Miller"), an African-American male, commenced employment with Defendant New York State Police ("State Police"), on March 30, 1987.  Initially, Plaintiff's job with the State Police was as a Recruit Trooper and in March 2008, Plaintiff began working as an Investigator ("Investigator") on the State Police's Violent Felony Warrant Squad ("VFWS"), where Plaintiff remained employed until retiring on August 18, 2015.  VFWS generally investigates and apprehends fugitives working with the United States Marshal's Office ("USMS") as part of the New York/New Jersey Task Force ("the Task Force"), which also works with other local and Federal law enforcement agencies.  The State Police is reimbursed for overtime paid to State Police employees while working as part of the Task Force by the USMS.  Within Western New York, the Task Force is divided into a Buffalo contingent and a Niagara County contingent, which is where Plaintiff was first assigned to work with the VFWS before moving to the Buffalo contingent.  For the entire time Plaintiff worked in the VFWS with the Buffalo contingent of the Task Force, Plaintiff's supervisor

---

[2] Taken from the pleadings and motion papers filed in this action.

was Defendant Kevin Kendall ("Kendall"), a Caucasian male, who was promoted to Senior Investigator on January 6, 2000, and joined the VFWS in August 2003, where Kendall remained until retiring on March 30, 2018, after nearly 30 years as a State Police employee.  State Police Lieutenant Brian Ratajczak ("Lt. Ratajczak") with the Bureau of Criminal Investigations ("BCI"), was Kendall's direct supervisor while Kendall worked in the VFWS.  From 1995 to 1996, prior to working together in the VFWS, Plaintiff worked as an Investigator with Kendall at the State Police barracks in Clarence, New York ("the Clarence barracks").

Plaintiff maintains that while working with Kendall, Kendall created a racially hostile work environment by using racially derogatory language.  On July 15, 2013, Plaintiff filed an internal complaint with the State Police ("Internal Complaint"),[3] accusing Kendall of racial harassment based on Kendall's repeated use of racially derogatory language despite Plaintiff advising Kendall that Plaintiff considered such language inappropriate and offensive.  In the Internal Complaint, Plaintiff explains that while working together at the Clarence barracks, Plaintiff and Kendall had numerous discussions about racial and cultural diversity in America.  During one such conversation, Kendall inquired why it was considered acceptable for an African-American to use a racial slur such as "nigger"[4] but not for people of other races to use the slur, and Plaintiff explained that he had a "personal zero tolerance" for the slur and did not think there was any context in which the word should be used by anyone. Internal Complaint at 1-2 (Dkt. 77 at 32-33).  Plaintiff describes 12 separate incidents occurring between June 2010 and June 11, 2013, in which Kendall allegedly used

---

[3] Personius Declaration Exh. C (Dkt. 77 at 31-37).
[4] Given the offensive nature of this racial slur, the court heretofore refers to it as "n—".

racially offensive language in Plaintiff's presence during work.  Plaintiff concluded that Kendall's asserted ongoing use of the racial slur was humiliating and degrading, negatively affected his employment morale, job performance and, ultimately, Plaintiff's safety, and constituted race-based harassment directed toward Plaintiff.  Internal Complaint at 6 (Dkt. 77 at 37).

When Plaintiff commenced working in the VFWS, the Task Force did not provide overtime reimbursement to the State Police, and an overtime work assignment required a supervisor's authorization.  During fiscal year 2009-2010, the Task Force began reimbursing the State Police for overtime with overtime work assignments still requiring authorization by a supervisor, with overtime work opportunities offered to VFWS Investigators based on seniority.  At that time, Plaintiff was the VFWS employee with the least seniority.  The overtime assignment system changed during the 2010-2011 fiscal year, with VFWS members no longer requiring supervisory authorization for overtime assignments, but an annual monetary cap of approximately $ 17,000 was imposed as the maximum dollar amount the Task Force would reimburse for each Investigator with the VFWS.  After this change was implemented, Kendall, as supervisor, monitored the number of overtime hours worked by each Investigator to make sure no Investigator worked hours in excess of that which could be reimbursed by the Task Force.  Kendall used e-mail to inform each VFWS Investigator of the amount of overtime for which they were eligible.

An investigation of Plaintiff's Internal Complaint ("the Internal Investigation"), was commenced by State Police Captain Kevin M. Reilly ("Reilly"), on July 31, 2013, and concluded on November 14, 2013.  In furtherance of the Internal Investigation, Reilly,

assisted by State Police Senior Investigator June Bradley ("Bradley"), interviewed

Plaintiff, Kendall, and numerous co-workers of Plaintiff and Kendall, including State

Police Investigators and USMS Deputies, as well as other law enforcement officers and

agency administrators including a Niagara County Sheriff Deputy, a Homeland Security

Immigration and Customs Enforcement Agent, New York State Department of Motor

Vehicles Agent, Buffalo Police Detective, and also reviewed several videos and data

pertaining to overtime assignments.  Information collected during the Internal

Investigation was included in the Report of Personnel Investigation #20130377

("Internal Investigation Report").[5]  The Internal Investigation Report's conclusion

indicates that "[a] major part of this investigation involves Investigator Miller's

sensitivity/perception towards racial disparity" with Plaintiff perceiving several of the

incidents of which Plaintiff complained involved "racial overtones" imputing "some flavor

of racial bias," yet "it was also readily apparent that several of the incidents were

'overblown' by Investigator Miller."  Internal Investigation Report at 27.  "Many" of

Plaintiff's co-workers, including African-American co-workers, described Plaintiff as

"over-sensitive" regarding issues of race, were afraid to discuss any type of racial

incident with Plaintiff, and were "at least guarded" while around Plaintiff for fear of

"set[ting] him off."  *Id.*  Ultimately, only one of the incidents of which Plaintiff complained

was determined to have any merit, in particular, that Defendant Kendall "acted in an

unprofessional and un-businesslike manner when he posted a comment which

contained the word "n—" under his fictitious Facebook account where the use of the

---

[5] Zimmermann Declaration Exh. G (Dkt. 85 at 437-68).

comment was not needed to achieve the needed results."[6]  *Id.* at 31.  On March 14, 2014, Kendall was censured for use of the racial slur in creating the fictitious Facebook account, *id.*, although the Letter of Censure does not fault Kendall for including racially offensive language in the Facebook posting, but for failing to document Kendall had received permission to post a photo of an actual person in creating the fictitious Facebook persona.  Letter of Censure (Personius Exh. I, Dkt. 78 at 6-7).  After Plaintiff filed the Internal Complaint, he was approached by his next-in-command, one Lieutenant Kevin Reyes ("Lt. Reyes"), who offered to transfer Plaintiff to another assignment with the State Police, but Plaintiff turned down the offer, asserting he only wanted to work on the VFWS.  Fitness for Duty Evaluation at 3 (Dkt. 74-3 at 63).[7]

Plaintiff maintains that in August 2013, Kendall denied Plaintiff an overtime work assignment as retaliation for Plaintiff asking Kendall to refrain from making racially derogatory comments in Plaintiff's presence.  The overtime work assignment was with the USMS Sex Offender Detail ("the Detail),[8] in which Plaintiff initially expressed interest in participating to Kendall in July 2013, with Kendall agreeing Plaintiff could participate when the Detail became available.  Amended Complaint ¶ 30.  On August 7, 2013, Plaintiff contacted Kendall for permission to work on the Detail, but Kendall denied the request and Plaintiff attributes the denial to his filing of the Internal Complaint.

---

[6] Kendall included in the account's profile a photo of an African American woman after obtaining the woman's permission to use her image.
[7] Filed as Christensen Declaration Exh. B (Dkt. 74-3 at 42-69).
[8] The purpose of the Sex Offender Details was "to undertake physical checks of the residences of registered sex offenders to verify their actual living arrangements, and to arrest offenders who were found to be out of compliance."  Rooney Affidavit (Dkt. 76-6) ¶ 9.  The details primarily were staffed by local police department detectives, with Deputy U.S. Marshals, and members of the Task Force, including investigators assigned to the VFWS, also working on these details.  *Id.* ¶ 10.

On September 9, 2013, while the Internal Investigation was underway, but prior to its conclusion on November 14, 2013, Plaintiff filed an administrative complaint with New York State Division of Human Rights and the Equal Employment Opportunity Commission ("EEOC") ("Administrative Claim"),[9] alleging race discrimination and retaliation, particularly by Kendall who, in conversing with Plaintiff since 1995, had repeatedly used the words "savages," "animals," "monkey," and "n—" in referring to African Americans despite Plaintiff's repeated requests to Kendall not to use such language in referring to African Americans.  Plaintiff further claimed that as a result of filing the Internal Complaint complaining about Kendall's racially offensive language, Plaintiff was denied overtime opportunities.  On February 27, 2014, the EEOC mailed Plaintiff a Dismissal and Notice of Rights letter ("Right to Sue Letter").[10]  Amended Complaint ¶ 9.

It is undisputed that Plaintiff has been treating for depression since the early 1990s for which Plaintiff has continuously taken the antidepressant Zoloft.  Plaintiff has treated with various psychiatrists, including Madiha Mirza, M.D., P.C. ("Dr. Mirza"), since 2005.  At an appointment with Dr. Mirza on June 16, 2014, Plaintiff reported work was "stressing me out," and that he did not like Kendall, and that Plaintiff "really felt like smashing [Kendall] in the face."  Zimmermann Dec. Exh. H at 29-30 (Dkt. 85 at 482-83).  Plaintiff also mentioned financial responsibilities, including paying three mortgages and his mother's car lease, contributed to his stress.[11]  *Id.* at 59 (Dkt. 85 at 485).  By letter

---

[9] Zimmermann Declaration Exh. I (Dkt. 85 at 489-93).
[10] No copy of the Right to Sue Letter has been filed, but Defendants do not dispute that the Right to Sue Letter was issued and that Plaintiff exhausted administrative remedies relative to this action.
[11] The three mortgages included Plaintiff's own mortgage on the home in which he lived, the mortgage on his mother's home in Georgia, and the mortgage on the home where his deceased sister, prior to her death, had lived in Rochester and where her daughter continued to live while she finished high school.

dated June 16, 2014 ("Dr. Mirza's Letter"),[12] Dr. Mirza advised the State Police that she

had treated Plaintiff for Major Depression Disorder since February 21, 2005, that

Plaintiff's depression symptoms were increasing because of high levels of work-related

stress, rendering Plaintiff unable to work from June 16, 2014 to June 30, 2014.  Plaintiff

sent Dr. Mirza's Letter by e-mail to Lt. Reyes, Plaintiff's Dep. Tr. at 481, who forwarded

Dr. Mirza's Letter to to Defendant Francis P. Christensen ("Christensen"), who, in his

position as State Police Deputy Superintendent for Employee Relations, was charged

with oversight of the State Police Office of Human Resources ("OHR"), including

administration of policies under the State Police Members Manual ("Members Manual").

Christensen Declaration ¶¶ 2-4; Christensen Dep. Tr.[13] at 14-15 (Dkt. 74-3 at 14-15).

Upon receiving Dr. Mirza's Letter attributing Plaintiff's inability to work for two weeks to

high stress levels, and given Plaintiff had access to a service weapon, Christensen was

concerned about the safety of Plaintiff and others, *id.* ¶¶ 11-12, and directed State

Police Division Physician Robert Kelleher, M.D. ("Dr. Kelleher"), to review Plaintiff's

medical documentation and Dr. Kelleher responded in a memorandum dated June 17,

2014 ("June 17, 2014 Memo") (Dkt. 74-3 at 46), indicating that Plaintiff was "incapable

of continuing on full and strenuous duty . . . [and] should be placed on involuntary leave

immediately" as provided for by Rule 13 of the Members Manual ("Rule 13").[14]  Plaintiff

was advised that to continue receiving his regular pay, he was to "use all unused sick

---

[12] Christensen Declaration Exh. B (Dkt. 74-3 at 44).

[13] References to "Christensen Dep. Tr." are to the pages of the transcript of Christensen's deposition, portions of which are filed as Christensen Declaration Exh. A (Dkt. 74-3 at 8-41).

[14] Codified as 9 N.Y. CODE R. & REGS. § 488.1, providing that if the State Police superintendent "reasonably determines" a State Police employee's "continued presence. . . on the job represents a potential danger to persons, including such [employee], or property, or would unreasonably interfere with operations, the superintendent may immediately place such member on involuntary leave of absence."  9 N.Y. CODE R. & REGS. § 488.1(b).

leave, vacation, or other time allowances to which [Plaintiff was] entitled" for the involuntary leave. *Id.* In connection with his placement on involuntary leave, Plaintiff was required to surrender his badge, service weapon, identification, and cellular phone. Amended Complaint ¶ 39. Plaintiff was further advised he was to undergo a psychological evaluation by a consultative examiner selected by the State Police, Christensen Declaration ¶ 260 and Exh. B (Dkt. 74-3 at 46), and, accordingly, a Fitness for Duty Evaluation ("psychological examination") was scheduled for Plaintiff with psychologist William F. McIntyre, Ph.D. ("Dr. McIntyre"), on July 23, 2014, in Albany, New York. Christensen Declaration Exh. B (Dkt. 74-3 at 59-60). During the psychological examination, Plaintiff repeated his stressors included working, especially with Kendall whom Plaintiff wanted to punch in the face, and his financial responsibilities. Plaintiff explained that he spent 20 years as a loyal employee with the State Police, felt old and tired, and was "not going to take any of [Kendall's] shit anymore." Zimmermann Dec. Exh. H at 61 (Dkt. 85 at 486). Plaintiff further reported fleeting ideas of suicide, although he had no plans to do so other than "if I have to go, then I'm not going alone," explaining that it was "a given" that the remark referred to Kendall. *Id.* at 62 (Dkt. 85 at 487). Following the psychological examination, Dr. McIntyre prepared a Fitness for Duty Evaluation report ("Fitness Evaluation")[15], noting in his clinical impressions (1) Plaintiff's history of depression exceeds 20 years, with Dr. Mirza's treatment notes entirely focusing on Plaintiff's depression and devoid of any complaints about racism until 2013; (2) Plaintiff's on-going racism grievance "permeates his every thought and dominated his presentation in the interview" and "clearly impacts

---

[15] Dkt. 74-3 at 61-64

his mood" although Plaintiff's "complaints about racism do not appear to be delusional in

nature and do not reflect an underlying psychological disorder"; (3) Plaintiff's stressors

outside his job are largely financial and Plaintiff has a limited social support network to

help him cope; and (4) Plaintiff "is a risk for harming himself and/or others.  He has

vague suicidal thoughts and specifically mentioned 'taking out' his supervisor.  The

Division should take precautions regarding any department or personal weapons he

may own."  Fitness Evaluation at 3-4 (Dkt. 74-3 at 63-64).  Dr. McIntyre concluded that

Plaintiff

> is not fit to return to work as an investigator for the Division of State Police at this
> time.  His chronic depression has worsened in recent months due to perceived
> racial injustices to the point that he has voiced vague suicidal ideation and
> harbors aggressive thoughts towards his immediate supervisor (Kevin Kendall).
> He admits that something would probably happen between them if he returned to
> work.

*Id.* at 4 (Dkt. 74-3 at 64).

In his Medical Certification After Examination,[16] Dr. McIntyre opines that Plaintiff "is not

fit for full and strenuous duty.  There is a medical condition present that would prevent

the patient from performing all functions of a New York State Trooper . . . ."  In a

memorandum dated August 6, 2014, Dr. Kelleher concurred with Dr. McIntyre's findings

and conclusion. Dkt. 74-3 at 47.  By letter dated August 13, 2014, Christensen advised

Plaintiff his involuntary leave was extended because Plaintiff was not fit for duty, that

Plaintiff was to consider "charging" his leave accruals under the original involuntary

leave order, and that Plaintiff had a right to a hearing to contest the involuntary leave.

*Id.* at 48.  Plaintiff requested a hearing before the superintendent, which was conducted

---

[16] Dkt. 74-3 at 65.

before Deputy Superintendent Steven F. Cumoletti ("Cumoletti"), on September 18, 2014 ("Superintendent's Hearing").[17]   Cumoletti upheld the involuntary leave.

On October 20, 2014, while on involuntary leave from his State Police employment, Plaintiff submitted a Request to Engage in Outside Employment ("outside employment request"),[18] seeking permission to work on a part-time basis as a Ramp Agent with Delta Global Services ("DGS"), an airline business located at Buffalo Niagara International Airport in Cheektowaga, New York.  The outside employment request initially was denied by Lt. Ratajczak based on the application of  New York State Police Administrative Regulation H1 ("Reg. H_"),[19] a State Police policy prohibiting outside employment for an employee on sick or personal leave.  The initial denial was affirmed by State Police Major Michael Cerretto, and was further reviewed by State Police Counsel Kevin Gagan, Esq. ("Gagan"), who concurred with the denial.

Plaintiff never submitted any medical evidence indicating an improvement in his mental status, and remained on involuntary leave until he retired on August 18, 2015, at age 50.  Plaintiff maintains he originally intended to work for the State Police until age 62.

---

[17] A copy of the transcript of the Superintendent's Hearing is filed as Plaintiff's Exh. E (Dkt. 88-1 at 27-130).
[18] Declaration of Kevin Gagan, Exh. B (Dkt. 74-4 at 11).
[19] A copy of the relevant portions of the State Police Administrative Manual – Article 8, including Reg. 8H is filed as Gagan Declaration Exh. A (Dkt. 74-4 at 4-9.

## DISCUSSION

**1.    Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a

claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).  "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir. 2009)).

## 2.    Employment Discrimination

As stated, Background at 3, Plaintiff asserts race-based employment discrimination claims under Title VII, § 1981, and § 1983.

### A.    § 1983 Claims

Preliminarily, with regard to Plaintiff's Fourth, Fifth, and Sixth Claims alleging against Defendant Kendall disparate treatment, retaliation, and hostile work environment based on Plaintiff's race in violation of § 1983, "Section 1983, to the extent pertinent here, allows an action at law against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges,

or immunities secured by the Constitution and laws.'" *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting 42 U.S.C. § 1983). Section 1983, however, "is not itself a source of substantive rights." *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979). Rather, § 1983 merely provides "a method for vindicating federal rights elsewhere conferred," *id.,* such as those conferred by § 1981. *Patterson*, 375 F.3d at 225. Indeed, "the express cause of action for damages created by § 1983 constitutes the *exclusive* federal remedy for violation of the rights guaranteed in § 1981 by state governmental units . . . ." *Jett v. Dallas Independent School District,* 491 U.S. 701, 733, (1989) (italics added). A § 1983 action may not, however, be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII. *See, e.g., Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 143 (2d Cir.1993) ("A plaintiff cannot use Section 1983 to gain perceived advantages not available to a Title VII claimant"). Nevertheless, "[a] Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action," such as a claim for denial of equal protection, "so long as the § 1983 claim is based on a distinct violation of a constitutional right." *Gierlinger v. New York State Police,* 15 F.3d 32, 34 (2d Cir.1994); *see, e.g., Saulpaugh,* 4 F.3d at 143 (recognizing district court's dismissal of § 1983 claims would be vacated insofar as the plaintiff couched such claims in terms of the First Amendment, and Fourteenth Amendment's Due Process and Equal Protection clauses, so long as cognizable violations of these Constitutional provisions were alleged).

In the instant case, Plaintiff's § 1983 claims for employment discrimination (Fourth Claim), retaliation (Fifth Claim), and hostile work environment (Sixth Claim), are

asserted only against Defendant Kendall.  Further, each of the § 1983 Claims is couched in terms of a violation of Title VII, but Kendall, as an individual, is not a proper defendant to a Title VII claim; rather, Title VII provides for liability against an employer. *See Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012) ("Title VII does not impose liability on individuals . . . ." (citing *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) ("under Title VII individual supervisors are not subject to liability."))). Accordingly, Plaintiff cannot state a claim under § 1983 based on a violation of Title VII, nor does treating Plaintiff's § 1983 Claims as asserting claims under Title VII save them because Kendall is sued as Plaintiff's supervisor with his former employer, Defendant State Police.

Plaintiff nevertheless maintains his § 1983 claims are predicated on violations of the Fourteenth Amendment's Equal Protection Clause.  Plaintiff's Memorandum at 7-8 (citing *Vega v. Hempstead Union Free School District*, 801 F.3d 72 (2d Cir. 2015)). Plaintiff's reliance on *Vega*, however, is inapposite.  In particular, in *Vega*, the Second Circuit recognized that "[t]he Fourteenth Amendment provides public employees with the right to be 'free from discrimination,'" *Vega*, 801 F.3d at 87 (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)), and that "a plaintiff's 'equal protection claim parallels his Title VII claim,' except that a § 1983 claim, unlike a Title VII claim, can be brought against an individual."  *Id.* at 88 (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004))  "Consequently, public employees aggrieved by discrimination in the terms of their employment may bring suit under 42 U.S.C. § 1983 against any responsible persons acting under color of state law."  *Id.* (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122-23 (2d Cir. 2004)).  A § 1983 claim

has two elements, including "(1) 'the violation of a right secured by the Constitution and laws of the United States,' and (2) 'the alleged deprivation was committed by a person acting under color of state law.'"  *Id.* (quoting *Feingold*, 366 F.3d at 159).  Here, the parties do not dispute that Plaintiff has established that Kendall, as a state employee working in his position as a senior investigator with the State Police, was acting under color of state law.  What Plaintiff has not alleged, however, is a violation of any federal law or other right secured by the Constitution, other than Title VII which, as discussed above, does not provide for an action to be maintained against an individual or supervisor.  In contrast, in *Vega*, the plaintiff actually asserted a violation of the Fourteenth Amendment's Equal Protection Clause.  *See Vega*, 2014 WL 2157536, at * 7 (E.D.N.Y. May 22, 2014) (describing the complaint as alleging the defendant, "under color of state law, knowingly violated plaintiff's equal protection rights by attempting to transfer plaintiff without a rational reason and based on plaintiff's Hispanic origin."), *vacated and remanded*, 801 F.3d 72.  Significantly, in adopting the undersigned's recommendation, addressing the earlier motions to dismiss, that because no argument was asserted supporting dismissal of either Plaintiff's § 1981 or § 1983 Claims which were asserted only against Kendall who did not separately move to dismiss but, rather, joined in State Defendants' motion to dismiss, whether such claims were facially sufficient was not addressed, R&R at 20-21; *Miller v. New York State Police*, 2016 WL 2868840, at * 8  (W.D.N.Y. May 17, 2016), District Judge Arcara noted that although a non-federal public employee may bring race-based employment discrimination claims under both Title VII and § 1983, "§ 1983 is *not* a backdoor for bringing a Title VII claim against an individual defendant," and that "it is still important to correctly identify the

basis for the Plaintiff's claims *before* summary judgment and/or trial." D&O at 5 n. 2 (italics added); *Miller v. New York State Police*, 2016 WL 4472748, at * 3 n. 2 (W.D.N.Y. Aug. 25, 2016) (same). Plaintiff, however, has not identified the basis for his § 1983 claim, and a belated attempt to do so in an argument asserted in opposition to summary judgment does not satisfy the pleading specificity requirements. *See Lewis v. Lee*, 737 Fed.Appx. 24, 29 (2d Cir. June 5, 2018) ("A party is not entitled to amend his complaint on summary judgment." (citing *Greenridge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach the merits of an argument raised for the first time in opposition to summary judgment and not pleaded in the complaint)).

Accordingly, insofar as here, Plaintiff asserts the Equal Protection Clause as the basis for his § 1983 Claims, the Amended Complaint is completely devoid of any reference to the Fourteenth Amendment Equal Protection Clause, and Plaintiff's § 1983 Claims should be DISMISSED for failure to state a claim.

### B.    Title VII Claims and § 1981 Claims

Plaintiff alleges claims for racially-based disparate treatment, retaliation, and hostile work environment against Defendant State Police under Title VII (First, Second, and Third Claims), and against Defendant Kendall under § 1981 (Seventh, Eighth, and Ninth Claims). The legal analysis for each type of employment discrimination claim, *i.e.*, disparate treatment, retaliation, and hostile work environment, is the same regardless of whether the claims are brought under Title VII or § 1981. *Littlejohn v. City of New York*, 795 F.3d 297, 312, 315, 320-21 (2d Cir. 2015) (recognizing the same analysis applies to disparate treatment, retaliation, and hostile work environment claims whether brought under Title VII or § 1981).

Preliminarily, the court addresses State Defendants' argument that the Title VII's statute of limitations scheme bars several of Plaintiff's claims. State Defendants' Memorandum at 5; State Defendants' Reply at 2-3. In particular, Title VII requires an administrative discrimination charge be filed within 300 days of the alleged unlawful employment practice, 42 U.S.C. § 2000e-5(e)(1), such that Plaintiff's filing of the Administrative Claim with the EEOC on September 9, 2013, bars his Title VII claims insofar as they are based on conduct occurring more than 300 days earlier, *i.e.*, March 13, 2013. *Id.* State Defendants specifically assert Plaintiff's Title VII claims that he was denied overtime in 2009-10 as well as several asserted usages of racially offensive language to which Plaintiff alleges he was subjected by Kendall occurred prior to March 13, 2013 and, thus, are time-barred. *Id.* Plaintiff does not dispute that several asserted instances of racially-discriminatory conduct are time-barred, but maintains the instances may still be considered as evidence in connection with Plaintiff's claims for hostile work environment, Plaintiff's Response – State Defendants at 5-6, a point with which State Defendants concur. State Defendants' Reply at 2-3. The parties are correct that although certain discrete acts falling outside the 300-day period for Plaintiff's Administrative Claim may not serve as the predicate for his Title VII disparate treatment claims, such incidents may be considered as evidence of Plaintiff's Title VII hostile work environment claim. *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75-76 (2d Cir. 2010) (holding that hostile work environment claims differ from discrimination claims based on discrete acts such that consideration of a hostile work environment claim may include behavior allegedly occurring outside the statutory time period so long as an act

contributing to the alleged hostile work environment occurred within the statutory period).

### 1. Disparate Treatment Claims

Plaintiff alleges claims for racially-based disparate treatment against Defendant State Police under Title VII (First Claim), and against Defendant Kendall under § 1981 (Seventh Claim).  Whether brought under Title VII or § 1981, employment discrimination claims are analyzed according to the burden-shifting standard articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) ("*McDonnell Douglas*").  *Littlejohn*, 795 F.3d at 312 (disparate treatment claims brought under both Title VII & § 1981 are analyzed pursuant to the *McDonnell Douglas* burden-shifting evidentiary framework.").  Under the so-called "*McDonnell Douglas* burden shifting test," the plaintiff must first establish a *prima facie* case of employment discrimination.  *Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014).  Upon the plaintiff meeting this initial burden for a *prima facie* case of either discrimination, "the burden shifts to the [defendant] employer to give a legitimate, non-discriminatory reason for its actions."  *Kirkland*, 760 F.3d at 225 (citing *McDonnell Douglas*, 411 U.S. at 802).  Should the defendant meet its burden, "the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for race discrimination . . .."  *Id.* ("the employee's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination." (internal quotation marks, alterations, and citation omitted)).

### a. *Prima Facie* Case of Disparate Treatment

Under the so-called "*McDonnell Douglas* burden shifting test," the plaintiff must

first establish a *prima facie* case of employment discrimination. *Kirkland*, 760 F.3d at

225. To establish a *prima facie* case of race discrimination, "a plaintiff must proffer

evidence that (1) he belongs to a protected group; (2) he was qualified for his position;

(3) his employer took an adverse employment action against him; and (4) the adverse

action occurred in circumstances giving rise to an inference of race discrimination."

*Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014) (citing *Terry v.*

*Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). As relevant here, it is undisputed that

Plaintiff, as an African-American, belongs to the class of race protected under § 1981

and Title VII, 42 U.S.C § 1981(a); 42 U.S.C. § 2000e-2(a)(2), thus establishing the first

element of his race-based employment disparate treatment claims, State Defendants'

Memorandum at 7; Defendant Kendall's Memorandum at 5. Nor do Defendants dispute

that Plaintiff satisfactorily performed his job duties and thus was qualified for his

Inspector position until June 16, 2014, *i.e.*, when Plaintiff was first placed on involuntary

leave. *Id.* With regard to the third element, requiring an adverse employment action,

Plaintiff alleges Defendant Kendall denied Plaintiff an overtime work assignment in

August 2013, Amended Complaint ¶¶ 30-35, 107, and Defendant State Police denied

both Plaintiff's overtime and outside employment requests. *Id.* ¶¶ 52-62, 67-69. Plaintiff

further maintains such adverse employment actions occurred under circumstances

giving rise to an inference of discrimination. Plaintiff's Response – State Defendants at

8-11; Plaintiff's Response – Kendall at 11-13. Plaintiff maintains that Defendants have

failed to provide race-neutral reasons for the adverse employment actions which, in any

event, occurred under circumstances establishing any race-neutral reasons are but a pretext for racially-based employment discrimination.  Plaintiff's Response – State Defendants at 8-11; Plaintiff's Response – Kendall at 11-13.  The asserted denial of an overtime work opportunity does not constitute an adverse employment action, but material issues of genuine fact preclude the court from determining whether the denial of the outside employment request constitutes an adverse employment action.

Specifically, "'[a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.'" *Vega*, 801 F.3d at 85 (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  "'An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  *Id.* (quoting *Terry*, 336 F.3d at 138).  "'Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.'"  *Id.*   The Second Circuit's interpretation of "materially adverse change in the terms and conditions of employment" includes the "refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," as well as "lesser action" meeting the adversity threshold depending on the factual circumstances and context of the action.  *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006) (citing cases).  *See also Figueroa v. City of N.Y.*, 198 F.Supp.2d 555, 567-68 (S.D.N.Y. 2002) ("To sustain an adverse employment action, a plaintiff must endure a materially adverse change in the terms and conditions of employment . . ..  A materially

adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity." (citing cases)).

With regard to Plaintiff's assertion that he was denied an overtime work opportunity by working a "detail" with the Task Force in August 2013, Defendants maintain that the overtime work opportunity did not result in a sufficiently material deprivation to constitute an adverse employment action.  State Defendants' Memorandum at 7; Defendant Kendall's Memorandum at 5-8.  In support of their argument, State Defendants rely on Plaintiff's admission that despite not being chosen to participate in the August 2013 Detail, Plaintiff was selected and participated in two subsequent Details, including one later in August 2013, and one in September 2013, both prior to the end of the USMS's fiscal year on September 30, 2013.  State Defendants' Memorandum at 7.  State Defendants also submit proof that the overtime earned by VFWS member varied from year to year, with the overtime earned by Plaintiff, who admits having the least amount of seniority, not significantly lower than white and Hispanic co-workers, and during fiscal year 2012-13, when Plaintiff was denied the August 2013 Detail, Plaintiff had more overtime hours than one Robert Gardner, Plaintiff's co-worker on the VFWS who is an Investigator and white.  *Id.*  Kendall adds that despite being denied the August 13 Detail, the amount of overtime Plaintiff worked for fiscal year 2012-13 was only one hour short of the maximum number of overtime hours Plaintiff was permitted to work that year, and that Plaintiff's overtime compensation for that year exceeded Kendall's overtime compensation by several thousand dollars.  Defendant Kendall Memorandum at 7.  Significantly, a denial of overtime can be considered an adverse employment action, "but only if the plaintiff

sufficiently alleges that he was materially harmed by the action." *Jeanty v. Newburgh Beacon Bus Corp.*, 2018 WL 6047832, at * 7 (S.D.N.Y. Nov. 19, 2018) (citing cases). Here, Plaintiff makes no such assertion nor does Plaintiff dispute Kendall's assertion that Plaintiff was selected for other overtime details such that Plaintiff, at the end of the fiscal year, had earned all but one hour of the overtime for which he was eligible under the overtime policy then in place.  Furthermore, missing a small amount of overtime work assignments has been held insufficiently material to constitute an adverse employment action under Title VII and § 1981.  *See*, *e.g.*, *Sealy v. State University of New York at Stony Brook*, 2018 WL 3151701, at * 11 (E.D.N.Y. Mar. 5, 2018) (dismissing Title VII complaint for failure to plead adverse employment action based on denial of a single overtime work opportunity in the absence of any facts supporting that the "denial rose above a 'minor workplace inconvenience.'" (quoting *Avillan v. Donahoe*, 483 Fed.Appx. 637, 638 (2d Cir. 2012)); *Mayo-Coleman v. American Sugars Holding, Inc.*, 2017 WL 4157379, at * 8 (S.D.N.Y. Sept. 18, 2017) (denial of overtime request, without more, is not an adverse employment action under Title VII absent facts alleging the denial plausibly resulted in some material detriment such as an opportunity for career advancement or other material detrimental or material change in the terms and conditions of employment); *Figueroa*, 198 F.Supp. 2d at 568 (holding defendant's clerical error that precluded the plaintiff from working on one particular day did not constitute a materially adverse employment action under Title VII); *Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 491 F.Supp.2d 386, 400, 402 (S.D.N.Y. 2007) (considering an employee's 24-hour overtime decrease from previous year as "a small fluctuation . . . hardly sufficient to make a showing of an adverse employment

action" under either Title VII or § 1981).  Accordingly, here, Plaintiff's claim that he was

denied a single opportunity for overtime during the August 2013 Detail, unaccompanied

by any evidence the loss of such overtime resulted in any materially detrimental change

in the terms and conditions of his employment, especially in light of Kendall's

undisputed assertion that Plaintiff earned all but a single hour of overtime for which he

was eligible during the relevant fiscal year, simply falls short of establishing an adverse

employment action.  Nevertheless, assuming, *arguendo*, an issue of fact exists as to

whether the denial of the Detail overtime opportunity was an adverse employment

action, in the interest of completeness, the court will consider whether Defendants have

provided a legitimate, nondiscriminatory reason for the denial.  *See* Discussion, *infra*, at

28-29.

   With regard to the denial of Plaintiff's outside employment request as constituting

an adverse employment action, no party references any case on point, and the court's

research has revealed none.  Nevertheless, under the undisputed facts supported by

evidence in the record, once Plaintiff was placed on involuntary leave, Plaintiff was

required to use his accrued sick and personal leave in order to be compensated for the

lost working hours.  Although, as Christensen explains, involuntary leave is not

considered a suspension or disciplinary action, during which Plaintiff would be without

pay, and Plaintiff was permitted to access accrued sick leave, annual leave, or personal

leave to cover his pay for the period of absence, Christensen Declaration ¶ 8, an

extended involuntary leave could quickly deplete an employee's leave accrual, leaving

the employee without any pay for the duration of the leave.  Under these circumstances,

the denial of an outside employment request could result in a material change in the

terms or conditions of employment.  *See Welch v. Columbia Memorial Physician Hosp. Organization, Inc.*, 2015 WL 6855810, at * 6 (N.D.N.Y. Nov. 6, 2015) (considering change in work schedule that precluded plaintiff from attending school and working second job "at least is arguably" an adverse employment action).  There is thus at least a material issue of fact as to whether the denial of Plaintiff's outside employment request constituted an adverse employment action, precluding summary judgment on this issue.  For the sake of this report and recommendation, the court assumes genuine issues of material fact also exist regarding the fourth element, *i.e.*, that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.

### b.  Legitimate, Non-Discriminatory Reason

Having assumed, *arguendo*, that Plaintiff has established a *prima facie* case of employment discrimination based on the denials of an overtime opportunity with the Detail in August 2013, and Plaintiff's outside employment request, the burden shifts to Defendants to proffer a legitimate, non-discriminatory reason for such denials.  With respect to Defendants State Police and Kendall denying Plaintiff an overtime work opportunity with the Detail in August 2013, Defendant State Police explains that although in July 2013, Plaintiff discussed with Kendall the issue of overtime opportunities with the Detail, agreeing they would both go on Detail in August 2013, Plaintiff concedes he never contacted the USMS about working on the subject Detail, despite Plaintiff's acknowledging the USMS selected the participants for details.  State Police Defendants' Memorandum at 7.  Defendant Kendall similarly attributes Plaintiff's non-selection for the Detail to Plaintiff's failure to timely inquire about working on the

Detail.  Defendant Kendall's Memorandum at 6; Kendall Affidavit ¶ 22.  As Kendall

explains, oversight of the Detail was provided by Deputy U.S. Marshal Richard Rooney

("Rooney"), Kendall Affidavit ¶ 20, who provided notification of details to the Task Force

members, *id.* ¶ 21, following which it was the responsibility of the various Task Force

members to contact Rooney regarding serving on a particular detail.  *Id.* ¶ 22.  Rooney

avers that as per established protocol, the August 2013 Detail was scheduled, he sent

advance notification to other law enforcement personnel, including VFWS members

Kendall and Plaintiff, and it was the obligation of such law enforcement officers to inform

Rooney of their interest in participating in a particular detail.  Rooney Affidavit ¶¶ 14-18.

Only Kendall and then State Police Investigator Lawrence Jackson expressed interest in

participating in the August 2013 Detail, with Plaintiff not contacting Rooney until the first

day of the Detail when it was about to commence.  *Id.* ¶¶ 19-21.  Rooney maintains that

he was present in the room when Kendall received a telephone call from Plaintiff

inquiring about participating in the Detail, and Rooney told Kendall the Detail already

had sufficient participants and Kendall repeated that information to Plaintiff.  *Id.* ¶¶ 22-

25.  Rooney further explains that when Plaintiff approached him several days later at

the USMS office in Buffalo, inquiring about not being included in the Detail, Rooney,

rather than raising the issue of Plaintiff's untimely inquiry which Rooney though might

result in an argument, instead informed Plaintiff about the next detail that was being

planned to take place in a few weeks.  *Id.* ¶¶ 26-28.  Plaintiff did participate in and earn

overtime for the subsequent detail.  *Id.* ¶ 29.  Plaintiff does not dispute Rooney's version

of the circumstances under which Plaintiff was not selected to participate in the Detail,

but maintains that he was unaware of the dates of the Detail.  Even assuming Plaintiff's

assertion that he was unaware of the dates of the Detail is correct, such assertion establishes only that Plaintiff did not receive the advance notification.  Both Kendall and Rooney, however, maintains it was Rooney who was responsible for providing notice of the scheduling of a Detail to Task Force members.  Rooney Affidavit ¶ 14; Kendall Affidavit ¶ 21.  Accordingly, at most, the failure to select Plaintiff for participation in the August 2013 Detail can be attributed to a possible miscommunication by Rooney, rather than Kendall or the State Police, which does not support a racially-discriminatory motive on the part of State Defendants or Kendall.  *See Zacharowicz v. Nassau Health Care Corp.*, 177 Fed.Appx. 152, 155 (2d Cir. Apr. 21, 2006) (affirming district court's grant of summary judgment on plaintiff's Title VII employment discrimination claims where the plaintiff's argument in opposition created at most only a "'weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred'" (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).  *See also Norton's v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998) (explaining that anti-discrimination law "does not make employers liable for doing stupid or even wicked things; it makes them liable for *discriminating* . . . ." (italics in original)).

As for the denial of Plaintiff's outside employment request, State Defendants explain Plaintiff's outside employment request was denied under New York State Police Administrative Regulation 8H ("Reg. 8H__"), which prohibits any employee from participating in outside employment while on sick or personal leave or when absent from duty because of disability.  Gagan Declaration ¶¶ 15-19, and Reg. 8H1(b)(4) Exh. A at 8-47 (Dkt. 74-4 at 5) (providing "No Member may engage in outside work or gainful

occupation: When on Sick Leave or Personal Leave; or When absent from duty because of disability."). Significantly, the placement of Plaintiff on involuntary leave is not considered a disciplinary act; rather, such placement required Plaintiff to use unused sick leave, vacation, and other time allowances to which he was entitled. Christensen Dec. ¶ 15 and Exh. B (Dkt. 74-3 at 46). Accordingly, upon being placed on involuntary leave status, Plaintiff also was using either his accrued sick leave or personal leave which, by operation of Reg. 8H1(b)(4), precluded Plaintiff from engaging in outside employment. Furthermore, insofar as Plaintiff may have exhausted his accrued sick and personal leave while on involuntary leave status, a point Plaintiff does not argue, that Plaintiff was placed on involuntary leave because of the determinations by Dr. Mirza, Dr. Kelleher, and Dr. McIntyre that Plaintiff was unfit for duty based on increasing chronic depression to the point that Plaintiff had suicidal ideation and aggressive thoughts particularly toward his supervisor, Defendant Kendall, is undisputed. As such, it cannot be reasonably disputed that Plaintiff's leave was because of a mental disability which, under Reg. 8H1(b)(4) also precludes Plaintiff from engaging in outside employment.

State Defendants thus have demonstrated a legitimate, non-discriminatory reason for terminating Plaintiff's employment, thereby shifting the burden back to Plaintiff to establish such reason was mere pretext for unlawful race-based employment discrimination.

### c.     Pretext to Discrimination

Where the defendant articulates a legitimate, nondiscriminatory reason for its challenged actions, "the presumption of discrimination is rebutted and it 'simply drops

out of the picture.'"  *Connell v. Consolidated Edison Co. of New York, Inc.*, 109

F.Supp.2d 202, 207 (S.D.N.Y. 2000) (quoting *St. Mary's Honor Center*, 509 U.S. at 510-

11).  Then the plaintiff must show, "without the benefit of any presumptions, that more

likely than not the employer's decision was motivated at least in part by a discriminatory

reason."  *Id.* (citing *Grady v. Affiliated Center, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).

Plaintiff may do this by relying on the evidence already presented to establish a *prima

facie* case of discrimination, as well as any additional evidence.  *Id.*  "[B]ecause the

fourth prong of the prima facie case in this context is proof of circumstances giving rise

to an inference of discrimination, as a practical matter, there is little difference between

the evidence that a plaintiff would present in proving just the prima facie case and

pretext in proving the 'ultimate fact of discrimination.'"  *Id.* at 208 n. 5.  Further, "where a

remark is susceptible of two or more meanings, only one of which may be relevant to

discriminatory intent, it is 'perfectly appropriate' for a court at the summary judgment

stage . . . to ask whether a reasonable finder of fact, considering such a remark, 'could

conclude from both [the] remark and other evidence in the record that [the plaintiff] met

her burden of proving pretext.'"  *Walsh v. New York City Housing Authority*, 828 F.3d

70, 90 (2d Cir. 2016) (quoting *Govori v. Goat Fifty, L.L.C.*, 519 Fed.Appx. 732, 735 (2d

Cir. 2013)).

In the instant case, Plaintiff has completely failed to argue or to provide any

evidence challenging the non-selection of Plaintiff to participate in the August 2013

Detail, or State Defendants' legitimate and non-discriminatory reasons for denying

Plaintiff's outside employment request.  Accordingly, even when viewed in the light most

favorable to Plaintiff, the record fails to establish the existence of any issue of fact

requiring trial as to whether any of Defendants' proffered explanations for the legitimate, non-discriminatory reasons for either alleged adverse employment action is mere pretext for race-based discrimination as Plaintiff alleges.

Summary judgment therefore should be GRANTED in favor of State Defendants and Defendant Kendall on Plaintiff's disparate treatment claims.

### 2.    Retaliation

Plaintiff alleges claims for racially-based retaliation against Defendant State Police under Title VII (Second Claim), and against Defendant Kendall under § 1981 (Eighth Claim).  Whether brought under Title VII or § 1981, retaliation claims are analyzed according to the same burden-shifting standard articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) ("*McDonnell Douglas*").  *Littlejohn*, 795 F.3d at 315 (retaliation claims brought under both Title VII and § 1981 are analyzed pursuant to the *McDonnell Douglas* burden-shifting test).

### a.    *Prima Facie* Case of Retaliation

Under the so-called "*McDonnell Douglas* burden shifting test," the plaintiff must first establish a *prima facie* case of retaliation with regard to employment.  *Kirkland*, 760 F.3d at 225.  For a *prima facie* case of retaliation "a plaintiff is required to show by a preponderance of the evidence that: (1) the plaintiff participated in a protected activity; (2) the defendant knew of the protected activity; (3) the plaintiff experienced an adverse employment action, . . . and (4) a causal connection exists between the protected activity and the adverse employment action."  *Blanc v. Sagem Morpo, Inc.*, 394 Fed.Appx. 808, 809 (2d Cir. Oct. 1, 2010) (citing *Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003)).  With respect to the first element of a *prima facie* retaliation claim,

activity that is protected against retaliation includes not only formal complaints filed with an agency such as the EEOC, or commencing a lawsuit, but also internal complaints made to management, *Raniola v. Bratton*, 243 F.3d 610, 624-25 (2d Cir. 2001) (citing cases), and the plaintiff need not prove that her underlying complaint of discrimination had merit." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012) (citing cases). Here, it is undisputed that Plaintiff's filing of the Internal Complaint alleging race-based employment discrimination qualified as protected activity under Title VII and § 1981,[20] as well as that Defendants were aware of such activity, thus establishing the first and second elements for the Title VII and § 1981 retaliation claims.

For the third element requiring an adverse employment action, Plaintiff again asserts the denial of the August 2013 overtime opportunity.  Amended Complaint ¶ 74 (Second Claim asserted against Defendant State Police under Title VII), and ¶ 112 (Eighth Claim asserted against Defendant Kendall under § 1981).[21]  As discussed in connection with the disparate treatment claims, Discussion, *supra*, at 26-28, because the denial of the August 2013 overtime opportunity did not result in a materially detrimental change in the terms and conditions of his employment but, at most, one hour of lost overtime pay, it does not satisfy the third element of a retaliation claim. Assuming, *arguendo*, the loss of one hour of overtime does qualify as an adverse employment action, Plaintiff must establish a causal connection between the adverse employment action and the protected activity by plausibly establishing "'that the

---

[20] Plaintiff does not rely on his filing of the Administrative Claim with the EEOC in asserting he participated in protected activity and, as stated, Facts, *supra*, at 10-11, the filing of the Administrative Claim on November 14, 2013, occurred after the missed detail overtime opportunity.
[21] Plaintiff does not assert the denial of his outside employment request was an adverse employment action in connection with his retaliation claims.

retaliation was a 'but-for' cause of the employer's adverse action. . . .'" *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Vega*, 801 F.3d at 90-91). "'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.'" *Id.* "Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity." *Id.* "Even without direct evidence of causation, 'a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action.'" *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)). In the instant case, the fact that the denial of the overtime opportunity occurred only weeks after Plaintiff filed his Internal Complaint complaining of racially-based discrimination, and while the Internal Investigation was on-going, is circumstantial evidence establishing the fourth element requiring a causal connection between Plaintiff's participation in the protected activity and the adverse employment action. *See Feingold v. New York*, 366 F.3d 138, 156-57 (2d Cir. 2004) (fact that the plaintiff's employment was terminated within two weeks of Plaintiff complaining to supervisor sufficient to indirectly establish causal connection for retaliation claim). Accordingly, if the denial of the overtime opportunity qualifies as an adverse employment action, its temporal proximity to Plaintiff's filing of the Internal Complaint is sufficient to establish a *prima face* case of retaliation under Title VII and § 1981, and the burden shifts to Defendants to establish a legitimate, non-retaliatory reason for the adverse employment action.

### b.  Legitimate, Non-Retaliatory Reason

The same legitimate, non-discriminatory reasons for denying Plaintiff the overtime opportunity on the August 2013 Detail that preclude Plaintiff's disparate treatment claims, Discussion, *supra*, at 29-32, are also legitimate, non-retaliatory reasons for the same action.  As such, the court turns to whether there is sufficient evidence in the record to support a finder of fact's determination that such reason is mere pretext for retaliation.

### c.  Pretext to Retaliation

"If a defendant establishes a legitimate, non-discriminatory reason for the adverse action, the plaintiff must present evidence that retaliation was the 'but-for' cause of the action."  *Montanez v. McDean LLC*, 770 Fed.Appx. 592, 595 (2d Cir. May 16, 2019) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).  Unlike the establishment of a *prima facie* case of retaliation, at this point, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage."  *Kwan*, 737 F.3d at 847.  Rather, the Supreme Court has instructed that "a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Id.*, 737 F.3d at 845 (quoting *Nassar,* 570 U.S. at 349).   However, "but-for" causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.  *Id.*, 737 F.3d at 846.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate,

nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* (citing cases).

In the instant case, Plaintiff relies in support of pretext only on the Internal Complaint's filing's temporal proximity to the denial of the Detail overtime opportunity. Plaintiff's Response – State Defendants at 12-13; Plaintiff's Response – Defendant Kendall at 15-16. Temporal proximity alone, while sufficient to demonstrate causation for the purpose of establishing a *prima facie* case of retaliation, is not sufficient to rebut an otherwise legitimate, non-retaliatory reason as mere pretext. *Kwan*, 737 F.3d at 847. Although a plaintiff may rely on evidence comprising a *prima facie* case along with temporal proximity, *id.* (citing cases), here, Plaintiff references no other evidence, but merely asserts that the alleged retaliatory nature of denial of an overtime opportunity is "bolstered" by the fact that it was Kendall's first opportunity to act in a retaliatory manner against Plaintiff after Plaintiff file the Internal Complaint. Plaintiff's Response – State Defendants at 1213. This novel argument, a seeming tautology, however, adds nothing to the fact that Plaintiff is relying only on the temporal proximity of the overtime denial and the filing on the Internal Complaint. Accordingly, in the absence of some additional basis to find a pretext for retaliation, other than temporal proximity, summary judgment should be GRANTED in favor of State Defendants and Defendant Kendall on the retaliation claims.

### 3.    Hostile Work Environment

Plaintiff's claims for hostile work environment under Title VII against Defendant State Police (Third Claim), and under § 1981 against Defendant Kendall (Ninth Claim),

are predicated on racially offensive statements by Kendall as previously outined.  *See*

Facts, *supra*, at 7-10.  In support of summary judgment on the hostile work environment

claims, Defendants argue that none of the derogatory language of which Plaintiff

complains were directed toward Plaintiff, and the statements on which Plaintiff relies to

support his hostile work environment claims either were simply repeated by Kendall in

carrying out the duties of his employment and, in any event, occurred over a number of

years and thus were too isolated and sporadic to sustain such claim.  State Defendants'

Memorandum at 9-13; Defendant Kendall's Memorandum at 11-13.  In opposition to

summary judgment, Plaintiff maintains Defendants' arguments ignore that some of

Kendall's statements were not necessarily uttered in furtherance of the performance of

Kendall's job, and occurred over a much shorter span of time than Defendants assert.

Plaintiff's Response – State Defendants at 13-17; Plaintiff's Response – Defendant

Kendall at 16-17.  In further support of summary judgment, Defendants argue Plaintiff's

hostile work environment claims are not supported by the totality of the circumstances.

State Defendants' Reply at 9-16; Defendant Kendall's Reply at 6-8.  There is no merit to

Plaintiff's hostile work environment claims.

　　　With regard to a hostile work environment claim, "Title VII does not establish a

'general civility code' for the American workplace.  *Petrosino v. Bell Atlantic*, 385 F. 3d

210, 223 (2d Cir. 2004) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S

75, 81 (1998)).  "'[S]imple teasing, offhand comments, and isolated incidents (unless

extremely severe) will not amount to discriminatory changed in the terms and conditions

of employment.'"  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 76 (2d Cir. 2001) (quoting

*Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)), *abrogated on other grounds*

by *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  Rather, to establish a hostile

work environment under Title VII or § 1981 and defeat summary judgment, "a plaintiff

must show that 'the workplace is permeated with discriminatory intimidation, ridicule,

and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'"  *Littlejohn*, 795 F.3d at 320-

21 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citations and internal

quotation marks omitted)).  "'This standard has both objective and subjective

components: the conduct complained of must be severe or pervasive enough that a

reasonable person would find it hostile or abusive, and the victim must subjectively

perceive the work environment to be abusive.'"  *Id.* at 321 (quoting *Raspardo v.

Carlone,* 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris,* 510 U.S. at 21–22)).  "'The

incidents complained of must be more than episodic; they must be sufficiently

continuous and concerted in order to be deemed pervasive.'"  *Id.* (quoting *Raspardo*,

770 F.3d at 114 (internal quotation marks omitted)).  In determining whether a plaintiff

suffered a hostile work environment, the totality of the circumstances must be

considered, "including 'the frequency of the discriminatory conduct; its severity; whether

it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.'"  *Id.* (quoting *Harris,*

510 U.S. at 23).

 Here, although Plaintiff testified at his deposition that between 2008 and 2010,

Defendant Kendall used "the N word" in Plaintiff's presence, Plaintiff's Dep. Tr. at 193,

Plaintiff does not recall that Kendall ever directed the slur toward Plaintiff and could not

recall a specific use of such language until 2010.  *Id.* at 194-97.  Plaintiff relates 12

incidents involving racially offensive remarks Kendall made in his presence over a period of three years between 2010 and 2013, and which Plaintiff included in his Internal Complaint.  Amended Complaint ¶¶ 15-29.   These twelve remarks, none of which Plaintiff alleges were directed toward him, can be divided into several categories including three incidents where Kendall repeated a comment made in the course of his employment as a Senior Investigator with the State Police.  Specifically, in June 2010, while searching for a suspect on the streets of Buffalo, Plaintiff and Kendall came across a Caucasian woman who told her bi-racial son "you better watch out before they come get your n— ass . . .."  Amended Complaint ¶ 15; Internal Complaint ¶ 12 (Dkt. 77 at 37).  Plaintiff maintains that although Plaintiff was present when the remark was made, Kendall repeated the statement to Plaintiff while laughing.  *Id.*   On February 17, 2011, while Plaintiff and Kendall were searching for the target of a warrant, Kendall recounted to Plaintiff that an African-American witness Kendall interviewed in connection with the search stated "y'all ain't gonna catch him, he's a smart n--."  Amended Complaint ¶ 17; Internal Complaint ¶ 10 (Dkt. 77 at 36).  Plaintiff asserts Kendall used a "derogatively minstrelsy voice" to repeat the phrase to Plaintiff.  *Id.*  On July 27, 2012, while present at the VFWS office, Kendall repeated that Buffalo Police Detective Brendan Kiefer ("Kiefer") reported that while searching for an African-American suspect, Kiefer interviewed the suspect's Caucasian girlfriend who reportedly referred to her boyfriend, the suspect, as "that n--," to which Kiefer reportedly asked the girlfriend why she continued to refer to her boyfriend by the racial slur, stating ". . . so that means you're sitting there with his baby that's half a n--."  Amended Complaint ¶ 18; Internal Complaint ¶ 8 (Dkt. 77 at 35-36).  Plaintiff does not deny that in making

these three statements, Kendall was, in the course of an investigation, repeating statements made by other law enforcement officers or witnesses.  Plaintiff also agrees that none of the comments were directed toward him, nor asserts he expressed any offense at the statements at the time.  Accordingly, these three statements are not sufficiently frequent or severe, physically threatening or humiliating, nor unreasonably interfered with Plaintiff's work performance and, at most, are mere offensive utterances of an occasional nature which do not support a hostile work environment claim. *Littlejohn*, 795 F.3d at 320-21.

Three other remarks of which Plaintiff complains did not contain any racial slurs, but Plaintiff maintains they were nevertheless racially offensive.  In particular, during August 2010, Kendall, while on duty, after reading a newspaper article reporting that several victims, all African-American of a recent shooting incident had criminal records, referred to the victims as "animals."  Amended Complaint ¶ 9; Internal Complaint ¶ 1 (Dkt. 77 at 36-37).  When Plaintiff inquired why Kendall referred to the victims as "animals," Kendall reportedly responded by shrugging his shoulders, *id.*, and maintains his use of the word "animals" referred not to the victim's race, but to their behavior. Kendall's Internal Complaint Interview Tr.[22] at 39 (Dkt. 78 at 47).  During the summer of 2012, while searching for a fugitive inside a residence, Kendall remarked, "They're you know fucking animals, how can they live in this shit."  Amended Complaint ¶¶ 15-16; Internal Complaint ¶ 9 (Dkt. 77 at 36).  Plaintiff admitted the residence was dirty but maintains that it was not Kendall's "place to judge . . .."  Plaintiff's Internal Complaint Interview Tr.[23] at 40 (Dkt. 77 at 78).   On January 14, 2013, while searching for a

---

[22] Filed as Personius Declaration Exh. J (Dkt. 78 at 8 - 77).
[23] Filed as Personius Declaration Exh. D (Dkt. 77 at  38-102).

suspect, Kendall told the suspect's African-American sister that her fugitive brother and a bunch of other "savages" beat up a "retarded kid."  Amended Complaint ¶ 23; Internal Complaint ¶ 5 (Dkt. 77 at 34-35).  Kendall maintains his use of the term "savages" referred to the act of "beating a retarded kid into unconsciousness" which Kendall characterizes as "an act of savagery," and was in no way intended as a derogatory reference to the suspect's race.  Kendall's Internal Complaint Interview at 36-37.  Plaintiff admits that he would not disagree that a gang assault on a developmentally disabled person could be considered an act of savagery.  Plaintiff's Dep. Tr. at 465.  These three incidents therefore are not sufficiently frequent or severe, physically threatening or humiliating, nor unreasonably interfered with Plaintiff's work performance and, at most, are mere offensive, casual utterances which do not support a hostile work environment claim.  *Littlejohn*, 795 F.3d at 320-21.  Moreover, a plaintiff's subjectively held belief that comments indicate co-workers were engaging in activity intended to create a racially-hostile work environment, unsupported by any evidence in the record of such intention, will not sustain a hostile work environment claim.  *See Thompson v. Board of Trustees Community-Technical Colleges*, 2014 WL 2048580, at *5 (D.Conn. May 19, 2014) ("Plaintiff cannot rely on his conclusory and subjective beliefs, unsupported by any objective evidence in the record, to sustain his [racially] hostile work environment claim).

Three other incidents of which Plaintiff complains refer to Kendall's repeated use of a "derogatory, mocking, minstrelsy voice" to imitate of a Caucasian colleague's impression of an "old Black guy" who stated, "aww man . . . I ain't seen that n—in a minute."  Amended Complaint ¶¶ 25 (January 28, 2013), 28 (May 2, 2013), and 29

(June 11, 2013); Internal Complaint ¶¶ 1 (June 11, 2013), 2 (May 2, 2013), and 4

(January 28, 2013).  Plaintiff identified the colleague Kendall was imitating as Kiefer.

Plaintiff's Internal Complaint Interview Tr. at 55.  Although Kendall denies uttering the

phrase, Plaintiff admits he did never verbally object to the phrase but on June 11, 2013,

Plaintiff shook his head and walked away.  *Id.* at 17.  Again, Plaintiff agrees that the

statement was never directed toward Plaintiff, and while not language befitting law

enforcement personnel, the repetition of this statement, three times over the course of

six months, is not sufficiently frequent or severe, physically threatening or humiliating,

did not unreasonably interfere with Plaintiff's work performance and, at most, constitute

mere occasional offensive utterances which do not support a hostile work environment

claim.  *Littlejohn*, 795 F.3d at 320-21.

Plaintiff claims that while in the VFWS office on an unspecified date in 2013,

Kendall called Plaintiff over to the computer on which Kendall was playing a You-Tube

video captioned "Sweet Brown's Cold Pop Express," comprised of an edited music

video of an actual news report of an interview with a female African-American tenant

who escaped from a fire in an apartment complex.  Amended Complaint ¶¶ 26-27;

Internal Complaint ¶ 3 (Dkt. 77 at 34).  According to Plaintiff, after viewing the video with

Plaintiff, Kendall began laughing and imitating the woman "using a derogatory, mocking,

minstrelsy voice."  *Id.*  Plaintiff advised Kendall he did not find the video funny, but did

not attribute the absence of humor to the fact that Plaintiff found the video to be racially

offensive, Plaintiff's Internal Complaint Interview Tr. at 20-21; and admits the video

"went viral"[24] because people could find it humorous for reasons other than race. Plaintiff's Dep. Tr. at 466-47.  Kendall admits playing the video for Plaintiff, but only because he found it humorous and did not consider it as negatively portraying African Americans.  Kendall's Internal Complaint Interview Tr. at 46.  Plaintiff's admission that the video could be found humorous for reasons other than race establishes that no reasonable person would find it hostile or abusive, *Littlejohn*, 795 F.3d at 320-21, such that the video does not support Plaintiff's allegation that Kendall created a racially hostile work environment.

Plaintiff alleges in November 2012, Kendall, in the course of his employment and as part of an undercover investigation of a suspect sanctioned by the State Police, created a Facebook account using the pseudonym "Shaniqua Staxx O'Mann Williams," an African-American female.  Amended Complaint ¶ 20-22; Internal Complaint ¶¶ 6-7 (Dkt. 77 at 35).  According to Plaintiff, Kendall "routinely" posted under this pseudonym comments containing racial slurs, including a posting to the account of the suspect the day after the suspect's arrest, following which Kendall read the posting aloud to Plaintiff, including the racial slur.  *Id.*  Kendall admits creating the Facebook account and the posting, explaining he requested Plaintiff's assistance in wording the posting to perpetuate the undercover identity hoping to elicit responses providing more information because the suspect's arrest was not the end of the case.  Kendall's Internal Complaint Interview Tr. at 50-52.  Plaintiff has conceded Kendall's motivation for the racially-offensive language was to preserve the Facebook account's apparent authenticity for

---

[24] The term "go viral" refers to Internet content – an image, picture, video, meme, etc. – that becomes very popular on various social networking websites.  *See* Urban Dictionary, Go Viral, *available at* https://www.urbandictionary.com/define.php?term=go%20viral, last visited August 12, 2019.

future use in the undercover investigation.  Plaintiff's Internal Complaint Interview Tr. at

34-35.[25]   In fact, former State Police Investigator Jackson agreed that the use of

racially offensive language is a universally accepted law enforcement technique when

posing in an undercover capacity.  Jackson Affidavit ¶¶ 55-61.  Simply put, no

reasonable person could interpret Kendall's creation and use of the Facebook account

under a pseudonym and the subsequent Facebook postings using the vernacular of the

suspect and the suspect's associates as creating a racially hostile work environment for

Plaintiff.

The final incident on which Plaintiff relies in support of his hostile work

environment claim pertains to the same incident on January 14, 2013, when Kendall

and Plaintiff, while searching for the suspect who was involved in the gang beating of

the developmentally disabled individual, advised the suspect's African-American sister

that her brother was wanted in connection with the crime. Amended Complaint ¶¶ 23-

24; Internal Complaint ¶ 5 (Dkt. 77 at 34-35).  According to Plaintiff, after finishing with

the sister, Kendall remarked to Plaintiff that the sister "had a great body for monkey

sex."  *Id.*  Plaintiff responded that the sister was "not his type," but did not voice offense

to the apparent racial slur.  Plaintiff's Internal Complaint Interview at 27.  It cannot be

denied that reasonable people would find this remark offensive.  Even assuming

Kendall made the remark, a point which Kendall denies, Kendall's Internal Complaint

Investigation Tr. at 31, it is the only comment attributable to Kendall that can be found

---

[25] Following the completion of the Internal Investigation, Kendall was reprimanded not for the mere
inclusion of the racial slurs in the Facebook postings, but because the identity Kendall assumed in
creating the Facebook account was that of a real person whose permission Kendall failed to obtain prior
to creating the account and making the postings.  March 14, 2014 Letter of Censure, Personius Exh. I
(Dkt. 78 at 6-7).

undeniably racially offensive.  Significantly, a single remark will not support a hostile work environment claim unless outrageous.  *See Fox v. Costco Wholesale Corporation*, 918 F.3d 65, 74 (2d Cir. 2019) ("Even an isolated act may be so serious that it requires the conclusion that the terms and conditions of employment were altered.").  This single remark, however, does not meet that threshold given that Plaintiff does not even argue it altered the conditions of his employment.  *Holtz*, 258 F.3d at 74-75.  As such, although the court does not condone the remark as beyond the pale for discussion among law enforcement personnel, it is insufficient to support Plaintiff's hostile work environment claim.

In opposing summary judgment, Plaintiff references several additional incidents Plaintiff maintains establish the workplace was racially-hostile.  Plaintiff's Response – Kendall at 2.  Specifically, Plaintiff maintains that after being transferred to the VFWS, Plaintiff discussed with Kendall that in 2009, Niagara County Sheriff Deputy Granto ("Granto") subjected Plaintiff to a traffic stop, and Kendall stated he did not believe the traffic stop was racially motivated, but admitted that a person of color, wearing dreadlocks, and speeding in a vehicle with tinted windows was more likely to be pulled over for the speeding infraction than Kendall's 70-year old mother.  Plaintiff's Response – Kendall at 2.  Kendall maintains he did not believe race was the motivating factor for the stop given that Plaintiff admitted he was speeding, but if Plaintiff really thought the traffic stop was racially motivated, Kendall had no authority over the situation and Plaintiff should make a complaint with the Niagara County Sheriff.  Kendall Dep. Tr. at 122-23.  Plaintiff does not contest this explanation.

In 2012 or 2013, Plaintiff complained to Kendall that a Task Force member was singing a song that was racially motivated against Plaintiff because Plaintiff is black, but Kendall did not agree.  Plaintiff's Response – Kendall at 2.  According to Kendall, the song Plaintiff complained about was "Black Betty" and U.S. Deputy Marshal Brent Novak was singing it, but Kendall did not think it had anything to do with Plaintiff and told Plaintiff that.  Kendall Dep. Tr. at 126-27.  In any event, it was not Kendall who was singing the song.  Subsequently, on June 4, 2013, Plaintiff complained to Kendall that Novak had referred to Plaintiff as "the black guy."  Plaintiff's Response – Kendall at 3.  When Kendall responded he did not believe the remark was racially motivated, Plaintiff engaged Kendall in a conversation in an attempt to enlighten Kendall about racially inappropriate language, following which Kendall stated, "Look, Lee, you've been black even longer than me."  *Id*.  Kendall does not deny making the comment, but maintains he was trying to "lighten the mood" by referring to the fact that not being an African-American, Kendall did not always understand that certain references could be interpreted as racially-motivated but that Plaintiff could file a formal complaint about Novak with the USMS.  Kendall Dep. Tr. at 129-34.  Although Plaintiff maintains Kendall should have processed Plaintiff's statements as formal complaints, Plaintiff's Response – Kendall at 3, nothing in the record indicates Plaintiff ever requested Kendall to do so but, in any event, Kendall did advise Plaintiff with whom such complaint could be filed. The record does not indicate Plaintiff followed up on Kendall's suggestions.

Plaintiff further maintains the Kendall once referred to Plaintiff as having "nappy hair," with regard to Plaintiff's dreadlocks.  Plaintiff's Response – Kendall at 3.  In connection with the Internal Investigation, Kendall explained that he used the phrase to

demonstrate that a previous comment Plaintiff had made to someone else was ill-advised.  Kendall Internal Investigation Statement[26] at 42.  In particular, Plaintiff was "ogling" a "real tall attractive woman," and stated, "My, aren't you a willowy one," *id.*, with the woman responding that she knew she was tall, and acted offended.  *Id.*  After they were no longer in the woman's presence, Plaintiff asked Kendall what he thought the woman's problem was, and Kendall told Plaintiff, ". . . you can't talk to people like that. How would you like it if she walked up to you and said, . . . isn't your hair nappy?" *Id.*  Plaintiff did not respond, but became quiet, *id.*, which Kendall interpreted as indicating Kendall had gotten his point across to Plaintiff.  *Id.* at 43.  Plaintiff does not dispute this explanation which, taken in context, is devoid of any racially-offensive meaning.

In the absence of any evidence on which a reasonable jury could find the working environment to which Plaintiff was subjected was so permeated by racially offensive comments and conduct as to alter the terms and conditions of Plaintiff's employment, *Littlejohn*, 795 F.3d at 320-21, Plaintiff's hostile work environment claim must fail.

### a.    Constructive Discharge

Insofar as State Defendants anticipate Plaintiff may attempt to argue he was subjected to a constructive discharge,[27] such claim has not been pleaded, State Defendants' Memorandum at 13, and cannot survive summary judgment because it is predicated solely on Plaintiff's subjective beliefs about his working conditions which, even if established, were not sufficiently offensive as to render Plaintiff's working

---

[26] Filed as Personius Declaration Exh. J at 8 – 99.
[27] The court notes Plaintiff's retirement on August 18, 2015, occurred after commencing the instant action on May 23, 2014, but before filing the Amended Complaint on October 25, 2016.

conditions poor.  *Id.* at 13-14.  Plaintiff maintains he was constructively discharged by

the hostile work environment, Plaintiff admits he did not raise such claim in his

Amended Complaint, but asserts that his retirement on August 18, 2015, was intended

to mitigate his damages given he was on involuntary leave for which he was not paid

after exhausting his accrued leave.  Plaintiff's Response – State Defendants.  According

to Plaintiff, the stress he endured because of "significant verbal abuse" resulted in

Plaintiff being placed on unpaid leave from June 17, 2013 until retiring on August 18,

2015, thus establishing the elements of a constructive discharge claim.  *Id.*  In reply,

State Defendants reiterate that Plaintiff should not be permitted to further amend the

Amended Complaint to belatedly assert the constructive discharge claim.  In any event,

assuming, *arguendo*, that Plaintiff has sufficiently alleged a constructive discharge

claim, summary judgment should be granted on its merits.

  In particular, defeating summary judgment on his constructive discharge claim

requires Plaintiff to adduce evidence that his "employer . . . intentionally create[d] a work

atmosphere so intolerable that he [was] forced to quit involuntarily."  *Petrosino v. Bell*

*Atl.*, 385 F.3d 210, 229 (2d Cir. 2004) (internal quotation marks and citation omitted).

Significantly, the standard to establish a constructive discharge is "higher" than to

establish a hostile work environment.  *Fincher v. Depository Trust & Clearing Corp.*, 604

F.3d 712, 725 (2d Cir. 2010) (recognizing that standard for constructive discharge claim

is "higher" than standard for hostile work environment claim and concluding plaintiff who

failed to establish hostile work environment necessarily also failed to demonstrate

constructive discharge).  Accordingly, the same reasons that support granting summary

judgment in favor of Defendants on Plaintiff's hostile work environment claim also

support granting summary judgment on any constructive discharge claim that Plaintiff may have pleaded.

### b. Based to Impute Offensive Conduct to Employer

Even assuming, *arguendo*, that Plaintiff successfully pointed to some evidence that could be construed by a reasonable jury as establishing that he experienced a hostile work environment, State Defendants would not be liable absent "a specific basis [ ] for imputing the objectionable conduct" to State Police.  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).  "When the harasser is a supervisor, the employer is presumed to be absolutely liable."  *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998) (citing *Faragher*, 524 U.S. at 807).  Accordingly, because it is Kendall, Plaintiff's supervisor, who is alleged to have created the racially-hostile work environment, the record would support imputing such conduct to State Police.

Nevertheless, Defendants are entitled to summary judgment on Plaintiff's hostile work environment claim based on the *Faragher/Ellerth* affirmative defense.  As stated, "[b]eyond demonstrating a hostile work environment, a plaintiff must show a basis for imputing the objectionable conduct to the employer."  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010) (citing *Alfano*, 294 F.3d at 373).  "When [ ] the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer."  *Id.* (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); and *Faragher*, 524 U.S. at 807).  "But even then the defending employer may be permitted, subject to proof by a preponderance of the evidence, to raise the *Faragher/Ellerth* affirmative defense to liability or damages."  *Id.*

51

The *Faragher/Ellerth* defense, named for two cases the Supreme Court decided the same day, including *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), provides that "an employer is strictly liable for supervisory harassment that 'culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.'"  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137 (2004) (citing *Faragher*, 524 U.S. at 765, and *Ellerth*, 524 U.S. at 808).  *See also Ellerth*, 524 U.S. at 761 (identifying as tangible employment actions "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").  The *Faragher/Ellerth* defense also shields an employer from liability where the employer maintains an anti-harassment policy with which an employee has failed to demonstrate compliance.

The *Faragher/Ellerth* defense consists of two elements providing that even if a supervisor's behavior resulted in a tangible employment action against the plaintiff, the employer will not be liable if (1) "the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise."  *Gorzynski*, 596 F.3d at 103 (quoting *Faragher*, 524 U.S. at 807).  With regard to the first element, the maintenance of a written anti-harassment policy providing a procedure for an employee who is the victim of harassment to report the harassment to the defendant for investigation satisfies the first element.  *See Gorzynski*, 596 F.3d at 103-04 (finding employer's maintenance of formal, written anti-harassment policy providing procedure for Plaintiff to

report harassment to employer for investigation satisfies first element of

*Faragher/Ellerth* defense); *Ferraro v. Kellwood Co.*, 440 F.3d 96, 102 (2d Cir. 2006)

("An employer may demonstrate the exercise of reasonable care, required by the first

element [of the *Faragher/Ellerth* defense], by showing the existence of an

antiharassment policy during the period of the plaintiff's employment...."). "With regard

to the second element, "proof that an employee has unreasonably failed to use the

employer's complaint procedure normally suffices to satisfy the employer's burden."

*Ferraro*, 440 F.3d at 102 (citing *Faragher*, 524 U.S. at 807; and *Ellerth*, 524 U.S. at

765).

In the instant case, it is undisputed that Plaintiff, by filing on July 15, 2013, the

Internal Complaint with Defendant State Police's Equal Employment Opportunity Office,

availed himself of the policy maintained by the State Police for dealing with the

discriminatory behavior to which Plaintiff alleges he was subjected, thus establishing the

first element of the defense.  Defendant State Police undertook an extensive

investigation of the Internal Complaint, including obtaining statements or memoranda

from more than 20 witnesses, extensive interviews of both Plaintiff and Kendall,

reviewing relevant overtime records, and specifically inquiring as to the circumstances

under which each of the twelve incidents on which Plaintiff relies in support of his hostile

work environment claim occurred.  *See* Internal Investigation Report, *passim*.  That

Plaintiff did not avail himself of the internal policy until July 15, 2013, after which date

Plaintiff does not allege any further racially derogatory conduct, establishes the second

element of the defense, *i.e.*, Plaintiff unreasonably failed to take advantage of

opportunities provided by the State Police to prevent or correct the conduct of which

Plaintiff complained.  *Ferraro*, 440 F.3d at 102.  Accordingly, Defendant State Police is shielded from liability on Plaintiff's hostile work environment claim by the *Faragher/Ellerth* defense.

### C.    ADA, FMLA, and Rehabilitation Act Claims

Plaintiff alleges disability-based employment discrimination against State Defendants[28] in violation of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12201 *et seq.* ("ADA").  Amended Complaint, Tenth Claim.  Plaintiff specifically claims he suffered an adverse employment action, including being placed on involuntary leave as of June 17, 2014, subsequent to which Plaintiff's outside employment request was denied, based on Defendant's perception that Plaintiff was disabled.  *Id.*  Plaintiff also alleges State Defendants, in violation of the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), denied Plaintiff's request for two weeks of leave pursuant to the FMLA in accordance with Dr. Mirza's note requesting such leave, causing State Defendants to perceive Plaintiff to be disabled based on depression, Amended Complaint, Eleventh Claim, and subsequently retaliated against Plaintiff for making a request for FMLA leave by placing Plaintiff on unpaid involuntary leave.  Amended Complaint, Twelfth Claim.  Similar to his FMLA claims, Plaintiff alleges Defendants violated the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ("Rehabilitation Act"), by denying Plaintiff's request for leave because of a perception that Plaintiff was disabled based on depression, Amended Complaint, Thirteenth Claim, and retaliated against Plaintiff for requesting leave by denying

---

[28] Although initially pleaded against Defendant Kendall, Plaintiff has since withdrawn the claim against Kendall because the ADA does not provide for liability against individuals.  Plaintiff's Response – Kendall at 18.

Plaintiff's outside employment request.  Amended Complaint, Fourteenth Claim.

Plaintiff's claims under the ADA, FMLA and Rehabilitation Act are inter-related insofar

as Plaintiff maintains that upon presenting State Defendants with Dr. Mirza's Letter of

June 16, 2014, advising that Plaintiffs Major Depressive Disorder, for which Dr. Mirza

had treated Plaintiff since February 21, 2005, had worsened, attributing such worsening

to high levels of work-related stress, and rendered Plaintiff unable to work from June 16,

2014 to June 30, 2014, State Defendants immediately placed Plaintiff on involuntary

leave without pay, and subsequently denied Plaintiff's outside employment request such

that Plaintiff had no choice but to retire.  A strict application of the relevant laws on

which Plaintiff relies in support of such claims establishes no violation occurred under

any of these laws.

### 1.    ADA

With regard to the alleged ADA violation, the ADA prohibits disability

discrimination with regard to, *inter alia*, the terms and conditions of employment,

including an employer's failure to make "'reasonable accommodations to the known

physical or mental limitations of an otherwise qualified [employee] with a disability.'"

*McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42

U.S.C. § 12112(b)(5)(A)).  "Claims alleging disability discrimination in violation of the

ADA are subject to the [*McDonnell Douglas*] burden-shifting analysis. . . ."  *Id.*  In

particular, "'[a] plaintiff must establish a prima facie case; the employer must offer

through the introduction of admissible evidence a legitimate non-discriminatory reason

for the discharge; and the plaintiff must then produce evidence and carry the burden of

persuasion that the proffered reason is pretext.'"  *Id.* (quoting *Sista v. CDC Ixis N. Am.,*

*Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  As relevant here, plaintiff makes out a *prima facie* case of disability discrimination based on a failure to accommodate by showing that (1) he has a disability within the meaning of the ADA; (2) his employer is covered by the statute and had notice of that disability; (3) with or without reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) he suffered an adverse employment action because of his disability.  *Fox*, 918 F.3d at 71.  In the instant case, the first two elements of a *prima facie* case under the ADA are not disputed.  What are disputed, however, are whether Plaintiff, with a reasonable accommodation, could perform the essential functions of his job and whether State Police subjected Plaintiff to an adverse employment action by refusing to provide such accommodation and instead, placing Plaintiff on involuntary leave.

In the Amended Complaint, Plaintiff alleges that he was able to perform the essential functions of his job, having been a State Police employee since 1987, Amended Complaint ¶ 122, but that he suffered an adverse employment action when State Defendants, operating under the perception that Plaintiff had a disability, placed Plaintiff on involuntary leave without pay as of June 17, 2014, and the denied his outside employment request.  *Id*. ¶ 123.  In arguing in support of summary judgment, State Defendants do not deny that Plaintiff was subjected to an adverse employment action once Plaintiff's involuntary leave status continued beyond the initial two weeks requested in Dr. Mirza's Letter, but maintain that Plaintiff's depression precluded Plaintiff from resuming the essential functions of his job.  State Defendants' Memorandum at 16-17.  According to State Defendants, once Plaintiff expressed suicidal ideation, along with a desire to physically assault and possible kill Kendall,

State Police had no option other than to place Plaintiff on involuntary leave, and that Plaintiff's inability to be present for work rendered Plaintiff unable to perform the essential functions of his job. *Id.* at 17-18.  In opposition, Plaintiff maintains that it is the immediate placement of Plaintiff on unpaid involuntary leave to which he objects, Plaintiff's Response – State Defendants at 21-22, implying Plaintiff should have been permitted to take two weeks of paid vacation. *Id.* at 22-23.  Plaintiff also asserts for the first time that he was never offered, in lieu of the involuntary leave, a light-duty position that did not require Plaintiff to carry a firearm. *Id.* at 23-24. In further support of summary judgment, State Defendants argue the involuntary leave was essentially the same leave requested by Dr. Mirza's Letter, State Defendants' Reply at 8, and that insofar as Plaintiff was not offered a light-duty position pending medical clearance for Plaintiff to return to his Inspector position, Plaintiff never requested such accommodation, as is his burden. *Id.* at 8-9.  There is no merit to Plaintiff's ADA claim for several reasons.

First, Plaintiff's assertions in support of his ADA claim imply that had Plaintiff been granted a two-week leave as requested by Dr. Mirza's Letter, such leave would have been paid and would not have extended beyond two weeks.  This position, however, ignores State Police policy Rule 13 providing that if a concern as to an employee's fitness to perform his job duties based on either a physical or mental impairment is raised either from an internal or external source, Defendant Christensen, as the Deputy Superintendent for Employee Relations, was required to refer the matter to the Division Physician, here, Dr. Kelleher.  Christensen Declaration ¶¶ 6-7.  Accordingly, upon receiving Dr. Mirza's Letter advising Plaintiff had been diagnosed

with "Major Depressive Disorder" and was "unable to work" for two weeks because of "increasing symptoms of depression" and "high levels of work related stress," Christensen immediately notified Dr. Kelleher who determined Plaintiff was incapable of performing his full and strenuous job duties and should immediately be placed on involuntary leave which Christensen did as of the close of business on June 17, 2014. *Id.* ¶¶ 11-14.  Christensen further advised Plaintiff he was required to undergo an evaluation by a physician selected by the State Police, and that Plaintiff was entitled to use accrued sick and personal time pending resolution of the matter, and that if Plaintiff ultimately were found fit for duty, such accrued time would be restored to Plaintiff.  *Id.* ¶ 15.  Further, because Plaintiff's Investigator position required Plaintiff to carry a firearm, Christensen was concerned that, because of increasing symptoms of depression and high levels of work-related stress, as Dr. Mirza reported in her letter of June 16, 2014, Plaintiff may pose a threat to himself or to others particularly, as noted, Kendall, rendering Plaintiff unable to perform the duties of his State Police Investigator position. *Id.* ¶ 17.  As Christensen observes, Dr. Mirza's Letter does not identify any particular job duties that Plaintiff remained capable of performing, but merely states Plaintiff was "unable to work," *id.* ¶ 18, supporting Christensen's placement of Plaintiff on involuntary leave.  *Id.* ¶ 19.  After being placed on involuntary leave, Plaintiff was evaluated by Dr. McIntyre who reported Plaintiff expressed by suicidal ideation and thoughts of assaulting or killing his supervisor, Defendant Kendall, rendering Plaintiff unfit to return to work.  *Id.* ¶¶ 20-23.  Thereafter, Plaintiff followed the State Police procedure to appeal Dr. McIntyre's finding, which was upheld.  *Id.* ¶¶ 23-27.  Because Plaintiff never provided any medical evidence indicating an improvement in his condition, Plaintiff

remained on involuntary leave.  *Id.* ¶ 28.  Significantly, Plaintiff does not deny any of this.  Accordingly, the record establishes Plaintiff remained unfit for duty beyond the two weeks requested in Dr. Mirza's Letter, such that Plaintiff was unable to report to work and, thus, unable to perform the essential functions of his State Police Investigator position with or without an accommodation.

Nor is there any merit to Plaintiff's assertion that he was wrongfully placed on unpaid leave.  Specifically, as State Defendants explain, Plaintiff was permitted to use accrued sick and personal time during his voluntary leave, with such leave being restored should Plaintiff be found fit for duty.  Plaintiff does not dispute this.  The placement of Plaintiff on involuntary leave thus does not support Plaintiff's ADA claim. Moreover, insofar as Plaintiff maintains he was never offered a light-duty position that did not require Plaintiff to carry a firearm, not only did Plaintiff never request such an accommodation, as generally is his burden, *McElwee v. County of Orange*, 700 F.3d 635, 641-42 (2d Cir. 2012) ("it is generally 'the responsibility of the individual with a disability to inform the employer that an accommodation is needed . . .'" (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cri. 2008)), but Plaintiff also failed to show such a position was available, as is also his burden, *id.*, and in any event, does not dispute Christensen's deposition testimony that he was without discretion to make such an accommodation for an employee with a mental fitness issue.  Christensen Dep. Tr. at 36-37.  Nor does Plaintiff point to any caselaw or other legal authority requiring that an extended medical leave must be paid, and the court's research reveals none. [29] There thus is no merit to Plaintiff's ADA claim.

---

[29] Although the Second Circuit has yet to speak on whether a request for medical leave constitutes a reasonable accommodation under the ADA, *see Wenc v. New London Board of Education*, 702

### 2.    FMLA

As for Plaintiff's FMLA claims, the FMLA provides eligible employees to take up to 12 weeks of unpaid leave per year because of a serious health condition that prevents them from performing their work functions.  29 U.S.C. § 2612(a)(1).  The FMLA further provides that an employee who takes such leave has the right to return to a prior position or to an "equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a).  Under the FMLA, an employee has "'a private right of action to seek both equitable relief and money damages against any employer (including a public agency) in any Federal or State court of competent jurisdiction' should that employer 'interfere with, restrain, or deny the exercise of the FMLA rights.'"  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, (2d Cir. 2006) (quoting *Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 724-25 (2003)).

With regard to Plaintiff's FMLA claims, the essence of such claims is that Plaintiff's placement on involuntary leave was unpaid and extended beyond the two weeks requested in Dr. Mirza's Letter.  As discussed in connection with Plaintiff's ADA

---

Fed.Appx. 27, 30 (2d Cir. Aug. 21, 2017) (recognizing the Second Circuit has "not squarely addressed in a published opinion when a medical leave may constitute a 'reasonable accommodation' under the ADA. . ."), courts within the Second Circuit have held a request for medical leave can be a reasonable accommodation.  *See Naik v. Modern Marketing Concepts, Inc.*, 2018 WL 4078624, at *6 (N.D.N.Y. Aug. 27, 2018) (collecting cases where a request for a leave of absence was found to be a reasonable accommodation under the ADA, including *Reddick v. Niagara Mohawk Power Co.*, 2010 WL 5185098, at *6 (N.D.N.Y. Dec. 10, 2010); *Bateman v. Project Hosp., Inc.*, 2009 WL 3232856, at * 12 (E.D.N.Y. Sept. 30, 2009); and *Powers v. Polygram Holding, Inc.*, 40 F.Supp.2d 195, 201 (S.D.N.Y. 1999) (holding a request for medical leave of absence generally constitutes a reasonable accommodation)).  For example, in *Powers*, the court specified that in the absence of "a unique set of facts," such as where the requested leave is "very long," the request is for sporadic leave where the employer would not know in advance when the employee would be absent, where it was clear that even after returning from the leave, the employee would remain unqualified to perform the essential functions of his job, or the employee was hired to perform a specific task within a finite period of time which would be impossible with the leave, a medical leave would not be a reasonable accommodation.  *Powers*, 40 F.Supp.2d at 201.

claim, however, the record is devoid of any evidence indicating that the continuation of Plaintiff's claim beyond two weeks was for anything other than legitimate concerns that Plaintiff remained mentally unfit to resume his State Police Investigator position. Moreover, the FMLA provides only for "unpaid" leave, *Sista*, 445 F.3d at 174 ("The FMLA gives eligible employees an 'entitlement' to twelve workweeks per year of unpaid leave . . . ." (citing 29 U.S.C. § 2612(a)(1))).  Accordingly, even if Plaintiff was denied leave under the FMLA, State Defendants, by placing Plaintiff on involuntary leave under which Plaintiff was able to use his accrued sick and personal leave so as to be paid, at least until he exhausted such accrued time, with the opportunity to recoup the time should he be declared fit to return to duty, placed Plaintiff in a financially more favorable situation than if Plaintiff were on leave under the FMLA.

Furthermore, although Plaintiff also asserts a retaliation claim under the FMLA, *i.e.*, that the denial of his outside employment request which would have permitted Plaintiff to earn some income while on involuntary leave from his State Police Investigator position was intended to retaliate against Plaintiff for complaining about the denial of FMLA leave, as discussed above, Discussion, *supra*, at 31-32, State Defendants have provided a legitimate nondiscriminatory reason for the denial, which Plaintiff has failed to rebut.  In particular, the denial of Plaintiff's outside employment request was pursuant to State Police Reg. 8H prohibiting any employee from participating in outside employment while on sick or personal leave or when absent from duty because of disability.  Gagan Declaration ¶¶ 15-19, and Reg. 8H1(b)(4) Exh. A at 8-47 (Dkt. 74-4 at 5) (providing "No Member may engage in outside work or gainful occupation: When on Sick Leave or Personal Leave; or When absent from duty

because of disability.").  Because it cannot be reasonably disputed that Plaintiff's leave

was because of a mental disability which, under Reg. 8H1(b)(4) also precludes Plaintiff

from engaging in outside employment, the denial of Plaintiff's outside employment

request cannot sustain Plaintiff's retaliation claim.

Plaintiff's discrimination and retaliation claims under the FMLA are thus without

merit.

### 3.    Rehabilitation Act

Insofar as Plaintiff asserts claims under the Rehabilitation Act, a *prima facie* case

of employment discrimination is the same under the Rehabilitation Act as under the

ADA, and is also subject to the *McDonnell Douglas* burden-shifting analysis.  *Regional

Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48-49

(2d Cir. 2002).  Accordingly, for the same reasons Plaintiff's ADA discrimination claim

fails, *see* Discussion, *supra*, at 55-59, his Rehabilitation Act discrimination claim also

fails.  Furthermore, Plaintiff makes essentially the same retaliation claim under the

Rehabilitation Act as asserted under the FMLA and State Defendants' legitimate,

nondiscriminatory reason for denying Plaintiff's outside employment request, unrebutted

by Plaintiff, also establishes the lack of merit to this claim.

Plaintiff's discrimination and retaliation claims under the Rehabilitation Act are

therefore without merit.

## CONCLUSION

Based on the following, State Defendants' Motion (Dkt. 74) should be

GRANTED; Defendant Kendall's Motion (Dkt. 76) should be GRANTED; the Clerk of

Court should be directed to close the file.


Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      August  22nd, 2019
Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**

*Thomas v. Arn*,   474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      August 22nd, 2019
                  Buffalo, New York